IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-N/A<br><br>COMPLAINT<br><br>THREE-JUDGE COURT REQUESTED |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

## I.    INTRODUCTION

1.    The Constitution assigns to Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises." Art. I, § 8. Yet over the last three months, the President has imposed, modified, escalated, and suspended tariffs by executive order, memoranda, social media post, and agency decree. These edicts reflect a national trade policy that now hinges on the President's whims rather than the sound exercise of his lawful authority. By claiming the authority to impose immense and ever-changing tariffs on whatever goods entering the United States he chooses, for whatever reason he finds convenient to declare an emergency, the President has upended the constitutional order and brought chaos to the American economy.

Page 1 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

2.    The President has no authority to arbitrarily impose tariffs as he has done here. The text and history of the International Emergency Economic Powers Act (IEEPA)—the statute the President has invoked for the most damaging of his tariffs—confirm that the President cannot impose such tariffs under that law. And even if it did, it would not allow the worldwide tariffs he has imposed, which were not a response to an emergency as IEEPA defines it and have no nexus to the circumstances that purported to justify them.

3.    Because these tariffs are unlawful, this Court should declare that they are not in force, enjoin the Defendant agencies and officers from enforcing them, and vacate the agency actions implementing them.

## II.    PARTIES

### A.    Plaintiff States

4.    The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

5.    The State of Arizona is a sovereign state of the United States. Arizona is represented by Attorney General Kris Mayes. The Attorney General is Arizona's chief law enforcement officer and is authorized to institute this action.

6.    The State of Colorado is a sovereign state in the United States. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

7.    The State of Connecticut is a sovereign state of the United States. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

Page 2 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

8.      The State of Delaware is a sovereign state of the United States. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

9.      The State of Illinois is a sovereign state of the United States. Illinois is represented by Attorney General Kwame Raoul. The Attorney General is Illinois's chief law enforcement officer and is authorized to institute this action. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

10.     The State of Maine is a sovereign state of the United States. Maine is represented by Attorney General Aaron Frey. The Attorney General is Maine's chief law enforcement officer and is authorized to institute this action pursuant to 5 Me. Rev. Stat. § 191.

11.     The State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

12.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

13.     The State of New Mexico is a sovereign state in the United States. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

14.     The State of New York is a sovereign state in the United States. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

Page 3 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

15.     The State of Vermont is a sovereign state of the United States. Vermont is represented by Attorney General Charity Clark. The Attorney General is the chief legal officer of Vermont and is authorized to institute this action.

**B.     Federal Defendants**

16.     Donald Trump is President of the United States. He is sued in his official capacity for declaratory relief only.

17.     The Department of Homeland Security is an agency of the United States federal government.

18.     Kristi Noem is Secretary of the Department of Homeland Security. She is sued in her official capacity.

19.     U.S. Customs and Border Protection is an agency of the United States federal government and a component of the Department of Homeland Security.

20.     Pete R. Flores is the Acting Commissioner for U.S. Customs and Border Protection. He is sued in his official capacity.

21.     The United States is a statutory defendant under 28 U.S.C. § 1581. That statute also waives the United States' sovereign immunity. *See Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1328 (Fed. Cir. 2001).

### III.     JURISDICTION

22.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1581(i)(1).

23.     The Plaintiff States request the Chief Judge of this Court designate three judges "to hear and determine" this action because it "(1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order;" and "(2) has broad or significant implications in the administration or interpretation of the customs laws." 28 U.S.C. § 255.

Page 4 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

## IV.    FACTUAL AND LEGAL BACKGROUND

**A.    Congress's tariff powers**

24.    The U.S. Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States…." Art. I, § 8.

25.    Congress has exercised this authority by providing an extensive statutory structure for "Duties, Imposts and Excises" on imports to the United States, which are codified in Title 19 of the U.S. Code.

26.    For most of the nation's history, Congress directly legislated tariffs.

27.    After the disastrous Smoot-Hawley Tariff Act of 1930, which contributed to the Great Depression, Congress moved to create a two-part structure for the nation's tariffs. Congress delegated to the President the authority to negotiate agreements with foreign countries that would reduce the United States' tariffs in exchange for reductions in other nations' tariffs. Today, the United States is party to more than a dozen such trade agreements that set limited U.S. tariffs. Congress has passed legislation consenting to and implementing these agreements as a matter of federal law. *See, e.g.*, 19 U.S.C. ch. 22 (implementing the Uruguay Round Agreements); 19 U.S.C. ch. 26 (implementing the Dominican Republic-Central America Free Trade Agreement ("CAFTA")); 19 U.S.C. ch. 29 (implementing the United States-Mexico-Canada Agreement ("USMCA")).

28.    Congress has authorized the President to raise duties, more commonly called tariffs, in specific circumstances. For example, the Executive Branch may impose "countervailing duties" when "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy" of a product imported in the United States in a manner that injures a domestic industry. 19 U.S.C. § 1671(a). To impose such tariffs, however, an agency must investigate and enter a "final determination of

Page 5 -    COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

whether or not a countervailable subsidy is being provided with respect to the subject merchandise," 19 U.S.C. § 1671d(a)(1), among other findings.

29.     Similar prerequisites are required to impose antidumping tariffs, 19 U.S.C. § 1673, *et seq.*; to institute tariffs to address threats to national security, 19 U.S.C. § 1862(b)–(c) (Section 232 of the Trade Expansion Act of 1962); to impose tariffs to protect domestic industries, 19 U.S.C. § 2251 (Section 201 of the Trade Act of 1974); to institute tariffs to respond to violations of international trade agreements, 19 U.S.C. §§ 2411–2420 (Section 301 of the Trade Act of 1974); and to impose a "temporary import surcharge" to "deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1) (Section 122(a) of the Trade Act of 1974).

30.     In addition to requiring a finding of certain facts before imposing tariffs, Congress also limited the duration and manner of tariffs imposed under each of these statutes. *See, e.g.*, 19 U.S.C. § 1675(a) (requiring annual review of antidumping and countervailing duty orders); 19 U.S.C. § 2132(a)(3) & (d) (limiting tariffs or other import measures to 150 days and requiring that they be nondiscriminatory). Together, the factual predicates, procedural requirements, and substantive limits established by these statutes ensure that Congress retains control over its "Power to lay and collect Taxes, Duties, Imposts and Excises," U.S. Const., Art. I, § 8, cl. 1, and prevents the President from exercising this power arbitrarily.

31.     None of these prerequisites to impose congressionally authorized tariffs has been met, and the tariffs challenged here do not purport to rest on any of these statutory authorities. Instead, the President relies on IEEPA as the sole substantive legal authority for his orders.

