IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No. 1:25-cv-00077-GSK-TMR-JAR<br><br>MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | |
| Defendants. | |

## MOTION

The plaintiffs in this action ("States") move under U.S. Court of International Trade Rule 65 for a preliminary injunction barring the United States, the U.S. Department of Homeland Security and its Secretary Kristi Noem, U.S. Customs and Border Protection and its Acting Commissioner Peter R. Flores, and others in active concert or participation with them, from implementing Executive Order 14193, "Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border," 90 Fed. Reg. 9113 ("Canada Tariff Order"); Executive Order 14194, "Imposing Duties To Address the Situation at Our Southern Border," 90 Fed. Reg. 9117 ("Mexico Tariff Order"); Executive Order 14195, "Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China," 90 Fed. Reg. 9121 ("China Tariff Order"); and Executive Order 14257, "Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits," 90 Fed. Reg. 15041 ("Worldwide Tariff Order"), each as amended (collectively, "IEEPA Tariff Orders"), including by imposing any tariffs pursuant to those orders ("IEEPA Tariffs"), for the pendency of this litigation, including any appeals.

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## TABLE OF CONTENTS

MOTION.................................................................................................................. i

TABLE OF AUTHORITIES ................................................................................ iv

MEMORANDUM OF LAW ................................................................................. 1

    I.      INTRODUCTION ........................................................................... 1

    II.     LEGAL AND FACTUAL BACKGROUND ........................................ 2

        A.     Legal background.................................................................... 2

              1.     Congress has authority to impose tariffs and has authorized the President to negotiate and set tariff rates in limited circumstances. ........................................ 2

              2.     Congress authorized the President to impose or adjust tariffs to address persistent trade problems.................... 3

              3.     In enacting the Trading with the Enemy Act, Congress created sweeping emergency economic powers to address national emergencies........................................... 4

              4.     In the 1970s, Congress sought to limit Presidential emergency economic powers by enacting IEEPA and the National Emergencies Act. ............................................ 6

        B.     The IEEPA Tariff Orders........................................................ 7

        C.     The economic fallout .............................................................. 8

        D.     The harm to States ................................................................. 8

    III.    LEGAL STANDARD................................................................... 10

    IV.    ARGUMENT .............................................................................. 11

        A.     The States have standing...................................................... 11

        B.     The States are likely to succeed on the merits. ......................... 15

              1.     The IEEPA Tariff Orders exceed the President's authority.......... 15

                    a.     The text, context, and history of IEEPA do not establish authority to impose tariffs. ................................ 15

                    b.     If Congress intended to convey the broad powers President Trump claims under IEEPA, it would have expressed that intent clearly. .................................... 18

              2.     The Tariff Orders do not satisfy IEEPA's requirements. ............. 20

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

a.    This Court has authority to review whether the President has identified an unusual or extraordinary threat and whether the IEEPA Tariff Orders "deal with" that threat.................................................................. 20

b.    IEEPA does not authorize the Worldwide Tariff Order. .......................................................................... 22

c.    IEEPA does not authorize the Canada and Mexico Tariff Orders or the China Tariff Orders. ........................ 25

d.    *Yoshida* forecloses the President's interpretation of IEEPA. .......................................................................... 26

3.    U.S. Customs and Border Protection acted arbitrarily and capriciously and in excess of statutory authority. ........................ 27

C.    The States will suffer irreparable harm.................................................... 29

1.    The IEEPA Tariffs are disrupting procurement by state agencies and universities.................................................. 30

2.    Recovery of "tariff surcharges" would not be economically feasible. .......................................................................... 31

3.    President Trump's misuse of IEEPA to impose, modify, escalate, or suspend tariffs on whim seriously impairs budgeting processes. ...................................................... 32

4.    President Trump's misuse of IEEPA to impose tariffs causes irreparable procedural and related harm............................ 34

D.    The equities and public interest weigh heavily in favor of an injunction. .................................................................. 36

E.    A nationwide injunction is necessary to provide complete relief. ............ 38

V.    CONCLUSION.................................................................................... 40

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ....................................... 43

PROPOSED ORDER.................................................................................... 44

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014)................................................................................................16

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021).........................................................................................18, 19

*Aluminum Extrusions Fair Trade Comm. v. United States*,
607 F. Supp. 3d 1332 (Ct. Int'l Trade 2022) ........................................................10

*Am. Frozen Food Inst., Inc. v. United States*,
855 F. Supp. 388 (Ct. Int'l Trade 1994) ................................................................29

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010)................................................................................36

*Atlas Powder Co. v. Ireco Chemicals*,
773 F.2d 1230 (Fed. Cir. 1985)..............................................................................36

*Baker v. Carr*,
369 U.S. 186 (1962)................................................................................................20

*Bernhardt v. Los Angeles County*,
339 F.3d 920 (9th Cir. 2003) .................................................................................36

*Best Mattresses Int'l Co. Ltd. v. United States*,
557 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) ........................................................10

*Biden v. Nebraska*,
600 U.S. 477 (2023)................................................................................................18

*BlephEx, LLC v. Myco Indus., Inc.*,
24 F.4th 1391 (Fed. Cir. 2022) ..............................................................................37

*Califano v. Yamasaki*,
442 U.S. 682 (1979)................................................................................................38

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008).................................................................12, 14, 26

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) .................................................................................36

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*City & Cty. of San Francisco v. U.States Citizenship & Immigration Servs.,*
    981 F.3d 742 (9th Cir. 2020) ................................................... 28

*City of Grants Pass v. Johnson,*
    603 U.S. 520 (2024) .......................................................... 21, 22

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations*
    *v. United States,*
    393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ......................... 29

*Diginet, Inc. v. W. Union ATS, Inc.,*
    958 F.2d 1388 (7th Cir. 1992) ............................................ 15

*E. Bay Sanctuary Covenant v. Biden,*
    993 F.3d 640 (9th Cir. 2021) .......................................... 38, 39

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ............................................. 28

*Edye v. Robertson,*
    112 U.S. 580 (1884) ........................................................ 39

*FEC v. Akins,*
    524 U.S. 11 (1998) .......................................................... 13

*Filtration Dev. Co., LLC v. United States,*
    60 Fed. Cl. 371 (2004) ..................................................... 21

*Gundy v. United States,*
    588 U.S. 128 (2019) (Gorsuch, J. dissenting) ...................... 19

*Harmelin v. Michigan,*
    501 U.S. 957 (1991) ........................................................ 22

*In re Section 301 Cases,*
    524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ....................... 11

*In re Section 301 Cases,*
    570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ....................... 28

*Invenergy Renewables LLC v. United States,*
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ................. *passim*

*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) ........................................................ 21

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ........................................................ 19

Page v

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
    __ F.Supp.3d __, 2025 WL 1187730 (D.D.C. Apr. 24, 2025)................................39

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)....................................................................................36

*Litton Sys., Inc. v. Sundstrand Corp.*,
    750 F.2d 952 (Fed. Cir. 1984)...............................................................................37

*Maryland v. Louisiana*,
    451 U.S. 725 (1981)...............................................................................................12

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)........................................................................................11, 13

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014)...................................................................................37

*Mistretta v. United States*,
    488 U.S. 361 (1989)...............................................................................................19

*Nat. Res. Def. Council, Inc. v. Ross*,
    331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) .........................................................14

*Nken v. Holder*,
    556 U.S. 418 (2009)...............................................................................................36

*North Carolina v. Covington*,
    581 U.S. 486 (2017)...............................................................................................38

*Obriecht v. Foster*,
    727 F.3d 744 (7th Cir. 2013) .................................................................................21

*PrimeSource Bldg. Prods., Inc. v. United States*,
    59 F.4th 1255 (Fed. Cir. 2023) ..............................................................................35

*Qingdao Taifa Grp. Co. v. United States*,
    581 F.3d 1375 (Fed. Cir. 2009)........................................................................11, 19

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ...............................................................................36

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018)..............................................................................36

*State of Fla. v. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ..............................................................................38

Page vi

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ........................................................................28

*Thyssenkrupp Materials NA Inc. v. United States*,
    498 F. Supp. 3d 1372 (Ct. Int'l Trade 2021) .............................................39

*Trump v. Hawaii*,
    585 U.S. 667 (2018)....................................................................................17

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ........................................................ *passim*

*Ugine & Alz Belg. v. United States*,
    452 F.3d 1289 (Fed. Cir. 2006)..................................................................10

*United States v. Davis*,
    99 F.4th 647 (4th Cir. 2024) ......................................................................21

*United States v. Dhafir*,
    461 F.3d 211 (2d Cir. 2006).......................................................................21

*United States v. Ptasynski*,
    462 U.S. 74 (1983).....................................................................................39

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)..............................................................................18, 19

*V.O.S. Selections, Inc. v. Trump*,
    No. 1:25-cv-00066 ........................................................................................7

*Whitman v. American Trucking Ass'ns., Inc.*,
    531 U.S. 457 (2001)....................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...................................................................................10, 36

*Zenith Radio Corp. v. United States*,
    518 F. Supp. 1347 (Ct. Int'l Trade 1981) ..................................................40

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
    566 U.S. 189 (2012)...................................................................................20

## Federal Statutes

5 U.S.C. §§ 702–703, 706...............................................................................38

5 U.S.C. § 706(2) .....................................................................................27, 29

16 U.S.C. § 1540(f)........................................................................................15

Page vii

19 U.S.C. ch. 22 ............................................................................................................3

19 U.S.C. ch. 26 ............................................................................................................3

19 U.S.C. ch. 29 ............................................................................................................3

19 U.S.C. § 1338 .........................................................................................................37

19 U.S.C §§ 1351–54 (2018) .......................................................................................2

19 U.S.C. § 1671(a) ................................................................................................3, 16

19 U.S.C. § 1671d(a)(1) ..............................................................................................3

19 U.S.C. § 1673 ..........................................................................................................3

19 U.S.C. § 1675(a) .....................................................................................................3

19 U.S.C. § 1862 ........................................................................................................35

19 U.S.C. § 2132 ...............................................................................................5, 16, 17

19 U.S.C. §§ 2251–55 ..................................................................................................3

19 U.S.C. § 2251(a) ...................................................................................................35

19 U.S.C. § 2252 ....................................................................................................3, 35

19 U.S.C. § 2253(a)(3)(A) .............................................................................15, 16, 17

19 U.S.C. § 2411 ...............................................................................................3, 16, 17, 37

19 U.S.C. § 2417 ..........................................................................................................4

50 U.S.C. §§ 1601, et seq. ............................................................................................6

50 U.S.C. § 1701(a) ............................................................................................ *passim*

50 U.S.C. § 1702(a) ................................................................................................2, 15

50 U.S.C. § 1705 ........................................................................................................18

50 U.S.C. § 4305 ..........................................................................................................4

Administrative Procedure Act ...................................................................27, 28, 38

Endangered Species Act ............................................................................................15

First War Powers Act of 1941, P.L. 77-593, § 301, 55 Stat. 839 (1941) ....................4

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

International Emergency Economic Powers Act ............................................................ *passim*

National Emergencies Act, P.L. 94-412 (Sept. 14, 1976), 90 Stat. 1255 .................................6, 21

Reciprocal Trade Agreements Act of 1934, P.L. 73-316, ch. 474, § 1, 48 Stat. 943, 943–44 ...............................................................................................................2, 3

Smoot-Hawley Tariff Act of 1930 ...........................................................................2

Tariff Act of 1930 Section 338 ..............................................................................5

Trade Act of 1974, Pub. L. 93-618, § 122, 88 Stat. 1987 ................................5, 16, 34, 35

Trade Expansion Act of 1962 Section 232 ..................................................5, 34, 35

Trading with the Enemy Act ...................................................................... *passim*

**Other Authorities**

Brand, Ronald A,. *GATT and the Evolution of United States Trade Law*, 18 Brook. J. Int'l L. 101 (1992) .........................................................................3

Goldman, David, *Trump Starts the Clock for New Tariffs to Take Effect*, CNN, (Apr. 23, 2025) ...................................................................................33

