IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | Case No.  1:25-cv-00077-GSK-TMR-JAR<br><br>DECLARATION OF<br>PROFESSOR JAMES R. HINES JR. |

Plaintiffs,

v.

DONALD J. TRUMP, in his capacity as
President of the United States;
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of the Department of
Homeland Security; UNITED STATES
CUSTOMS AND BORDER PROTECTION;
PETER R. FLORES, in his official capacity as
Acting Commissioner for U.S. Customs and
Border Protection; and THE UNITED
STATES,

Defendants.

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 1 of 35

# Table of Contents

I.  Qualifications and methods...............................................................................................1

    A.  Qualifications. ...........................................................................................1

    B.  Methods....................................................................................................1

II.  The Economic background. ..............................................................................2

III.  U.S. Current account deficits and U.S. manufacturing....................................11

IV.  Scope of recent tariff action. ..........................................................................15

V.  Economic impact of tariff action. ....................................................................18

VI.  Impact of tariffs on prices of imported goods.................................................23

VII.  Exposures of state governments.....................................................................25

VIII.  Evaluation of recent tariff action. ..................................................................32

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

# I.    Qualifications and methods.

## A.    Qualifications.

1.    I teach at the University of Michigan, where I am the Richard A. Musgrave Collegiate Professor of Economics in the Department of Economics and the L. Hart Wright Collegiate Professor of Law in the law school.  My scholarly work concerns various aspects of government finance.  I have a B.A. and M.A. from Yale University and a Ph.D. from Harvard University, all in economics.

2.    Prior to joining the Michigan faculty, I was a full-time faculty member first at Princeton University and then at Harvard University; additionally, I have held visiting appointments at Columbia University, the London School of Economics, the University of California-Berkeley, the University of Melbourne, and Harvard Law School.  I have testified before Congress on nine occasions, and in 2017 received the National Tax Association's Daniel M. Holland Medal for lifetime achievement in the study of public finance.

3.    I am a past President of the American Law & Economics Association and am the current President of the International Institute of Public Finance.  I am a Research Associate of the National Bureau of Economic Research, Research Director of the International Tax Policy Forum, a Fellow of the CESifo group in Germany, an International Research Fellow of the Centre for Business Taxation at Oxford University, and a Fellow of the Society for Empirical Legal Studies.  I am a former Co-Editor of the American Economic Association's Journal of Economic Perspectives and previously served as an Economist in the Bureau of Economic Analysis of the U.S. Department of Commerce.  Exhibit A provides more details about my experience and publications.

4.    I am being paid $250 per hour for my work on this matter, which represents a significant discount from my usual rate for expert witness or other consulting work.

## B.    Methods.

5.    This report was prepared based on reviews of the available evidence in the economics literature, and analysis of data available from various government documents and websites.

Page 1 -    DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 3 of 35

## II.    The Economic background.

6.    The U.S. economy was performing very well prior to the recent tariff actions of the U.S. government.  In calendar year 2024, U.S. gross domestic product (GDP) was $29.2 trillion, and $85,784 per capita, making the United States by far the world's largest economy, and Americans among the richest people in the world.  World Bank data indicate that, in 2023, and among all the world's countries other than a few small oil producers and tax havens, only Switzerland had a per capita income adjusted for purchasing power parity exceeding that of the United States;[1] the adjusted (in 2021 dollars) U.S. per capita income of $74,578 significantly exceeded the European average of $53,832, and also significantly exceeded the average incomes of Canada ($56,714), Australia ($60,447), the United Kingdom ($52,582), and Japan ($45,915).

[1] The World Bank data are available at https://data.worldbank.org/indicator/NY.GDP.PCAP.PP.KD.  In addition to the oil exporting countries Brunei, Norway, and Qatar, five small tax havens – Bermuda, the Cayman Islands, Ireland, Monaco, and Singapore – had reported per capita GDPs that exceeded the United States; but reporting difficulties can make it difficult to compare these GDPs to those of larger countries that are not tax havens.

Page 2 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 4 of 35

7.    U.S. economic affluence is the product of many decades of consistent economic growth.  Figure 1 depicts U.S. per capita income, in real (year 2017) dollars, for the years since World War Two.[2]  The shaded areas in the graph represent economic recession years – and predictably, economic growth falls during these occasional recessions, most recently during the Covid crisis.  The U.S. pattern, however, is that, in the years following these recessions, average U.S. income resumes a consistent upward path.  And that was indeed the experience of the U.S. economy following its recovery from the Covid crisis.

**Figure 1: U.S. Per Capita annual GDP, in Real (2017) Dollars.**



---

[2] The data depicted in this graph come from the U.S. Department of Commerce, Bureau of Economic Analysis, via the FRED website provided by the Federal Reserve Bank of St. Louis, and are available at https://fred.stlouisfed.org/.

Page 3 -    DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 5 of 35

8.     Furthermore, the U.S. economy did not face significant evident headwinds prior to 1 February 2025.  In its January 2025 projections of the budget and economic outlook for 2025-2035,[3] the Congressional Budget Office forecasted consistent annual real (inflation-adjusted) GDP growth of roughly two percent, which matches the U.S. experience over the last 25 years.  Figure 2 presents the Congressional Budget Office data on annual inflation-adjusted GDP growth over the last 25 years, and its projections for 2025-2035.

**Figure 2: U.S. Per Capita Inflation-Adjusted Annual GDP Growth Rates — Historical and CBO Projections.**



9.     High U.S. incomes translate into very high consumption levels for Americans; in 2024, per capital U.S. consumption expenditures were $58,272.  The World Bank international comparisons project indicates that the United States had the highest actual individual consumption per capita of any country in 2021, the last year for which internationally comparable consumption data were available.[4]

---

[3] Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

[4] These data are available at https://www.worldbank.org/en/programs/icp.

Page 4 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 6 of 35

10.    Over time, real U.S. consumption levels have exhibited the same consistent growth as has real U.S. GDP.  Figure 3 depicts U.S. per capita consumption, in real (year 2017) dollars, for the years since World War Two.  The pattern in Figure 3 matches that of Figure 1, steadily rising despite occasional dips due to recessions.

**Figure 3: U.S. Per Capita Annual Consumption, in Real (2017) Dollars.**



Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

11.    The U.S. labor market was similarly well situated.  The January 2025 U.S. unemployment rate of 4.0 percent was quite low by the standards of the last 75 years of U.S. economic history.  Figure 4 depicts monthly seasonally-adjusted U.S. unemployment rates, as calculated by the Bureau of Labor Standards and reported by the Federal Reserve Bank of St. Louis.  Only on brief occasions over the last 50 years has the U.S. unemployment rate been 4.0 percent or below.  While the Congressional Budget Office in January 2025 did not anticipate that the U.S. unemployment rate would remain this low, its 10-year projection was that the U.S. unemployment rate would rise only slightly, settling at a historically-favorable 4.3 percent rate, as depicted in Figure 5.[5]

**Figure 4: U.S. Monthly Unemployment Rate, Seasonally Adjusted.**



---

[5] The data underlying Figure 4 are available at https://fred.stlouisfed.org/series/UNRATE. Figure 5 is drawn from Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

Page 6 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

**Figure 5: CBO Projections of U.S. Unemployment.**



Page 7 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 9 of 35

12.     U.S. labor market health is also reflected in steady wage growth.  Since the year 2000, nominal U.S. wages have grown by roughly three percent each year, producing real purchasing power gains given a prevailing inflation rate of somewhat below two percent.  And as of January 2025, the Congressional Budget Office projected U.S. wages to continue growing at a three percent annual rate over the next ten years, while inflation was projected to persist at two percent.  Figure 6 presents these wage projections.[6]

**Figure 6: U.S. Annual Wage Growth — Historical and CBO Projections.**



--------

[6] Wage and inflation projections are available in Congressional Budget Office, The Budget and Economic Outlook: 2025 to 2035 (Washington, DC: Congressional Budget Office, January 2025).

Page 8 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 10 of 35

13.    It is also useful to consider the evolution over time of wages earned by workers at the median of the wage distribution.  Figure 7 presents Bureau of Labor Standards calculations of median weekly earnings, in 1982 - 1984 dollars adjusted for changes in the consumer price index.  Median earnings capture not only the labor market opportunities available to workers, but also the extent to which workers with different levels of human capital and labor market experience participate in the labor market.  Figure 7 indicates that median wages kept pace with inflation between 2000 and 2014, but that real wages significantly increased over the following ten years.

**Figure 7: Median Usual Weekly Real Earnings.**



Page 9 -   DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 11 of 35

14.     It is clear from this and other evidence that the U.S. economy was performing at a high level as of January 2025, and indeed had performed at a high level over many years, despite occasional setbacks such as the Covid crisis.  To be sure, there were concerns that U.S. economic performance might be difficult to sustain with an aging workforce, costly entitlement programs, and persistent government budget deficits.  But one of the encouraging aspects of the high level of average U.S. incomes, average wages, average consumption, and high rate of employment is that these features of the U.S. economy were projected to persist strongly into the future, despite potential headwinds from other considerations.  There was no U.S. economic crisis in January 2025.

Page 10 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 12 of 35

## III.   U.S. Current account deficits and U.S. manufacturing.

15.     The United States has run persistent current account deficits since the mid-1970s, which means that imports of goods and services consistently exceed exports.  In 2024, the United States exported goods and services worth $3.1802 trillion, representing 10.9 percent of GDP.   In the same year, the United States imported goods and services worth $4.0833 trillion, representing 14.0 percent of GDP.[7]  The resulting current account deficit of 3.1 percent of GDP is typical of recent years; and imports exceeding exports has been a consistent feature of the U.S. economy since the mid-1970s.  Note that it is standard in such calculations to consider trade in goods and services combined, rather than separating these two categories, in part because traded goods often embody significant service components, and in part because goods and services both have economic value for which importers pay.  The economics literature offers no reasons to focus exclusively on trade in goods or trade in services, instead indicating that what matters for policy and for our evaluation of economic performance is the sum of goods and services.  This is the same reason why goods and services are combined in calculating individual incomes, economic output, and GDP.[8]

---

[7] U.S. Bureau of Economic Analysis, U.S. International Trade in Goods and Services, December and Annual 2024, 5 February 2025, https://www.bea.gov/news/2025/us-international-trade-goods-and-services-december-and-annual-2024.

[8] In calculating its national income, the former Soviet Union used a method that routinely disregarded much of the output of its service sector, thereby focusing official attention on tangible goods and manufacturing.

Page 11 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 13 of 35

16.    Figure 8 presents net U.S. exports of goods and services as a fraction of GDP for the last 100 years, as calculated by the Bureau of Economic Analysis and reported by the Federal Reserve Bank of St. Louis.[9]  It is evident from the figure that imports of goods and services have exceeded exports by amounts that are volatile over time, but that has stabilized at roughly three percent of GDP annually for the last 15 years.

