## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
THE HONORABLE TIMOTHY M. REIF, JUDGE
THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Court No. 25-00077 |
| v. | ) ) ) | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## RESPONSE TO PLAINTIFFS' BRIEF REGARDING MOTION FOR SUMMARY JUDGMENT IN CASE NO. 25-00066

OF COUNSEL:

ALEXANDER K. HAAS
Director

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

Dated: May 12, 2025

## <u>TABLE OF CONTENTS</u>

ARGUMENT ............................................................................................................2

I.    IEEPA's Text, Context, And History Confirms That It Authorizes Tariffs .......................2

II.   Plaintiffs Cannot Establish That The Major-Questions Doctrine Applies, Or That It Would Help Them ...........................................................................................................10

III.  The National Emergency Is An Unreviewable Political Question And, Even If Subject To Review, Is Valid ....................................................................................14

CONCLUSION.....................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021) ................................................................................................11

*Al-Bihani v. Obama,*
   619 F.3d 1 (D.C. Cir. 2010) .....................................................................................8

*Almendarez-Torres v. United States,*
   523 U.S. 224 (1998) ...............................................................................................10

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
   751 F.2d 1239 (Fed. Cir. 1985) ...............................................................................8

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States,*
   102 F.4th 1252 (Fed. Cir. 2024) ..............................................................................9

*Bd. of Trs. of Univ. of Illinois v. United States,*
   289 U.S. 48 (1933) ...................................................................................................7

*Beacon Prods. Corp. v. Reagan,*
   633 F. Supp. 1191 (D. Mass. 1986) .................................................................14, 15

*Biden v. Nebraska,*
   600 U.S. 477 (2023) .....................................................................................11, 12, 13

*Bull v. Nationwide Mut. Fire Ins. Co.,*
   824 F.3d 722 (8th Cir. 2016) ...................................................................................9

*B-West Imports, Inc. v. United States,*
   75 F.3d 633 (Fed. Cir. 1996) ...................................................................................8

*Chang v. United States,*
   859 F.2d 893 (Fed. Cir. 1988) ...............................................................................14

*Corbett v. TSA,*
   19 F.4th 478 (D.C. Cir. 2021) ..................................................................................9

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................................14

*Dermark v. McDonough,*
   57 F.4th 1374 (Fed. Cir. 2023) ................................................................................6

*El-Shifa Pharm. Indus. Co. v. United States,*
   607 F.3d 836 (D.C. Cir. 2010) .........................................................................15, 16

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
    426 U.S. 548 (1976) ......................................................................................8

*Florsheim Shoe Co., Div. of Interco v. United States*,
    744 F.2d 787 (Fed. Cir. 1984) ................................................................8, 16

*Fober v. Mgmt. & Tech. Consultants, LLC*,
    886 F.3d 789 (9th Cir. 2018) .......................................................................9

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ....................................................................................17

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022) ............................................................11, 12

*Gilda Indus., Inc. v. United States*,
    446 F.3d 1271 (Fed. Cir. 2006) ....................................................................7

*Heller v. Doe*,
    509 U.S. 312 (1993) ....................................................................................17

*Htet v. Trump*,
    No. CV 24-1446, 2025 WL 522033 (D.D.C. Feb. 18, 2025) ......................17

*Humane Soc. of U.S. v. Clinton*,
    236 F.3d 1320 (Fed. Cir. 2001) ....................................................................8

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ..............................................................................14, 15

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ....................................................................................10

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) .......................................................................12

*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) ...................................................................16

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) .....................................................................12

*Ludecke v. Watkins*,
    335 U.S. 160 (1948) ..............................................................................14, 15

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ......................................................................................9

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ............................................................ 11, 12

*Michael Simon Design, Inc. v. United States*,
  609 F.3d 1335 (Fed. Cir. 2010) ....................................................... 16, 17

*Miller v. French*,
  530 U.S. 327 (2000) ............................................................................ 10

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ................................................................... 11

*Norfolk S. Ry. Co. v. Zayo Grp., LLC*,
  87 F.4th 585 (4th Cir. 2023) .................................................................. 9

*PrimeSource Bldg. Prods., Inc. v. United States*,
  59 F.4th 1255 (Fed. Cir. 2023) .............................................................. 17

*Pulsifer v. United States*,
  601 U.S. 124 (2024) ............................................................................... 6

*QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*,
  95 F.4th 984 (5th Cir. 2024) ................................................................... 7

*S. Corp. v. United States*,
  690 F.2d 1368 (Fed. Cir. 1982) .............................................................. 3

*Transpacific Steel LLC v. United States*,
  4 F.4th 1306 (Fed. Cir. 2021) ................................................. 10, 17, 19

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ............................................................................. 19

*United States v. Albert Inv. Co.*,
  585 F.3d 1386 (10th Cir. 2009) .............................................................. 9

*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011) ................................................................. 16

*United States v. Butler*,
  297 U.S. 1 (1936) ................................................................................... 7

*United States v. George S. Bush & Co.*,
  310 U.S. 371 (1940) ............................................................................. 16

*United States v. Shih*,
  73 F.4th 1077 (9th Cir. 2023) .......................................................... 18, 19

*United States v. Yoshida Int'l, Inc.,*
    526 F.2d 560 (C.C.P.A. 1975) .............................................................................passim

*USP Holdings, Inc. v. United States,*
    36 F.4th 1359 (Fed. Cir. 2022) .......................................................................15

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014)...........................................................................................11

*W. Virginia Univ. Hosps., Inc. v. Casey,*
    499 U.S. 83 (1991)................................................................................................3

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ...............................................................................11, 13, 14

*Yoshida Int'l, Inc. v. United States,*
    378 F. Supp. 1155 (Cust. Ct. 1974) ...................................................................5