**B.     IEEPA was enacted to restrain the President's powers, not enlarge them.**

32.     Congress enacted IEEPA five decades ago with the goal of restraining the President's emergency powers that were frequently invoked and abused in the preceding decades. *See* H.R. Rep. No. 95-459, at 3–9 (1977).

Page 6 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

33.    By the 1970s, Congress had grown troubled with the proliferation of emergency declarations under laws like the Trading with the Enemies Act (TWEA). Such laws were originally intended to lend the President special or heightened powers during times of crisis but were ultimately used as shortcuts around peacetime constraints on the President's powers. Congress recognized that the exception threatened to swallow the rule. As one House report on efforts to reform TWEA noted, TWEA bestowed upon the President "essentially an unlimited grant of authority for the President to exercise, at his discretion, broad powers in both the domestic and international economic arena, without congressional review." H.R. Rep. No. 95-459, at 7 (1977).

34.    One reform Congress made to curb the President's emergency powers was to restrict TWEA to its original purpose, limiting its application to "time[s] of war." 50 U.S.C. § 4305(b)(1). At the same time, Congress enacted IEEPA, which allowed the President to regulate imports and exports in response to certain non-wartime emergencies, while stressing that the triggering event had to be an "*unusual* and *extraordinary* threat." 50 U.S.C. § 1701 (emphasis added). Thus, it is not enough that the President declare a national emergency under the National Emergencies Act (NEA); only those arising from unusual and extraordinary threats originating "in whole or substantial part outside the United States" unlock IEEPA's grant of powers. *Id.* Congress also subjected the President's authority under IEEPA to reporting requirements and reserved for itself the ability to terminate declared emergencies by joint resolution. 50 U.S.C. § 1706.

35.    The powers set forth in IEEPA do not expressly include imposing or collecting tariffs. Rather, the President is empowered to:

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or

Page 7 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

payments involve any interest of any foreign country or a

national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the

jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation,

regulate, direct and compel, nullify, void, prevent or prohibit, any

acquisition, holding, withholding, use, transfer, withdrawal,

transportation, importation or exportation of, or dealing in, or

exercising any right, power, or privilege with respect to, or

transactions involving, any property in which any foreign country

or a national thereof has any interest by any person, or with respect

to any property, subject to the jurisdiction of the United States….

50 U.S.C. § 1702(a)(1). The President has additional authority to confiscate property "when the

United States is engaged in armed hostilities or has been attacked by a foreign country or foreign

nationals…." 50 U.S.C. § 1702(a)(1)(C).

     36.    Not once has any other President used IEEPA to impose tariffs. In the nearly five

decades since IEEPA was enacted, no other President has imposed tariffs based on the existence

of any national emergency, despite global anti-narcotics campaigns spearheaded by the United

States and longstanding trade deficits. *United States v. Yoshida Int'l,* 526 F.2d 560, 576 (Cust. &

Pat. App. 1975), held that similar language in TWEA authorized the imposition of a limited

import duty surcharge, but that case does not take into account subsequent actions by Congress

to rein in the President's authority, as explained above. And *Yoshida* made clear that even under

TWEA the President lacks authority to impose a surcharge "not reasonably related to the

emergency declared." *Id*. at 577.

Page 8 -   COMPLAINT – *Oregon, et al. v. Trump, et al.*

37.     Even in light of *Yoshida*, there is reason to believe that IEEPA does not authorize tariffs. Tariffs on products are not currency exchanges or banking transactions, so subsection (a)(1)(A) should not apply. Subsection (a)(1)(B), which gives the President the power to "regulate," should not authorize the challenged tariffs either because the regulation of imports is not synonymous with and does not include the power to impose tariffs on imports.

38.     Section 1702(a)(1)(B) allows the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" transactions involving the property of a foreign country or national. This is the language of embargoes and sanctions (which is what IEEPA has consistently been used for), and interpreting "regulate" to mean "ad valorem duty" would be incongruous with the context in which it appears. *See McDonnell v. United States*, 579 U.S. 550, 569 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.'") (citation omitted). IEEPA is designed to give the President appropriate powers to respond if a hostile power were importing items into the United States for nefarious purposes. It is not clear why under IEEPA that should continue upon payment of an appropriate duty.

39.     It is also noteworthy that IEEPA, in § 1702(a)(1)(B), envisions the President "regulat[ing]" both imports and exports under its authority. Because the export clause of the Constitution, Art. I, § 9, cl. 5, expressly prohibits imposing duties on exports, interpreting "regulate" to mean "impose a duty" would create a facial, and unnecessary, tension with the Constitution. The more natural reading of the statute is that Congress never intended it to be used for tariffs. *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (statutes "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score") (internal quotations omitted).

40.     Even assuming IEEPA does authorize some tariffs when there is an "*unusual* and *extraordinary* threat," 50 U.S.C. § 1701 (emphasis added), President Trump's unilateral imposition of his tariffs invoking IEEPA are aberrations that fly in the face of history and the

Page 9 -    COMPLAINT – *Oregon, et al. v. Trump, et al.*

legislative text. The novelty of citing IEEPA for the carte blanche tariff authority the President

has exercised is itself good reason to treat these Orders with suspicion. *See Util. Air Reg. Grp. v.*

*EPA*, 573 U.S. 302, 324 (2014) (when the executive branch claims "an unheralded power" to

regulate 'a significant portion of the American economy'" courts greet such announcements with

skepticism because they "expect Congress to speak clearly if it wishes to assign to an agency

decisions of vast economic and political significance." (citations omitted)).

41.     The powers explicitly set forth by IEEPA "may only be exercised to deal with an

unusual and extraordinary threat with respect to which a national emergency has been declared

for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C.

§ 1701(b).

**C.      The IEEPA Tariff Orders**

42.     Since February 1, 2025, President Trump has issued a flurry of executive orders

imposing sweeping tariffs, interspersed with other orders and memoranda modifying,

suspending, and clarifying some of the tariffs he just imposed. The President purported to rely on

IEEPA emergency powers as the substantive authority to impose all the tariffs described below.

These tariffs—defined below as the Canada Tariff Order, the Mexico Tariff Order, the China

Tariff Order, and the Worldwide Tariff Order, each as amended—are herein collectively referred

to as "IEEPA Tariff Orders."

43.     The preambles to the IEEPA Tariff Orders also cite other statutes, specifically the

NEA, 50 U.S.C. § 1601 *et seq.*; section 604 of the Trade Act of 1974, as amended, 19 U.S.C.

§ 2483; and 3 U.S.C. § 301. However, none of those statutes grants the President substantive

authority: the NEA governs procedures for declaring and ending emergencies but not substantive

emergency powers; section 604 of the Trade Act of 1974, as amended, requires the President to

memorialize import duties in the Harmonized Tariff Schedule of the United States but does not

provide substantive authority to impose tariffs; and 3 U.S.C. § 301 allows the President to

Page 10 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

delegate powers within the Executive Branch. None of the cited statutes authorizes the President to impose tariffs.