H.R. Rep. 77-1507 (1941) ..................................................................................4

H.R. Rep. 95-459 (1977) ...................................................................... *passim*

Krugman, Paul R., "The Persistence of the U.S. Trade Deficit." *Brookings Papers on Economic Activity*, vol. 1987, ..............................................................23

LaRocco, Lori Ann, *Trade War Fallout: Cancellations of Chinese Freight Ships Begin as Bookings Plummet*, CNBC, (Apr. 16, 2025) ............................................31

Reinbold, Brian & Wren, Yi, "Historical U.S. Trade Deficits," *St. Louis Fed On the Economy* (May 17, 2019) ..................................................................23

Tarullo, Daniel K., *Law and Politics in Twentieth Century Tariff History*, 34 UCLA L. Rev. 285 (1986) ...............................................................................2

Watt, Nick et al., *The First Boats Carrying Chinese Goods With 145% Tariffs Are Arriving in LA*, CNN (May 6, 2025) ....................................................................31

*Black's Law Dictionary* (4th ed. 1968) ...............................................................15

Federal Reserve, *Beige Book* (Apr. 2025) ...........................................................24

*Webster's Third New International Dictionary* (1961) .......................................15, 22

Page ix

**Rules and Regulations**

Court of International Trade Rule 65 ........................................................................ i, 40

Executive Order 11387, 33 Fed. Reg. 47 (Jan. 1, 1968) .............................................5

Executive Order 14193, "Imposing Duties To Address the Flow of Illicit Drugs
    Across Our Northern Border," 90 Fed. Reg. 9113 (Feb. 1, 2025) ...................... i, 7, 25, 26, 45

Executive Order 14194, "Imposing Duties To Address the Situation at Our
    Southern Border," 90 Fed. Reg. 9117 (Feb. 1, 2025) ................................... i, 7, 25, 45

Executive Order 14195, "Imposing Duties To Address the Synthetic Opioid
    Supply Chain in the People's Republic of China," 90 Fed. Reg. 9121 (Feb. 1,
    2025) ............................................................................................ i, 7, 26, 45

Executive Order 14197, 90 Fed. Reg. 9183 (Feb. 3, 2025) .........................................45

Executive Order 14198, 90 Fed. Reg. 9185 (Feb. 3, 2025) .........................................45

Executive Order 14228, 90 Fed. Reg. 11463 (Mar. 3, 2025) .......................................45

Executive Order 14231, 90 Fed. Reg. 11785 (Mar. 6, 2025) ...................................26, 45

Executive Order 14257, "Regulating Imports With a Reciprocal Tariff To Rectify
    Trade Practices That Contribute to Large and Persistent Annual United States
    Goods Trade Deficits," 90 Fed. Reg. 15041 (Apr. 2, 2025) ............. i, 7, 20, 22, 23, 29, 37, 45

Executive Order 14259, 90 Fed. Reg. 15509 (Apr. 8, 2025) .......................................45

Executive Order 14266, 90 Fed. Reg. 15625 (Apr. 9, 2025) ...................................24, 45

Proclamation 2914, 15 Fed. Reg. 9029 (Dec. 19, 1950) .............................................5

Proclamation 4074, "Imposition of Supplemental Duty for Balance of Payments
    Purposes," 36 Fed. Reg. 15724 (Aug. 17, 1971) ...................................................5

**Constitutional Provisions**

U.S. Const., Art. I, § 8 ................................................................................ *passim*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# MEMORANDUM OF LAW

## I.     INTRODUCTION

The Constitution grants Congress, not the President, the power to impose tariffs and duties. U.S. Const., Art. I, § 8, cl. 3. But over the last three months, President Trump has claimed the unilateral power to impose, modify, and escalate new tariffs on any country at any rate for however long he likes. He professes to have discovered that power in a decades-old law, the International Emergency Economic Powers Act (IEEPA), that no other President has used in that manner. The result for states, and the American economy more generally, has been chaos. Yet no legal authority gives the President the sweeping power he has arrogated to himself, and Congress did not intend IEEPA to be the basis for such action. This Court should enter a preliminary injunction to stop it.

First, the States are likely to prevail on the merits. IEEPA, which authorizes the President to "regulate … importation" during certain emergencies, does not empower the President to usurp Congress's authority to impose tariffs. Had Congress intended that the President could wield the unprecedented power that President Trump claims to find in IEEPA, it would have expressed that intent clearly. Even if IEEPA authorized a President to impose tariffs, it expressly limits that power to actions that deal with "unusual" and "extraordinary" threats. 50 U.S.C. § 1701(a). A trade deficit—the purported justification for President Trump's worldwide tariffs—is not an "unusual" and "extraordinary" threat. And arbitrary tariffs, designed to leverage benefits unrelated to trade, do not "deal with" any threat that President Trump has identified.

Second, unless this Court intervenes, the States will suffer irreparable harm. President Trump's tariffs are already disrupting procurement by state agencies and universities and impairing state budgeting processes. States will have no practical ability to recover the enormous expenses they will incur when buying vital goods and equipment as importers inevitably raise prices because of the IEEPA Tariff Orders.

Page 1 -   MOTION FOR PRELIMINARY INJUNCTION

Third, the balance of equities and the public interest favor an injunction pending further litigation. The federal government has no legitimate interest in keeping unlawful and destructive tariffs in place while this suit proceeds.

This Court should grant the States' motion for a preliminary injunction.

## II.     LEGAL AND FACTUAL BACKGROUND

### A.     Legal background

IEEPA authorizes the President to take certain specified measures "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Among other authorities, the President may "regulate" the "importation or exportation of" any foreign property. 50 U.S.C. § 1702(a).

Those authorities are best understood in the context of IEEPA's evolution from legislation governing emergency economic powers, a history that developed along with, but distinctly from, legislation governing tariffs and trade policy.

### 1.     Congress has authority to impose tariffs and has authorized the President to negotiate and set tariff rates in limited circumstances.

Congress, not the President, has the "Power To lay and collect Taxes, Duties, Imposts and Excises…." U.S. Const., Art. I, § 8. For the nation's first 140 years, Congress set tariffs directly. Daniel K. Tarullo, *Law and Politics in Twentieth Century Tariff History*, 34 UCLA L. Rev. 285, 285–86 (1986) (describing Congress's detailed revisions of tariff schedules between 1790 and 1930).

The modern system for imposing tariffs derives from legislation Congress enacted in response to the Great Depression. After the disastrous Smoot-Hawley Tariff Act of 1930, Congress enacted the Reciprocal Trade Agreements Act of 1934 (RTAA), P.L. 73-316, ch. 474, § 1, 48 Stat. 943, 943–44 (codified as amended at 19 U.S.C §§ 1351–54 (2018)). The RTAA

Page 2 -   MOTION FOR PRELIMINARY INJUNCTION

empowered the President to enter trade agreements that reduced U.S. and foreign countries' tariffs, subject to legislative approval. The RTAA system evolved into a two-step approach to trade policy under which the President negotiates trade agreements and Congress implements them through legislation. *See* Ronald A. Brand, *GATT and the Evolution of United States Trade Law*, 18 Brook. J. Int'l L. 101, 111–17 (1992) (explaining evolution of modern U.S. trade law).

Today, the United States is party to several such trade agreements that set tariffs. Congress has passed legislation consenting to and implementing these agreements as a matter of federal law. *See, e.g.*, 19 U.S.C. ch. 22 (implementing the Uruguay Round Agreements); 19 U.S.C. ch. 26 (implementing the Dominican Republic-Central America Free Trade Agreement ("CAFTA")); 19 U.S.C. ch. 29 (implementing the United States-Mexico-Canada Agreement ("USMCA")).

### 2. Congress authorized the President to impose or adjust tariffs to address persistent trade problems.

In addition to the Presidential authorities to negotiate tariffs, Congress has created limited tariff-adjustment authority for the Executive to respond to particular trade issues, such as countervailing subsidies or unfair pricing. *See* 19 U.S.C. § 1671(a) (countervailing duties authority); 19 U.S.C. § 1673 (anti-dumping authorities); 19 U.S.C. §§ 2251–55 (authority for duties to respond to harms or threats to domestic industry); 19 U.S.C. §§ 2411–20 (authority for duties to respond to unjustifiable or burdensome trade practices or violations of trade agreements).

To impose such tariffs, however, the President must follow particular procedures, make certain findings or determinations, and limit the duration and magnitude of the tariffs. *See* 19 U.S.C. § 1671(a) (limiting countervailing duties to amount equal to net countervailing subsidy); 19 U.S.C. § 1671d(a)(1) (providing procedures for countervailing duties); 19 U.S.C. § 1673 *et seq*. (providing limits and procedures for antidumping tariffs); 19 U.S.C. § 1675(a) (requiring annual review of antidumping and countervailing duty orders); 19 U.S.C. § 2252(e) (providing

Page 3 -    MOTION FOR PRELIMINARY INJUNCTION

limitations on duties to protect domestic injury); 19 U.S.C. § 2417 (providing procedures for duties imposed in response to burdensome trade practices).

**3.    In enacting the Trading with the Enemy Act, Congress created sweeping emergency economic powers to address national emergencies.**

In contrast to the detailed statutes carefully delegating authority to the President to adjust tariffs in response to particular economic circumstances, IEEPA descends from statutes addressing wartime and national emergencies.

In the early twentieth century, Congress enacted several statutes, including the Trading with the Enemy Act (TWEA), to address a string of global crises. P.L. 65-91 § 2 (Oct. 6, 1917), 40 Stat. 411, *codified as amended at* 50 U.S.C. § 4305. Among other powers, TWEA authorized the President to limit trading with, communicating with, or transporting citizens of foreign nations defined as "enemies." P.L. 65-91 §§ 1–4. Section 5(b) of TWEA empowered the President to "investigate, regulate, or prohibit" "any transactions in foreign exchange" during wartime. P.L. 65-91 § 5(b).

Congress soon expanded TWEA to address crises aside from war. In 1941, Congress expanded TWEA's Presidential authorities, among other ways, by adding the word "importation" to the list of objects that the President may "investigate, regulate, or prohibit." *See* First War Powers Act of 1941, P.L. 77-593, § 301, 55 Stat. 839 (1941). Although the legislative history does not indicate why it added "importation," Congress's primary concern was to create authority for the President to take or direct the use of foreign property. *See* H.R. Rep. 77-1507 (1941). Congress understood that, as written, TWEA did not provide "broad powers to take, administer, control, use, liquidate, etc., such foreign-owned property" that may threaten U.S. interests during war or national emergency. *Id.* at 3. The 1941 Amendments filled those gaps by permitting the President to "vest" seized foreign property and otherwise control and compel the use of foreign property during war. First War Powers Act of 1941, P.L. 77-593, § 301.

Page 4 -    MOTION FOR PRELIMINARY INJUNCTION

After World War II, "there was little that U.S. Presidents *could not* do, legally speaking, in the realm of economic warfare." Benjamin A. Coates, "The Secret Life of Statutes: A Century of the Trading with the Enemy Act," 1 *Modern American History* 151, 163 (2018). Multiple presidents used TWEA to impose economic sanctions on foreign adversaries, regulate foreign exchange, and control exports under the auspices of multiple national emergencies. *See, e.g.*, Proclamation 2914, 15 Fed. Reg. 9029 (Dec. 19, 1950) (President Truman enforcing economic sanctions against North Korea and China); Executive Order 11387, 33 Fed. Reg. 47 (Jan. 1, 1968) (President Johnson placing controls on capital exports).