**Figure 8: U.S. Net Imports of Goods and Services as Shares of GDP.**



17.    Despite running persistent trade deficits, the U.S. economy has thrived over the 50 years since the mid-1970s.  If trade deficits were damaging to economic performance, there should be ample evidence by now – but instead, the evidence if anything points in the opposite direction, one of a healthy U.S. economy with a current account deficit.

---

[9] See https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 12 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 14 of 35

18.     The Trump administration's 2 April 2025 tariff announcement called attention to low U.S. manufacturing output as a component of a national emergency that warrants the introduction of new tariffs.  It is true that over time U.S. manufacturing has declined as a fraction of the U.S. economy – a pattern that is typical of wealthy countries, and a reflection of structural transformations associated with technology changes and rising economic affluence.[10]  U.S. manufacturing value added – manufacturing output minus the value of inputs purchased from suppliers – was 9.9 percent of U.S. GDP as of the end of 2024, representing a decline from 13.1 percent 20 years earlier.  Figure 9 presents this series as calculated by the Bureau of Economic Analysis and reported by the Federal Reserve Bank of St. Louis.[11]

**Figure 9: U.S. Manufacturing Value Added as a Share of GDP.**



Source: U.S. Bureau of Economic Analysis via FRED®
*Shaded areas indicate U.S. recessions.*
myf.red/g/1lOXL

---

[10] For a comprehensive review of the evidence of long-run structural determinants of the declining manufacturing share of the economy, see Robert Z. Lawrence, Behind the curve: Can manufacturing still provide inclusive growth? (Washington DC: Peterson Institute for International Economics, 2024).  Similarly, Timothy J. Kehoe, Kim J. Ruhl, and Joseph B. Steinberg, Global imbalances and structural change in the United States, Journal of Political Economy, April 2018, 126 (2), 761-796, presents evidence that no more than 15 percent of the

Page 13 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 15 of 35

19.     Despite recent declines, manufacturing remains an important part of the U.S. economy, with 12.8 million employees as of January 2025.  Figure 10 presents the history of total U.S. employment in manufacturing, as calculated by the Bureau of Labor Statistics and reported by the Federal Reserve Bank of St. Louis.

**Figure 10: U.S. Manufacturing Employment.**



20.     Figure 10 indicates that U.S. manufacturing employment peaked in the 1980s, declined over the subsequent two decades, and then dropped considerably between 2000 and 2010.  Total manufacturing employment has risen somewhat over the last 15 years.

decline in U.S. goods-sector employment between 1992 and 2012 is attributable to U.S. trade deficits.

[11] See https://fred.stlouisfed.org/series/VAPGDPMA.

Page 14 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 16 of 35

21.     There is no crisis or emergency in U.S. manufacturing.  Instead, activity levels of U.S. manufacturing firms ebb and flow as they are subject to the forces of supply and demand, within the United States and internationally; the same is true of all other U.S. industries.  And as with other industries, supply and demand in manufacturing can be affected by U.S. and foreign government policies.  Despite or perhaps because of these government policies, it is clearly feasible, and indeed profitable, for U.S. manufacturers to persist and thrive in business, as evidenced by their contribution of 9.9 percent of the U.S. economy and employment of 12.8 million people.

22.     If the U.S. government believes that the U.S. economy would benefit from having additional domestic manufacturing activity, it can offer favorable tax treatment or other subsidies that would encourage greater investment in manufacturing.  Tariffs on imported manufacturing goods are extremely inefficient alternatives to such subsidies.  While such tariffs have the potential to help some domestic firms whose output competes with imported goods, the assistance that tariffs offer is indirect and very costly relative to the benefits they might deliver to U.S. manufacturers.  The economic principle of targeting is that efficiently-designed remedies are directed at the problems they seek to solve.  Imposing costly tariffs to assist domestic manufacturing makes little sense given that governments have access to normal tax and spending policies that are much more cost-effective in subsidizing the activities of specific industries.

## IV.    Scope of recent tariff action.

23.     The Trump administration has announced a series of tariff actions that collectively impose 10 percent across the board tariffs on imported goods, with specific countries and products targeted with higher rates.  There are also limited exceptions to these tariffs. Automobiles, steel and aluminum are subject to higher tariff rates based on separate tariff authorities but are not subject to IEEPA-based tariffs.  Imports from Canada, Mexico, and China are subject to higher IEEPA-based tariffs, and the administration has announced that imports from a large number of countries will be subject to tariffs at rates significantly exceeding 10 percent in an effort to reduce or eliminate the associated U.S. bilateral trade deficits.

Page 15 - DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 17 of 35

24.     The 10 percent tariffs are entirely unjustified by U.S. economic conditions, as are the higher rates on specified products, and the higher rates on imports from Canada, Mexico, China, and other countries.  There is no coherent economic theory or model that implies that a 10 percent tariff rate is warranted by economic conditions in the United States; nor that a 10 percent tariff would enhance U.S. wages or U.S. consumption.  Instead, the 10 percent tariff figure appears to be entirely arbitrary.

25.     Bilateral trade deficits are differences between amounts imported from, and exported to, specific foreign countries.  The United States has bilateral trade deficits with many countries, which is why, collectively, U.S. net exports of goods and services look as they do in Figure 8.  Whatever economic significance there may be to the U.S. current account deficits depicted in Figure 8, there is clearly no economic significance to U.S. bilateral trade deficits with individual countries.  In a barter economy, trade between transacting parties is always balanced; in a market economy it is not.  Individuals in their daily lives "import" more from grocery stores than they "export" to them; but there is nothing wrong or undesirable about this trade imbalance, since it is a normal feature of a market economy, and does not prevent individuals (and grocery stores) from balancing their budgets and accounts.  Indeed, attempts to economize on grocery store purchases by growing one's own food, in an effort to shrink a consumer's "trade deficit" with grocery stores, would be highly inefficient and counterproductive to the goal of maximizing economic welfare.

26.     Bilateral international trade deficits are produced by normal trading imbalances. For example, the United States might export airplanes and agricultural products to Italy, and simultaneously import an equal value of clothes from Italy, producing balanced bilateral trade. Or the United States could export airplanes and agricultural products to Italy, Italy could export fabricated metal products to France, and France could export clothes to the United States.  In the second example, the United States has a bilateral trade deficit with France (and a trade surplus with Italy), but the U.S. economic outcomes (exports and imports, treating French fashions to be equivalent in dollar terms to their Italian counterparts) are unchanged from the first example.

Page 16 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 18 of 35

27.     The Trump administration's efforts to impose tariffs on imports from individual countries based on U.S. bilateral trade deficits with those countries do not correspond to any coherent theory of trade.  There is no theory that says that a country's trade should be balanced with each individual trading partner, any more than a customer's "trade" should be "balanced" with a grocery store.  It is of course possible to design tariffs that will ensure that a country does not have bilateral trade deficits; a tariff rate sufficiently high to eliminate all imports will clearly suffice, as would somewhat lower rates.  But tariffs set this way bear no connection to any coherent economic objectives.

28.     The Office of the U.S. Trade Representative provides a document ("Reciprocal Tariff Calculations") explaining the basis on which rates were chosen for the country-specific reciprocal tariffs announced on 2 April 2025.[12]  The lone equation appearing in this document, together with the assumed parameter values, implies that values of country-specific new tariffs will equal to the ratio of net U.S. imports from a country to gross U.S. imports from the same country.  The reciprocal tariffs announced on 2 April 2025 do not, however, correspond to the rates produced by this formula, since instead of being based on net imports and gross imports from individual countries, they are based on net and gross imports of goods only, ignoring services.  Furthermore, the announced reciprocal tariffs are exactly half the rates implied by the formula, with the important exception that the minimum tariff rate is ten percent.

29.     Tariff rates chosen this way bear scant if any connection to the stated objective of balancing bilateral trade.

---

[12] This document is available at https://ustr.gov/issue-areas/presidential-tariff-actions.

Page 17 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 19 of 35

30.     First, bilateral trade includes services as well as goods, but the calculations ignore net and gross service imports.  Second, the assumed 0.25 pass-through of tariffs to import prices (the parameter $\varphi$ in the document) is too low by a factor of four, since the available evidence, including the study cited in the document as the basis of the assumed 0.25 pass-through rate, indicates that pass-through is roughly one for one.  Third, there is no objective-based reason to divide the calculated tariff rate by two, or to impose a minimum ten percent rate.  And fourth and most importantly, it is simply wrong to assume, as the calculations do, that "offsetting exchange rate and general equilibrium effects are small enough to be ignored."

31.     Partial equilibrium is a property of individual markets; general equilibrium is a property of all markets together.  It is well understood that, to the extent that one market affects another, general equilibrium considerations mean that partial equilibrium reasoning delivers misleading answers.  In the present context, the relevant general equilibrium consideration is that trade with one country affects trade with another.  Consequently, when the United States imposes a tariff on trade with country A, the tariff will change the U.S. bilateral trade balance with country B and all other U.S. trading partners, in part by affecting relative currency values, and in part through the usual process of economic substitution.  The "Reciprocal Trade Calculations" document, in assuming away any general equilibrium effects, ignores these important realities.  As a result, even if the reciprocal tariffs were imposed exactly as described in the document, they would not support bilateral trade balance, nor would they advance any other objective.

## V.    Economic impact of tariff action.

32.     The foundation of any modern economic system is trade between market participants.  Trade permits people to work at jobs in which they perform limited numbers of tasks, and nonetheless lead lives in which they consume thousands of different goods and services.  People need not produce everything they consume, because they can trade their services, and anything they might produce, in exchange for purchasing power they can then use to obtain everything else they want and can afford.  Anyone living in the modern world is so accustomed to this system of trade that it can be easy to lose sight of just how pervasive it is.

Page 18 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 20 of 35

33.     This market process of producing one thing and consuming another operates internationally as well as within a country's borders.  International trade has many of the same characteristics as the ordinary economic transactions that take place continually within countries. Of course there are differences; for example, since transporting things over long distances can be expensive, international transactions are somewhat less common than ordinary domestic transactions.  And since governments control borders, they have the ability to impose tariffs on imported goods.

34.     Tariffs impede the functioning of market economies by inserting additional costs into the operation of supply and demand in international markets.  As a result of these additional costs, market actors forgo transactions that would otherwise be cost-reducing and therefore mutually beneficial.  For example, the introduction of tariffs on goods that firms in an industry use in their production processes will raise production costs, encouraging firms in the industry to do a combination of reducing their production and seeking methods of producing that rely less on imports.  Either of these reactions is costly to firms in the affected industry, for the simple reason that these options were available even prior to the introduction of tariffs – so the fact that the firm had not previously curtailed production or sought alternative production configurations indicates that it was costly to do so.