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ...................................................................................6

U.S. Const. art. I, § 8, cl. 3 ...................................................................................6

**Statutes**

19 U.S.C. § 1862(c) ..............................................................................................7

19 U.S.C. § 2132 ..................................................................................................4

50 U.S.C. § 1622 ..................................................................................................6

50 U.S.C. § 1622(d) ........................................................................................6, 17

50 U.S.C. § 1702(a) ..............................................................................................6

50 U.S.C. § 1702(a)(1)(B) ...................................................................................4

50 U.S.C. § 1702(b) ..............................................................................................4

50 U.S.C. § 1702(b)(2) .........................................................................................4

50 U.S.C. § 1702(b)(3) .........................................................................................4

**Harmonized Tariff Schedule of the United States**

Heading 3072 .......................................................................................................4

Heading 8523 .......................................................................................................4

Heading 9903.01.30 ................................................................................................4

Heading 9903.01.31 ................................................................................................4

**Executive Actions**

Executive Order 13222,
   *Continuation of Export Control Regulations*,
   66 Fed. Reg. 44,025 (Aug. 22, 2001)................................................................18

Executive Order 14059,
   *Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade*,
   86 Fed. Reg. 71,549 (Dec. 17, 2021) ...............................................................19

Executive Order 14257,
   *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to
   Large and Persistent Annual United States Goods Trade Deficits*,
   90 Fed. Reg. 15,041 (Apr. 7, 2025) .................................................................19

Notice of Aug. 13, 2024,
   *Continuation of the National Emergency with Respect to Export Control Regulations*,
   89 Fed. Reg. 66,187 (Aug. 15, 2024).................................................................18

Notice of July 16, 2024,
   *Continuation of the National Emergency With Respect to Transnational Criminal
   Organizations*,
   89 Fed. Reg. 58,617 (July 18, 2024)................................................................19

Notice of Nov. 1, 2024,
   *Continuation of the National Emergency with Respect to Iran*,
   89 Fed. Reg. 87,761 (Nov. 4, 2024)..................................................................18

Notice of Oct. 11, 2024,
   *Continuation of the National Emergency with Respect to Significant Narcotics Traffickers
   Centered in Colombia*,
   89 Fed. Reg. 83,417 (Oct. 15, 2024).................................................................18

Proclamation 4074,
   *Imposition of Supplemental Duty for Balance of Payments Purposes*,
   36 Fed. Reg. 15,724 (Aug. 17, 1971)................................................................13

**Legislative Materials**

H.R. Rep. No. 95-459 (1977) ...............................................................................4

Joint Resolution, S.J. Res. 37, 119th Cong. (2025) ...............................................16

Joint Resolution, S.J. Res. 49, 119th Cong. (2025) ...............................................16

S. Rep. No. 93-1298 (1974)..............................................................................................5

**Other Authorities**

*Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*,
    Inv. No. 332-591, USITC Pub. No. 5405 (May 2023)............................................20

*Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025),
    https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-u-s-uk-reach-historic-trade-deal/
    [https://perma.cc/7CPW-8CF2]............................................................................20

Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income
    Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024),
    https://prosperousamerica.org/global-10-tariffs-on-u-s-imports-would-raise-incomes-and-pay-
    for-large-income-tax-cuts-for-lower-middle-class/
    [https://perma.cc/XUZ8-BG99]...........................................................................20

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE GARY S. KATZMANN, JUDGE
             THE HONORABLE TIMOTHY M. REIF, JUDGE
             THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) )     Court No. 25-00077 |
| v. | ) ) |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## RESPONSE TO PLAINTIFFS' BRIEF REGARDING
## MOTION FOR SUMMARY JUDGMENT IN CASE NO. 25-00066

Pursuant to this Court's April 29, 2025 order, ECF No. 10, defendants respectfully

submit this response to plaintiff states' brief setting forth their position on the motion for

summary judgment filed by the plaintiffs in *V.O.S. Selections, Inc., et al. v. Trump, et al.*, No.

25-00066.[1]  ECF No. 15 (States Br.).  Plaintiffs largely mirror the arguments made by the *V.O.S.*

plaintiffs, contending that the International Emergency Economic Powers Act (IEEPA) does not

authorize the imposition of tariffs and claiming that, even if it does, it does not authorize the

specific tariffs imposed pursuant to the Executive Orders at issue in that case.  But as defendants

established in their response to the summary-judgment motion, the Court of Customs and Patent

Appeals's (CCPA) decision in *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975),

compels the conclusion that IEEPA authorizes tariffs.  *Yoshida* interpreted materially identical

terms ("regulate . . . importation") in a materially similar context to include the power to impose

tariffs.  Plaintiffs have provided no persuasive justification for disregarding binding precedent

and for not treating like statutory language alike.  *Yoshida* and longstanding Federal Circuit

precedent also compel the conclusion that whether there is a national emergency and whether

these particular tariffs are justified are nonreviewable political questions.  Because neither state

plaintiffs nor the *V.O.S.* plaintiffs can show that the President acted outside his authority in

imposing tariffs under IEEPA, the Court should deny the motion for summary judgment in

*V.O.S.* and grant judgment in favor of defendants.

## ARGUMENT

I.    **IEEPA's Text, Context, And History Confirms That It Authorizes Tariffs**

Like the *V.O.S.* plaintiffs, plaintiffs here wrongly claim that IEEPA's text, context, and

history do not show Congress's clear intent to authorize the imposition of tariffs.  States Br. 2-3;

---

[1]  Plaintiffs have also filed a motion for preliminary injunction.  ECF No. 14 (States Mot.).  The Court has construed that motion as one for summary judgment.  ECF No. 18.  While defendants refer here to certain merits arguments made in that motion, as plaintiffs also did, *see* States Br. 1-2, defendants intend file a full response to plaintiffs' summary-judgment motion by the Court-ordered deadline.