      **i.**      **The Canada Tariff Order**

      44.      On February 1, 2025, President Trump issued Executive Order 14193, 90 Fed. Reg. 9113 ("Canada Tariff Order"), entitled Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border. The Canada Tariff Order imposed an additional 10 percent tariff on energy imports and an additional 25 percent tariff on most other imports from Canada.

      45.      The Canada Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward Canada.

      46.      The President's claim of emergency powers was based on "the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." Canada Tariff Order § 1.

      47.      The Plaintiff States agree that the fentanyl crisis requires urgent government action, but the imposition of tariffs is neither an effective nor a lawful response to that crisis. The Canada Tariff Order lacks any rationale for the tariff rates imposed and bears no relationship between the goods subject to the Order and the claimed emergency.

      **ii.**      **The Mexico Tariff Order**

      48.      On February 1, 2025, President Trump issued Executive Order 14194, 90 Fed. Reg. 9117 ("Mexico Tariff Order"), entitled Imposing Duties To Address the Situation at Our Southern Border. The Mexico Tariff Order imposed an additional 25 percent tariff on the import of goods from Mexico.

      49.      The Mexico Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward Mexico.

Page 11 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

50.    The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." Mexico Tariff Order § 1.

51.    As with the Canada Tariff Order, the President provided no justification for which goods would be subject to the Mexico Tariff Order or why he had chosen a 25 percent tariff rate.

### iii.    The China Tariff Order

52.    On February 1, 2025, President Trump issued Executive Order 14195, 90 Fed. Reg. 9121 ("China Tariff Order"), entitled Imposing Duties To Address the Situation at Our Southern Border. The China Tariff Order imposed an additional 10 percent tariff on the import of most goods from China.

53.    The China Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to U.S. trade policy toward China.

54.    The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." China Tariff Order § 1.

55.    And, again, the China Tariff Order contained no rationale for why it was necessary to tariff all products of China, or why the President had chosen 10 percent as the tariff rate, departing from the already unexplained 25 percent rate he had imposed on Mexico and Canada.

### iv.    The Worldwide Tariff Order

56.    On April 2, 2025, President Trump issued Executive Order 14257, 90 Fed. Reg. 15041 ("Worldwide Tariff Order"), entitled Regulating Imports with a Reciprocal Tariff to

Page 12 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits. The Worldwide Tariff Order imposed a 10% baseline tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9 (Annex I). The President revised the additional "reciprocal" tariffs in Annex I on April 3.

57.    The Worldwide Tariff Order relies only on IEEPA as the basis for its substantive authority to unilaterally institute these sweeping changes to the trade policy of the United States.

58.    A few years before Congress enacted IEEPA, Congress also enacted Section 122 of the Trade Act of 1974 to give the President explicit power to impose tariffs (temporary import surcharges) in response to balance-of-payments issues but then chose to omit the express power to tariff under IEEPA. Although the Worldwide Tariff Order purports to address the "large and persistent annual U.S. goods trade deficits," it does not rely on Section 122(a) of the Trade Act of 1974, 19 U.S.C. § 2132, which expressly contemplates tariffs to address the related concern of balance-of-payment deficits. That statute provides that "[w]henever fundamental international payments problems require special import measures to restrict imports" in order "(1) to deal with large and serious United States balance-of-payments deficits[,] (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium," the President "shall proclaim, for a period not exceeding 150 days … a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties … on articles imported into the United States …." 19 U.S.C. § 2132(a). The Worldwide Tariff Order neither relies on this statutory authority nor abides by its limits on the magnitude and duration of the tariffs it imposes.

59.    In providing tariff powers via Section 122 of the Trade Act of 1974, much like with other tariff statutes, Congress included substantive limitations and procedural safeguards limiting the grant of power to the executive. The President attempts to circumvent these types of substantive limitations and procedural safeguards by imposing tariffs under IEEPA in a

Page 13 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

unilateral, unpredictable, and far-reaching manner that is entirely unlawful. His unlawful actions have in turn caused persistent uncertainty that has resulted in erratic financial markets (*see* § IV., D, below).

60.    In addition, the purported "unusual and extraordinary threats" identified by President Trump as "national emergencies" do not amount to emergencies. Nor are they extraordinary or even unusual.

61.    The Worldwide Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits," but that does not constitute an "unusual and extraordinary threat" that would allow the President to invoke IEEPA's powers. 50 U.S.C. § 1701(a).

62.    As the Worldwide Tariff Order acknowledges, "annual U.S. goods trade deficits" are "persistent"; thus, by definition, they are not "unusual and extraordinary." The United States has run a persistent trade deficit in goods since the 1970s. Similarly, there is no "unusual and extraordinary" threat to wages or consumption.

63.    The IEEPA Tariff Orders impose, by executive order, the highest tariffs on imports the country has seen since the 1940s. The *baseline* 10 percent tariff imposed by the Worldwide Tariff Order already matches the highest *average* tariff rates on all imports seen toward the end of the 1940s. The Worldwide Tariff Orders even impose tariffs on places that are not involved in international trade, such as the British Indian Ocean Territory, whose only human inhabitants live on a joint American and British military base on the island of Diego Garcia, and the Heard and McDonald Islands, which have no known human inhabitants.

64.    Despite being described as "reciprocal" tariffs, the reciprocal tariffs described in the Worldwide Tariff Order were calculated with the intent of "balanc[ing] bilateral trade deficits between the U.S. and each of our trading partners." Office of the U.S. Trade Rep., *Reciprocal Tariff Calculations*; *see also* Office of the U.S. Trade Rep., *Presidential Tariff Actions*. The U.S. Trade Representative has acknowledged that there are "many causes," including "non-tariff

Page 14 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

economic fundamentals." But the U.S. Trade Representative provided no explanation for why President Trump's calculation entirely ignores a major driver of trade deficits: relative domestic purchasing power. In effect, the reciprocal tariff calculation unreasonably ignores that certain trading partners' populace simply has less aggregate purchasing power.

65.     The tariffs are also not designed to "deal with" the purported emergencies. The Administration published its basis for the country-by-country tariff rates. *See* Office of the United States Trade Representative, Reciprocal Tariff Calculations. The Administration's estimate of a key input of that formula—"the elasticity of import prices with respect to tariffs"— is a fabrication. The country-by-country tariff rates are based on what the administration claims as an estimate of "tariff and nontariff barriers" but are in fact a simple ratio of the trade deficit in goods as a percentage of total U.S. imports from the country arbitrarily subjected to the tariff. The Administration's chosen formula is not an accepted methodology for calculating trade barriers and has no basis in economic theory.