In 1971, concerned about the weakening of the U.S. dollar, President Nixon proclaimed a national emergency with respect to the balance of payments with U.S. trading partners and imposed surcharges on almost all dutiable goods. Proclamation 4074, "Imposition of Supplemental Duty for Balance of Payments Purposes," 36 Fed. Reg. 15724 (Aug. 17, 1971). In doing so, President Nixon suspended prior proclamations containing concessions on the tariff rates for dutiable goods. *See id.* The surcharges lasted less than six months. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 569 (C.C.P.A. 1975). In his proclamation, President Nixon relied only on Section 338 of the Tariff Act of 1930 and Section 232 of the Trade Expansion Act of 1962. *See* Proclamation 4074, 36 Fed. Reg. at 15724. Importers challenged the duties that they were required to pay, and the Court of Customs and Patent Appeals (CCPA) ultimately upheld the tariffs in *Yoshida* under TWEA. At President Nixon's request, Congress soon thereafter enacted legislation empowering the President to impose limited duties in response to balance-of-payments issues. *See* Section 122 of the Trade Act of 1974, Pub. L. 93-618, § 122, 88 Stat. 1987 (limiting tariffs to 15% and requiring a duration not exceeding 150 days) (codified at 19 U.S.C. § 2132).

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

4.      **In the 1970s, Congress sought to limit Presidential emergency economic powers by enacting IEEPA and the National Emergencies Act.**

By the 1970s, Congress began to overhaul Presidential emergency economic powers. The first step came in 1976 when Congress enacted the National Emergencies Act (NEA). P.L. 94-412 (Sept. 14, 1976), 90 Stat. 1255, *codified as amended at* 50 U.S.C. §§ 1601, et seq. The NEA ended all existing emergencies except those proclaimed under Section 5(b) of TWEA and placed new restrictions on the declaration of new emergencies. Just a year later, in 1977, Congress amended TWEA to make it applicable only during times of war. In the same year, Congress crafted IEEPA.

IEEPA was designed to take a different approach to emergency economic powers than TWEA. During the House markup of the bill that would revise TWEA, Chairperson Bingham suggested that TWEA created "a dangerous situation in that it virtually conferred on the President what could have been dictatorial powers that he could have used without any restraint by the Congress." Legislative History of the Wartime or National Emergencies Presidential Powers P.L. 95-223, at 5 (1977). The House Report expressed similar concerns about "the unlimited grant of authority" to exercise "broad powers" without Congressional review. H.R. Rep. No. 95-459, at 7.

Congress thus enacted IEEPA to impose "various substantive restrictions" on the exercise of authorities previously created for TWEA. *Id.* at 10. The primary limitation was the requirement of an "unusual" and "extraordinary" threat to U.S. interests, not simply a national emergency. *Id.* Similarly, IEEPA was not intended "to include authorities more appropriately lodged in other legislation, such as authority to regulate purely domestic transactions or to respond to purely domestic circumstances, or authority to control noneconomic aspects of international intercourse such as personal communications or humanitarian contributions." *Id.* at 11. And although Congress adopted the same list of authorities as in TWEA—including the power to "regulate" "importation or exportation of" or "any transactions involving" "any

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

property" held by a foreign country a foreign national—Congress intended that IEEPA would provide "somewhat narrower powers subject to congressional review…." *Id.* at 1.

**B.    The IEEPA Tariff Orders**

In a series of executive orders issued from February 1 to April 9, 2025, President Trump imposed tariffs on most imports worldwide based solely on the President's emergency powers under IEEPA.[1] On February 1, he imposed tariffs on most imports from Canada, Mexico, and China based on his declarations of emergencies regarding fentanyl trafficking, other crime, and—for Mexico and China only—immigration. 90 Fed. Reg. 9113; 90 Fed. Reg. 9117; 90 Fed. Reg. 9121. On April 2, he imposed tariffs worldwide, including additional tariffs on China, based on his conclusion that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits…." 90 Fed. Reg. 15041, 15041.

Over the past several months, the President suspended some tariffs, increased others, and modified the scope of the exceptions they allow. *See* Compl. ¶¶ 42–81 (detailing administrative history). Today, these orders, as amended (collectively, "IEEPA Tariff Orders"), subject most imports from China to a 145 percent additional tariff rate, most imports from Canada and Mexico to a 25 percent additional tariff rate, and most imports from the rest of the world to a 10 percent additional tariff rate. Additional tariffs under the Worldwide Tariff Order on 56 trading partners are scheduled to take effect on July 9, 2025. *See* Executive Order 14266, 90 Fed. Reg. 15625 (Apr. 9, 2025) (amending the Worldwide Tariff Order). These tariffs vary based on the size of the U.S. bilateral trade deficit with each such country. (*See* Decl. of Brian Simmonds Marshall, Ex. B (Reciprocal Tariff Calculations, Office of the United States Trade Representative).)

---

[1]    The preambles to the IEEPA Tariff Orders also cite other statutes, but none of those statutes provide the President substantive authority to impose tariffs. *See* Compl. ¶ 43; *see also* Government's Response in Opposition, ECF 32, *V.O.S. Selections, Inc. v. Trump*, No. 1:25-cv-00066, at 10–27 (raising no argument under the other statutes in response to motion to enjoin the Worldwide Tariff Order).

Page 7 -   MOTION FOR PRELIMINARY INJUNCTION

C.    **The economic fallout**

In 2024, the United States imported goods and services worth more than $4 trillion, representing 14 percent of the nation's gross domestic product. (Decl. of Professor James R. Hines, Jr., ¶ 15.) The IEEPA Tariffs tax nearly all of this economic activity. It is therefore unsurprising that the economic impact of the IEEPA Tariffs has been substantial, swift, and destructive.

The Federal Reserve reports that businesses intend to raise prices, just as the empirical economic evidence predicts. (Marshall Decl., Ex. A; Hines Decl. ¶ 43.) At the same time, tariffs hinder economic productivity, thereby reducing incomes and employment. (Hines Decl. ¶¶ 37, 41, 54–55.) The erratic imposition of the on-again, off-again IEEPA Tariffs have also created extraordinary uncertainty, further hindering business investment and overall economic activity. (*Id.* ¶¶ 38–39.)

D.    **The harm to States**

The IEEPA Tariffs have already harmed the States, and they will continue to do so if they remain in place. Those harms fall under three general categories, as the attached declarations describe in greater detail.

First, the tariffs impact state entities that are importers of record, such as state universities purchasing scientific equipment. For example, a department of the University of Oregon is purchasing a transmission electron microscope from a German manufacturer. (Decl. of Gregory Shabram (Or.) ¶ 13; *see also id.*, Ex. A (customs entry summary for similar purchase).) With the 10 percent tariff levied against goods from Germany, the import duty will be about $100,000. (*Id.* ¶ 13.) That department is still attempting to identify funding to cover the additional tariff costs. (*Id.*) The university is also in the process of identifying high-value purchases that will be affected by tariffs, with the estimated impact at current tariff rates already at more than $769,500. (*Id.* ¶¶ 9, 11, Ex. B.)

Page 8 -   MOTION FOR PRELIMINARY INJUNCTION

Second, vendors and suppliers who import goods and materials, or rely on imported components in making their own goods, are passing through the cost of tariffs to state entities. (*E.g.*, Decl. of Amy Ramsdell (Or.) ¶ 8 (Canadian snow blowers); Decl. of Hanna Emerson (Or.) ¶ 5, 7 (Chinese scientific supplies and Swiss robotics systems); Decl. of Kristine Ward (Ariz.) ¶ 7 (Israeli irrigation system supplies); Decl. of Robert Jaros (Colo.) ¶¶ 8, 10, 12, 18 (German, Chinese, and Canadian scientific equipment and Chinese office supplies); Decl. of Jenifer Johnson (Ill.) ¶ 7 (Chinese and Mexican computer products); Decl. of Jeanette Moy (N.Y.) ¶ 10 (Canadian energy); Decl. of Betsy Hayes (Minn.) ¶ 10, Ex. B (school buses with Chinese components); Decl. of Joshua Root (Minn.) ¶¶ 8–9 (Canadian dynamic road signs).) Because state agencies are operating on budgets set prior to the tariffs, the increased costs are leading to difficult decisions. For example, various state entities are purchasing essential equipment for their services, for which passed-through tariff costs will either result in the entity purchasing fewer units or reducing other services. (*E.g.*, Ramsdell Decl. (Or.) ¶ 12–13 (fewer purchases of tariffed goods such as snow blowers); Johnson Decl. (Ill.) ¶ 8–11 (delayed replacement of outdated computer equipment).) In aggregate, the 12 plaintiff States will pay an estimated $1.6 billion in increased costs per year due to the IEEPA Tariffs. (Hines Decl. ¶ 52; *see also* Moy Decl. (N.Y.) ¶ 11–12 (describing anticipated impacts to state spending due to tariffs).)

For those purchases, because the States are not the importers of record, they would not be entitled to reimbursement if the IEEPA Tariffs were declared unlawful. And reviewing each purchase and negotiating with vendors and suppliers would be administratively infeasible and impose additional and irrecoverable costs to the States. (Decl. of Jake Zelenka (Or.) ¶ 9; Jaros Decl. (Colo.) ¶ 42; Hayes Decl. (Minn.) ¶ 18.) Indeed, at least one supplier has asked its subsuppliers to keep calculations regarding tariff surcharges a trade secret. (Hayes Decl. (Minn.) ¶ 18.) And vendors are not always forthcoming with country-of-origin information (Jaros Decl. (Colo.) ¶ 32), potentially because it was not previously necessary to maintain accurate tracking of that information.

Page 9 -   MOTION FOR PRELIMINARY INJUNCTION

Lastly, the uncertainty resulting from the repeatedly changing tariff policies seriously impairs budgeting and procurement efforts. As to budgeting, the States' agencies and higher-education institutions set budgets to ensure responsible financial planning and spending. (*E.g.*, Shabram Decl. (Or.) ¶ 14; Ramsdell Decl. (Or.) ¶ 6; Jaros Decl. (Colo.) ¶ 35–36.) The ever-changing tariffs upend those budgets, making them a less reliable fiscal control. (*E.g.*, Shabram Decl. (Or.) ¶ 16; Emerson Decl. (Or.) ¶ 7; Johnson Decl. (Ill.) ¶¶ 20–21.) That uncertainty also impairs state universities' ability to apply for grants (*e.g.*, Shabram Decl. (Or.) ¶ 15–16), and puts infrastructure projects at risk of losing federal funding (*e.g.*, Ramsdell Decl. (Or.) ¶ 7). As to procurement, the uncertainty regarding what tariffs will apply at the time of import makes it difficult for the States' agencies and universities to obtain bids and to identify the true lowest bid. (*E.g.*, Emerson Decl. (Or.) ¶ 7; Johnson Decl. (Ill.) ¶¶ 13, 15–16, 20.) And due to the additional negotiation required to address the unexpected tariff costs, the States are also incurring additional and irrecoverable administrative costs. (*See, e.g.*, Shabram Decl. (Or.) ¶ 13; Jaros Decl. (Colo.) ¶¶ 6, 12, 39–40; Johnson Decl. (Ill.) ¶¶ 15–17.)

## III.    LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[N]o one factor, taken individually, is necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others." *Ugine & Alz Belg. v. United States*, 452 F.3d 1289, 1292–93 (Fed. Cir. 2006) (internal quotation marks omitted); *Best Mattresses Int'l Co. Ltd. v. United States*, 557 F. Supp. 3d 1338 (Ct. Int'l Trade 2022). While the plaintiff must show at least a "fair chance of success on the merits," "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show." *Aluminum Extrusions Fair Trade Comm. v. United States*, 607 F. Supp. 3d 1332, 1339 (Ct. Int'l Trade

Page 10 - MOTION FOR PRELIMINARY INJUNCTION

2022) (internal quotation marks omitted); *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378–79, 1381 (Fed. Cir. 2009); *see In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1367 n.13 (Ct. Int'l Trade 2021) ("Other circuit courts have stated that a fair chance is less than 50%.").

## IV.    ARGUMENT

### A.    The States have standing.

The States have standing to challenge the IEEPA Tariff Orders, because the orders are causing, and will continue to cause, economic harm to the States' governments. That economic harm is "a concrete and particularized injury that is either actual or imminent"; the harm is "fairly traceable" to Defendants' issuance, implementation, and enforcement of the IEEPA Tariff Orders; and "it is likely that a favorable decision will redress that injury" by enjoining the implementation and enforcement of the tariffs. *See Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).