35.     It is inefficient to induce producers to modify their production plans, since in the absence of such inducement the market gives firms incentives to choose cost-minimizing production configurations.  The economic cost of distorting economic behavior is known as deadweight loss; and the magnitude of deadweight loss generally rises with the square of the tax or tariff rate that induces the behavior change.[13]  This square rule means that the cost of the economic distortion caused by a ten percent tariff is generally four times the cost of a five percent tariff on the same good; and a fifteen percent tariff would produce economic distortions that cost roughly nine times as much as those produced by a five percent tariff.  Notably, the distortions introduced by tariffs apply both to sellers and buyers of traded goods, since given their mutual dependence, both are affected.

_____

[13] For a mathematical derivation of the square rule, and references to the extensive associated literature, see Alan J. Auerbach and James R. Hines Jr., Taxation and economic efficiency, in

Page 19 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 21 of 35

36.    Tariffs are inefficient because a country could avoid the associated deadweight losses simply by not imposing the tariffs.  Countries that nevertheless persist in imposing significant tariffs do so at their economic peril.  In distorting their own trade patterns, these countries make their economies less productive, and their residents correspondingly less prosperous.  It is true that specific domestic firms that compete with importers can find their market positions improved by higher tariff-inclusive prices charged by their competitors, so firm owners and possibly also their employees can benefit from the market protection afforded by high tariffs.  But it is a mistake to extrapolate this benefit to economic activity as a whole.  Tariffs that protect and therefore benefit individual firms or industries come at an even larger cost to all firms and industries, so the net effect on incomes and employment is negative.  These offsetting effects of specific tariffs on the rest of the economy can materialize even in local markets with unusually high concentrations of firms that stand to benefit from tariffs.  Evidence of the impact of the U.S. tariffs introduced in 2018 shows no discernable employment gains in local commuting zones where firms were particularly exposed to competition from imports that were subject to the tariffs.[14]  Despite the benefits tariffs afforded local firms that compete with imports, the tariffs' accompanying costs of distorting economic activity effectively neutralized any benefits to the local labor market.

---

Alan J. Auerbach and Martin Feldstein, eds. Handbook of Public Economics, volume 3 (Amsterdam: North-Holland, 2002), 1347-1421.

[14] David Autor, Anne Beck, David Dorn, and Gordon H. Hanson, Help for the heartland? The employment and electoral effects of the Trump tariffs in the United States, National Bureau of Economic Research Working Paper No. 32082, January 2024.

Page 20 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 22 of 35

37.     In a market economy, workers are paid according to their economic productivities.  Those who live and work in a country with a more productive economy are themselves more productive, and therefore receive greater market compensation.  In distorting a country's production patterns, tariffs reduce the productivity of firms and workers, and therefore reduce the wages and salaries received by workers, and the personal consumption that labor earnings support.  In distorting the economy, and thereby reducing income levels, tariffs also make it more difficult to finance government activities since tax revenue is heavily dependent on incomes.  Cross-country comparisons consistently show that government expenditures rise at least proportionately with national incomes, a pattern that holds even for welfare expenditures.[15]

38.     Tariffs also damage economies by increasing the uncertainties and risks faced by firms, investors, workers, and consumers.  To the extent that tariffs were unanticipated at the time that important investment decisions were made, the introduction of new tariffs is a major source of uncertainty.  Once imposed, tariffs might be increased or reduced; and unilaterally imposed tariffs invite retaliation, though it can be difficult or impossible to anticipate what form any retaliation may take.  Consequently, market actors are left guessing what incentives they and their competitors will face, now and in the future.  Firms, investors, and other economic actors benefit from being able to plan their activities; and needless sources of uncertainty make everything they do more costly.  As a result, firms, investors, and financial markets commonly react adversely to significant uncertainties.[16]  Consequently, the economic costs of tariffs consist not only of their distortionary effects on economic incentives, but also the costs of the economic uncertainties that tariffs introduce.

---

[15] See James R. Hines Jr., Will social welfare expenditures survive tax competition? Oxford Review of Economic Policy, Fall 2006, *22* (3), 330-348.

[16] For evidence of the impact of economic uncertainty on economic output, employment, and stock market returns, see Nicholas Bloom, The impact of uncertainty shocks, Econometrica, May 2009, 77 (3), 623-685, and Scott R. Baker, Nicholas Bloom, and Stephen J. Terry, Using disasters to estimate the impact of uncertainty, Review of Economic Studies, March 2024, 91 (2), 720-747.

Page 21 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

39.     As economies have grown, and technological changes have reduced shipping and other transport costs, international trade has risen as a fraction of total economic activity.  Higher trade levels bring with them greater potential for tariff distortions to damage economic performance.  Research indicates that, even in the 1930s, with much lower levels of international trade relative to (then depressed) economic output, the distortions produced by tariffs significantly reduced U.S. investment and GDP.[17]  More recently, cross-country evidence for 151 countries between 1963 and 2014 suggests that higher tariff levels are associated with higher unemployment and declines in domestic output and productivity.[18]

40.     Tariffs announced by the Trump administration will distort the U.S. economy and reduce productivity accordingly.  There is considerable scope for economic damage, given that, in 2024, U.S. imports of goods and services were $4.0833 trillion, representing 14.0% of GDP.  A recent study by Mary Amiti, Stephen Redding, and David Weinstein estimates that the deadweight losses produced by the U.S. tariffs introduced in 2018 were roughly half the magnitude of the revenue collected.[19]  The 2018 tariffs that they analyze were much smaller in magnitude than the IEEPA-based tariffs, estimated to raise just $3.2 billion per month in revenue by the end of 2018.  Since deadweight loss rises with the square of the tariff rate, and the 2025 tariffs are so much larger, the lost economic value associated with the 2025 tariffs should be much more than half of the projected tariff revenue, representing a significant drag on the U.S. economy.

---

[17] See Mario J. Crucini and James Kahn, Tariffs and aggregate economic activity: Lessons from the Great Depression, Journal of Monetary Economics, December 1996, 38 (3), 427-467.

[18] See Davide Furceri, Swarnali A. Hannan, Jonathan D. Ostry, and Andrew K. Rose, Macroeconomic consequences of tariffs, NBER Working Paper No. 25402, December 2018.

[19] Mary Amiti, Stephen J. Redding, and David E. Weinstein, The impact of the 2018 tariffs on prices and welfare, Journal of Economic Perspectives, Fall 2019, 33 (4), 187-210,

Page 22 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 24 of 35

## VI.  Impact of tariffs on prices of imported goods.

41.     Tariffs are taxes on imports.  Consequently, in the absence of other price changes, tariffs increase per-unit costs of providing imported goods.  In a competitive market, goods are priced at cost, including any relevant economic opportunity costs, and certainly including the costs of taxes and tariffs.  It follows that, in a competitive market setting, tariffs will increase the net-of-tariff prices of imported goods on a one-for-one basis, unless the tariffs induce changes in prices or other components of production costs.  Since the world economy is large, with many buyers of traded goods, and many (competitive) sellers, there is ample reason to expect the competitive paradigm to offer an informative guide to the likely impact of tariffs.

42.     It is useful to consider possible exceptions to the rule of complete tariff pass-through to prices in competitive markets.  Since tariffs change trade and production levels and patterns, these changes can themselves affect factor prices and costs.  In a competitive export industry with rising marginal costs, tariff-induced output reductions will also reduce average costs, and these cost reductions can somewhat mitigate the effect of tariffs on final prices paid by importing firms and consumers.  Furthermore, it may be the case that some important exporters or importers have little market competition and therefore market power, which generally will mean that higher production costs are passed through to consumers on less than a one-for-one basis.  As a result, it is possible that a country might introduce or increase its tariffs without its own firms and consumers bearing the full costs of the tariffs.  The more economically competitive the scenario for firms and countries, particularly once enough time has elapsed for economic actors to react to any tariff changes, the less likely it is that tariff pass-through to final prices will be incomplete; but the impact of tariffs on import prices remains an empirical question.

Page 23 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 25 of 35

43.    Evidence from recent tariff experiences strongly supports the conclusion that higher tariffs increase the costs of imported goods to the end customer on close to a one-to-one basis.  Several studies consider effect of 2018 U.S. tariff increases on prices of U.S. imports, using variation in tariff intensity across goods and sectors to identify price effects.  These studies consistently find that import prices rose one-for-one with the tariffs.[20]  This evidence is consistent with the implications of the competitive-market model, which holds that importers, including the United States, are unable to obtain price discounts from foreign suppliers simply by imposing tariffs on them.  Instead, importing countries that introduce or raise tariffs impose costs on themselves in the form of the economic distortions introduced by their own tariffs.

---

[20] See Mary Amiti, Stephen J. Redding, and David E. Weinstein, The impact of the 2018 tariffs on prices and welfare, Journal of Economic Perspectives, Fall 2019, 33 (4), 187-210; Mary Amiti, Stephen J. Redding, and David E. Weinstein, Who's paying for the US tariffs? A longer term perspective, American Economic Review, Papers and Proceedings, May 2020, 110, 541-546; Alberto Cavallo, Gita Gopinath, Brent Neiman, and Jenny Tang, Tariff pass-through at the border and at the store: Evidence from US trade policy, American Economic Review: Insights, 2021, 3 (1), 19-34; Pablo D. Fajgelbaum, Pinelopi K. Goldberg, Patrick J. Kennedy, and Amit K. Khandelwal, The return to protectionism, Quarterly Journal of Economics, February 2020, 135 (1), 1-55.  Similarly, Mumtaz Ahmad and Imtiaz Ahmad, Tariff pass-through and implications for domestic markets: Evidence from U.S. steel imports, Journal of International Trade & Economic Development, 2024, 33 (3), 482-496, finds that imported steel prices rose one-for-one with the 2018 U.S. tariffs.  The study by Alberto Cavallo, Gita Gopinath, Brent Neiman, and Jenny Tang is occasionally misinterpreted to imply that tariff costs are not fully passed through to importers – which is not what the study finds.  Instead, a portion of the study considers evidence of prices charged to final consumers by two companies that sell imported goods, attempting to identify their pricing practices in response to higher supplier prices, and finding less than complete pass-through in the short run.

Page 24 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 26 of 35

# VII.  Exposures of state governments.

44.     Direct expenditures by state and local governments represent significant portions of total U.S. consumption and income every year.  For example, in 2022, the last year for which comprehensive data are available from the Census of Governments, direct expenditures by U.S. state and local governments summed to $4.296 trillion, representing 16.4 percent of U.S. GDP. Of these, the state governments of the 12 states that are parties to this action collectively had direct expenditures of $460 billion, representing 10.7 percent of the country's total subnational government spending.[21]  Notably, of this $4.296 trillion of total expenditures, $1.135 trillion, or 26 percent, represented wage and salary expense.  The remaining $3.161 trillion of direct expenditure represented a combination of payments to business entities for goods and services, and transfer payments to individuals.