States Mot. 15-17.

*Yoshida* requires the Court to reject this argument.  526 F.2d at 576.  In *Yoshida*, the Court of Customs and Patent Appeals squarely held that that the phrase "regulate . . . importation" for IEEPA's predecessor statute authorizes the President to impose import duties. *Id.*  State plaintiffs contend that "*Yoshida*'s interpretation of 'regulate . . . importation' does not fix the meaning of those words in IEEPA," States Mot. 17, but *Yoshida*'s holding is still binding on that very point.  *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (adopting "[t]h[e] body of law represented by the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982").  While *Yoshida* considered IEEPA's predecessor statute, the Trading with the Enemy Act (TWEA), the core statutory provisions authorizing the President to "regulate . . . importation" are identical.  Plaintiffs have no answer for how TWEA could authorize the imposition of tariffs and IEEPA's identical language could not.  That is because there is none.  Instead, the court must "make sense rather than nonsense out of the *corpus juris*" and interpret IEEPA's identical language the same as TWEA.  *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991). *Yoshida* controls.

If anything, the argument that IEEPA authorizes tariffs is even stronger than the one the CCPA considered in *Yoshida* for TWEA.  As that court noted, there was "nothing in the TWEA or its history which specifically either authorizes or prohibits the imposition of a surcharge, and no judicial precedent involving the same," and the legislative history was "inconclusive[.]" *Yoshida*, 526 F.3d at 572-73, 576.  Here, by contrast, *Yoshida is* that judicial precedent, and the legislative history conclusively shows that Congress intended to keep the authority of the President to impose tariffs.  *See* U.S.-Br. 17-21.  Plaintiffs question whether Congress was aware

of *Yoshida*, States Mot. 17 ("*even if* Congress was aware of *Yoshida* when it enacted

IEEPA . . .") (emphasis added), but Congress undeniably knew of *Yoshida* and its interpretation

of TWEA as authorizing tariffs, explicitly acknowledging the case in a pre-enactment report,

H.R. Rep. No. 95-459, at 5 (1977).  Aware that the court with exclusive jurisdiction over the

question had held that "regulate . . . importation" authorized imposition of tariffs, Congress not

only kept the exact same operative language in IEEPA, but declined to add tariffs as an

exception to the general grant of authority set forth in 50 U.S.C. § 1702(a)(1)(B).[2]  Plaintiffs

offer no compelling reason why Congress—with clear knowledge of *Yoshida*'s holding—would

have failed to make clear the alleged exclusion of tariffs from IEEPA's ambit, if that were its

intention.

Plaintiffs argue that Congress's enactment of Section 122 of the Trade Act of 1974 (19

U.S.C. § 2132) means that it intended to limit the circumstances in which a President may

impose tariffs, implying that, because Section 122 removed tariffs from IEEPA's delegation of

authority, *Yoshida* no longer controls.  States Mot. 17.  But *Yoshida* was decided after Section

122 was enacted, yet that court rejected the idea that statutes applicable in non-emergency

---

[2]  Proposed amici curiae—the plaintiffs in *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, Case No. 25-00078—claim that the exceptions listed in section 1702(b) do not indicate that IEEPA authorizes tariffs because the excepted goods are not the "kinds of goods on which tariffs would be imposed."  Princess Awesome Br. 6, Case No. 25-00078, ECF No. 37-1.  This is far from true.  The Harmonized Tariff Schedule of the United States (HTSUS) explicitly incorporates headings governing the types of excepted goods listed in section 1702(b)(3).  *See, e.g.*, heading 3072, HTSUS ("*Photographic film* in rolls, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in rolls, sensitized, unexposed") (emphasis added); heading 8523, HTSUS ("*Discs*, *tapes*, solid-state non-volatile storage devices, 'smart cards' and other media for the recording of sound or of other phenomena . . .") (emphasis added).  Further, the products that are covered by 50 U.S.C. § 1702(b)(2) and (3), respectively, are specifically exempted from IEEPA tariffs by HTSUS heading precisely because those goods would otherwise be subject to the tariffs.  *See* headings 9903.01.30 and 9903.01.31, HTSUS (exempting from IEEPA reciprocal tariffs products covered by 50 U.S.C. § 1702(b)(2) and (3), respectively).

situations can narrow the powers available in an emergency, including Section 122.  *See* 526 F.2d at 578 ("trade acts" that do not involve "national emergency powers" did not narrow TWEA's scope).  In any event, plaintiffs' contention is belied by the intersecting timelines of the *Yoshida* litigation and the passage of the Trade Act of 1974.  In July 1974, the trial court in *Yoshida* concluded that TWEA did not authorize tariffs.  *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974).  In response, Congress passed the Trade Act of 1974, which authorized the President to impose a limited surcharge to address certain balance-of-payments issues.  *See* S. Rep. No. 93-1298, at 88 (1974) (enacting the Trade Act as "necessary . . . *in the light of the recent decision by the United States Customs Court*," despite Congress's view that the President's "authority" to impose import surcharges was already "manifest") (emphasis added).  But the CCPA's decision reversing the trial court and holding that "regulate . . . importation" authorizes tariffs was issued *after* the enactment of Section 122.  Thus, when Congress enacted Section 122 in 1974, it only sought to ensure that, if the CCPA did not reverse the trial court, the President would still have a mechanism to impose tariffs to address a balance-of-payments deficit.  And when it enacted IEEPA in 1977, the most recent change in the statutory landscape was *Yoshida*—not Section 122.  Plaintiffs point to *no* history supporting the notion that Congress enacted a non-emergency statute (Section 122) to strip the President's authority to impose tariffs in an emergency situation, and they fail to establish that the "legal background" against which IEEPA was enacted permits departing from *Yoshida*.