66.     The specific academic work the Administration cites concludes that nearly all of the cost of tariffs (95%) carries over to domestic purchasers, but the Administration falsely claims that only 25% of the cost of tariffs is passed through to domestic customers. As the co-author of the article cited to justify that calculation explained, the Administration's misstatement of the evidence results in vastly higher tariff levels than called for by its own methodology. *See* Brent Neiman, "The Trump White House Cited My Research to Justify Tariffs. It Got It All Wrong." *N.Y. Times* (Apr. 7, 2025).

67.     The U.S. Trade Representative also provided no explanation justifying setting the *baseline* tariff at 10 percent.

68.     The tariffs are also not designed to "deal with" the purported emergencies, because they are intended, at least in part, to raise revenue. *See, e.g.*, The President's News Conference With Prime Minister Keir Starmer of the United Kingdom (Feb. 27, 2025) ("[W]e

Page 15 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

took in hundreds of billions of dollars [with past tariffs]. . . . [I]t's going to make our country rich.").

69.     The tariffs will depress Americans' wages by slowing economic growth, increasing unemployment, and raising inflation. And, instead of reducing threats to Americans' consumption levels, the tariffs will make the goods that Americans (and the Plaintiff States) depend on more expensive and scarce.

**v.     Delaying and adding exceptions to the Canada and Mexico Tariff Orders**

70.     On February 3, 2025, President Trump issued Executive Order 14197, 90 Fed. Reg. 9183, entitled Progress on the Situation at Our Northern Border, and Executive Order 14198, 90 Fed. Reg. 9185, entitled Progress on the Situation at Our Southern Border. These executive orders delayed by four weeks implementation of the Canada Tariff Order and the Mexico Tariff Order, respectively.

71.     On March 6, 2025, President Trump issued Executive Order 14231, 90 Fed. Reg. 11785, entitled Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border, and Executive Order 14232, 90 Fed. Reg. 11788, entitled Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border. These orders exempted products originated in Mexico and Canada under the rules of the United States of America, United Mexican States, and Canada Agreement. The orders also reduced the tariff rates on potash imports from both countries from 25 percent to 10 percent.

**vi.     Increasing the tariffs on imports from China**

72.     On March 3, 2025, President Trump issued Executive Order 14228, 90 Fed. Reg. 11463, entitled Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China, which increased the additional tariff on nearly all imports imposed by the February 1 China Tariff Order from 10 percent to 20 percent. The justification for this action was his "determin[ation] that the [People's Republic of China] has not taken

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions, and that the crisis described in [the China Tariff Order] has not abated."

73.    On April 2, the Worldwide Tariff Order imposed two additional tariffs on imports from China: the 10 percent worldwide tariff, plus a 34 percent "reciprocal tariff" (Annex 1). In aggregate, that raised the overall additional tariffs on nearly all China imports to 64 percent (20 percent from the China Tariff Order, as amended March 3 and April 2, plus 44 percent from the Worldwide Tariff Order).

74.    On April 8, 2025, President Trump issued Executive Order 14259, 90 Fed. Reg. 15509, entitled Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China, which imposed an additional 50 percent tariff on goods from China under the Worldwide Tariffs Order, raising the total level of tariffs to 114 percent. The President's justification was that the People's Republic of China (PRC) imposed a "34 percent tariff … on all goods imported into the PRC originating from the United States." "In [the President's] judgment, this modification [was] necessary and appropriate to effectively address the threat to the national security and economy of the United States."

75.    The next day, April 9, the President again increased the tariffs on imports from China, issuing Executive Order 14266, 90 Fed. Reg. 15625, entitled Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment. That executive order amended the Worldwide Tariff Order to increase the tariff on nearly all imports from China another 31 percent, to a total of 145 percent (20 percent from the China Tariff Order, as amended March 3 and April 2, plus 125 percent from the Worldwide Tariff Order). The executive order again "determined that it is necessary and appropriate to address the national emergency … by modifying the [Harmonized Tariff Schedule of the United States] and taking other actions to increase the duties imposed on the PRC in response to this latest retaliation. In [the President's] judgment, this modification [was] necessary and appropriate to effectively address the threat to U.S. national and economic security posed by the PRC's contribution to the conditions reflected

Page 17 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

in large and persistent trade deficits, including PRC industrial policies that have produced systemic excess manufacturing capacity in the PRC and suppressed U.S. domestic manufacturing capacity, which conditions are made worse by the PRC's recent actions."

76.    The President also changed the administration of tariffs with China by applying tariffs to even low-value imports that had historically been excluded from duties. On April 2, 2025, President Trump issued Executive Order 14256, 90 Fed. Reg. 14899, entitled Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports, which eliminated the de minimis exclusion on low-value imports from China. The President's April 8 order further changed the rates imposed. On April 9, Executive Order 14266 further increased the tariff rate for low-value imports to 120 percent, plus $100 per postal item.

### vii.    Partially suspending the Worldwide Tariff Order

77.    Executive Order 14266, issued on April 9, also delayed the country-specific "reciprocal" tariffs listed in Annex 1 of the Worldwide Tariff Order by 90 days (except for those imposed on China, as described above). Those tariffs are now scheduled to go into effect on July 9.

78.    The April 9 executive order left in place, however, the 10 percent tariff on nearly all goods imported worldwide.

### viii.    Exempting electronics from the Worldwide Tariff Order

79.    On April 11, 2025, President Trump issued a Presidential Memorandum entitled Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended. That memorandum "clarified" that the exclusion in the Worldwide Tariff Order for semiconductors included various other electronic devices, such as smartphones, solid-state storage devices, and monitors.

Page 18 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

ix.     **Current tariff rates under the IEEPA Tariff Orders**

80.     Currently, the Canada and Mexico Tariff Orders, as amended, provide for a 25 percent additional tariff on imports from Canada and Mexico (except for imports governed by USMCA, which are subject to no additional tariff, and potash imports from both countries and energy imports from Canada, which are subject to a 10 percent additional tariff). Currently, the China Tariff Order and Worldwide Tariff Order, as amended, impose a 145 percent tariff rate for imports from China (except for electronics, steel, aluminum, automotive, copper, pharmaceutical, lumber, certain minerals, and energy products, and other products listed in Annex II of the Worldwide Tariff Order, which are subject only to the 20 percent rate under the China Tariff Order only). Currently, the Worldwide Tariff Order, as amended, imposes a 10 percent tariff rate for imports from the rest of the world (except for electronics, steel, aluminum, automotive, copper, pharmaceutical, lumber, certain minerals, and energy products, and other products listed in Annex II of the Worldwide Tariff Order, which are not tariffed under the order).