The IEEPA Tariff Orders are causing an injury in fact to the States, in the form of actual, ongoing, and imminent economic harm. That harm includes the increased cost of goods and equipment that are subject to the tariffs, as well as increased costs of services from contractors and vendors who rely on those goods and equipment. (*E.g.*, Shabram Decl. (Or.) ¶¶ 5–7, 13, Ex. B; Emerson Decl. (Or.) ¶¶ 5, 7; Ward Decl. (Ariz.) ¶ 6–8; Johnson Decl. (Ill.) ¶ 14; Hayes Decl. (Minn.) ¶¶ 8–15, Exs. A–F; Root Decl. (Minn.) ¶¶ 8–17, Exs. A–D; Moy Decl. (N.Y.) ¶ 10.) Further, the unpredictable nature of the frequently changing tariffs is severely harming States' ability to plan and budget their limited resources. (*E.g.*, Emerson Decl. (Or.) ¶ 7; Johnson Decl. (Ill.) ¶¶ 20–21.) The ongoing tariffs also will increase States' administrative costs through the cost of keeping up with the constantly changing tariffs and verifying that contractors' claimed tariff expenses actually result from tariffs in place at that particular moment. (*E.g.*, Johnson Decl. (Ill.) ¶ 17.)

Page 11 - MOTION FOR PRELIMINARY INJUNCTION

This economic harm is both actual and imminent. The States have already suffered actual harm, in the form of increased costs of equipment purchases and service contracts. (*E.g.*, Shabram Decl. (Or.) ¶ 7, Ex. A; Emerson Decl. (Or.) ¶ 5; Zelenka Decl. (Or.) ¶ 6–8; Johnson Decl. (Ill.) ¶ 14; Hayes Decl. (Minn.) ¶¶ 11–13, Exs. C–E.)

Such increased costs are ongoing and will continue for the duration of the tariffs. Importers, vendors, and contractors will continue to pass on the costs of the tariffs to States. Both this Court and the Federal Circuit have recognized that "economic logic" can support an allegation that tariffs will cause imminent harm to a plaintiff, regardless of whether the plaintiff will pay the tariffs directly. *See Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008) (Canadian wheat sellers "could fairly employ economic logic" rather than "empirical analysis" to establish that it was "more likely than not they would be injured" by tariffs on Canadian wheat and distribution of tariff proceeds to an entity promoting North Dakotan wheat; *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1273–74 (Ct. Int'l Trade 2019) (both testimony and "economic logic" showed that, "because of the [challenged tariff decision], the price of bifacial [solar] panels will rise, causing substantial economic injuries to Invenergy's solar energy projects and larger business"); *see also Maryland v. Louisiana*, 451 U.S. 725, 736–37 (1981) (plaintiff states had standing to challenge a Louisiana tax imposed on natural gas pipeline companies, when the states were "major purchasers of natural gas whose cost ha[d] increased as a direct result" of the tax).

Here, economic logic demonstrates that even using conservative estimates the States will face $1.6 billion in costs due to the announced tariffs. (Hines Decl. ¶ 52.) But the States do not rely on economic logic alone but rather have provided detailed declarations describing the already-observed behavior of vendors. (*E.g.*, Jaros Decl. (Colo.) ¶¶ 8–13, 18–21, 26-27, 33-34, Exs. 1–6 (correspondence reflecting tariff-based price increases and surcharges); Hayes Decl. (Minn.) ¶¶ 8–15, Exs. A–F (same); Johnson Decl. (Ill.) ¶ 16 (vendors increasing prices or insisting on contract language allowing vendors to pass on costs to the state); Emerson Decl.

Page 12 - MOTION FOR PRELIMINARY INJUNCTION

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(Or.) ¶ 7 (Swiss robotics manufacturer "reserv[ing] the right to adjust the prices accordingly" in the event of "new or increased tariffs").)

The uncertainty of the costs associated with IEEPA Tariffs is also ongoing, as their unpredictable nature hampers the States' ability to budget and negotiate contracts. (*See, e.g.*, Emerson Decl. (Or.) ¶ 7; Jaros Decl. (Colo.) ¶ 39; Johnson Decl. (Ill.) ¶ 15, 20–21.) This Court has recognized similar harms as not only actual or imminent harm, but irreparable harm. *See Invenergy*, 422 F. Supp. 3d at 1291 ("The [challenged tariff decision] causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects.").

The economic harm to the States is concrete and particularized. The injuries described above are not merely an "abstract and indefinite" harm to the "common concern for obedience to law." *See FEC v. Akins*, 524 U.S. 11, 23 (1998) (internal quotation marks omitted). Rather, they are concrete economic harms to each State's government. *See Invenergy*, 422 F. Supp. 3d at 1273–74 (plaintiff sufficiently alleged that a tariff increase on solar panels would cause "economic, business, and reputational harms" that were "concrete and particularized to [the plaintiff]").

The fact that others are suffering similar harms does not make the harms to States any less concrete and particularized. "[W]here a harm is concrete, though widely shared, the [Supreme] Court has found 'injury in fact.'" *Akins*, 524 U.S. at 24; *see Massachusetts*, 549 U.S. at 522 (harms from rising sea levels, though "widely shared," constituted a "particularized injury [to the Commonwealth of Massachusetts] in its capacity as a landowner"). Here, the IEEPA Tariff Orders are causing concrete harm to the finances of each State, as described in the States' detailed declarations. That harm is "sufficiently concrete and specific such that the fact that [similar harm] is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts." *See Akins*, 524 U.S. at 25.

Page 13 - MOTION FOR PRELIMINARY INJUNCTION

Those concrete, particularized injuries are traceable to the IEEPA Tariff Orders. This Court and the Federal Circuit have recognized that the economic harm caused by a tariff is not limited to the importers who pay the tariff directly, and have held that causation is established when economic harm suffered by purchasers is fairly traceable to the tariff. *Invenergy*, 422 F. Supp. 3d at 1274; *Canadian Lumber*, 517 F.3d at 1333. In *Invenergy*, causation was established when the plaintiff's "economic and reputational harms stem[med] from reliance on [the prior tariff status quo] and attempt to adjust to the [challenged tariff decision]." 422 F. Supp. 3d at 1274. Here, similarly, "even if some of the specific harms [States] allege[] involve relationships with third parties," the States' "injuries would not exist but for the implementation of the" IEEPA Tariffs. *See id.*; *see also Canadian Lumber*, 517 F.3d at 1334 (finding tariff scheme was likely to cause economic injury to Canadian wheat sellers). Even where the States are not paying the tariffs directly, the impact of those tariffs on the cost of goods, equipment, and services on which the States rely, and the impact on the States' ability to accurately plan and budget, are traceable to the tariffs themselves.

Those injuries can be redressed by an order enjoining the implementation and enforcement of those tariffs. Redressability, like traceability, "can be established even if the injury is indirect." *Invenergy*, 422 F. Supp. 3d at 1274. The fact "that actions of third parties may redress part of the alleged injury is not a conclusive bar to standing." *Id.* Redressability is satisfied when a third party "is likely to respond to the government's conduct in a way that causes the plaintiff's injury to be redressed." *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1357 (Ct. Int'l Trade 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992)). Enjoining the IEEPA Tariffs would remedy the economic harm to the States by eliminating the tariff costs that importers are passing on to the States. *Cf. Ross*, 331 F. Supp. 3d at 1359, 1371–72 (entering preliminary injunction prohibiting importation of certain fish products, because third parties were "likely to respond to [the ban] in a way that reduces … harm to plaintiffs' recreational and esthetic interests").

Page 14 - MOTION FOR PRELIMINARY INJUNCTION

**B.**     **The States are likely to succeed on the merits.**

The States are likely to succeed on the merits of their claims that the IEEPA Tariff Orders are unlawful. IEEPA does not authorize the President to impose tariffs. But even if it did, the Tariff Orders would not satisfy IEEPA's requirements.

**1.**     **The IEEPA Tariff Orders exceed the President's authority.**

The power that IEEPA confers to "regulate" imports to "deal with an unusual an extraordinary threat," 50 U.S.C. § 1701(a), does not include the power to impose tariffs or duties.

**a.**     **The text, context, and history of IEEPA do not establish authority to impose tariffs.**

Nothing in IEEPA expressly authorizes the President to impose tariffs or duties. The wording of Section 1702(a)(1)(B) provides that, among other things, the President may "regulate … importation." 50 U.S.C. § 1702(a)(1)(B). The term "regulate" means to control or establish something by rule. *See, e.g.*, "Regulate," *Black's Law Dictionary* (4th ed. 1968) ("To fix, establish, or control; to adjust by rule, method, or established mode."); *Webster's Third New International Dictionary*, 1913 (1961) (defining "regulate" to mean "to govern or direct according to rule"). But even if the term "regulate" may encompass a broad range of conduct, it does not include the power to impose taxes or collect revenue. The law routinely distinguishes between the power to create rules and the power to raise or collect revenue. *See, e.g.*, U.S. Const., Art. I, § 8, cls. 1–2 (distinguishing the regulation of commerce from the collection of taxes or duties); 16 U.S.C. § 1540(f) (distinguishing authority "to promulgate such regulations as may be appropriate to enforce" the Endangered Species Act and authority to "charge reasonable fees for expenses to the Government connected with [authorized] permits or certificates"); *see also Diginet, Inc. v. W. Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax.").

Similarly, if Congress had intended to empower the President to impose tariffs or duties, it easily could have specified that authority by using more particular wording. *See, e.g.*, 19

Page 15 - MOTION FOR PRELIMINARY INJUNCTION

U.S.C. § 2253(a)(3)(A) (authorizing President to "proclaim an increase in, or the imposition of, any duty on the imported article"); 19 U.S.C. § 2411(c)(1)(B) (authorizing the Executive branch to "impose duties"). Indeed, Congress has enacted numerous statutes authorizing the imposition of tariffs in specific circumstances. 19 U.S.C. § 1671(a) (providing for "countervailing duties" to protect domestic injuries against "countervailing subsidies"); 19 U.S.C. § 2253(a)(3)(A) (authorizing the President to "proclaim an increase in, or the imposition of, any duty" on imported articles posing threat to domestic industry); 19 U.S.C. § 2411(c)(1)(B) (same for unjustifiable or unreasonable trade policies or violations of trade agreements). Congress's omission to specify that authority for the President shows that it did not intend to grant it.

The history of IEEPA confirms that conclusion. In enacting IEEPA, Congress was not empowering the President to use tariffs in response to emergencies constituting extraordinary threats. *Abramski v. United States*, 573 U.S. 169, 179 (2014) (courts consider a statute's context, structure, history, and purpose). To be sure, Congress was aware that President Nixon had used IEEPA's predecessor statute, TWEA, as authority to impose surcharges on goods for which Congress had already authorized tariffs. *See* H.R. Rep. 95-459, at 5 (1977) (identifying Section 5(b) of TWEA). But Congress's awareness of President Nixon's use of Section 5(b) of TWEA must be understood in light of Congress's undeniable skepticism about prior invocations of TWEA. *See* H.R. Rep. No. 95-459, at 2 (describing Presidential authorities in IEEPA as "more limited in scope" than Section 5(b) of TWEA); *id.* at 5 (describing uses of TWEA that "would appear also to be beyond the authority of section 5(b)"). And Congress almost immediately enacted legislation to limit the circumstances in which a President may impose tariffs to respond to balance-of-payments problems. *See* Section 122 of the Trade Act of 1974, codified at 19 U.S.C. § 2132 (limiting tariffs to 15% and requiring a duration not exceeding 150 days). After specifically prescribing those limitations to govern the only circumstance in which a President had used TWEA to impose tariffs, Congress would not have intended to create in IEEPA the

Page 16 - MOTION FOR PRELIMINARY INJUNCTION

same unbounded Presidential power that President Nixon claimed in TWEA. At the very least, Congress was not endorsing the use of tariffs under IEEPA.[2]

Viewed in light of that history, *Yoshida*'s interpretation of "regulate … importation" in TWEA does not fix the meaning of those words in IEEPA. *See Yoshida*, 526 F.2d at 576–77 (concluding that authority to "regulate … importation" includes authority to temporarily suspend prior tariff concessions). Between President Nixon's Proclamation 4074 and the enactment of IEEPA, Congress significantly altered the President's authority to impose tariffs in response to specific trade issues. *See* 19 U.S.C. § 2411(c)(1)(B) (authorizing the Trade Representative to "impose duties" in response to trade agreement violations or burdensome trade practices); 19 U.S.C. § 2253(a)(3)(A) (authorizing "an increase in, or the imposition of, any duty on the imported article" to protect domestic industry). And it enacted legislation that expressly limited Presidential authority to impose tariffs in response to the balance-of-payments problems that prompted President Nixon to impose tariffs under TWEA. *See* 19 U.S.C. § 2132 (authorizing the President to proclaim a temporary import surcharge not to exceed 15 percent *ad valorem* for a period no longer than 150 days to "deal with large and serious United States balance-of-payment deficits"). Hence, even if Congress was aware of *Yoshida* when it enacted IEEPA, it was legislating against a completely different legal background in which it was affording far less deference to the President in the area of tariffs. *See Trump v. Hawaii*, 585 U.S. 667, 692 (2018) (reasoning that drafting history may suggest a different meaning from that of borrowed statute if Congress makes a "critical alteration" to statutory scheme). For those reasons, *Yoshida*'s interpretation of TWEA does not fix the meaning of IEEPA.