45.     State government expenditures can be divided into two categories of potential exposure to tariff-related price increases.  The first category is higher purchase prices faced by state governments.  In order to understand the likely scope of tariff effects, it is helpful to review government purchasing patterns.  The Census of Governments provides information on direct expenditures by category; figures for 2022, including totals for the 12 states that are parties to this action, appear in Table 1.[22]

### Table 1: 2022 State and Local Government Direct Expenditures ($ billions)

| Expenditure Classification | S/L Total | 12 States | State% | S/L% |
|---|---|---|---|---|
| Total direct expenditure | 4,296.3 | 459.6 | 10.7 | 23.3 |
| Direct general expenditure | 4,027.0 | 444.0 | 11.0 | 23.3 |
| Capital outlay | 371.3 | 22.0 | 5.9 | 21.8 |
| Other direct general expenditure | 3,655.7 | 422.0 | 11.5 | 23.4 |

---

[21] These states are Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, Oregon, and Vermont.

[22] Information in Table 1 is drawn from https://www.census.gov/data/datasets/2022/econ/local/public-use-datasets.html.

Page 25 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 27 of 35

| | | | | |
|---|---|---|---|---|
| **Education services:** | | | | |
| Education | 1,264.4 | 76.9 | 6.1 | 22.4 |
| Capital outlay | 118.0 | 4.5 | 3.8 | 21.5 |
| Higher education | 340.4 | 53.2 | 15.6 | 19.3 |
| Capital outlay | 32.6 | 4.3 | 13.3 | 15.9 |
| Elementary & secondary | 832.7 | 6.3 | 0.8 | 23.9 |
| Capital outlay | 84.8 | 0.1 | 0.0 | 23.6 |
| Other education | 91.3 | 17.3 | 19.0 | 20.6 |
| Libraries | 14.1 | 0.1 | 0.6 | 26.9 |
| | | | | |
| **Social services and income maintenance:** | | | | |
| Public welfare | 971.0 | 216.4 | 22.3 | 25.4 |
| Hospitals | 261.2 | 19.6 | 7.5 | 17.5 |
| Capital outlay | 11.2 | 1.1 | 10.1 | 19.6 |
| Health | 154.3 | 16.4 | 10.6 | 17.5 |
| Employment security administration | 5.9 | 1.2 | 19.7 | 21.8 |
| Veterans' services | 1.5 | 0.1 | 9.1 | 9.9 |
| | | | | |
| **Transportation:** | | | | |
| Highways | 210.6 | 21.7 | 10.3 | 20.3 |
| Capital outlay | 115.5 | 13.2 | 11.4 | 18.9 |
| Air transportation (airports) | 31.3 | 0.2 | 0.6 | 29.1 |
| Parking facilities | 2.1 | 0 | 0.2 | 17.8 |
| Sea and inland port facilities | 6.9 | 0 | 0.4 | 10.7 |
| | | | | |
| **Public safety:** | | | | |
| Police protection | 139.9 | 4.0 | 2.9 | 22.8 |
| Fire protection | 64.0 | 0 | 0 | 22.3 |
| Correction | 91.3 | 11.3 | 12.4 | 21.1 |
| Capital outlay | 2.5 | 0.3 | 12.6 | 19.9 |
| Protective inspection and regulation | 19.1 | 1.6 | 8.4 | 15.3 |
| | | | | |
| **Environment and housing:** | | | | |
| Natural resources | 40.8 | 4.2 | 10.3 | 17.4 |
| Capital outlay | 7.3 | 0.3 | 3.6 | 16.5 |
| Parks and recreation | 50.8 | 1.6 | 3.2 | 25.5 |
| Capital outlay | 11.4 | 0.4 | 3.1 | 26.9 |
| Housing & community development | 74.0 | 3.2 | 4.3 | 24.7 |
| Sewerage | 70.2 | 0.1 | 0.2 | 18.1 |
| Capital outlay | 23.5 | 0 | 0.1 | 23.2 |
| Solid waste management | 29.8 | 0.2 | 0.8 | 20.9 |

Page 26 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 28 of 35

| | | | |
|---|---|---|---|
| Capital outlay | 2.0 | 0 | 0.4 | 33.5 |
| Governmental administration: | | | | |
| Financial administration | 70.7 | 10.4 | 14.7 | 21.4 |
| Judicial and legal | 56.8 | 7.6 | 13.5 | 23.8 |
| General public buildings | 18.0 | 0.6 | 3.6 | 23.1 |
| Other governmental administration | 47.3 | 2.2 | 4.7 | 19.7 |
| Interest on general debt | 104.3 | 10.9 | 10.4 | 31.0 |
| General expenditure, n.e.c.: | | | | |
| Miscellaneous commercial activities | 4.6 | 0 | 0.6 | 7.5 |
| Other and unallocable | 221.9 | 33.2 | 15.0 | 34.2 |
| Utility expenditure | 258.4 | 14.8 | 5.7 | 24.0 |
| Capital outlay | 57.6 | 1.7 | 2.9 | 23.3 |
| Water supply | 83.0 | 0.1 | 0.1 | 18.9 |
| Electric power | 84.0 | 7.3 | 8.9 | 19.9 |
| Gas supply | 7.2 | 0 | 0 | 9.1 |
| Transit | 84.1 | 7.4 | 8.8 | 34.2 |
| Liquor store expenditure | 11.0 | 0.8 | 7.6 | 8.9 |

46.    The first column in Table 1 is direct expenditures by all U.S. state and local governments, while the second column is direct expenditures by the state governments of the 12 states that are parties to this action.  The third column is the fraction of total U.S. state and local government spending represented by the 12 state governments that are parties to this action; and the fourth column is the fraction of total U.S. state and local government spending represented by the 12 states that are parties to this action, inclusive of both their state and local components.

Page 27 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 29 of 35

47.     The data in Table 1 indicate that the largest categories of state government expenditure are education; public welfare; hospitals and health; highways; corrections; financial and legal administration; electric utilities; and transit expenditures. While states vary in their distributions of these expenditures, the third column of Table 1 shows that the 12 states that are parties to this action have spending patterns that are broadly typical of U.S. state and local governments as a group. Thus for example, these 12 state governments represented 10.7 percent of all state and local government direct expenditures in 2022, including 6.1 percent of education spending, 10.3 percent of highway spending, and 8.9 percent of electric utility spending.

48.     Tariffs directly affect the prices paid by state governments for imported goods. They also affect the prices paid for goods that are produced domestically but that rely, either directly or indirectly, on imported components. For example, imported steel may be used by a U.S. domestic vehicle manufacturer to produce a garbage truck purchased by a local government. And imported plastics may be used by a robot company to produce robots that are in turn purchased by the vehicle manufacturer and used to produce garbage trucks ultimately purchased by local governments. Since tariffs raise the costs of imported production inputs, they have effects on all of the prices along the production chain.

49.     In order to trace the likely impact of tariffs on prices faced by state governments, it is necessary to identify the extent to which the goods that they purchase rely directly and indirectly on imports. Fortunately, it is possible to do so using the input-output matrix information on the U.S. economy produced by the Bureau of Economic Analysis of the U.S. Department of Commerce. These calculations use detailed information from periodic industrial censuses, updated with annual surveys, to identify the extent to which production of different commodities and industries rely on intermediate purchases from others. It is possible to use this information to infer how much steel production is required in garbage truck manufacture, taking account of the reality that many of the components of a garbage truck, and the equipment used in the manufacture of a garbage truck, themselves contain steel.

Page 28 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 30 of 35

50.     Importantly for the present purpose, it is possible to use the input-output matrix information to identify the extent to which goods that are consumed in the United Sates rely directly and indirectly on imports.  What is known as the import matrix identifies the values of imports, distinguished by category, that are used directly and indirectly by different sectors of the U.S. economy.  To the extent that tariffs increase the net costs of imported goods, the import matrix entries should indicate how much these higher costs are passed on to different sectors of the U.S. economy.

51.     Table 2 presents import matrix entries for U.S. state and local government activities in 2023.[23]  The table indicates that purchases by state and local governments incorporated $123.0 billion of imported goods.  Taking the 12 states that are parties to this action to be typical of others, and applying their 10.7 percent of total direct spending, it follows that their 2023 expenditures incorporated imports worth $13.2 billion.  Instead applying the 23.3 percent of total direct combined spending of state plus local governments in these 12 states, it follows that their 2023 expenditures incorporated imports worth $28.7 billion.

---

[23] The import matrix is available at https://www.bea.gov/industry/input-output-accounts-data. Table 2 uses the input matrix after redefinitions, and combines different categories of state/local operations into a total figure for state and local government.  Input matrix data are available only for combined state and local government purchases.  Service imports are omitted from Table 2.

Page 29 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 31 of 35

**Table 2: 2023 State and Local Government Purchases Import Requirements**

| Import product category | S/L government requirement ($ billions) |
|---|---|
| Farms | 0.5 |
| Forestry, fishing, and related activities | 0.7 |
| Oil and gas extraction | 2.2 |
| Mining, except oil and gas | 0.9 |
| Utilities | 0.04 |
| Wood products | 0.9 |
| Nonmetallic mineral products | 1.0 |
| Primary metals | 0.3 |
| Fabricated metal products | 2.4 |
| Machinery | 10.5 |
| Computer and electronic products | 5.6 |
| Electrical equipment, appliances, and components | 3.0 |
| Motor vehicles, bodies and trailers, and parts | 41.8 |
| Other transportation equipment | 0.06 |
| Furniture and related products | 1.3 |
| Miscellaneous manufacturing | 2.5 |
| Food and beverage and tobacco products | 6.7 |
| Textile mills and textile product mills | 1.2 |
| Apparel and leather and allied products | 0.7 |
| Paper products | 1.6 |
| Printing and related support activities | 0.3 |
| Petroleum and coal products | 21.1 |
| Chemical products | 12.6 |
| Plastics and rubber products | 5.2 |
| Total | $ 123.0 |

Page 30 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 32 of 35

52.     This information makes it possible to estimate changes in the costs of goods purchased by state governments due to tariffs announced by the Trump administration citing its authority under the International Emergency Economic Powers Act (IEEPA).  The Yale Budget Lab estimates that the Trump administration's IEEPA-based February 1, 2025 orders for tariffs on Canada, Mexico, and China together impose burdens equivalent to an across the board 7.5 percent tariff on all U.S. imports.  The Yale Budget Lab also estimates that the Trump administration's IEEPA-based April 2, 2025 order for worldwide tariffs imposes burdens equivalent to an across the board 11.5 percent additional tariff, making the combined burden of the tariffs under these two IEEPA-based orders equivalent to a 19 percent tariff.[24]  Of course the actual burden on state governments depends on the extent to which these tariffs are fully enforced, as well as the extent to which state government purchases are concentrated on goods subject to high tariff rates.  Table 2 indicates that imports embedded in purchases by state and local governments are particularly concentrated in motor vehicles, which represent one-third of the total.  Many (though not all) of these motor vehicle imports are not subject to IEPPA-based tariffs.  Using the conservative assumption that the average IEEPA-based tariff rate on imports embedded in state government purchases is just 12 percent, and applying a 100 percent pass-through rate, it follows that the tariffs announced under IEEPA authority raise the costs of direct purchases by the governments of the 12 states that are parties to this action by $1.6 billion per year.  Adding local government purchases in these 12 states increases the tariff-induced burden to $3.4 billion per year.