State plaintiffs argue that *Yoshida* somehow "forecloses the President's interpretation of IEEPA."  State Mot. 26-27.  But they wrench statements from context and point to nothing that changes the fact that *Yoshida* conclusively interpreted "regulate . . . importation" to include the power to impose tariffs—the key interpretive question at issue here.  Indeed, at most, state

plaintiffs point to portions of *Yoshida* that limit its holding to the facts presented (namely, the scope of President Nixon's action) and leave for another day legal questions not directly presented. Regardless, contrary to plaintiffs' contention, the challenged action here is not of unlimited duration. National-emergency declarations automatically terminate after one year unless the President notifies Congress that the emergency "continue[s]," 50 U.S.C. § 1622(d), and Congress at any time can use a fast-track procedure to terminate the national emergency, *id.* § 1622.

Even looking beyond *Yoshida*, plaintiffs' argument fails. Plaintiffs argue that the Constitution undermines reading IEEPA to authorize tariffs because Article I gives Congress the power to lay and collect taxes and duties in one clause and the power to regulate commerce in another. States Br. 2 (citing U.S. Const. art. I § 8, cls. 1, 3). But plaintiffs' attempts to mismatch snippets from the Constitution to misread IEEPA are impermissibly acontextual. The "text" must be read "in context." *Pulsifer v. United States*, 601 U.S. 124, 133 (2024); *see Dermark v. McDonough*, 57 F.4th 1374, 1381 (Fed. Cir. 2023) ("Context always matters, and the specific context in which that language is used is especially important.") (cleaned up). IEEPA's text critically differs from the Constitution, as do its context, history, and purpose. *See, e.g.*, *Dermark*, 57 F.4th at 1381, 1385 ("The essence of the context-dependency principle . . . is that a term with one meaning in one provision can take on a different meaning in a different provision that contains surrounding words that require the different meaning," especially when the language is "enacted at different times."). IEEPA empowers the President to "regulate . . . *importation*," 50 U.S.C. § 1702(a) (emphasis added), not "regulate Commerce with foreign nations," U.S. Const. art. I, § 8, cl. 3. "Regulate" is a transitive verb and requires an object to complete its meaning; that IEEPA and the Constitution have different objects ("importation" and

"commerce," respectively) shows that the difference in text matters. *See, e.g.*, *QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*, 95 F.4th 984, 995 (5th Cir. 2024) ("The subsequent verbs . . . are clearly transitive and require an object to complete the thought."). And unlike the Constitution, the term "regulate" in IEEPA comes within a list of other broad terms that reinforce the term's breadth.

Plaintiffs' theory is also contradicted by the many courts that have long held that tariffs are a form of "regulation" of commerce, conflicts with the emergency statutes' purpose, which is to give the President broad and flexible tools to address threats to the United States, and ignores IEEPA's historical backdrop of President Nixon and *Yoshida*. U.S.-Br. 17-21.

Moreover, the Supreme Court has squarely rejected the idea that tariffs are merely a revenue-raising measure, identical to taxes, explicitly stating that merely "because the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce. The contrary is well established." *Bd. of Trs. of Univ. of Illinois v. United States*, 289 U.S. 48, 57-58 (1933); *see United States v. Butler*, 297 U.S. 1, 63 n.10 (1936) (tariff laws have their "basis in the power to regulate foreign commerce."). The Federal Circuit has agreed that tariffs, distinct from taxes, "involv[e] foreign trade[.]" *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1283 (Fed. Cir. 2006).

Plaintiffs assert that, "if Congress intended to delegate its authority to impose taxes and tariffs in IEEPA, it would have used more specific wording[,]" as they claim it does in other tariff-related statutes. States Br. 2. Not so. Congress employed similarly broad language— "adjust . . . imports"—in Section 232 of the Trade Expansion Act of 1962, and the Supreme Court has held that Section 232 authorizes the imposition of tariffs. 19 U.S.C. § 1862(c)

(allowing the President to "adjust . . . imports" in a non-emergency situation that threatens to impair national security); *see Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976) (Section 232's "adjust . . . imports" means that "the President's authority extends to the imposition of . . . duties[.]").  Plaintiffs provide no meaningful explanation for why "regulate . . . importation" cannot authorize tariffs but "adjust . . . imports" does.  And for good reason: a tariff controls importation "as much as a quota" would, because both actions have "initial and direct impact on imports."  *Algonquin*, 426 U.S. at 571; *see Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise" of "the power to regulate commerce") (collecting cases); *id.* at 575 ("to impose duties can be to 'regulate'").  Rather than tie the President's hands, Congress clearly granted the President flexibility[3] to determine what action to take to address a national emergency, including choosing an import control that, "[u]nlike quotas and other forms of action," can "be quickly imposed and removed" and are "administratively less complex."  *Id.* at 580.  So it is unsurprising that even the *V.O.S.* plaintiffs agree that if "[a] tariff does . . . fix, establish, *adjust,* or direct imported

---

[3]  Plaintiffs also ignore that Federal Circuit precedent requires "a broad construction" of "congressional authorizations of presidential power" in reading statutes involving foreign affairs, including trade. *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 793 (Fed. Cir. 1984); *see, e.g.*, *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329-30 (Fed. Cir. 2001) ("Congress does not set out to tie the President's hands" in matters where "international relations are concerned," and to do so, it "must say so in clear language[.]"); *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) ("[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1247 (Fed. Cir. 1985) ("congressional delegations [to the President] are normally given a broad construction" in the "international field").  Plaintiffs' omission is not surprising because this "deeply rooted tradition of judicial restraint" dooms their arguments.  *Al-Bihani v. Obama*, 619 F.3d 1, 38-39 (D.C. Cir. 2010) (Kavanaugh, J., concurring).  To conclude otherwise would violate "basic tenets of statutory interpretation and the tripartite separation of powers," "Article II of the Constitution and the constitutional avoidance canon," and bedrock "prudential considerations."  *Id.* at 39.

property," then IEEPA's phrase "regulate . . . importation" includes the authority to impose tariffs.  VOS-Reply. 4 (emphasis added).