81.     Under the Worldwide Tariff Order, as amended by Executive Order 14266, 90 Fed. Reg. 15625 (Apr. 9, 2025), the Worldwide Tariff Order will impose additional tariffs on 56 trading partners on July 9.

82.     Under the Administration's interpretation of IEEPA, the President can change these tariff policies at any time without notice.

**D.     Collection and enforcement under the IEEPA Tariff Orders**

83.     U.S. Customs and Border Protection is responsible for the collection of tariffs. 6 U.S.C. §§ 211(c)(4), 215(1); 19 U.S.C. § 4301(2)(A). To facilitate the collection of tariffs, Customs and Border Protection uses its Cargo Systems Messaging Service to inform importers of changes to the amount and administration of import duties. The guidance incorporates and imposes the current duties imposed under the IEEPA Tariff Orders.

Page 19 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

84.     Customs and Border Protection enforces the Canada Tariff Order under CSMS # 64297449 - GUIDANCE: Additional Duties on Imports from Canada (issued March 3, 2025), and CSMS # 64336037 - GUIDANCE – Update on Additional Duties on Imports from Canada – USMCA Qualifying Products and Potash (issued March 6, 2025).

85.     Customs and Border Protection enforces the Mexico Tariff Order under CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (issued March 3, 2025), and CSMS # 64335789 - GUIDANCE – Update on Additional Duties on Imports from Mexico - USMCA Qualifying Products and Potash (issued March 6, 2025).

86.     Customs and Border Protection enforces the China Tariff Order under CSMS # 64299816 - UPDATE – Additional Duties on Imports from China and Hong Kong (issued March 3, 2025).

87.     Customs and Border Protection enforces the Worldwide Tariff Order under CSMS # 64701128 - UPDATED GUIDANCE – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025 (issued April 10, 2025), and CSMS # 64724565 - UPDATED GUIDANCE – Reciprocal Tariff Exclusion for Specified Products; April 5, 2025 Effective Date (issued April 11, 2025).

88.     IEEPA establishes civil and criminal penalties, including up to 20 years in prison, for a violation or attempted violation of an order or regulation issued under its statutory authority. 50 U.S.C. § 1705.

**E.    The IEEPA Tariff Orders' economic destruction**

89.     President Trump has chosen to wield IEEPA to impose tariffs on the world at his whim, muddled by threats, additions, exceptions, exemptions, and pauses. The direct consequence has been an erratic financial market and a destabilized U.S. and global economy.

90.     The IEEPA Tariff Orders will cause a substantial increase in prices for goods within the Plaintiff States and throughout the United States. The U.S. Trade Representative's methodology for calculating the size of the "reciprocal" tariffs assumes that 25 percent of the

Page 20 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

tariffs will be passed on as increases to retail prices on the tariffed goods, and the studies that USTR's analysis cites conclude that the actual figure is 95 percent. The overwhelming consensus of economists is that these price increases will lead to significant inflation and risk recession.

91.     The immediate impact of these predictions can be seen in the capital markets. Between March 3 and April 8, 2025, the S&P 500 lost about 850 points (a 14.5 percent drop), and the Dow Jones Industrial Average lost just over 5,500 points (a 13 percent drop). A substantial majority of those losses from March 3 to April 8—between 70 to 90 precent— occurred after the date of the Worldwide Tariff Order. Between April 2, and April 8, the S&P 500 lost almost 700 points (a 12 percent drop), and the Dow Jones Industrial Average lost about 4600 points (an 11 percent drop).

92.     The effect on the market of the President's partial suspension of the Worldwide Tariff Order further demonstrates the causal relationship. Following the President's announcement that he would suspend the country-specific tariffs for 90 days, the markets partially recovered. On April 9, the S&P 500 recovered by about 480 points, a 9.5 percent gain from April 8 but still down 10 percent from January 21. Likewise, the Dow Jones Industrial Average recovered by about 3,000 points, an 8 percent gain from April 8 but still down 8 percent from January 21.

93.     The market losses are primarily attributable to the IEEPA Tariff Orders. Trade organization publications, expert commentary, and news reporting is replete with evidence that the market losses are largely a reaction to the President's threatened and imposed tariffs.

## V.     THE PLAINTIFF STATES' INTERESTS

**A.     The Plaintiff States will have increased costs when purchasing necessary equipment and supplies essential to their economies.**

94.     The Plaintiff States provide a wide range of public services to their residents and visitors. Essential to the provision of those services is the purchase of equipment, supplies, and parts, many of which are imported from other countries. Other products are manufactured in the

Page 21 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

United States but contain components that are imported from other countries. Because tariffs directly impact the costs of these products, they cause direct financial harm to the Plaintiff States.

95.     For example, the University of Oregon and Oregon State University are public research universities that purchase an array of items to provide educational opportunities for their students and to produce high quality research. The University of Oregon and Oregon State University are two of Oregon's seven public universities established by Or. Rev. Stat. § 352.002, each of which is "a governmental entity performing governmental functions and exercising governmental powers." Or. Rev. Stat. § 352.033. Among other things, the State of Oregon's public universities act for the State of Oregon by ensuring access and affordability to education, fostering an informed citizenry, and creating original knowledge and advancing innovation. *See, e.g.*, Or. Rev. Stat. §§ 352.039, 350.001, 350.005, 350.009.

96.     Among the array of items that the University of Oregon purchases is specialized equipment for scientific research. Because specialized equipment must meet particular specifications and standards for the research group, it is often only reasonably available from a few sources, which are all foreign. Purchasing specialized equipment also often requires an order date several months in advance of delivery. To mitigate the risk of unexpected import costs, purchase-order terms frequently include a term allowing the vendor to make price adjustments before delivery.

97.     That has already occurred. On November 8, 2024, the University of Oregon purchased a cryogenic single-photon counting detector system from ID Quantique, Inc., for its Center of Optics. At that time, the purchase price was $182,733. IDQ shipped the cryogenic system from Switzerland on April 8. At that time, the additional "reciprocal" tariff scheduled to go into effect for imports from Switzerland was 31 percent. The system arrived after the announced pause, resulting in the lower—but still substantial—10 percent worldwide tariff collected at the port by U.S. Customs and Border Protection. As a result of that additional tariff,

Page 22 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

the customs broker required the University of Oregon to pay an additional $18,579 before it would deliver the cryogenic system.

98.    That is only one example of purchases that are awaiting shipment. If left in place, the unlawful IEEPA Tariff Orders will increase the cost of each purchase by, at minimum, an additional 10 percent imposing financial harm to the State of Oregon through the University of Oregon.