---

[2]    The House Report makes clear that it did not "endorse[]" or "disclaim[]" existing uses of Section 5(b) of TWEA. *See* H.R. Rep. 95-459, at 10.

Page 17 - MOTION FOR PRELIMINARY INJUNCTION

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

>   **b.    If Congress intended to convey the broad powers President Trump claims under IEEPA, it would have expressed that intent clearly.**

The U.S. imports over $4 trillion of goods annually, representing 14 percent of the U.S. economy. (*See* Hines Decl. ¶ 15.) By threatening to affect nearly all imports, the IEEPA Tariff Orders have created chaos and uncertainty across almost every aspect of the world economy. (Hines Decl. ¶¶ 38–43.) President Trump reads IEEPA to permit him to continue the chaos by imposing *any* tariff rate on *any* goods from *any* country based on what he claims are unreviewable determinations about national emergencies and the proper measures for dealing with them.

If Congress intended to give such unbounded authority to the President to make decisions of "vast economic and political significance," it would have expressed that intent clearly. *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted); *see also Alabama Ass'n of Realtors v. Dep't of Health & Human Servs*., 594 U.S. 758, 764 (2021) (noting that the "sheer scope" of claimed authority is a reason for caution in interpreting a Congressional delegation of authority). In other words, Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001). IEEPA's use of the word "regulate" is "a wafer-thin reed on which to rest" authority as sweeping as President Trump claims in imposing tariffs on almost every U.S. trading partner.[3] *Alabama Ass'n of Realtors*, 594 U.S at 765.

Reinforcing that conclusion is the fact that President Trump's use of IEEPA to impose tariffs and repeatedly modify them at whim is completely unprecedented. In interpreting a statute delegating authority to the Executive Branch, courts must consider how Presidents have used the statute on prior occasions. *Biden v. Nebraska*, 600 U.S. 477, 497 (2023) (considering that factor).

---

[3]    Equally important, people who violate IEEPA orders are subject to significant civil and criminal penalties. *See* 50 U.S.C. § 1705 (imposing civil penalties of at least $250,000 and criminal sanctions including a fine up to $1,000,000 or imprisonment up to 20 years). On President Trump's reading of IEEPA, he can change the criminal-liability goalposts for thousands of people subject to IEEPA orders and regulations at any time, creating obvious notice and fairness problems.

Page 18 - MOTION FOR PRELIMINARY INJUNCTION

Especially when the Executive Branch "claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' … [the courts] typically greet its announcement with a measure of skepticism." *See Util. Air Regul. Grp.*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Courts should be especially skeptical here: No President before President Trump has invoked IEEPA to impose any tariffs, let alone tariffs on almost all goods from every country in the world.

At the very least, the President's reading of IEEPA would raise significant constitutional problems that this Court should avoid by reading the statute more narrowly. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). The IEEPA Tariff Orders pose a significant intrusion into the separation of powers. Congress alone has constitutional authority to impose tariffs. U.S. Const., Art. I. § 8, cl. 1. Although Congress delegated some authority to the President through various trade acts, President Trump's reading of IEEPA would throw aside the "intelligible principles" that Congress enacted to cabin his delegated authority. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (describing Congress's obligation to establish "intelligible principles" in delegating authority to the Executive Branch). Under President Trump's reading, he has authority to override Congress's exclusive authority to impose tariffs and rewrite the tariff schedules at his whim.

In short, President Trump's reading of IEEPA would provide him "a breathtaking amount of authority" that would make unclear what measures of trade policy have been "place[d] outside" his reach. *Alabama Ass'n of Realtors*, 594 U.S. at 764–65. Taken that far, President Trump's reading would risk U.S. trade policy "becoming nothing more than the will of the current President." *Gundy v. United States*, 588 U.S. 128, 155 (2019) (Gorsuch, J. dissenting). This Court should construe IEEPA to avoid those serious constitutional problems.

Page 19 - MOTION FOR PRELIMINARY INJUNCTION

2.    **The Tariff Orders do not satisfy IEEPA's requirements.**

Even if IEEPA otherwise authorized tariffs to "deal with" unusual and extraordinary

threats, 50 U.S.C. § 1701(a), the IEEPA Tariff Orders do not satisfy those requirements. For the

Worldwide Tariff Order, the President does not identify an "unusual and extraordinary threat."

And none of the IEEPA Tariff Orders "deal[s] with" the "unusual and extraordinary threat[s]"

that they identify.

a.    **This Court has authority to review whether the President has identified an unusual or extraordinary threat and whether the IEEPA Tariff Orders "deal with" that threat.**

Courts must "decide cases properly before it, even those it 'would gladly avoid.'"

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194 (2012). One narrow exception is the

political-question doctrine. *Id.* at 195. A controversy "involves a political question … where

there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political

department; or a lack of judicially discoverable and manageable standards for resolving it." *Id.*

(quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).

But the political question doctrine does not apply in cases involving the lawfulness of

executive action under a statute. *See id.* at 196 (there is no political question when "the Judiciary

must decide [which] interpretation of the statute is correct"). And although cases involving

foreign relations often involve political questions, "it is error to suppose that every case or

controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369

U.S. 186, 211 (1962). Instead, courts must consider "the particular question posed" in the

"specific case" to determine whether the political question doctrine prevents a claim from going

forward. *Id.*

Here, the "particular question[s] posed" in this "specific case" is whether President

Trump's executive orders imposing the IEEPA Tariffs violate the requirements of IEEPA.

IEEPA does not flow from a constitutional commitment to the Executive Branch in responding

to problems affecting foreign commerce. To the contrary, Congress has exclusive authority to

Page 20 - MOTION FOR PRELIMINARY INJUNCTION

impose duties and to "regulate commerce with foreign nations." U.S. Const., Art I, § 8, cls. 1, 3. Nor does IEEPA suggest that the President's authorities to "deal with" threats to U.S. interests draw on Article II powers. IEEPA "meaningfully constrains the [President's] discretion" by requiring that "[t]he authorities granted to the President … may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." *United States v. Dhafir*, 461 F.3d 211, 216–17 (2d Cir. 2006) (internal quotation marks and citation omitted). By creating those meaningful restraints in IEEPA, Congress intended that Presidential powers exercised under IEEPA would be subject to court review. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.").

Nor does IEEPA suffer from a lack of judicially discoverable and manageable standards for resolving the question in this case. Courts often interpret or apply terms like "extraordinary" or "unusual" in litigation. *See, e.g.*, *City of Grants Pass v. Johnson*, 603 U.S. 520, 542–43 (2024) (interpreting the Cruel and Unusual Punishments Clause); *United States v. Davis*, 99 F.4th 647, 655 (4th Cir. 2024) (interpreting whether an "extraordinary and compelling" reason exists for release from prison); *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) (considering whether "extraordinary" circumstances exist to justify equitable tolling); *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 381 (2004) (applying "unusual and compelling circumstances" exception to bidding process). And courts often must review the fit between means and ends in legislation.

Finally, the States are not challenging the President's declaration of an emergency under the National Emergencies Act. Rather, they are asking the Court to review whether the President has identified an "unusual and extraordinary" threat under IEEPA, and whether he has properly exercised his statutory authority to "deal with" any such threat. That separate statutory requirement is not beyond the review of courts even if it implicates complex issues of policy or politics. *See Japan Whaling*, 478 U.S. at 229 ("[N]ot every matter touching on politics is a

Page 21 - MOTION FOR PRELIMINARY INJUNCTION

political question."); *Yoshida*, 526 F.2d at 579 ("Though courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency, they will not hesitate to review the actions taken in response thereto or in reliance thereon."). Accordingly, this Court can review the President's use of emergency powers under IEEPA.

> **b.    IEEPA does not authorize the Worldwide Tariff Order.**

For two reasons, President Trump has failed to satisfy IEEPA's requirements for imposing the Worldwide Tariff Order: (1) by relying on longstanding trade policy problems, President Trump has failed to identify "an unusual and extraordinary" threat; and (2) the Worldwide Tariffs do not "deal with" the threats that they identify.

The President may exercise authority under IEEPA only to address an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). An "extraordinary" threat is "not of the ordinary order or pattern." *Webster's Third New International Dictionary*, 807 (1961) (defining "extraordinary"). As Congress explained when it enacted IEEPA, "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H.R. Rep. No. 95-459, at 10. President Trump cannot satisfy that statutory requirement based on his own admission that "annual U.S. goods trade deficits" are "persistent." Executive Order 14257, 90 Fed. Reg. 15041 (Apr. 2, 2025). Any problem that is "persistent" is a "normal, ongoing problem[,]" not unusual or extraordinary. H.R. Rep. No. 95-459, at 10; *see also City of Grants Pass*, 603 U.S. at 543 (concluding that a city's fines for unauthorized camping were not "unusual" because "similar punishments have been and remain among 'the usual mode[s]' for punishing offenses throughout the country"); *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (noting that "unusual" means "such as [does not] occu[r] in ordinary practice") (citation and quotation marks omitted, brackets in *Harmelin*).

Page 22 - MOTION FOR PRELIMINARY INJUNCTION

Even if "persistent" problems can also be "unusual" ones, the persistent trade deficits that President Trump has identified are not "extraordinary threats." To the contrary, trade deficits have been a feature of the U.S. economy for decades. (*See* Hines Decl. ¶¶ 15–16); Executive Order 14257, 90 Fed. Reg. 15041 (describing the historical "framework [that] set in motion events, agreements, and commitments" that created the "persistent annual U.S. goods trade deficits as a feature of the global trading system"); Brian Reinbold and Yi Wen, "Historical U.S. Trade Deficits," *St. Louis Fed On the Economy* (May 17, 2019) (describing decades long history of trade deficits in the United States), *available at* https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits; Paul R. Krugman, "The Persistence of the U.S. Trade Deficit." *Brookings Papers on Economic Activity*, vol. 1987, no. 1, 1987, pp. 1–43 (describing reasons for the persistence of trade deficits in 1970s and 1980s). And trade deficits are not threats to a modern economy like ours, much less extraordinary threats. (Hines Decl. ¶¶ 17, 25–27, 32–39.) Similarly, the threat of suppressed wages or consumption do not constitute "unusual" or "extraordinary" threats in today's U.S. economy. To the contrary, reliable economic data shows that wages and personal consumption have generally increased over the last decade. (*Id.* ¶¶ 10–13 & Figs. 3–7.) Nor is there any new or extraordinary threat to U.S. manufacturing. (*Id.* ¶¶ 18–21 & Figs. 9–10.)