---

[24] See https://budgetlab.yale.edu/research/fiscal-economic-and-distributional-effects-20-tariffs-china-and-25-tariffs-canada-and-mexico and https://budgetlab.yale.edu/research/where-we-stand-fiscal-economic-and-distributional-effects-all-us-tariffs-enacted-2025-through-april.

Page 31 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

53.     The second category of potential state and local government exposure to tariff-related price increases lies in their responsibilities to provide income support to their populations. Table 1 indicates that state and local governments collectively spent $971 billion on public welfare in 2023, of which the state governments of the 12 states that are parties to this action spent $216.4 billion.  Tariffs that raise prices faced by consumers erode the value of these welfare payments, requiring additional government expenditures simply to keep beneficiaries whole.  Applying the 2024 U.S. ratio of imports to GDP (14.0 percent) to the $216.4 billion welfare expenditure, it follows that, with full pass-through of tariffs to prices, and again very conservatively taking the average tariff rate to be 12 percent, the 12 state governments that are parties to this action would need to increase their welfare spending by $3.6 billion to maintain their real values.  Adding local government welfare expenditures increases this total to $4.1 billion.  Consequently, incorporating the need to maintain the real purchasing power of welfare expenditures more than doubles the implied burden on state governments because of the IEEPA-related tariffs.

## VIII.  Evaluation of recent tariff action.

54.     The IEEPA tariffs announced by the Trump administration will significantly impair the performance of the U.S. economy.  This action is entirely unwarranted by prevailing economic conditions, since far from facing an economic emergency, the U.S. economy in January 2025 was the envy of the world.  Indeed, the tariffs that the administration announced have the potential to create a significant economic crisis where one did not previously exist.

55.     The IEEPA tariffs will reduce U.S. incomes, including U.S. real wages and consumption.  They will impose costs on U.S. consumers, including state governments, without delivering economic benefits in return.  The rates at which the tariffs are imposed – 10 percent in some cases, 25 percent in others, and based on U.S. bilateral trade deficits in still others – are unrelated to economic conditions or consequences for the U.S. economy, instead being entirely arbitrary.

Page 32 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 34 of 35

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 6, 2025, at Chicago, Illinois.**

_____

JAMES R. HINES Jr.

Page 33 -  DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax (971) 673-5000

Attachment 2 to Motion
for Preliminary Injunction
Page 35 of 35

# JAMES R. HINES JR.

Curriculum Vitae
April 2025

**ECONOMICS OFFICE**

Department of Economics
University of Michigan
343 Lorch Hall
611 Tappan Avenue
Ann Arbor, MI  48109-1220
jrhines@umich.edu

**LAW OFFICE**

University of Michigan Law School
964 Legal Research
801 Monroe Street
Ann Arbor, MI  48109-1210
jrhines@umich.edu

## EDUCATION

Harvard University, Ph.D., Economics, 1986.
Yale University, M.A., Economics, 1980.
Yale College, B.A., *cum laude*, Economics, 1980.

## TEACHING POSITIONS

L. Hart Wright Collegiate Professor of Law, University of Michigan Law School, 2009-present.
Professor of Law, 2006-present.  Visiting Professor, 2005-2006.

Richard A. Musgrave Collegiate Professor of Economics, College of Literature, Science, and the
Arts, University of Michigan, 2006-present.  Professor of Economics, 2001-present.

Visiting Professor of Economics and Visiting Professor of Law, University of California-
Berkeley, 2008-2009.

Visiting Professor of Law, Harvard Law School, 2005.

Professor of Business Economics, Stephen M. Ross School of Business, University of Michigan,
1999-2005.  Professor by courtesy, 2005-present.  Associate Professor, 1997-1999.

Professor of Public Policy, Gerald R. Ford School of Public Policy, University of Michigan,
2001-2005.

Associate Professor of Public Policy, John F. Kennedy School of Government, Harvard
University, 1992-1997.  Visiting Assistant Professor, 1991-1992.

Assistant Professor of Economics & Public Affairs, Department of Economics and School of
Public and International Affairs, Princeton University, 1986-1991.

Visiting Lecturer, Department of Economics, Harvard University, 1988-1989.

Visiting Assistant Professor, Department of Economics, Columbia University, 1988.

Teaching Fellow, Department of Economics, Harvard University, 1982-1985.

## RESEARCH AFFILIATIONS

Research Associate, National Bureau of Economic Research, 1997-present.  Faculty Research Fellow, 1986-1997.

Research Director, Office of Tax Policy Research, Stephen M. Ross School of Business, University of Michigan, 1997-present.

Research Director, International Tax Policy Forum, 2001-present.

Co-Director, Program in Law & Economics, University of Michigan Law School, 2009-present.

Distinguished Fellow, CESifo Group, Germany, 2014-present.  Research Fellow, 1999-2014.

International Research Fellow, Centre for Business Taxation, Oxford University, 2007-present.

Eminent Research Scholar, University of Melbourne, Australia, 2024.  Academic Guest, 2023.

Becker Friedman Visiting Fellow, University of Chicago, 2013.

International Research Fellow, Institute for Fiscal Studies, London, United Kingdom, 2007-2010.

Visiting Research Associate, STICERD, London School of Economics, London, United Kingdom, 2003-2004.

Visiting Scholar, Institute for International Integration Studies, Trinity College, Dublin, Ireland, 2003.

Associate Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1989-1991.


## EDITORIAL BOARDS

Editorial Board, *American Law and Economics Review*, 2013-present.

Editorial Advisory Board, *National Tax Journal*, 2019-present.

Editorial Advisory Board, *Journal of Risk and Financial Management*, 2020-present.

Editorial Advisory Board, *The Economists' Voice*, 2012-2020.  Co-Editor, 2010-2012.

Co-Editor, *Journal of Public Economics*, 2010-2013.

Co-Editor, *Journal of Economic Perspectives*, 2004-2010.

Editor, *FinanzArchiv*, 2000-2003.

Editor, *National Tax Association Proceedings*, 2001.

Associate Editor, *Journal of International Financial Markets, Institutions and Money*, 1997-2013.

Editorial Board, *B.E. Journal of Economic Analysis & Policy*, 2001-2016.

Associate Editor, *Journal of Regional Science*, 2003-2010.

Associate Editor, *New Palgrave Dictionary of Economics*, 2nd edition (Basingstoke, UK: Palgrave Macmillan, 2008).

Associate Editor, *Quarterly Journal of Economics*, 1997-2001.

Associate Editor, *International Tax and Public Finance*, 1993-1998.

Board of Editors, *World Politics*, 1992-1998.  Associate Editor, 1990-1991.

### PROFESSIONAL BOARDS

President, International Institute of Public Finance, 2024-present.  President-Elect, 2023-2024;
Board of Management, 2020-2023.

President, American Law & Economics Association, 2023-2024.  Vice President, 2022-2023;
Secretary-Treasurer, 2021-2022.

Fellow, Society for Empirical Legal Studies, 2019-present.  Board of Directors, 2016-2019.  Co-
President, Conference on Empirical Legal Studies, 2018.

Scientific Advisory Board, MannheimTaxation ScienceCampus, Germany, 2014-present.

Scientific Advisory Board, Ifo Institute and CESifo Council, Germany, 2016-2024.

Board of Directors, National Tax Association, 2010-2013. Program Chair, National Tax
Association annual conference, 2000.

### GOVERNMENT SERVICE

Panel of International Academic Expertise on Business Tax, Her Majesty's Revenue and
Customs, United Kingdom, 2008-2012.

Academic Advisory Panel, Massachusetts Special Commission on Business Tax Policy,
1992-1993.

Panel of Technical Experts, Social Security Advisory Council, U.S. Social Security Commission,
1990.

Economist, Bureau of Economic Analysis, United States Department of Commerce, 1980-1981.

### RESEARCH AWARDS

Daniel M. Holland Medal, National Tax Association, 2017.

Richard A. Musgrave Visiting Professorship, International Institute of Public Finance and
CESifo, 2014.

Researcher of the Year Award, University of Michigan Ross School of Business, 2005.

Contribution to the Research Environment Award, University of Michigan Ross School of
Business, 2000.

### TEACHING PRIZES

Michigan Economics Society Outstanding Professor Award, University of Michigan, 2010.

Dean's Teaching Honor Roll, Ford School, University of Michigan, 2001, 2002, 2003 and 2005.

Dean's Teaching Award, Kennedy School, Harvard University, 1996 and 1997.

Manuel Carballo Award for Excellence in Teaching, Kennedy School, Harvard University, 1994.

Teaching Prize, Woodrow Wilson School Graduate Student Association, Princeton University, 1990.

Honorable Mention, Allyn Young Teaching Prize, Harvard University, 1983.

Harvard-Danforth Certificate for Excellence in Teaching, Harvard University, 1982.

## KEYNOTE ADDRESSES

Max Planck Institute for Tax Law and Public Finance Conference, Berlin, Germany, 2024.

RSIT Conference, University of Tübingen, Germany, 2024.

Inaugural Global Wealth Management Lecture, George Mason University, 2023.

Presidential Address, American Law & Economics Association, Boston MA, 2023.

RIDGE May Forum, Workshop on Public Economics, Montevideo, Uruguay, 2018.

Werner Sichel Lecture, Western Michigan University, Kalamazoo MI, 2017.

MannheimTaxation Annual Conference, Mannheim, Germany, 2017.

Urban Economic Policy Annual Conference, Drexel University, Philadelphia PA, 2016.

Royal Society Lecture, Institute for Fiscal Studies, London, United Kingdom, 2014.

Bank of France Conference on Competitiveness and Corporate Taxation, Paris, France, 2014.

Richard Musgrave Lecture, CESifo Group, Munich, Germany, 2014.

Canadian Public Economics Group Annual Conference, Edmonton, Canada, 2013.

International Institute of Public Finance Annual Conference, Dresden, Germany, 2012.

## BOOKS

***Global Goliaths: Multinational Corporations in the 21st Century Economy***, edited, with C. Fritz Foley and David Wessel (Washington, DC: Brookings, 2021). ISBN 978-0-815-73855-8.