Plaintiffs repeatedly harp on the IEEPA's breadth, suggesting that breadth equals ambiguity.  State Mot. 18, 27.  But law and logic say otherwise.  *See, e.g.*, *United States v. Albert Inv. Co.*, 585 F.3d 1386, 1395 (10th Cir. 2009) ("Although this language is very broad, a statute's breadth does not make it ambiguous."); *Bull v. Nationwide Mut. Fire Ins. Co.*, 824 F.3d 722, 725 (8th Cir. 2016) ("Breadth and ambiguity are not synonymous."); *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 794 n.3 (9th Cir. 2018) ("Rather, the text is broad. Breadth alone does not equal ambiguity."); *Norfolk S. Ry. Co. v. Zayo Grp., LLC*, 87 F.4th 585, 592 (4th Cir. 2023) ("Ambiguity is one thing; breadth quite another."); *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259-60 (Fed. Cir. 2024) (concluding that breadth does not equal ambiguity because "[b]y using nonspecific statutory language, Congress invokes its 'ability to delegate power under broad general directives.'").  Instead, IEEPA's broad language is intentional, meant to give the President "the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  *Yoshida*, 526 F.2d at 573 ("the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully"); *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) ("The broad language of § 202(a)(1) reflects an intentional effort to confer the flexibility necessary to forestall such obsolescence."); *Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) ("Congress' choice of 'broad language' in the Act 'reflects an intentional effort to confer the flexibility necessary' for TSA to address yet unknown threats to transportation security and safety as they arise.").  That is especially true given the bedrock principle that statutes delegating authority to the President in international trade are to

9

be read broadly.  U.S.-Br. 19-20.

Finally, plaintiffs' constitutional-avoidance argument fails.  *See* States Mot. 19.  First, there is no grave constitutional doubt.  *See, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1332 (Fed. Cir. 2021) (rejecting application of constitutional-doubt canon when "there is no substantial constitutional doubt").  Plaintiffs entirely ignore that the circuits that have upheld IEEPA against nondelegation challenges have done so against a standard *higher* than the one that applies here.  U.S.-Br. 32 n.2.  Moreover, the nondelegation standard is even *easier* to meet here where foreign affairs and national security is at issue.  *Id.* 31-32.  Given *Yoshida*'s holding that TWEA passed the nondelegation doctrine, circuit court rulings holding that IEEPA passed a more stringent nondelegation standard, and the fact that the standard here is even lower because of the President's overlapping authority, there is no nondelegation issue here.  *Id.* 27-32.  Second, constitutional avoidance applies "only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).  Text, context, history, and purpose show that IEEPA clearly authorizes the President to impose tariffs on imports; plaintiffs' reading is thus "plainly contrary to the intent of Congress" and should not be adopted.  *Miller v. French*, 530 U.S. 327, 341 (2000).

## II.    Plaintiffs Cannot Establish That The Major-Questions Doctrine Applies, Or That It Would Help Them

Both plaintiffs and amicus curiae, the Institute for Policy Integrity at New York University School of Law (NYU),[4] argue that the Executive Orders at issue implicate the major-

---

[4] While NYU's amicus brief was filed in *V.O.S.*, defendants respond to it here, given the lack of opportunity to otherwise do so before the May 13, 2025 hearing.  Defendants reserve the right to respond more fully to the amicus briefs by the deadline set forth in this Court's rules.

questions doctrine. States Mot. 18-19; Case No. 25-00066, ECF No. 44 at 13-17 (NYU Br.). But they largely sidestep that the doctrine does not apply to authority delegated to the President or in the national-security context.

NYU claims that Supreme Court decisions "strongly indicat[e]" that the major-questions doctrine applies to Presidential action, NYU Br. 19-20, but the Supreme Court has *never* applied the doctrine to a statute delegating power to the President. Instead, it has repeatedly and intentionally described the doctrine as applicable to executive *agencies*. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 502 (2023); *West Virginia v. EPA*, 597 U.S. 697, 724 (2022); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). And a unanimous panel of the Ninth Circuit has recognized that "[t]he Major Questions Doctrine is motivated by skepticism of agency interpretations" and "does not apply to Presidential actions." *Mayes v. Biden*, 67 F.4th 921, 933, 934 (9th Cir. 2023), *vacated as moot by* 89 F.4th 1186 (Mem.) (9th Cir. 2023). "[D]etermining that the Major Questions Doctrine prevents the President from exercising lawfully delegated power . . . would be rewriting the Constitution's Faithfully Executed Clause in a way never contemplated by the Framers." *Id.*

Since *Mayes*, one judge of the Ninth Circuit has applied the doctrine to the President. *Nebraska v. Su*, 121 F.4th 1, 20 (9th Cir. 2024) (Nelson, J., concurring). But the *Su* majority "d[id] not address the . . . argument that this doctrine does not apply to congressional delegations of authority to the President." *Id.* at 14 n.6. Authority in other circuits is mixed. The Eleventh Circuit has not held the doctrine applies to presidential action. The lead opinion in *Georgia v. President of the United States*, 46 F.4th 1283, 1289 (11th Cir. 2022), is signed by a single judge. A second judge's opinion concurring in the result makes no mention of the major-questions doctrine. *Id.* (Edmondson, J., concurring in the result). And the panel's third judge would have

held the doctrine inapplicable. *Id.* at 1313 (Anderson, J., concurring in part and dissenting in part). Judge Anderson recognized that "the President . . . does not suffer from the same lack of political accountability that agencies may, particularly when the President acts on a question of economic and political significance." *Id.* A dissenting judge in *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022), also would have followed Judge Anderson's reasoning. *Id.* at 1038 (Graves, J., dissenting). As for the Sixth Circuit, *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), the court "never squarely addressed its reasoning for treating presidential action the same as agency action." *Mayes*, 67 F.4th at 933-34.