99.    Among other goods, Oregon State University purchases scientific supplies for use by its students and researchers. Oregon State University's vendor for these supplies notified Oregon State University that because of the U.S. Government's tariffs on materials imported from China, as well as a tariff on imported steel and aluminum, the vendor was forced to implement a surcharge of 2.3% on products. The cost of this surcharge is passed on directly to Oregon State University. Other vendors are also passing along costs of the IEEPA Tariff Orders to Oregon State University. These surcharges and cost increases have a direct adverse impact on Oregon State University and, in turn, impose financial harm to the State of Oregon.

100.    Another example is the cost of testing kits purchased by the Oregon Health & Sciences University. OHSU is a public corporation that performs functions and services for the benefit of the State of Oregon. It is a "governmental entity performing governmental functions and exercising governmental powers." Or. Rev. Stat. § 353.020. Its purpose is to serve the people of Oregon by "providing education in health, science, [and] engineering"; "[c]onduct[ing] research in health care, engineering, biomedical sciences, and general sciences"; and provide and support healthcare throughout the state. Or. Rev. Stat. § 353.030.

101.    OHSU's pharmacy partner has already seen a 20 percent increase in the price of testing kits, due to both existing and impending tariffs. OHSU reasonably expects the pharmacy partner to pass those costs on to OHSU. Because OHSU requires testing kits on a monthly basis, these tariff impacts will be recurring so long as Tariff Orders—and the continued threatening of tariffs—remain in place.

Page 23 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

102.    The Oregon Department of Transportation is a state agency that provides service, builds infrastructure, and maintains equipment to further transportation safety and efficiency. Or. Rev. Stat. § 184.615. For that purpose, ODOT has a long-term contract with URS Electronics for the purchase of traffic video surveillance equipment. On April 16, 2025, URS Electronics informed ODOT that one of its vendors, Bosch Security division, "announced a 7.9% across the board price increase that will go into effect on May 1st, to help offset some of their cost increases experienced due to current federal government trade policies." Those vendor-price increases will be passed on to ODOT, harming ODOT with increased operations costs for the foreseeable future.

103.    The Arizona Department of Transportation (ADOT) has a long list of procurement contracts for the purchase of equipment, supplies, or parts, many of which are imported from other countries or have component parts imported from other countries. The tariffs are already increasing costs for ADOT. Notably, on March 14, 2025, one contractor requested a price increase, citing the increased duty cost stated "in Executive Order 14228 of March 3, 2025."

104.    Arizona's universities are also directly harmed by the tariffs imposed pursuant to the IEEPA Tariff Orders. For example, Arizona State University, the largest public university in the country, conducts research of national significance that depends on its ability to source specialized equipment not available from domestic sources. Using just one project as an exemplar, the SHIELD USA program spearheaded by Arizona State University faces the prospect of up to $1.4 million in increased costs from fully implemented tariffs. This would be especially counterproductive as SHIELD USA aims to drive innovation in the domestic microchip packaging ecosystem, expand capacity for domestic advanced packaging, and help to regain U.S leadership in microelectronics while strengthening national security.

105.    As a purchaser of imported products from countries subject to one or more of the IEEPA Tariff Orders, the State of Delaware is directly harmed by these tariffs. For example, the

Page 24 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Maintenance and Operations Division of the Delaware Department of Transportation purchases approximately 20 dump trucks per year: both the two-ton bodies of the trucks and truck rims are imported. Maintenance and Operations also purchases John Deere tractor parts that are made in Mexico, and Stihl chainsaws and trimmers that are made in Germany. The Office of Fleet Services of Delaware's Office of Management and Budget provides state agencies with access to vehicles. Fleet Services manages a fleet of about 3,000 vehicles, 25 percent of which are minivans from Stellantis (Chrysler), assembled in Windsor, Ontario. Fleet Services purchases an average of 70 minivans per year. Also, as Delaware moves to electrify its fleet, Fleet Services will purchase vehicles such as the Ford Mach-E, Chevrolet Blazer EV, Chevrolet Equinox EV, and Toyota BZ4x, which are manufactured outside the United States. Even those vehicles in Delaware's fleet assembled in the United States often include parts sourced worldwide. Any increase in tariffs caused by these unlawful tariffs inflicts a direct pecuniary injury to Delaware's finances.

106.    New York's Office of General Services (NYOGS) estimates that tariffs, particularly those on Mexico, Canada, and China, will have significant impacts on bid prices, supply chains, and construction claims. NYOGS's primary responsibilities include managing and leasing real property, designing and building facilities, and contracting for goods, services, and technology for the State of New York.

107.    Energy pricing is particularly threatened. In 2024, New York State imported 7.7 Terawatt-hours of Canadian electricity, valued in the hundreds of millions of dollars. Canada is the number one supplier of energy to the United States generally, including around 85 percent of U.S. electricity imports.

108.    When President Trump imposed tariffs on Canada, the Ontario and Quebec Premiers threatened retaliatory restrictions on electricity exports to the U.S. This would be catastrophic. NYOGS estimates that if Ontario or Quebec restricted electricity exports to New York, prices would soar at a time when the State is facing capacity restraints and is relying more

heavily on Canadian hydropower than ever. New York cannot simply buy less electricity or buy electricity from other sources.

109.    In the construction context, NYOGS bid about $1 billion in 2024, with approximately half on labor and half on materials. Assuming NYOGS bids a comparable annual portfolio, if even only 37 percent of these materials are subject to tariffs at 25 percent, then the potential cost impact could be between $40 million and $50 million to New York's projects. In NYOGS's experience, these price increases rarely fully recover to pre-event levels. Consequently, the tariffs will likely have a long-term negative effect on project costs and, consequently, agency capital programs.

110.    Outside of the construction context, NYOGS estimates that 50 percent to 75 percent of the products purchased by New York may be manufactured in a tariff-impacted nation. Based on an estimated average total spend of $5 billion, a 25 percent tariff on Mexico and Canada and a 10 percent tariff on China will likely have a portfolio-wide impact of roughly $106 million for New York State agencies.

111.    NYOGS estimates that potential contractual impacts on active construction projects due to imposed tariffs would be similar to what New York experienced during COVID. Unlike during COVID, however, when New York was bidding projects in a soft and uncertain economy, there is no shortage of construction work today. Contractors are very busy despite higher interest rates.

112.    The IEEPA Tariff Orders also injure Plaintiff States by increasing the price of goods and services that they purchase from domestic producers and suppliers that rely on imports. For example, Oregon's largest natural gas utility imports most of its natural gas from Canada. It has already made a regulatory filing to reserve the right to show that the cost of tariffs "should be recovered in rates…." The State of Oregon uses natural gas for most of its building energy use and it would be injured as an electricity ratepayer by any increase in the rates for natural gas.