In addition, the Worldwide Tariffs do not "deal with" persistent trade deficits, 50 U.S.C. § 1701(a), because they bear no reasonable connection to remedying them. An exercise of authority under IEEPA "deal[s] with" an unusual and extraordinary threat when it "bear[s] a reasonable relation to the particular emergency confronted." *Yoshida*, 526 F.2d at 579. The IEEPA Tariff Orders do not pass that test.

President Trump declared that persistent trade deficits have harmed domestic production, undermined the U.S. manufacturing base, and forced the U.S. "defense-industrial base" to depend on foreign adversaries. Executive Order 14257, 90 Fed. Reg. 15041. But tariffs are not targeted to "deal with" any of those problems. (Hines Decl. ¶¶ 20–22.) Nor will tariffs address

Page 23 - MOTION FOR PRELIMINARY INJUNCTION

President Trump's concern about the suppression of domestic wages and consumption. (*See* Hines Decl. ¶¶ 39–40, 54–55; Marshall Dec.., Ex. A (Federal Reserve, *Beige Book* (Apr. 2025)) (noting that prices had increased across the nation in part because "[m]any firms have already received notices from suppliers that costs would be increasing" and that "[m]ost businesses expected to pass through additional costs to customers").) In fact, tariffs will cause job losses and decrease consumption. (Hines Decl. ¶¶ 39, 54–55.)

At any rate, the Worldwide Tariffs are not calibrated to alleviate suppressed wages or consumption. The baseline 10 percent tariff applies without regard to how any particular country's trade practices threaten domestic industries. (*See* Hines Decl. ¶ 24; Marshall Decl., Ex. C (observing that "[t]he 10 percent minimum number is completely arbitrary and has no derivation").) And the reciprocal tariffs are not responsive to any country's tariff rates; rather, they are based on a formula with dubious theoretical assumptions and controversial methodological approaches. (*See* Hines Decl. ¶¶ 28–31; Marshall Decl., Ex. B (Reciprocal Tariff Calculations, Office of the United States Trade Representative (USTR)), Ex. C (observing that "the foreign 'tariff rates' are invented numbers derived from no explicit policies, based on the dubious theoretical assumption that unspecified but retaliation-worthy factors conspired to 'prevent trade from balancing'"); Ex. D (economist cited by USTR analysis concluding that, properly "computed tariffs would have been as little as one-fourth of what they are").)

If anything, the Worldwide Tariffs are designed to achieve ends wholly unrelated to a national emergency arising from suppressed domestic wages or consumption. President Trump himself has boasted about those non-emergency objectives. For instance, President Trump has made clear that he intends to use tariffs as leverage in securing benefits unrelated to protections to domestic industry: foreign aid, the military presence of foreign nations in certain countries, and payment for troops in those areas. *See, e.g.*, Executive Order 14266, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025) (explaining that "more than 75 other foreign trading partners" had approached the United States in the wake of the April 2 Executive Order to address trade

Page 24 - MOTION FOR PRELIMINARY INJUNCTION

reciprocity and "national and economic security concerns"). Along similar lines, President Trump has repeatedly suggested that tariffs are effective because they bring in revenue, not because they alleviate suppressed wages or consumption giving rise to an "extraordinary" threat. *See, e.g.*, Marshall Decl., Ex. E (the President remarking that "if you don't make your product in America … you will have to pay a tariff — differing amounts, but a tariff — which will direct hundreds of billions of dollars and even trillions of dollars into our Treasury to strengthen our economy and pay down debt."), Ex. F (Treasury Secretary estimates worldwide tariffs will generate $300 billion to $600 billion annually), Ex. G ("When Tariffs cut in, many people's Income Taxes will be substantially reduced, maybe even completely eliminated. … THE EXTERNAL REVENUE SERVICE IS HAPPENING!!!"). But raising revenue through tariffs and other taxes or duties is Congress's constitutional responsibility. Congress has plainly not delegated that constitutional authority to the President through IEEPA.

### c.  IEEPA does not authorize the Canada and Mexico Tariff Orders or the China Tariff Orders.

Similarly, the Canada and Mexico Tariff Orders bear no reasonable connection to the threats that they claim to address. President Trump declared that border security threats, including drug trafficking, gave rise to an extraordinary and unusual threat. Executive Order 14193, 90 Fed. Reg. 9113 (Feb. 1, 2025) (describing threat underlying Canada Tariff Order); Executive Order 14194, 90 Fed. Reg. 9117 (Feb. 1, 2025) (same for Mexico Tariff Order). Yet the Canada and Mexico Tariff Orders are not tailored to counteract drug trafficking for the obvious reason that drug traffickers will not pay tariffs on the drugs that they illegally smuggle into this country. The executive orders do not even attempt to explain how imposing tariffs on all lawfully imported goods will deter the smuggling of illegal drugs. Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, 90 Fed. Reg. at 9118. If anything, the tariffs will increase the price of lawful goods compared to illegal drugs, causing harm to lawful commerce without necessarily impacting illegal trade.

Page 25 - MOTION FOR PRELIMINARY INJUNCTION

Nor do the Canada and Mexico Tariff Orders target the particular inputs or accessories to drug manufacture or transportation. Instead, the tariffs apply to almost all goods, including Canadian energy resources, regardless of their relationship to "illicit drugs like fentanyl" or drug-trafficking organizations. Executive Order 14193, 90 Fed. Reg. 9113. The adjustments to the tariff rates on potash illuminate the arbitrary nature of the tariff rates vis-à-vis drug trafficking or the fentanyl crisis: In reducing the rate from 25 percent to 10 percent for potash, President Trump did not even suggest that the tariff or the adjustment to it might aid in preventing or reducing drug trafficking. Executive Order 14231, 90 Fed. Reg. 11785 (describing reduction of tariff rate on potash).

Likewise, the China Tariff Orders bear no reasonable connection to the threats that they claim to address. Again, President Trump has identified border security threats, including China's failure to arrest, seize, detain, or otherwise intercept drug suppliers and other criminals, as the basis for his declaration of a national emergency. Executive Order 14195, 90 Fed. Reg. 9122. Yet the China Tariff Orders do not target goods related to drug trafficking. They apply to almost *all* goods imported from China—including toys, clothing, and food products.

### d.    *Yoshida* forecloses the President's interpretation of IEEPA.

In upholding President Nixon's use of TWEA to suspend previous tariff concessions, *Yoshida* made clear that a President's authority to use emergency economic powers was limited. President Nixon's Proclamation 4074, after all, imposed surcharges only on dutiable goods that "had been the subject of prior tariff concessions" and that did not exceed congressionally established rates. *Yoshida*, 526 F.2d at 577. In those respects, as the CCPA reasoned, Proclamation 4074 was not "tear[ing] down or supplant[ing] the entire tariff scheme of Congress" but "impos[ing] a limited surcharge, as 'a temporary measure' … calculated to help meet a particular national emergency." *Id.* at 577–78. President Trump's Tariff Orders, by contrast, are not limited, temporary, or calibrated to deal with any genuine threats.

Page 26 - MOTION FOR PRELIMINARY INJUNCTION

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Equally important, in issuing Proclamation 4074, President Nixon was not "impos[ing] whatever tariff rates he deems desirable." *Id.* at 577 at 578. Otherwise, as the CCPA recognized, significant constitutional problems would arise: "The mere incantation of 'national emergency' cannot, of course, sound the death-knell of the Constitution. Nor can it repeal prior statutes or enlarge the delegation in [section 5(b) of TWEA]." *Id.* at 583. Put another way, "[t]he declaration of a national emergency is not a talisman enabling the President to rewrite the tariff schedules …." *Id.* President Trump's broad reading of his authority under IEEPA is nothing more than the talisman that *Yoshida* warned against. *See id.* (observing that it was not "sanction[ing] the exercise of an unlimited power").

For those reasons, if *Yoshida*'s reasoning determined anything about the use of tariffs under IEEPA, it established only that surcharges on duties can be no higher than congressionally approved tariff rates. *See id.* at 577 (explaining that the surcharge was within the parameters of rates already established through "earlier concessions following presidentially negotiated trade agreements" and "congressionally established rates"). At the very least, *Yoshida* forecloses President Trump's reading of IEEPA under which he may impose *any* tariff at *any* rate on *any* country for however long he desires.

### 3.    U.S. Customs and Border Protection acted arbitrarily and capriciously and in excess of statutory authority.

The States are also likely to prevail on the merits of their Administrative Procedure Act (APA) claims.

Under the APA, a reviewing court must "hold unlawful and set aside agency action" when that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Agency action is arbitrary and capricious in violation of the APA if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

Page 27 - MOTION FOR PRELIMINARY INJUNCTION

runs counter to the evidence before the agency," or makes a determination that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *City & Cty. of San Francisco v. U.S. Citizenship & Immigration Servs.*, 981 F.3d 742, 759 (9th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "No language in the APA prevents or excepts review of an agency action that implements a presidential action. Thus, as a textual matter, final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (citations omitted); *accord In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1324 (Ct. Int'l Trade 2022) (applying same principle); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) (same).

The Custom and Border Protection's Cargo Systems Messaging Service Guidance, implementing the Tariff Orders, are arbitrary and capricious for two reasons: (1) by implementing the Tariff Orders, each Guidance relies on factors that are both unrelated to an "unusual and extraordinary threat" as required under IEEPA and implausible and counter to the evidence; and (2) they fail to consider the economic consequences of the imposition of tariffs or consider alternative to tariffs.

First, as explained, in implementing the IEEPA Tariff Orders, each Cargo Systems Messaging Service Guidance relies on factors unrelated to the "unusual and extraordinary" threat identified by President Trump for each set of IEEPA Tariff Orders. The Worldwide Tariffs were calculated by a formula unrelated to other countries' tariff rates or the causes of trade deficits supposedly giving rise to the national emergency. The baseline 10 percent tariff rate has no basis in any economic measure identified by the U.S. Trade Representative. The sheer extent of the tariffs—covering even places that do not trade with the United States, some of which contain no human inhabitants—shows the lack of any connection to the reciprocal rates imposed. Similarly, the Mexico, Canada, and China Tariff Orders have no obvious connection to the threat of drug trafficking or the fentanyl crisis.

Page 28 - MOTION FOR PRELIMINARY INJUNCTION

Second, in implementing the IEEPA Tariff Orders, each Cargo Systems Messaging Service Guidance fails to consider the economic consequences of the imposition of tariffs. Indeed, the IEEPA Tariff Orders will have vast and devastating effects on the U.S. economy. (Hines Decl. ¶¶ 54–55).

Finally, because the IEEPA Tariff Orders violate IEEPA, each Cargo Systems Messaging Service Guidance implementing them is therefore "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). For that reason, too, this court should set aside the Cargo Messaging Service Guidance.

**C.    The States will suffer irreparable harm.**

Absent a preliminary injunction, the IEEPA Tariffs will irreparably harm the States. State agencies and universities are already incurring additional costs due to tariffs and will continue incurring more costs if they remain in place or increase. In fact, they are already scheduled to increase on July 9, 2025, when the reciprocal tariffs under Executive Order 14257 go back into effect. Further, President Trump's misuse of IEEPA to impose, modify, escalate, and suspend tariffs on a whim has wrought significant uncertainty for state agencies and universities budgeting the costs of providing vital public services.

"Irreparable harm is that harm that cannot be reasonably redressed in a court of law." *Am. Frozen Food Inst., Inc. v. United States*, 855 F. Supp. 388, 394 (Ct. Int'l Trade 1994). "In evaluating irreparable harm, the court must consider the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief." *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (brackets, quotation marks, and citations omitted). Courts generally give greater weight to the latter two factors. *Id.* Each of those factors supports a showing of irreparable harm here.

Page 29 - MOTION FOR PRELIMINARY INJUNCTION

1.    **The IEEPA Tariffs are disrupting procurement by state agencies and universities.**

The IEEPA Tariffs have seriously and irreparably disrupted procurement by state agencies and universities, and they will continue to do so in the absence of a preliminary injunction. That is especially so, given the President's threats to continue misusing IEEPA to rewrite tariff schedules with no reasoned basis.