***International Taxation***, edited (Cheltenham, UK: Edward Elgar, 2007). ISBN 981-1-84376-446-5.

***Comparative Fiscal Federalism: Comparing the European Court of Justice and the U.S. Supreme Court's Tax Jurisprudence***, edited, with Reuven S. Avi-Yonah and Michael Lang (Alphen aan den Rijn, The Netherlands: Kluwer Law International, 2007). ISBN 978-90-411-2552-1.

***Taxing Corporate Income in the 21st Century***, edited, with Alan J. Auerbach and Joel Slemrod (Cambridge, UK: Cambridge University Press, 2007).  ISBN 978-0-521-87022-1.

***International Taxation and Multinational Activity***, edited (Chicago: University of Chicago Press, 2001).  ISBN 0-226-34173-9.

***Rethinking Estate and Gift Taxation***, edited, with William G. Gale and Joel Slemrod (Washington, DC: Brookings, 2001).  ISBN 0-8157-0069-5.

***The Effects of Taxation on Multinational Corporations***, edited, with Martin Feldstein and R. Glenn Hubbard (Chicago: University of Chicago Press, 1995).  ISBN 0-226-24095-9.

***Taxing Multinational Corporations***, edited, with Martin Feldstein and R. Glenn Hubbard (Chicago: University of Chicago Press, 1995).  ISBN 0-226-24094-0.

### ARTICLES AND BOOK CHAPTERS

Risky trust investments, ***Michigan State Law Review***, forthcoming.

Capital gains realizations, (with Daniel Schaffa), ***Economics Letters***, November 2024, *244* (111990), 1-4.

Martin Feldstein (1939-2019), in Robert A. Cord, ed. ***The Palgrave Companion to Harvard Economics***, volume 2 (Cham, Switzerland: Palgrave Macmillan, 2024), 667-685.

The role of trusts in taxing the rich, ***Oxford Review of Economic Policy***, Autumn 2023, *39* (3), 460-477.

Digital tax arithmetic, ***National Tax Journal***, March 2023, *76* (1), 119-143.

Corporate taxes and union wages in the United States, (with R. Alison Felix), ***International Tax and Public Finance***, December 2022, *29* (6), 1450-1494.

Certain effects of random taxes, (with Michael J. Keen), ***Journal of Public Economics***, November 2021, *203* (104412), 1-13.

Multinational activity in the modern world, (with C. Fritz Foley, Raymond J. Mataloni Jr., and David Wessel), in C. Fritz Foley, James R. Hines Jr., and David Wessel, eds. ***Global Goliaths: Multinational Corporations in the 21st Century Economy*** (Washington, DC: Brookings, 2021), 1-32.

Principles for policymakers, (with C. Fritz Foley and David Wessel), in C. Fritz Foley, James R. Hines Jr., and David Wessel, eds. ***Global Goliaths: Multinational Corporations in the 21st Century Economy*** (Washington, DC: Brookings, 2021), 537-546.

Taxes as pandemic controls, (with Ashley C. Craig), ***National Tax Journal***, December 2020, *73* (4), 969-986.

Income inequality, progressive taxation, and tax expenditures, in Sisay Asefa and Wei-Chiao Huang, eds. ***The Political Economy of Inequality: U.S. and Global Dimensions*** (Kalamazoo, MI: Upjohn Press, 2020), 145-166.

Inter vivos transfers of ownership in family firms, (with Niklas Potrafke, Marina Riem, and Christoph Schinke), ***International Tax and Public Finance***, April 2019, *26* (2), 225-256.

Investment ramifications of distortionary tax subsidies, (with Jongsang Park), *Journal of Public Economics*, April 2019, *172* (1), 36-51.

Perils of tax reform, *National Tax Journal*, June 2018, *71* (2), 357-376.

Business tax burdens and tax reform, *Brookings Papers on Economic Activity*, Fall 2017, *48* (2), 449-471.

Multinational firms and tax havens, (with Anna Gumpert and Monika Schnitzer), *Review of Economics and Statistics*, October 2016, *98* (4), 713-727.

Are PILOTs property taxes on nonprofits? (with Fan Fei and Jill R. Horwitz), *Journal of Urban Economics*, July 2016, *94* (1), 109-123.

Taxing sales of depreciable assets, *Michigan Business & Entrepreneurial Law Review*, Spring 2016, *5* (2), 161-172.

Trade credit and taxes, (with Mihir A. Desai and C. Fritz Foley), *Review of Economics and Statistics*, March 2016, *98* (1), 132-139.

Delegating tax, (with Kyle D. Logue), *Michigan Law Review*, November 2015, *114* (2), 235-274.

Corporate taxation, in James D. Wright, ed. *International Encyclopedia of the Social & Behavioral Sciences, 2nd Edition*, volume 4 (Oxford, UK: Elsevier, 2015), 946-948.

Understanding the AMT, and its unadopted sibling, the AMxT, (with Kyle D. Logue), *Journal of Legal Analysis*, Winter 2014, *6* (2), 367-408.

How serious is the problem of base erosion and profit shifting? *Canadian Tax Journal*, June 2014, *62* (2), 443-453.

The redistributive potential of wealth transfer taxes, *Public Finance Review*, November 2013, *41* (6), 885-903.

How important are perpetual tax savings? in Jeffrey R. Brown, ed. *Tax Policy and the Economy*, volume 27 (Chicago: University of Chicago Press, 2013), 101-124.

Who offers tax-based business development incentives? (with R. Alison Felix), *Journal of Urban Economics*, May 2013, *75* (1), 80-91.

Income and substitution effects of estate taxation, *American Economic Review*, Papers and Proceedings, May 2013, *103* (3), 484-488.

The tax revenue capacity of the U.S. economy, in Franklin Allen, Anna Gelpern, Charles Mooney and David Skeel, eds. *Is U.S. Government Debt Different?* (Philadelphia, PA: FIC Press, 2012), 113-125.

Tax policy and the efficiency of U.S. direct investment abroad, (with Mihir A. Desai and C. Fritz Foley), *National Tax Journal*, December 2011, *64* (4), 1055-1082.

U.S. defense contracts during the tax expenditure battles of the 1980s, (with Susan J. Guthrie), ***National Tax Journal***, June 2011, *64* (2), 731-752.

Peter Mieszkowski and the general equilibrium revolution in public finance, ***Proceedings of the National Tax Association Annual Conference***, 2010, *102*, 213-216.

State fiscal policies and transitory income fluctuations, ***Brookings Papers on Economic Activity***, Fall 2010, *41* (2), 313-337.

Treasure islands, ***Journal of Economic Perspectives***, Fall 2010, *24* (4), 103-126.

The last best hope for progressivity in tax, (with Edward J. McCaffery), ***Southern California Law Review***, July 2010, *83* (5), 1031-1098.

International capital taxation, (with Rachel Griffith and Peter Birch Sørensen), in James Mirrlees, Stuart Adam, Timothy Besley, Richard Blundell, Stephen Bond, Robert Chote, Malcolm Gammie, Paul Johnson, Gareth Myles and James Poterba, eds. ***Dimensions of Tax Design: The Mirrlees Review*** (Oxford, UK: Oxford University Press, 2010), 914-996.

The attack on nonprofit status: A charitable assessment, (with Jill R. Horwitz and Austin Nichols), ***Michigan Law Review***, May 2010, *108* (7), 1179-1220.

Income misattribution under formula apportionment, ***European Economic Review***, January 2010, *54* (1), 108-120.

Taxing inheritances, taxing estates, ***Tax Law Review***, Fall 2009, *63* (1), 189-207.

Which countries become tax havens? (with Dhammika Dharmapala), ***Journal of Public Economics***, October 2009, *93* (9-10), 1058-1068.

> Reprinted in Dhammika Dharmapala, ed. ***The Economics of Tax Avoidance and Evasion*** (Cheltenham, UK: Edward Elgar, 2017).

How globalization affects tax design, (with Lawrence H. Summers), in Jeffrey R. Brown and James M. Poterba, eds. ***Tax Policy and the Economy***, volume 23 (Chicago: University of Chicago Press, 2009), 123-157.

Domestic effects of the foreign activities of U.S. multinationals, (with Mihir A. Desai and C. Fritz Foley), ***American Economic Journal: Economic Policy***, February 2009, *1* (1), 181-203.

Reconsidering the taxation of foreign income, ***Tax Law Review***, Winter 2009, *62* (2), 269-298.

Foreign income and domestic deductions, ***National Tax Journal***, September 2008, *61* (3), 461-475.

Capital structure with risky foreign investment, (with Mihir A. Desai and C. Fritz Foley), *Journal of Financial Economics*, June 2008, *88* (3), 534-553.

Excess burden of taxation, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 3 (Basingstoke, UK: Palgrave Macmillan, 2008), 75-77.

Excise taxes, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 3 (Basingstoke, UK: Palgrave Macmillan, 2008), 103-105.

Tax havens, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 8 (Basingstoke, UK: Palgrave Macmillan, 2008), 173-175.

Taxation of foreign income, in Steven N. Durlauf and Lawrence E. Blume, eds. *The New Palgrave Dictionary of Economics*, 2nd ed., volume 8 (Basingstoke, UK: Palgrave Macmillan, 2008), 192-194.

Market reactions to export subsidies, (with Mihir A. Desai), *Journal of International Economics*, March 2008, *74* (2), 459-474.

Corporate taxation and international competition, in Alan J. Auerbach, James R. Hines Jr., and Joel Slemrod, eds. *Taxing Corporate Income in the 21st Century* (Cambridge, UK: Cambridge University Press, 2007), 268-295.

    Reprinted in Vito Tanzi and Howell H. Zee, eds. *Recent Developments in Public Finance*, volume 2 (Cheltenham, UK: Edward Elgar, 2011), 346-373.

Dividend policy inside the multinational firm, (with Mihir A. Desai and C. Fritz Foley), *Financial Management*, Spring 2007, *36* (1), 5-26.

The internal markets of multinational firms, (with Mihir A. Desai and C. Fritz Foley), *Survey of Current Business*, March 2007, *87* (3), 42-48.

Taxing consumption and other sins, *Journal of Economic Perspectives*, Winter 2007, *21* (1), 49-68.

Capital controls, liberalizations, and foreign direct investment, (with Mihir A. Desai and C. Fritz Foley), *Review of Financial Studies*, Winter 2006, *19* (4), 1433-1464.

    Reprinted in Vihang Errunza, ed. *Finance in Emerging Markets*, volume 2 (London, UK: Routledge, 2016).

Will social welfare expenditures survive tax competition? *Oxford Review of Economic Policy*, Fall 2006, *22* (3), 330-348.

The demand for tax haven operations, (with Mihir A. Desai and C. Fritz Foley), *Journal of Public Economics*, March 2006, *90* (3), 513-531.

Reprinted in Dhammika Dharmapala, ed. ***The Economics of Tax Avoidance and Evasion*** (Cheltenham, UK: Edward Elgar, 2017).