Plaintiffs cite *Biden v. Nebraska* for the proposition that the Supreme Court considered how Presidents used statutes declaring national emergencies in invoking the major-questions doctrine. States Br. 18. But they ignore a crucial distinction—in *Nebraska*, while the President declared a national emergency, it was the Secretary of Education who took the agency action at issue. 600 U.S. at 486, 501. Indeed, *Nebraska* does not even mention the President in its discussion of the major-questions doctrine, instead observing that "the Secretary of Education claims the authority, *on his own*, to release 43 million borrowers from their obligations to repay . . . student loans." *Id.* at 501 (emphasis added). *Nebraska* cannot be fairly read to suggest that the major-questions doctrine applies to the President, particularly with regard to a national emergency related to foreign affairs and national security.

In any event, even if the major-questions doctrine applied to the President, the doctrine's clear-authorization requirement still would not be triggered. NYU claims that the tariffs are both "unheralded," because no President has used IEEPA to impose tariffs, and "transformative," because their imposition "converts" IEEPA into a statute that authorizes broad tariffs, even though other statutes that authorize tariffs already exist. NYU Br. 13. But President Nixon

relied on the same statutory language in TWEA to impose tariffs in response to a threat to the country's balance-of-payments crisis, so the President's invocation of IEEPA to impose tariffs is not "unheralded," but rather grounded in precedent.  Proclamation 4074, *Imposition of Supplemental Duty for Balance of Payments Purposes*, 36 Fed. Reg. 15,724 (Aug. 17, 1971).  NYU posits that the Supreme Court might not consider the exercise of authority under a "different" statute to defeat the "unheralded" prong because the focus should be on the "actual statutory provision at hand."  NYU Br. 14.  But focusing on the "actual statutory provision at hand" only shows the obvious—that the statutory provision relied upon by President Nixon uses *exactly the same* language as the one at issue in this case, and Congress specifically chose to use the same language shortly after President Nixon relied on the language to impose tariffs and the CCPA upheld that exercise of power.  And plaintiffs do not deny that courts, including the Supreme Court, have looked to TWEA precedent in interpreting IEEPA, showing the statutes' deep connection.  U.S.-Br. 17.  Nor is reliance on IEEPA to impose tariffs transformative.  Presidents have repeatedly and continually used IEEPA to impose trade sanctions based on foreign policy-concerns.  *See* U.S.-Br. 24 (collecting several examples).  In any event, IEEPA could not have been "converted" into a statute authorizing tariffs because it has always authorized tariffs.  *See Yoshida*, 526 F.2d at 576-77.

Regardless, IEEPA easily passes the major-question doctrine's clear-authorization test.  Though the major-questions doctrine requires "clear congressional authorization," *West Virginia*, 597 U.S. 697, the standard is not a magic-words requirement.  *See Nebraska*, 600 U.S. at 511 (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the precise agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis

for the agency action is necessary") (emphasis added).  IEEPA provides far more than "a

colorable textual basis," *id.* at 722; text, context, history, and purpose overwhelmingly show that

IEEPA authorizes the President to impose tariffs to address a declared national emergency.

Because IEEPA clearly authorizes the President to impose tariffs, plaintiffs' and NYU's major-

questions argument fails.

## III.    The National Emergency Is An Unreviewable Political Question And, Even If Subject To Review, Is Valid

Plaintiffs suggest that a court can question whether the threat the President identified is

truly "unusual and extraordinary," States Br. 4, but they cite little authority for that proposition.

That is because no persuasive authority exists.  But there is substantial contrary authority.  *See,*

*e.g.*, *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *Ctr. for Biological*

*Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020); *Beacon Prods. Corp. v. Reagan*, 633

F. Supp. 1191, 1194-95 (D. Mass. 1986); U.S.-Br. 33 (collecting other cases).  Determining

whether there is an "unusual and extraordinary" threat to the United States is not "a purely legal

question of statutory interpretation[,]" but rather a matter of "policy choices and value

determinations constitutionally committed for resolution to . . . the confines of the Executive

Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  "[C]ourts are

fundamentally underequipped to formulate national policies or develop standards for matters not

legal in nature."  *Id.* (quotation omitted).  That is why courts have never reviewed a President's

national-emergency declaration or finding of a national-security threat under IEEPA.  *See* U.S.-

Br. 32-36 (collecting cases).

Consider *Ludecke v. Watkins*, 335 U.S. 160 (1948).  There, the President's delegated

powers were conditioned on the existence of a "declared war."  *Id.* at 161.  The Supreme Court

explained that the judiciary could review whether a declared war still existed by looking to see

whether "a political act" had occurred terminating the war—for example, a "treaty or legislation or Presidential proclamation." *Id.* at 168-69. But "[w]hether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled." *Id.* at 169. And because "[t]he political branch of the Government ha[d] not brought the war with Germany to an end" (the President having "proclaimed that 'a state of war still exist[ed]'" despite "the unconditional surrender of Germany and the disintegration of the Nazi Reich"), the Court held that there was still a "declared war" authorizing the President's use of delegated powers. *Id.* at 170 ("It is not for us to question a belief by the President that enemy aliens" still posed security risks. "These are matters of political judgment for which judges have neither technical competence nor official responsibility.").