Page 26 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

B.    **The President's imposition, modification, and reinstatement of tariffs by executive order and memoranda forces the Plaintiff States to incur administrative costs.**

113.    The President's invocation of the IEEPA to impose, modify, and reinstate tariffs by executive order, memoranda, social media post, and other means has resulted in national trade policy that reflects the President's whims on a particular day rather than reasoned decision. The President's abrupt policy changes have disrupted the economies of the Plaintiff States. In just March and April, the President has imposed sweeping tariff-rate changes on at least four occasions, with numerous purported clarifications and exemptions made in between, as well as the repeated retaliatory rate-hikes for China.

114.    Those erratic swings in trade policy not only affect the markets, but they also harm the Plaintiff States' ability to procure goods and services and to budget for and audit price adjustments.

115.    For example, the Oregon Department of Transportation builds, maintains, and plans for the State of Oregon's transportation infrastructure. *See, e.g.*, ORS § 184.615. To build and maintain that infrastructure, ODOT frequently requires the work of general contractors. Conditions are currently changing far more quickly than normal. Due to cost volatility, material suppliers and subcontractors are substantially reducing the length of time that they will commit to prices, making it more challenging for ODOT to secure bid extensions from prime contractors. That results in a harm to ODOT by making it more difficult to obtain competitive bids from high-quality prime contractors.

116.    The IEEPA Tariff Orders have also created procurement uncertainty for Oregon State University. Oregon State University regularly issues requests for proposals or solicitations and receives proposals from across the country and internationally. Because of the price uncertainty caused by the IEEPA Tariff Orders, many of the solicitations received are conditional and indicate that costs may change depending on cost fluctuations. For example, Oregon State University recently received a proposal for a robotics system for research from a Swiss manufacturer that stated the total price with the disclaimer that "[p]ricing is based on

Page 27 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

current US tariff regulations for imports from Switzerland. In the event that new or increased tariffs are imposed on the quoted products or their components prior to delivery, [vendor] reserves the right to adjust the prices accordingly." These conditional solicitations necessitated by the IEEPA Tariff Orders make it impossible for Oregon State University to evaluate which solicitation is the lowest bid and budget accordingly.

117.    In Illinois, the Department of Information Technology (DOIT) purchases about 15,000 imported personal computers for state employees each year, along with necessary accessories and support products (screens, docking stations, etc.). Because of the uncertainty surrounding tariffs, DOIT's ability to negotiate future contracts has been seriously hindered, and DOIT's stock of available computers and hardware inventory has dwindled as negotiations dragged on. In the end, DOIT was constrained to accept a contract under which the vendor is explicitly permitted to pass on the cost of any tariff to the State of Illinois.

118.    The potential for tariffs and the chaos around the on-again, off-again tariff policies have also impacted New York already. When contractors experience financial impacts that are beyond their control, they will attempt to identify ways to mitigate their losses and request notices under the contract for relief. New York has already experienced fluctuating prices and delays caused by vendors adjusting to higher risk.

119.    Cost volatility also affects the ability of state agencies and entities to plan their budgets. For example, the University of Oregon is currently setting its budget for fiscal year 2026 (July 1, 2025 through June 30, 2026). Due to the President's purported ability to change tariffs by executive order or memorandum, budgeting for the additional cost of tariffs effectively requires the University of Oregon to predict the President's state of mind at particular times of the fiscal year. As a result, the university must plan its FY 2026 budget with a potential tariff rate on any given item ranging from 10 to 145 percent, which substantially undermines the university's ability to make financial plans and decisions.

Page 28 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

120.    As another example, OHSU is currently setting its budget for its Fiscal Year 2026, with its fiscal years also being July 1 through June 30. OHSU's Board of Directors will formally adopt the budget in May. Given the uncertainties related to tariffs, OHSU is unable to accurately plan its expenses for the next fiscal year. Already in past years, despite increasing revenue, spending has outpaced revenue. The substantial tariffs imposed and threatened by the President will only worsen that problem. If the costs of tariffs cause OHSU to significantly exceed its budget, it creates a serious risk that OHSU will need to cut expenses by scaling back its services and laying off staff, which harms OHSU and the State of Oregon.

121.    Unpredictable tariffs also are already burdening or almost certainly will burden the Plaintiff States by increasing administrative costs. When tariff rates increased in the past, many Plaintiff States saw vendors and contractors claim the rate increases as the basis for price adjustments. Although vendors that ship directly from foreign ports can include documentation from U.S. Customs and Border Protection evidencing the applied tariff rate, that is not possible with most domestic manufacturers that use foreign-sourced components. Whether due to opportunism or avoidance of incurring their own administrative costs, many Plaintiff States have experienced some vendors and contractors attempting to impose price adjustments that are not reasonably based on increased tariff rates.

122.    When a vendor or contractor seeks to impose a price-adjustment based on tariff rates, many Plaintiff States' agencies audit the adjustment to ensure that it is reasonably based on actual costs incurred. That is particularly difficult with regard to domestically produced goods made in part with foreign-sourced components, or contracted services that use some foreign-sourced materials. Due to the President's erratic—and sometimes inconsistent—tariff-rate directives, many of the Plaintiff States' agencies must piece together the applicable tariff for a particular day by reviewing multiple executive orders, memoranda, social media posts, and so on, and *also* investigate how much of those costs were actually incurred by the vendor or contractor. That imposes a substantial and additional administrative cost to many Plaintiff States.

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## CAUSES OF ACTION

### Count I
### The IEEPA Tariff Orders are Ultra Vires and Violate the Separation of Powers
### (Against All Defendants)

123.     The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

124.     The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises…." Art. I, § 8, cl. 1.

125.     No statute authorizes the President to issue the IEEPA Tariff Orders. The only statute conveying substantive authority to the President cited in the Orders is IEEPA. But IEEPA does not authorize the imposition of such tariffs, if it authorizes tariffs at all. In addition, the Worldwide Tariff Order does not address an "unusual and extraordinary threat." Moreover, the tariffs the Orders impose are not designed "to deal with"—and thus have an insufficient nexus to—the purported "unusual and extraordinary threat[s]" the Orders identify.

126.     The President's authority under IEEPA may be exercised only to address an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

127.     The statutory requirement of an "unusual and extraordinary threat" is not met by the President's declaration of emergency accompanying the Worldwide Tariff Order. As the Worldwide Tariff Order acknowledges, "annual U.S. goods trade deficits" are "persistent"; thus, by definition, they are not "unusual and extraordinary." There is no other "unusual and extraordinary threat" addressed by the Worldwide Tariff Order.

128.     The President's emergency powers under the IEEPA "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

129.    The tariffs imposed under the Canada and Mexico Tariff Orders do not "deal with" the "unusual and extraordinary threat[s]" they identify: there is no connection between the border security threats the orders identify, including drug trafficking, and the tariffs imposed by the orders.