The IEEPA Tariffs have already frustrated—and continue to frustrate—state entities' procurement of goods and equipment from foreign manufacturers. As one example, the University of Oregon's Materials Science Institute is currently expending work hours to identify funding to cover the unexpected $100,000 tariff cost for a German transmission electron microscope. (Shabram Decl. (Or.) ¶ 13.) Likewise, one of the vendors for Oregon State University is implementing a 2.3 percent surcharge on scientific supplies due in part to tariffs on materials imported from China. (Emerson Decl. (Or.) ¶ 5.) If left in place, the IEEPA tariffs will put the university in the difficult position of forgoing purchases that are critical to its mission to account for the unexpected increased costs. (*Id.* ¶ 6.) Meanwhile, the Illinois Department of Innovation and Technology has expended numerous work hours during the past months in assessing, reacting, and responding to unavailability and increased costs of needed products, and in attempting to find new ways to nonetheless obtain those products to continue to provide services to Illinois state agencies. (Johnson Decl. (Ill.) ¶ 17.).

Similarly, unexpected tariff costs are impairing state agencies' ability to replace outdated equipment and provide essential government services. For example, the Illinois Department of Innovation & Technology has faced difficulties in negotiating contracts and in placing orders on existing contracts, requiring the agency to pause its efforts to replace older devices used by state employees. (Johnson Decl. (Ill.) ¶¶ 8–9, 16.) Similarly, in the case of the Oregon Department of Transportation, increased tariff costs are likely to result in the purchase of fewer units of tariffed goods, such as snow blowers required to clear snow from the state's roadways. (Ramsdell Decl. (Or.) ¶¶ 12–13.) In both cases, the state agencies' options ultimately mean reduced services,

Page 30 - MOTION FOR PRELIMINARY INJUNCTION

whether due to relying on outdated equipment, delaying deployment of improvements, or delaying other agency spending.

Those are only some examples of many. *See, e.g.*, Section II.D, above. And those harms cannot be redressed by a mere order to reimburse tariff payments at the end of this case. *Cf. Invenergy*, 422 F. Supp. 3d at 1291 ("The [challenged tariff decision] causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects."). The IEEPA Tariffs will thus continue forcing the state agencies and universities to make difficult budgetary decisions necessary to provide the public services for which they exist.

The IEEPA Tariffs further cause irreparable harm by disrupting established supply chains. (*E.g.*, Moy Decl. (N.Y.) ¶ 14 (describing anticipated contracting issues if supply chain issues result in delays or unavailability of products).) In many cases, these supply chains are part of long-term price agreements with vendors. (*E.g.,* Jaros Decl. (Colo.) ¶¶ 16, 20 (describing "remaining two years of the State Price Agreement").) Those supply chains are on the verge of serious and irreparable disruption, as ports report fewer shipments from China due to the economically determinantal tariff rates for vendors, currently 145 percent. *See, e.g.*, Lori Ann LaRocco, *Trade War Fallout: Cancellations of Chinese Freight Ships Begin as Bookings Plummet*¸ CNBC (Apr. 16, 2025), https://www.cnbc.com/2025/04/16/ trade-war-fallout-china-freight-ship-decline-begins-orders-plummet.html (reporting "diminished freight container traffic to North America"); Nick Watt et al., *The First Boats Carrying Chinese Goods With 145% Tariffs Are Arriving in LA*, CNN (May 6, 2025), https://www.cnn.com/2025/ 05/06/business/tariffs-price-increases-shortages-ports (same).

### 2. Recovery of "tariff surcharges" would not be economically feasible.

The States will also be harmed by paying more for goods, equipment, and services where third parties must pay the tariffs. Vendors and contractors have indicated that they will be raising prices due to the IEEPA Tariffs. (*E.g.*, Emerson Decl. (Or.) ¶ 7; Ward Decl. (Ariz.) ¶ 7; Hayes Decl. (Minn.) ¶¶ 8–14, Exs. A–F; Root Decl. (Minn.) ¶¶ 9, 13–14, 17, Exs. B–D.) Once those

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

vendors and contractors have passed the tariff costs on to the States in the form of increased prices, it is infeasible for the States to recover those costs. Even if this Court ultimately holds that the tariffs are unlawful, the States have no obvious legal remedy against vendors, contractors, or importers to recover paid tariff surcharges or negotiated price increases.

And even if the States could force repayment, it would not be economically feasible to do so, given the vast number of vendors and contractors that would be implicated. The States, including their various agencies and universities, make a large number of purchases each year and engage various service contractors for an array of purposes. (*E.g.*, Emerson Decl. (Or.) ¶ 5; Decl. of Todd Strole (Ill.) ¶¶ 3–5; Hayes Decl. (Minn.) ¶¶ 3–7; Root Decl. (Minn.) ¶¶ 7–8, 12–13, 18–19.) Auditing a vendor's price adjustment to ensure that it is reasonably based on tariff-related costs is difficult and involves substantial administrative costs. (Jaros Decl. (Colo.) ¶ 42; Hayes Decl. (Minn.) ¶ 18.) That process is particularly difficult with regard to domestically produced goods made in part with foreign-sourced components or contracted services that use some foreign-sourced materials. (*See, e.g.*, Strole Decl. (Ill.) ¶ 5 (domestically-produced land management equipment containing component parts almost entirely manufactured overseas).) Indeed, many of the tariff-based costs that vendors and contractors pass on to States could themselves be based on costs that importers or other vendors have incurred and passed along the supply chain. (Hines Decl. ¶ 48.) For the States to calculate and verify every tariff-based cost passed on to the States, identify the vendors, contractors, or importers from whom to seek repayment, and then somehow force each of those parties to repay those costs would not be practicable.

### 3. President Trump's misuse of IEEPA to impose, modify, escalate, or suspend tariffs on whim seriously impairs budgeting processes.

The IEEPA Tariffs are already harming States' ability to plan and develop budgets. The constantly changing IEEPA Tariffs deprive the States of reasonable certainty as to how much

Page 32 - MOTION FOR PRELIMINARY INJUNCTION

goods and services will cost, which bids from contractors are the lowest, and what their agencies and universities can afford.

President Trump's unpredictable changes to the IEEPA Tariffs have injected further, severe uncertainty as to the future. Over the past three months, the effective tariff rates on Canada, Mexico, China, and the rest of the world have fluctuated wildly, including the IEEPA Tariffs on imports from China ranging from 10 percent to 145 percent. The sudden and drastic increases, pauses, and exceptions to the tariffs, as well as the President's recent threats to increase tariffs again, have made it impossible for the States to form expectations with any degree of reasonable certainty. *See, e.g.*, David Goldman, *Trump Starts the Clock for New Tariffs to Take Effect*, CNN (Apr. 23, 2025) https://www.cnn.com/2025/04/23/business/new-tariffs-trump-weeks (quoting the President as threatening to impose tariffs "[o]ver the next two, three weeks").

The resulting uncertainty frustrates the States' budgeting. The States' agencies and universities cannot properly set their budgets if they lack reasonable certainty as to how much goods and materials will cost over the coming year. *See* Section II.D, above. If state entities must plan their budgets with a potential tariff rate on any given item ranging from 10 to 145 percent, depending on whether the President decides to increase, suspend, or modify a tariff on any given date, that undermines their ability to allocate resources and make investments. (*E.g.*, Ramsdell Decl. (Or.) ¶ 11; Shabram Decl. (Or.) ¶ 16; Ward Decl. (Ariz.) ¶ 9–10); *cf. Invenergy*, 422 F. Supp. 3d at 1291–92 (finding irreparable harm in the form of business uncertainty, including unexpected tax consequences that would "severely disadvantage [the plaintiff's] projects to the points where some likely will not be developed as planned … and others might not be developed at all"). To account for that, many state entities must set aside funding for tariff contingencies, necessarily reducing funds available for investments in research equipment, as well as infrastructure and other public services. (*E.g.* Shabram Decl. (Or.) ¶ 18; Ramsdell Decl. (Or.) ¶ 7; Jaros Decl. (Colo.) ¶ 38.)

Page 33 - MOTION FOR PRELIMINARY INJUNCTION

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Impairing budgeting has knock-on effects, too. For the University of Oregon, the uncertainty about tariff policies means its departments are unable to precisely forecast budgets when applying for grants. (Shabram Decl. (Or.) ¶ 17.) And its neuroimaging center lacks sufficient financial certainty to determine whether it will need to operate a reduced capacity if its end-of-life MRI machine is decommissioned. (*Id.*) Likewise, the Oregon Department of Transportation is faced with a conundrum when budgeting for capital improvement projects—if it does not set aside enough funds for tariff contingencies, it may need to cancel projects; but if it over-programs costs, it risks losing federal funding for the projects. (Ramsdell Decl. (Or.) ¶ 7.)

Similar harms are shared across the States. *See* Section II.D, above. And without a preliminary injunction, President Trump's continued assertion of authority under IEEPA to repeatedly change tariff rates will continue to frustrate the States' budgeting. Those injuries cannot be remedied later.

### 4. President Trump's misuse of IEEPA to impose tariffs causes irreparable procedural and related harm.

Lastly, the States are irreparably harmed by President Trump's misuse of IEEPA to bypass procedural requirements of the appropriate tariff statutes. Specifically, had the President used either Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. §§ 1801–1991, or Section 201 of the Trade Act of 1974, 19 U.S.C. §§ 2101–2497b, the applicable procedural requirements would have required the federal government to take a reasoned approach to tariffs and provided an opportunity for the States to influence the government's decision-making. Because President Trump continues to threaten to impose new tariffs under IEEPA, a preliminary injunction is necessary to avoid further irreparable procedural harm and related harms. *See Invenergy*, 422 F. Supp. 3d at 1291 ("If the court were to issue a decision on the merits ordering USTR to undertake a notice and comment process for reconsideration of the Exclusion without first issuing a PI, the Withdrawal would become the new status quo and USTR may be less likely to consider other views.").

Page 34 - MOTION FOR PRELIMINARY INJUNCTION

Section 232 is the appropriate authority for Defendants to impose tariffs based on national security concerns. When the President exercises his authority under Section 232, he must adhere to certain procedural requirements, including the Secretary of Commerce's initial investigation, the Secretary's report and recommendation, and a limitation on the President's tariff authority to the findings for which he concurs with the Secretary. *See* 19 U.S.C. § 1862 (specifying procedure and authorities); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1257–58 (Fed. Cir. 2023) (summarizing). By improperly invoking IEEPA instead of Section 232 to address supposed national security threats with tariffs, President Trump has bypassed those procedural protections.

Those procedural protections ensure that trade policy responses to national security are made on a reasoned basis to avoid needless business uncertainty, which the States rely on to make sound procurement and budgeting decisions. *See Invenergy*, 422 F. Supp. 3d at 1291 (holding that procedural violation "cause[d] irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects"). And President Trump's continued threatening of further tariffs under IEEPA demonstrates his intent to bypass those procedural protections again, which will cause irreparable business-certainty harm without a preliminary injunction.

Similarly, the States are irreparably harmed by the procedural and business-certainty harms caused by bypassing the protections of Section 201. Section 201 is the appropriate tool for a President to address surges in imported goods that harm domestic industry. Under Section 201, the President's authority to impose tariffs to address that harm requires the U.S. International Trade Commission to determine that the imports are "a substantial cause of serious injury, or the threat thereof, to the domestic industry." 19 U.S.C. § 2251(a). In turn, the Commission's determination may only be made after an investigation, during which the Commission must "afford interested parties and consumers an opportunity … to present evidence [or] comment" on the issue. 19 U.S.C. § 2252(b)(3). Thus, the President's bypassing of that procedure with hasty

Page 35 - MOTION FOR PRELIMINARY INJUNCTION

IEEPA orders not only irreparably harms business certainty, but it also causes irreparable procedural harm by denying States the opportunity to influence the resulting trade policy.