Taxation and multinational activity: new evidence, new interpretations, (with Mihir A. Desai and C. Fritz Foley), ***Survey of Current Business***, February 2006, *86* (2), 16-22.

Do tax havens divert economic activity? (with Mihir A. Desai and C. Fritz Foley), ***Economics Letters***, February 2006, *90* (2), 219-224.

Foreign direct investment and the domestic capital stock, (with Mihir A. Desai and C. Fritz Foley), ***American Economic Review***, Papers and Proceedings, May 2005, *95* (2), 33-38.

Shortfalls in the long run: predictions about the social security trust fund, (with Timothy Taylor), ***Journal of Economic Perspectives***, Spring 2005, *19* (2), 3-9.

Do tax havens flourish? in James M. Poterba, ed. ***Tax Policy and the Economy***, volume 19 (Cambridge, MA: MIT Press, 2005), 65-99.

A multinational perspective on capital structure choice and internal capital markets, (with Mihir A. Desai and C. Fritz Foley), ***Journal of Finance***, December 2004, *59* (6), 2451-2487.

Reprinted in Stijn Claessens and Luc Laeven, eds. ***A Reader in International Corporate Finance***, volume 2 (Washington, DC: World Bank, 2006), 243-279.

Reprinted in James R. Hines Jr., ed. ***International Taxation*** (Cheltenham, UK: Edward Elgar, 2007), 215-251.

Foreign direct investment in a world of multiple taxes, (with Mihir A. Desai and C. Fritz Foley), ***Journal of Public Economics***, December 2004, *88* (12), 2727-2744.

Reprinted in James R. Hines Jr., ed. ***International Taxation*** (Cheltenham, UK: Edward Elgar, 2007), 143-160.

Old rules and new realities: corporate tax policy in a global setting, (with Mihir A. Desai), ***National Tax Journal***, December 2004, *57* (4), 937-960.

Might fundamental tax reform increase criminal activity? ***Economica***, August 2004, *71* (283), 483-492.

The costs of shared ownership: evidence from international joint ventures, (with Mihir A. Desai and C. Fritz Foley), ***Journal of Financial Economics***, August 2004, *73* (2), 323-374.

On the timeliness of tax reform, ***Journal of Public Economics***, April 2004, *88* (5), 1043-1059.

Sensible tax policies in open economies, ***Journal of the Statistical and Social Inquiry Society of Ireland***, 2003/2004, *33*, 1-36.

Evaluating international tax reform, (with Mihir A. Desai), ***National Tax Journal***, September 2003, *56* (3), 487-502.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 496-511.

Perfect taxation with imperfect competition, (with Alan J. Auerbach), in Sijbren Cnossen and Hans-Werner Sinn, eds. *Public Finance and Public Policy in the New Century* (Cambridge, MA: MIT Press, 2003), 127-153.

Chains of ownership, regional tax competition, and foreign direct investment, (with Mihir A. Desai and C. Fritz Foley), in Heinz Herrmann and Robert Lipsey, eds. *Foreign Direct Investment in the Real and Financial Sector of Industrial Countries* (Berlin: Springer-Verlag, 2003), 61-98.

Michigan's flirtation with the Single Business Tax, in Charles L. Ballard, Paul N. Courant, Douglas C. Drake, Ronald C. Fisher, and Elisabeth R. Gerber, eds. *Michigan at the Millennium* (East Lansing, MI: Michigan State University Press, 2003), 603-628.

Applied public finance meets general equilibrium: The research contributions of Arnold Harberger, *Proceedings of the National Tax Association Annual Conference*, 2002, *94*, 1-8.

Expectations and expatriations: Tracing the causes and consequences of corporate inversions, (with Mihir A. Desai), *National Tax Journal*, September 2002, *55* (3), 409-440.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 272-303.

Excerpted in Michael J. Graetz, ed. *Foundations of International Income Taxation* (New York: Foundation Press, 2004), 114-118.

International taxation, (with Roger H. Gordon), in Alan J. Auerbach and Martin Feldstein, eds. *Handbook of Public Economics*, volume 4 (Amsterdam: North-Holland, 2002), 1935-1995.

Excerpted in Michael J. Graetz, ed. *Foundations of International Income Taxation* (New York: Foundation Press, 2004), 525-526.

Taxation and economic efficiency, (with Alan J. Auerbach), in Alan J. Auerbach and Martin Feldstein, eds. *Handbook of Public Economics*, volume 3 (Amsterdam: North-Holland, 2002), 1347-1421.

Repatriation taxes and dividend distortions, (with Mihir A. Desai and C. Fritz Foley), *National Tax Journal,* December 2001, *54* (4), 829-851.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 304-326.

Another look at whether a rising tide lifts all boats, (with Hilary W. Hoynes and Alan B. Krueger), in Alan B. Krueger and Robert M. Solow, eds. *The Roaring Nineties: Can Full Employment Be Sustained?* (New York: Russell Sage, 2001), 493-537.

Corporate taxation, in Neil J. Smelser and Paul B. Baltes, eds. *International Encyclopedia of the Social & Behavioral Sciences*, volume 4 (Oxford, UK: Elsevier, 2001), 2810-2812.

Exchange rates and tax-based export promotion, (with Mihir A. Desai), *Proceedings of the National Tax Association Annual Conference*, 2001, *93*, 275-285.

The uneasy marriage of export incentives and the income tax, (with Mihir A. Desai), in James M. Poterba, ed. *Tax Policy and the Economy*, volume 15 (Cambridge, MA: MIT Press, 2001), 41-94.

International taxation and the location of inventive activity, (with Adam B. Jaffe), in James R. Hines Jr., ed. *International Taxation and Multinational Activity* (Chicago: University of Chicago Press, 2001), 201-226.

"Tax sparing" and direct investment in developing countries, in James R. Hines Jr., ed. *International Taxation and Multinational Activity* (Chicago: University of Chicago Press, 2001), 39-66.

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 95-122.

What is benefit taxation? *Journal of Public Economics*, March 2000, *75* (3), 483-492.

The case against deferral: A deferential reconsideration, *National Tax Journal*, September 1999, *52* (3), 385-404.

Excess capital flows and the burden of inflation in open economies, (with Mihir A. Desai), in Martin Feldstein, ed. *The Costs and Benefits of Price Stability* (Chicago: University of Chicago Press, 1999), 235-268.

Nonprofit business activity and the unrelated business income tax, in James M. Poterba, ed. *Tax Policy and the Economy*, volume 13 (Cambridge, MA: MIT Press, 1999), 57-84.

Lessons from behavioral responses to international taxation, *National Tax Journal*, June 1999, *52* (2), 305-322.

Three sides of Harberger triangles, *Journal of Economic Perspectives*, Spring 1999, *13* (2), 167-188.

"Basket" cases: Tax incentives and international joint venture participation by American multinational firms, (with Mihir A. Desai), *Journal of Public Economics*, March 1999, *71* (3), 379-402.

Tax policy and the activities of multinational corporations, in Alan J. Auerbach, ed. *Fiscal Policy: Lessons from Economic Research* (Cambridge, MA: MIT Press, 1997), 401-445.

International taxation and corporate R&D: Evidence and implications, in James M. Poterba, ed. ***Borderline Case: International Tax Policy, Corporate Research and Development, and Investment*** (Washington, DC: National Academy Press, 1997), 39-52.

    Reprinted (with minor changes) as Doing R&D in the right places, ***Chemtech***, August 1998, *28* (8), 12-17.

Altered states: Taxes and the location of foreign direct investment in America, ***American Economic Review***, December 1996, *86* (5), 1076-1094.

    Reprinted in James R. Hines Jr., ed. ***International Taxation*** (Cheltenham, UK: Edward Elgar, 2007), 52-70.

Dividends and profits: Some unsubtle foreign influences, ***Journal of Finance***, June 1996, *51* (2), 661-689.

Fundamental tax reform in an international setting, in Henry J. Aaron and William G. Gale, eds. ***Economic Effects of Fundamental Tax Reforms*** (Washington, DC: Brookings, 1996), 465-502.

From each according to his surplus: Equi-proportionate sharing of commodity tax burdens, (with John C. Hlinko and Theodore J. F. Lubke), ***Journal of Public Economics***, November 1995, *58* (3), 417-428.

The flypaper effect, (with Richard H. Thaler), ***Journal of Economic Perspectives***, Fall 1995, *9* (4), 217-226.

Taxes, technology transfer, and the R&D activities of multinational firms, in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***The Effects of Taxation on Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 225-248.

Interest allocation rules, financing patterns, and the operations of U.S. multinationals, (with Kenneth A. Froot), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***The Effects of Taxation on Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 277-307.

Taxes, technology transfer, and R&D by multinational firms, in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***Taxing Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 51-62.

The tax treatment of interest and the operations of U.S. multinationals, (with Kenneth A. Froot), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. ***Taxing Multinational Corporations*** (Chicago: University of Chicago Press, 1995), 81-93.

No place like home: Tax incentives and the location of R&D by American multinationals, in James M. Poterba, ed. ***Tax Policy and the Economy***, volume 8 (Cambridge, MA: MIT Press, 1994), 65-104.

Credit and deferral as international investment incentives, ***Journal of Public Economics***, October 1994, *55* (2), 323-347.

Fiscal paradise: Foreign tax havens and American business, (with Eric M. Rice), *Quarterly Journal of Economics*, February 1994, *109* (1), 149-182.

Reprinted in Dhammika Dharmapala, ed. *The Economics of Tax Avoidance and Evasion* (Cheltenham, UK: Edward Elgar, 2017).

Reprinted in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), 18-51.

On the sensitivity of R&D to delicate tax changes:  The behavior of US multinationals in the 1980s, in Alberto Giovannini, R. Glenn Hubbard, and Joel Slemrod, eds. *Studies in International Taxation* (Chicago: University of Chicago Press, 1993), 149-187.

Budget spillovers and fiscal policy interdependence: Evidence from the states, (with Anne C. Case and Harvey S. Rosen), *Journal of Public Economics*, October 1993, *52* (3), 285-307.

Erratum, *Journal of Public Economics*, February 1994, *53* (2), 325.

Reprinted in Harvey S. Rosen, ed. *The Fiscal Behavior of State and Local Governments* (Cheltenham, UK: Edward Elgar, 1997), 3-25.

Reprinted in Wallace E. Oates, ed. *The Economics of Fiscal Federalism and Local Finance* (Cheltenham, UK: Edward Elgar, 1998), 535-557.

Arm's-length pricing:  Some economic perspectives, (with Charles H. Berry and David F. Bradford), *Tax Notes*, 10 February, 1992, *54* (6), 731-740.

The flight paths of migratory corporations, *Journal of Accounting, Auditing and Finance*, Fall 1991, *6* (4), 447-479.

Capital flight and tax competition: Are there viable solutions to both problems? (with Alberto Giovannini), in Alberto Giovannini and Colin Mayer, eds. *European Financial Integration* (Cambridge, UK: Cambridge University Press, 1991), 172-210.