The result is the same here. The Court can determine whether the political act of determining that an "unusual and extraordinary" threat exists has occurred (*i.e.*, whether the President has declared a national emergency). The answer to that question is easy: the President declared an emergency stemming from just such a threat. But the Court has "neither technical competence nor official responsibility" to question whether that threat exists or rises to the level of plaintiffs' understanding of "unusual and extraordinary." *Ludecke*, 335 U.S. at 170; *see Japan Whaling Ass'n*, 478 U.S. at 230; *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) (the President's determination of "the existence of a [national-security] 'threat'" is unreviewable); *Beacon Prods.*, 633 F. Supp. at 1195 ("How, for example, is the court to determine whether Nicaragua poses more than an ordinary or usual threat?"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (Courts have "consistently held . . . that courts are not a forum for reconsidering the wisdom of discretionary decisions made by

15

the political branches in the realm of foreign policy or national security."); *Lee v. Garland*, 120 F.4th 880, 890-91 (D.C. Cir. 2024) ("the Constitution commits national-security judgments to the political branches").

Moreover, IEEPA and the National Emergency Act clearly "place[] the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms." *United States v. Amirnazmi*, 645 F.3d 564, 581 (3d Cir. 2011). In other words, whether there is a proper national-emergency declaration of a national emergency and whether there is an unusual and extraordinary threat are textually committed for Congress to decide. That is especially obvious here, because Congress has initiated the fast-track procedure it enacted. *See, e.g.,* Joint Resolution, S.J. Res. 49, 119th Cong. (2025) (49-49 failed vote on resolution terminating the national emergency the President declared in Executive Order 14257); Joint Resolution, S.J. Res. 37, 119th Cong. (2025) (passed Senate resolution terminating the national emergency the President declared in Executive Order 14193 regarding fentanyl from Canada; currently held in the House). The Court should let the political process resolve these political questions.

Plaintiffs also contend that the means the President chose to deal with the "unusual and extraordinary" threat he has identified are not "reasonably related" to those threats. States Br. 4–5. This question is also unreviewable. Just how to exercise IEEPA authority to deal with a threat is a determination that is "committed to the President's discretion," even if it involves consideration of "the nation's economic interests." *Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1343 (Fed. Cir. 2010); *see United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940); *Florsheim*, 744 F.2d at 796 ("the presidential decision is a 'multifaceted judgmental decision,' for which there is 'no law to apply'"); *El-Shifa*, 607 F.3d at 843 (that "the strategic choices directing the nation's foreign affairs are constitutionally committed to the

political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters"); *Htet v. Trump*, No. CV 24-1446, 2025 WL 522033, at *7 (D.D.C. Feb. 18, 2025) (finding unreviewable the means chosen under IEEPA to address emergency because "[t]he Court would then need to opine on whether the President's action effectively counters the threat"). Section 232 precedent confirms as much. There, as here, "there is no review of the President's pertinent factual and remedial-appropriateness determinations." *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023) (the court "may not second-guess the facts found and measures taken by the President to support his adjustment").

Even if the President's discretionary determination to regulate importation by imposing tariffs were reviewable, plaintiffs would still have "the burden to establish that there is no 'reasonably conceivable' state of facts that could provide a rational basis for" the President's action.[5] *Transpacific*, 4 F.4th at 1333 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). They come nowhere close.

Plaintiffs hinge their argument that a trade deficit cannot constitute an "unusual and extraordinary threat" under IEEPA on the premise that the trade deficit is not "rare and brief," but instead is a persistent state of affairs. States Br. 4, States Mot. 22. But nothing about "unusual and extraordinary" speaks to timing. And Congress's express allowance for the extension of national emergencies that persist after one year confirms it did not understand the term that way. *See* 50 U.S.C. § 1622(d). Indeed, Presidents have issued Executive Orders, under

---

[5] Despite plaintiffs' implication to the contrary, States Br. 4 (arguing that the tariffs are "arbitrary"), the President's actions are not subject to review under the Administrative Procedure Act. *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (Presidential action is not subject to APA requirements); *Michael Simon Design, Inc.*, 609 F.3d at 1340.

the National Emergency Act and IEEPA, addressing emergencies that have lasted for decades. In fact, one emergency declared under IEEPA was recently extended into its 45th year, Notice of Nov. 1, 2024, *Continuation of the National Emergency with Respect to Iran*, 89 Fed. Reg. 87,761 (Nov. 4, 2024) (continuing national emergency, with respect to the Iran hostage crisis, dating back to 1979).

Recent presidential declarations have also extended other persistent emergencies. *See, e.g.*, Notice of Aug. 13, 2024, *Continuation of the National Emergency with Respect to Export Control Regulations*, 89 Fed. Reg. 66,187 (Aug. 15, 2024) (continuing national emergency, dating back to 2001, with respect to the expiration of the Export Administration Act of 1979); Notice of Oct. 11, 2024, *Continuation of the National Emergency with Respect to Significant Narcotics Traffickers Centered in Colombia*, 89 Fed. Reg. 83,417 (Oct. 15, 2024) (continuing national emergency, dating back to 1995, with respect to narcotics trafficking in Colombia). Plaintiffs' interpretation of IEEPA and the NEA would throw doubt on these and other ongoing national emergencies.