130.    The tariffs imposed under the China Tariff Order does not "deal with" the "unusual and extraordinary threat" it identifies: there is no connection between the manufacture and trafficking of fentanyl and the tariffs imposed by the order.

131.    The tariffs imposed under the Worldwide Tariff Order do not "deal with" the purported "unusual and extraordinary threat[s]" the Order identifies:

a.    The nearly worldwide 10 percent tariff level is wholly unconnected to the stated basis of the emergency declaration: it applies without regard to any country's trade practices or purported threat to domestic industries.

b.    The level of additional tariffs published in Annex I of the Tariff Order exceeds what is necessary "to deal with" the purported emergency.

c.    The Trump Administration has said that it intends to use the Tariff Order to advance unrelated policy objectives in direct contravention of IEEPA. White House Press Secretary Karoline Leavitt said during an April 8 press briefing that: "The President ... is going to have a custom, tailor-made approach to each and every country, and if that means discussions of foreign aid, of our military presence in these countries, how those troops are paid for ... that could be part of the negotiation." With respect to a potential change to the Tariff Order with respect to South Korea, the President wrote: "I just had a great call with the Acting President of South Korea. We talked about their tremendous and unsustainable Surplus,

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Tariffs, Shipbuilding, large scale purchase of U.S. LNG, their joint

venture in an Alaska Pipeline, and payment for the big time Military

Protection we provide to South Korea…."

    d.    The President's suspension of the country-specific tariffs underscores the

lack of nexus between the purported economic threats the Worldwide

Tariff Order identifies and the tariffs it imposes.

132.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is unconstitutional and ultra vires.

133.    The IEEPA Tariff Orders are not authorized by the IEEPA or any other statute. As such, they are ultra vires and unlawful.

134.    Further, because the President lacks statutory authority to impose the tariffs in the IEEPA Tariff Orders, the IEEPA Tariff Orders are an exercise of Congressional authority in violation of separation of powers.

## Count II
## No statutory authority — 5 U.S.C. § 706(2)(C)
### (Against U.S. Customs and Border Protection)

135.    The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

136.    U.S. Customs and Border Protection is an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1).

137.    The Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025 (each, a "Guidance") are each a final

Page 32 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

agency action subject to review under the APA. Each Guidance marks the consummation of its decision-making process because it announces the agency's implementation of the IEEPA Tariff Orders.

138.     Each Guidance is an action by which rights or obligations have been determined or from which legal consequences will flow because it immediately changes tariffs rates charged at importation.

139.     Each Guidance implements a series of tariffs that are without statutory authorization and are contrary to law. *See* Count I, above.

140.     The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

141.     Plaintiff States are also entitled to vacatur of each Guidance under 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing U.S. Customs and Border Protection from implementing each Guidance.

## Count III
### Arbitrary and Capricious — 5 U.S.C. § 706(2)(A)
### (Against U.S. Customs and Border Protection)

142.     The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

143.     U.S. Customs and Border Protection is an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1).

144.     The Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion

Page 33 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

of Other Country-Specific Rates, Effective April 10, 2025 (each, a "Guidance") are each a final agency action subject to review under the APA. Each Guidance marks the consummation of its decision-making process because it announces the agency's implementation of the IEEPA Tariff Orders.

145.    Each Guidance is an action by which rights or obligations have been determined or from which legal consequences will flow because it immediately changes tariffs rates charged at importation.

146.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

147.    Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

148.    Each Guidance is arbitrary and capricious because it relies on factors unrelated to an "unusual and extraordinary threat" as required under IEEPA, it fails to consider the economic consequences of the imposition of tariffs, and is implausible and counter to the evidence.

149.    Plaintiff States are also entitled to vacatur of each Guidance under 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing U.S. Customs and Border Protection from implementing each Guidance.

Page 34 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff States pray that the Court:

      a.      Declare that the IEEPA Tariff Orders, as amended, are ultra vires and contrary to law;

      b.      Hold unlawful and set aside the Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 - Guidance: Additional Duties on Imports from Canada (as amended by CSMS # 64472173, CSMS # 64514918, and CSMS # 64336037), CSMS # 64297292 – Guidance: Additional Duties on Imports from Mexico (as amended by CSMS # 64335789), and CSMS # 64701128 – Updated Guidance – Reciprocal Tariffs – Increase in Rate for China and Reversion of Other Country-Specific Rates, Effective April 10, 2025;

      c.      Preliminarily and permanently enjoin Secretary Noem, Acting Commissioner Flores, the Defendant agencies, their agents, and anyone acting in concert or participation with them from implementing, instituting, maintaining, or giving effect to (i) the IEEPA Tariff Orders, as amended, and (ii) U.S. Customs and Border Protection's Cargo Systems Messaging Service (CSMS) # 64297449 (issued March 3, 2025), CSMS # 64336037 (issued March 6, 2025), CSMS # 64297292 (issued March 3, 2025), CSMS # 64335789 (issued March 6, 2025), CSMS # 64299816 (issued March 3, 2025), CSMS # 64701128 (issued April 10, 2025), and CSMS # 64724565 (issued April 11, 2025), by entering an order consistent with the constitutional requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const., Art. I, § 8, cl. 1;

Page 35 -  COMPLAINT – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

d.     Award the Plaintiffs States' costs of suit and reasonable attorneys' fees

and expenses under any applicable law; and

e.     Award such additional relief as the interests of justice may require.

DATED: April 23, 2025

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon

By: _/s/ Brian Simmonds Marshall_
Benjamin Gutman
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue*
Nina R. Englander*
Senior Assistant Attorneys General
YoungWoo Joh**
Alexander C. Jones*
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Chris.Perdue@doj.oregon.gov
Nina.Englander@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Alex.Jones@doj.oregon.gov

Attorneys for the State of Oregon

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: _/s/ Syreeta A. Tyrell_
Joshua D. Bendor*
Solicitor General
Syreeta A. Tyrell*
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-8310
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

Page 36 - COMPLAINT – _Oregon, et al. v. Trump, et al._

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss*
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
Peter J. Farrell*
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of
Minnesota

**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

Attorneys for the State of New Mexico

Page 37 - COMPLAINT – *Oregon, et al. v. Trump, et al.*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson*
Assistant Chief Deputy Attorney General
Gretchen Helfrich*
Deputy Chief, Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

Attorneys for the State of Illinois

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal
Initiatives
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov

Attorneys for the State of New York

**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
Vivian A. Mikhail*
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine

**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

Attorneys for the State of Vermont

*\* Admission application forthcoming*

*\*\* Admission application pending*

Page 38 - COMPLAINT – *Oregon, et al. v. Trump, et al.*