**D.    The equities and public interest weigh heavily in favor of an injunction.**

The final two elements of the test for preliminary relief—the balance of the equities and the public interest—merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors require the court to consider the parties' respective hardships should the injunction be granted, as well as whether an injunction serves the public's interest. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018); *Winter*, 555 U.S. at 25–29.

To begin, there is a strong public interest in protecting the rule of law and not allowing the executive branch to unlawfully impose tariffs on the world at its whim, muddled by threats, additions, exceptions, and pauses. *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law[.]"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Invenergy*, 422 F. Supp. 3d at 1294, *modified*, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) (quoting *Am. Signature, Inc.*). That interest is heightened where, as here, the President's unlawful actions have devastating economic consequences nationwide. (Hines Decl. ¶¶ 54–55); *see also Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (Internal quotations omitted.)); *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (public interest includes "the consequences of granting or denying the injunction to non-parties"); *Bernhardt v. Los Angeles County*, 339 F.3d 920, 932 (9th Cir. 2003) (same).

Balancing the parties' relative harm, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1231 (Fed. Cir. 1985) (rejecting a defendant's

Page 36 - MOTION FOR PRELIMINARY INJUNCTION

request to "continue the alleged infringements at the rate they occurred when the suit was filed, even though the assessment of likelihood of success had shown that such acts would probably be held unlawful"). Moreover, while the States are seeking to prevent immediate and irreparable harms, *see* Section IV.C, above, a preliminary injunction will not affect the long-term goals identified by President Trump to support his unlawful tariffs. The trade deficits that President Trump has identified are neither "unusual" nor "extraordinary." Rather, they have been a feature of U.S. trade policy for decades. Some identified harms, such as the loss of manufacturing jobs, have taken place over the span of decades and likely will require decades to reverse. *See* Executive Order 14257, 90 Fed. Reg. 15041, 15044 (describing manufacturing "trends" from 1997 to 2024). And because none of the tariffs bear a reasonable connection to remedying the identified threat, whatever threat exists will continue to do so regardless of whether the tariffs are implemented.

Thus, any burden to the federal government amounts to the restoration of what has long been the non-emergent status quo. *See Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) ("The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits."); *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1404–05 (Fed. Cir. 2022) (Although "not the sole objective" of preliminary injunctions," preservation of the status quo "is inherent in the four preliminary injunction factors—particularly in the 'irreparable harm' and 'balance of hardships' factors."). *See also Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) ("The 'status quo' to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy." (Internal quotations and alterations omitted.)). And an injunction against imposing tariffs under IEPPA would not affect any power the President might have under other laws to pursue his trade policies. *See, e.g.*, 19 U.S.C. § 1338; 19 U.S.C. § 2411.

Page 37 - MOTION FOR PRELIMINARY INJUNCTION

**E.    A nationwide injunction is necessary to provide complete relief.**

In crafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (quotation omitted). The scope of the harm determines the scope of relief for preliminary injunctions. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."). *See also* 5 U.S.C. §§ 702–703, 706 (authorizing injunctive relief and the "set[ting] aside" of agency action under the APA). Courts have "consistently recognize[d] the authority of district courts to enjoin unlawful policies on a universal basis" in various circumstances, including when necessary to provide complete relief to the plaintiffs, where "a more limited injunction" would "needlessly complicate agency and individual action in response," where there is a particular need for uniformity, "where the plaintiffs are dispersed throughout the United States," or "to avoid the chaos and confusion of a patchwork of injunctions." *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (internal quotations and citation omitted; discussing the "important need for uniformity in immigration policy"); *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) ("A nationwide injunction may be warranted where it is necessary to provide complete relief to the plaintiffs, to protect similarly situated nonparties, or to avoid the chaos and confusion of a patchwork of injunctions." (Internal quotations and citations omitted.)).

Here, a nationwide injunction is appropriate. First, only a nationwide injunction will provide complete relief. The States purchase goods and services through vendors. Thus, even if the IEEPA Tariffs are not applied *directly* on them, they will nonetheless continue to incur financial harm when purchasing or contracting for necessary equipment and supplies essential to their economies. *See* Section II.D, above. A more limited judgment would be unworkable and likely would require enjoining enforcement of the IEEPA Tariffs against all existing and future

Page 38 - MOTION FOR PRELIMINARY INJUNCTION

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

vendors who deliver goods, or who use imported materials in the production of those goods, that are delivered to the geographically dispersed States.

To be sure, a nationwide injunction will provide relief to nonparties as a *collateral consequence*. But that collateral consequence does not mean that a nationwide injunction is unnecessary to provide *complete relief*. Using the example of the construction of a bridge that will be too low for a shipper to pass underneath, enjoining "construction" will benefit the individual shipper who sued as well as "all the other shippers who did not sue." *League of United Latin Am. Citizens v. Exec. Off. of the President*, __ F.Supp.3d __, 2025 WL 1187730, at *59 (D.D.C. Apr. 24, 2025) (citing *Com. of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 564, 14 L. Ed. 249 (1852)). "But it does not follow that the injunction's scope is improper; the remedy is tailored to the injury of the lone prevailing party." *Id*. So too here.

Even if the Court were able to craft an injunction that afforded the States complete relief and which had no collateral effect on nonparties, such a remedy would raise serious constitutional questions. The Uniformity Clause requires that "all Duties, Imposts and Excises shall be uniform throughout the United States." Art. I, § 8, cl. 1. "The purpose of this clause is to prevent the federal government from discriminating between states when levying taxes and duties." *Thyssenkrupp Materials NA Inc. v. United States*, 498 F. Supp. 3d 1372, 1380 (Ct. Int'l Trade 2021) (citing *Knowlton v. Moore*, 178 U.S. 41, 89 (1900)). A "tax is uniform when it operates with the same force and effect in every place where the subject of it is found." *Edye v. Robertson*, 112 U.S. 580, 594 (1884). Enjoining tariffs when one of the States acts as the importer risks accomplishing what Congress plainly cannot—"actual geographic discrimination." *See United States v. Ptasynski*, 462 U.S. 74, 85 (1983). Even short of constitutional concerns, there is an important need for uniformity in this area. *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (noting "important 'need for uniformity in immigration policy'").

Page 39 - MOTION FOR PRELIMINARY INJUNCTION

Finally, this Court should not require the States to post security. Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But the Court has the discretion whether to require a bond. *Zenith Radio Corp. v. United States*, 518 F. Supp. 1347, 1349 (Ct. Int'l Trade 1981) (discussing the court's discretion in setting security). The Court should exercise its discretion to waive that requirement here.

## V.    CONCLUSION

The States' motion for a preliminary injunction should be granted.

 DATED: May 7, 2025

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon


By: */s/ Brian Simmonds Marshall*
Benjamin Gutman
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue*
Leigh A. Salmon**
Nina R. Englander*
Senior Assistant Attorneys General
YoungWoo Joh
Alexander C. Jones*
Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Brian.S.Marshall@doj.oregon.gov
Chris.Perdue@doj.oregon.gov
Leigh.A.Salmon@doj.oregon.gov
Nina.Englander@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Alex.Jones@doj.oregon.gov

Attorneys for the State of Oregon

**KRISTIN K. MAYES**
Attorney General
State of Arizona


By: */s/ Syreeta A. Tyrell*
Joshua D. Bendor*
Solicitor General
Syreeta A. Tyrell*
Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
Peter J. Farrell*
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of Minnesota

**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
Chief Deputy Attorney General
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov

Attorneys for the State of New Mexico

Page 41 - MOTION FOR PRELIMINARY INJUNCTION

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson*
Assistant Chief Deputy Attorney General
Gretchen Helfrich
Deputy Chief, Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

Attorneys for the State of Illinois


**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine

* *Admission application forthcoming*

** *Admission application pending*


**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Special Counsel for Federal Initiatives
(929) 638-0447
Mark Ladov**
Special Counsel
Office: (212) 416-8240
Cell: (347) 814-9434
28 Liberty St.
New York, NY 10005
rabia.muqaddam@ag.ny.gov
mark.ladov@ag.ny.gov

Attorneys for the State of New York


**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane*
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

Attorneys for the State of Vermont

Page 42 - MOTION FOR PRELIMINARY INJUNCTION

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B), I certify that the States' memorandum of law, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, counsel's signature blocks, this certificate, and the proposed order), does not exceed 14,000 words.

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Senior Assistant Attorneys General
Oregon Department of Justice

Of Attorneys for the State of Oregon

Page 43 - MOTION FOR PRELIMINARY INJUNCTION

**PROPOSED ORDER**

THE STATE OF OREGON, THE STATE OF
ARIZONA, THE STATE OF COLORADO,
THE STATE OF CONNECTICUT, THE
STATE OF DELAWARE, THE STATE OF
ILLINOIS, THE STATE OF MAINE, THE
STATE OF MINNESOTA, THE STATE OF
NEVADA, THE STATE OF NEW MEXICO,
THE STATE OF NEW YORK, and THE
STATE OF VERMONT,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his capacity as
President of the United States;
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; UNITED STATES
CUSTOMS AND BORDER PROTECTION;
PETER R. FLORES, in his official capacity as
Acting Commissioner for U.S. Customs and
Border Protection; and THE UNITED
STATES,

        Defendants.

Case No. 1:25-cv-00077-GSK-TMR-JAR

ORDER ON MOTION FOR A
PRELIMINARY INJUNCTION

This matter is before the Court on the plaintiff States' Motion for Preliminary Injunction.

Upon consideration of the Motion and record thereon, and for the reasons set forth in the States'

Memorandum of Law, it is hereby:

    ORDERED that the Motion is GRANTED; and it is further

    ORDERED that the United States, the U.S. Department of Homeland Security and its

Secretary Kristi Noem, U.S. Customs and Border Protection and its Acting Commissioner Peter

R. Flores, and other persons who are in active concert or participation with them are hereby

ENJOINED during the pendency of this litigation, including any appeals, from implementing or

enforcing the following executive orders, as amended:

Page 44 - PROPOSED ORDER

- **Executive Order 14193** ("Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border"), 90 Fed. Reg. 9113 (February 1, 2025), as amended by Executive Order 14197, 90 Fed. Reg. 9183 (February 3, 2025) and Executive Order 14231, 90 Fed. Reg. 11785 (March 6, 2025);

- **Executive Order 14194** ("Imposing Duties To Address the Situation at Our Southern Border")**,** 90 Fed. Reg. 9117 (February 1, 2025), as amended by Executive Order 14198, 90 Fed. Reg. 9185 (February 3, 2025) and Executive Order 14232, 90 Fed. Reg. 11788 (March 6, 2025);

- **Executive Order 14195** ("Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China"), 90 Fed. Reg. 9121 (February 1, 2025), as amended by Executive Order 14228, 90 Fed. Reg. 11463 (March 3, 2025) and Executive Order 14256, 90 Fed. Reg. 14899 (April 2, 2025);

- **Executive Order 14257** ("Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits"), 90 Fed. Reg. 15041 (April 2, 2025), as amended by Executive Order 14259, 90 Fed. Reg. 15509 (April 8, 2025) and Executive Order 14266, 90 Fed. Reg. 15625 (April 9, 2025); and

it is further ORDERED that the U.S. Customs and Border Protection and other persons who are in active concert or participation with it are hereby ENJOINED during the pendency of this litigation, including any appeals, from implementing or enforcing any agency action implementing the executive orders enjoined above, including Cargo Systems Messaging Service (CSMS) # 64297449 (issued March 3, 2025), CSMS # 64336037 (issued March 6, 2025), CSMS # 64297292 (issued March 3, 2025), CSMS # 64335789 (issued March 6, 2025), CSMS #

Page 45 - PROPOSED ORDER

64299816 (issued March 3, 2025), CSMS # 64701128 (issued April 10, 2025), and CSMS #

64724565 (issued April 11, 2025).


DATED: _____          _____

         New York, New York          Judge


Page 46 -  PROPOSED ORDER

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000