Coming home to America: Dividend repatriations by U.S. multinationals, (with R. Glenn Hubbard), in Assaf Razin and Joel Slemrod, eds. *Taxation in the Global Economy* (Chicago: University of Chicago Press, 1990), 161-200.

Investment tax incentives and frequent tax reforms, (with Alan J. Auerbach), *American Economic Review*, Papers and Proceedings, May 1988, *78* (2), 211-216.

Taxation and U.S. multinational investment, in Lawrence H. Summers, ed. *Tax Policy and the Economy*, volume 2 (Cambridge, MA: MIT Press, 1988), 33-61.

The tax treatment of structures, in Martin S. Feldstein, ed. *Taxes and Capital Formation* (Chicago:  University of Chicago Press, 1987), 37-50.

Anticipated tax changes and the timing of investment, (with Alan J. Auerbach), in Martin S.

Feldstein, ed. *The Effects of Taxation on Capital Accumulation* (Chicago: University of Chicago Press, 1987), 163-196.

Notes on the tax treatment of structures, (with Roger H. Gordon and Lawrence H. Summers), in Martin S. Feldstein, ed. *The Effects of Taxation on Capital Accumulation* (Chicago: University of Chicago Press, 1987), 223-254.

National accounting for non-renewable natural resources in the mining industries, (with J. Steven Landefeld), *Review of Income and Wealth*, March 1985, *31* (1), 1-20.


### REVIEWS AND MISCELLANEOUS PUBLICATIONS

Comment on "Fiscal federalism and the role of the income tax," in David R. Agrawal, James M. Poterba, and Owen M. Zidar, eds. *Policy Responses to Tax Competition* (Chicago: University of Chicago Press, forthcoming).

Foreword: The 2018 Conference on Empirical Legal Studies, (with J.J. Prescott and Sonja Starr), *Journal of Empirical Legal Studies*, December 2019, *16* (4), 692.

Comment on "Fundamental tax reform: A comparison of three options," in Alan J. Auerbach and Kent Smetters, eds. *The Economics of Tax Policy* (New York: Oxford University Press, 2017), 369-374.

Reply to Becker and Fuest, *National Tax Journal*, June 2010, *63* (2), 278-280.

*International Financial Centers and the World Economy*, STEP Report 2009 (London, UK: Society of Trust and Estate Practitioners, 2009).

Tax policy experts express views on California's proposed tax plan, (with Joseph Bankman, Arnold C. Harberger, Walter Hellerstein, Charles E. McLure Jr., Steven M. Sheffrin, Kirk Stark, John A. Swain, and George Zodrow), *State Tax Notes*, 28 September, 2009, *53* (13), 916-918.

Protectionist pitfalls in U.S. tax reform, in Robert Goulder, ed. *Toward Tax Reform: Recommendations for President Obama's Task Force* (Falls Church, VA: Tax Analysts, 2009), 48-50.

Comment on "Capital levies and the transition to a consumption tax," in Alan J. Auerbach and Daniel Shaviro, eds. *Institutional Foundations of Public Finance: Economic and Legal Perspectives* (Cambridge, MA: Harvard University Press, 2008), 147-153.

Review of Jonathan Jones and Colin Wren, *Foreign Direct Investment and the Regional Economy*, *Journal of Regional Science*, October 2007, *47* (4), 845-847.

Introduction, in James R. Hines Jr., ed. *International Taxation* (Cheltenham, UK: Edward Elgar, 2007), xi-xviii.

Preface, (with Alan J. Auerbach and Joel Slemrod), in Alan J. Auerbach, James R. Hines Jr., and Joel Slemrod, eds. *Taxing Corporate Income in the 21st Century* (Cambridge, UK: Cambridge University Press, 2007), xi-xiii.

Introduction, in Reuven S. Avi-Yonah, James R. Hines Jr., and Michael Lang, eds. *Comparative Fiscal Federalism: Comparing the European Court of Justice and the U.S. Supreme Court's Tax Jurisprudence* (Alphen aan den Rijn, The Netherlands: Kluwer Law International, 2007), xix-xxiv.

Harmful tax competition and its harmful remedies, *British Tax Review*, 2006, *50* (2), 209-212.

More tax decadence: A review of C. Eugene Steuerle's *Contemporary U.S. Tax Policy*, *Journal of Policy Analysis and Management*, Summer 2005, *24* (3), 624-627.

Reply to Grubert, (with Mihir A. Desai), *National Tax Journal*, June 2005, *58* (2), 275-278.

Introduction to international tax competition, *Tax Notes International*, 28 June, 2004, *34* (13), 1295-1297.

Review of Andreas Haufler, *Taxation in the Global Economy*, *Journal of Economic Literature*, March 2004, *41* (1), 193-194.

Venture out alone, (with Mihir A. Desai and C. Fritz Foley), *Harvard Business Review*, March 2004, *82* (3), 22.

Comment on "An overview of international issues affecting U.S. tax administration," in Henry Aaron and Joel Slemrod, eds. *The Crisis in Tax Administration* (Washington, DC: Brookings, 2004), 57-60.

Corporate inversions: Stanley Works and the lure of tax havens, (with Mihir A. Desai and Mark F. Veblen), Harvard Business School Case 9-203-008, October 2002.

Comment on "Charitable giving in life and death," in William G. Gale, James R. Hines Jr., and Joel Slemrod, eds. *Rethinking Estate and Gift Taxation* (Washington, DC: Brookings, 2001), 370-373.

Comment on "Asset price effects of fundamental tax reform," in Kevin A. Hassett and R. Glenn Hubbard, eds. *Transition Costs of Fundamental Tax Reform* (Washington, DC: American Enterprise Institute, 2001), 92-95.
Introduction, in James R. Hines Jr., ed. *International Taxation and Multinational Activity* (Chicago: University of Chicago Press, 2001), 1-8.

Comment on "Portfolio responses to taxation: Evidence from the end of the rainbow," in Joel B. Slemrod, ed. *Does Atlas Shrug? The Economic Consequences of Taxing the Rich* (Cambridge, MA: Harvard University Press, 2000), 324-328.

Comment on "The influence of income tax rules on insurance reserves," in Kenneth A. Froot, ed. *The Financing of Catastrophe Risk* (Chicago: University of Chicago Press, 1999), 304-306.

Introduction, (with Martin Feldstein and R. Glenn Hubbard), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. *The Effects of Taxation on Multinational Corporations* (Chicago: University of Chicago Press, 1995), 1-6.

Introduction, (with Martin Feldstein and R. Glenn Hubbard), in Martin Feldstein, James R. Hines Jr., and R. Glenn Hubbard, eds. *Taxing Multinational Corporations* (Chicago: University of Chicago Press, 1995), 1-5.

Review of Gary Clyde Hufbauer, *U.S. Taxation of International Income*, *National Tax Journal*, March 1993, *46* (1), 69-71.

Comment on "State and federal tax equity: Estimates before and after the Tax Reform Act of 1986," *Journal of Policy Analysis and Management*, Winter 1993, *12* (1), 44-47.

Review of David Newbery and Nicholas Stern, eds. *The Theory of Taxation for Developing Countries*, *Journal of Economic Literature*, December 1989, *27* (4), 1698-1700.

Comment on "Decentralization in the public sector," in Harvey S. Rosen, ed. *Fiscal Federalism: Quantitative Studies* (Chicago: University of Chicago Press, 1988), 29-32.

More than its own reward (review of Charles T. Clotfelter's *Federal Tax Policy and Charitable Giving* and Arthur Andersen & Co.'s *Tax Economics of Charitable Giving*), *Foundation News*, September/October 1986, *27* (5), 7l-72.


## GOVERNMENT TESTIMONY

Testimony before the Committee on the Budget, United States Senate, 17 January, 2024, Washington, DC. Hearings on international taxation.

Testimony before the Committee on Finance, United States Senate, 25 March, 2021, Washington, DC. Hearings on international taxation.

Testimony before the Committee on Finance, United States Senate, 26 April, 2016, Washington, DC. Hearings on business tax reform.

Testimony before the Committee on Finance, United States Senate, 8 September, 2011, Washington, DC. Hearings on international tax reform.
Testimony before the Committee on Ways and Means, United States House of Representatives, 12 May, 2011, Washington, DC. Hearings on comprehensive tax reform.

Testimony before the Committee on Ways and Means, United States House of Representatives, 22 July, 2010, Washington, DC. Hearings on international transfer pricing.

Testimony before the State of California Commission on the 21st Century Economy, 12 February, 2009, Los Angeles, CA. Hearings on new revenue sources.

Testimony before the Committee on Finance, United States Senate, 26 June, 2008, Washington, DC.  Published in ***Foundation of International Tax Reform: Worldwide, Territorial, and Something in Between*** (Washington DC: U.S. Government Printing Office, 2008), 3-4, 10, 12, 15-16, 19, 21-23, 61-75.

Testimony before the Standing Committee on Finance, House of Commons, Canadian Parliament, 10 May, 2007, Ottawa, Canada.  Hearings on tax havens and tax avoidance.

Testimony before the Committee on Ways and Means, Select Revenue Measures Subcommittee, United States House of Representatives, 22 June, 2006, Washington, DC.  Hearings on the impact of international tax reform on U.S. competitiveness.

Testimony before the Presidential Advisory Panel on Federal Tax Reform, 12 May, 2005, Washington, D.C.  Hearings on exempting foreign-source dividends from U.S. taxation.

Testimony before the Committee on Finance, United States Senate, 15 July, 2003, Washington, DC.  Published in ***An Examination of U.S. Tax Policy and Its Effect on the International Competitiveness of U.S.-Owned Foreign Operations*** (Washington DC: U.S. Government Printing Office, 2004), 28-29, 41, 65-75.

### UNPUBLISHED PAPERS

Is C-SALT harmful to economic health? April 2025.

Tax reform and the Laffer curve, (with Ana Gamarra and José Félix Sanz-Sanz), February 2025.

How large is the government? February 2025.

Evaluating minimum taxation, NBER Working Paper No. 33140, November 2024.

Banks and tax-exempt debt arbitrage, (with Emily Horton), NBER Working Paper No. 32647, July 2024.

The effects of the reverse charge mechanism on the VAT gap, (with Albrecht Bohne, Antonios M. Koumpias, and Annalisa Tassi), February 2024.

Evaluating tax harmonization, NBER Working Paper No. 31900, November 2023.

Quality-aware tax incentives for charitable contributions, (with Zachary Halberstam), CESifo Working Paper No. 10250, January 2023.

Corporate taxation and the distribution of income, NBER Working Paper No. 27939, October 2020.

Random policies in federations, June 2020.

Rational choice and the rule against perpetuities, March 2020.

Rational intestacy and probate reform, December 2019.