Indeed, the 2001 Executive Order, which declared a national emergency with respect to export control regulations and is still active, did no more than extend the provisions of an expiring law that had been enacted in 1979. Executive Order 13222, *Continuation of Export Control Regulations*, 66 Fed. Reg. 44,025 (Aug. 22, 2001) (extending by Executive Order the provisions of the expiring Export Administration Act of 1979). And, when invited to second-guess the President's authority to invoke IEEPA in issuing the order, the Ninth Circuit declined to do so, holding that IEEPA did not "run afoul of the nondelegation doctrine" and that "courts must be hesitant to review the executive's declaration of a national emergency." *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023).

Nor should the Court countenance plaintiffs' claim that the "worldwide" nature of the tariffs affects the nature of the emergency, or the means of addressing it. States Br. at 4. Presidents have frequently issued Executive Orders that—rather than targeting specific countries or regions—have worldwide effect. *See, e.g., Continuation of the National Emergency with Respect to Export Control Regulations* (applying worldwide); Executive Order 14059, *Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade*, 86 Fed. Reg. 71,549 (Dec. 17, 2021) (declaring national emergency with respect to trafficking of fentanyl and other opioids, applied on a worldwide basis); Notice of July 16, 2024, *Continuation of the National Emergency With Respect to Transnational Criminal Organizations*, 89 Fed. Reg. 58,617 (July 18, 2024) (continuing national emergency with respect to transnational criminal activity, applied on a worldwide basis). The varying nature, length, and breadth of national emergencies declared by Presidents illustrates why "courts must be hesitant to review the executive's declaration of a national emergency." *Shih*, 73 F.4th at 1092.

Plaintiffs also opine on the economic wisdom of the President's use of tariffs to address the national emergency.[6] Even if the question were one for judicial review—which it is not— tariffs have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and are "'plausibly related to the Government's stated objective to protect' national security" and increase domestic production. *Transpacific*, 4 F.4th at 1333-34 (quoting *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018)) (rejecting the contention that differing tariff rates between countries

---

[6] Plaintiffs also fail to acknowledge that the basis for the declared emergency is not just "persistent annual U.S. goods trade deficits" but also the currently acute effects of such persistent trade deficits that have "atroph[ied]" our nation's "domestic production capacity" such that now, the United States' "military readiness" and "national security posture" are "compromise[d]." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,044-45 (Apr. 7, 2025).

was irrational, explaining that "it is rational for the President to try a steep increase on tariffs for only one major exporter to see if that strategy helps to achieve the legitimate objective of improve domestic capacity utilization without extending the increase more widely").

Indeed, in 2023, the International Trade Commission issued a report analyzing the effects of the President's previous tariffs, imposed under Sections 232 and 301, on more than $300 billion of U.S. imports. *Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023). This analysis revealed that the tariffs reduced imports from China, were effective in stimulating increased U.S. production of steel and aluminum, and had very minor effects on U.S. prices. *Id.* at 21-22. Further, the Coalition for a Prosperous America released an economic model simulating a worldwide 10 percent tariff on U.S. imports and found that the "tariff makes imports less competitive and domestic production of manufactured and other goods rise to take advantage of the opportunities" leading to "more jobs and more capital investment." Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024), https://prosperousamerica.org/global-10-tariffs-on-u-s-imports-would-raise-incomes-and-pay-for-large-income-tax-cuts-for-lower-middle-class/ [https://perma.cc/XUZ8-BG99].

Notably, the tariffs are already beginning to address the national emergency, as the extensive ongoing negotiations with many countries and the recently announced historic trade deal with the U.K. show. *See Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-u-s-uk-reach-historic-trade-deal/ [https://perma.cc/7CPW-8CF2]. The data and prompt real-world effects reveal that, at a minimum, the tariffs are a rational policy choice. And any debate about the particulars of the

underlying judgments and likely effects only underscores that the Executive Orders involve precisely the sort of judgement committed to the political branches of government, which this Court should not review.

At bottom, plaintiffs fail to show that the Court may review the national emergency, or the means enacted to address it. And, even if the Court could review the matter, plaintiffs cannot meet their burden of showing that no reasonably conceivable state of facts could provide a rational basis for the President's actions. Accordingly, the Court should reject their arguments.

## CONCLUSION

For these reasons, and those stated in our response to the *V.O.S.* plaintiffs' motion for summary judgment, the Court should deny the *V.O.S.* motion for summary judgment and enter judgment in favor of defendants.


DATED: May 12, 2025                            Respectfully submitted,

OF COUNSEL:                                    YAAKOV M. ROTH
                                               Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                                       ERIC J. HAMILTON
                                               Deputy Assistant Attorney General
STEPHEN M. ELLIOTT
Assistant Director                             PATRICIA M. McCARTHY
U.S. Department of Justice                     Director
Civil Division
Federal Programs Branch                        /s/ Claudia Burke
                                               CLAUDIA BURKE
                                               Deputy Director

                                               /s/ Justin R. Miller
                                               JUSTIN R. MILLER
                                               Attorney-In-Charge
                                               International Trade Field Office

                                               /s/ Sosun Bae
                                               SOSUN BAE
                                               Senior Trial Counsel
                                               LUKE MATHERS
                                               CATHERINE M. YANG
                                               BLAKE W. COWMAN
                                               COLLIN T. MATHIAS
                                               Trial Attorneys
                                               U.S. Department of Justice
                                               Civil Division
                                               Commercial Litigation Branch
                                               PO Box 480, Ben Franklin Station
                                               Washington, DC 20044
                                               (202) 305-7568
                                               sosun.bae@usdoj.gov

                                               *Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to the Court's April 29, 2025 order, that this brief contains 5,781 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Sosun Bae
SOSUN BAE