# EXHIBIT A

## IN THE UNITED STATES COURT OF
## INTERNATIONAL TRADE

Before The Honorable Gary S. Katzmann, Judge, The Honorable Timothy Reif, Judge, The Honorable Jane A. Restani, Judge

|  |  |
|---|---|
| THE STATE OF OREGON, *et al.,* <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00077 |

## BRIEF OF 148 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

Fred Norton
Nathan Walker
Josephine Petrick
Celine Purcell
Emily Kirk
Rebecca Kutlow
The Norton Law Firm PC
300 Frank Ogawa Plaza
Oakland, CA 94512
Telephone: 510-906-4900
fnorton@nortonlaw.com
nwalker@nortonlaw.com
jpatrick@nortonlaw.com
cpurcell@nortonlaw.com
ekirk@nortonlaw.com
rkutlow@nortonlaw.com

*Attorneys to Amici Curiae*

Jennifer Hillman (*application for admission pending*)
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
jennifer.hillman@law.georgetown.edu

Peter Harrell (*application for admission pending*)
Peter Harrell LLC
1102 St. Louis Place NE
Atlanta, GA 30306
harrell@peterharrelllaw.com

*Of Counsel*

# TABLE OF CONTENTS

INTEREST OF *AMICI* ............................................................................................... 1

INTRODUCTION ....................................................................................................... 4

DISCUSSION ............................................................................................................. 7

    I. When Congress Delegates Its Constitutional Authority to Impose Tariffs, It Does So Explicitly and with Express Parameters and Procedural Safeguards................................ 7

        A. Congress, not the President, has the constitutional power to impose tariffs...... 7

        B. When Congress delegates its tariff-raising authority, it does so explicitly and specifically. ............................................................................................... 7

        C. When Congress delegates its tariff-raising authority, it imposes substantive limitations and procedural controls on the imposition of tariffs.......................... 10

    II. IEEPA Does Not Authorize the Raising or Lowering of Tariffs. ............................... 16

        A. The plain text of IEEPA does not provide the President with the power to impose tariffs. ................................................................................................ 17

        B. Congress has demonstrated it knows how to clearly and unmistakably authorize tariffs when it wants to—and it did not do so in IEEPA...................... 18

        C. Congress addressed the need for the President to impose tariffs in appropriate, genuine trade emergencies in other tariff statutes, not IEEPA. ............................ 19

        D. IEEPA's power to "regulate" does not include the power to "tariff." ............. 22

        E. The term "regulate" in IEEPA cannot include the power to impose tariffs because it would put IEEPA in conflict with the constitutional prohibition on export taxes. ................................................................................................ 24

        F. The court's opinion in United States v. Yoshida International, Inc. does not control here or establish that IEEPA provides for tariffs...................................... 24

    III. IEEPA's Legislative History and Historical Practice Confirm It Does Not Delegate Congress's Tariff Power. ................................................................................................ 25

        A. IEEPA's legislative history confirms it was not intended to grant tariff-raising authority to the President. .................................................................................. 25

        B. For nearly 50 years, Presidents used IEEPA without imposing tariffs, which are a poor fit for carrying out IEEPA's purposes. ..................................................... 28

    IV. Allowing the President to Impose Tariffs Under IEEPA Would Allow the Executive to Usurp Trade Power. ................................................................................................... 31

CONCLUSION ........................................................................................................... 34

APPENDIX OF *AMICI* ............................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

Cases

*A.G. Spalding & Bros. v. Edwards,*
    262 U.S. 66 (1923) ............................................................................................................. 24

*Am. Inst. Int'l Steel v. United States,*
    376 F. Supp. 3d 1355 (Ct. Int'l Trade 2019) .................................................................. 7

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ................................................................................... 18, 23, 29, 31

*Bittner v. United States,*
    598 U.S. 85 (2023) ......................................................................................................... 18

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568 (1988) ....................................................................................................... 24

*Erlenbaugh v. United States,*
    409 U.S. 239 (1972) ....................................................................................................... 23

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ................................................................................................. 13, 19

*Field v. Clark,*
    143 U.S. 649 (1892) ......................................................................................................... 4

*Gundy v. United States,*
    588 U.S. 128 (2019) ....................................................................................................... 31

*J.W. Hampton, Jr. & Co. v. United States,*
    276 U.S. 394 (1928) ......................................................................................................... 4

*Jama v. Immig. & Customs Enf't,*
    543 U.S. 335 (2005) ....................................................................................................... 18

*Marland v. Trump,*
    498 F. Supp. 3d 624 (E.D. Pa. 2020) ............................................................................ 20

*Nat'l. Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................................. 23, 24

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
    587 U.S. 601 (2019) ....................................................................................................... 21

*Rack Room Shoes v. United States*,
   821 F. Supp. 2d 1341 (Ct. Int'l Trade 2012) .......................................................... 22

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ..................................................................................................... 21

*TikTok Inc. v. Garland*,
   604 U.S. __, 145 S. Ct. 57 (2025) ............................................................................. 20

*TikTok Inc. v. Trump*,
   507 F. Supp. 3d 92 (D.D.C. 2020) ..................................................................... 20, 23

*Totes-Isotoner Corp v. U.S.*,
   569 F. Supp. 2d 1315 (Ct. Int'l Trade 2008) .......................................................... 22

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014) ........................................................................................ 18, 23, 25

*United States v. Am. Trucking Ass'ns*,
   310 U.S. 534 (1940) ..................................................................................................... 31

*United States v. Braxtonbrown-Smith*,
   278 F.3d 1348 (D.C. Cir. 2002) ................................................................................ 31

*United States v. Penn*,
   63 F.4th 1305 (11th Cir. 2023) ................................................................................. 23

*United States v. Yoshida Int'l, Inc.*,
   526 F.2d 560 (C.C.P.A. 1975) ..................................................................... 21, 24, 25

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................................................................................ 18, 23, 25

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001) ..................................................................................................... 25

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ....................................................................................................... 7

Statutes

12 U.S.C. § 5491 ................................................................................................................ 23

15 U.S.C. § 78(d) .............................................................................................................. 23

19 U.S.C. § 1338 ........................................................................................................ 8, 9, 12

19 U.S.C. § 1338(a) .................................................................................................. 8, 10, 18

19 U.S.C. § 1862 ..................................................................................................... passim

19 U.S.C. § 1862(c) ........................................................................................................ 8

19 U.S.C. § 2132 ............................................................................................... 8, 9, 12, 20

19 U.S.C. § 2132(a)(3)(A) ......................................................................................... 8, 10

19 U.S.C. § 2253(a)(3) ................................................................................................... 10

19 U.S.C. § 2253(a)(3)(A)–(B) ....................................................................................... 9

19 U.S.C. § 2411(c)(1)(B) ........................................................................................ 9, 10

19 U.S.C. § 1673 ............................................................................................................. 8

19 U.S.C. §§ 2251-2254 .................................................................................................. 8

19 U.S.C. §§ 2411-2420 .................................................................................................. 8

47 U.S.C. § 303(e) ........................................................................................................ 23

50 U.S.C. § 1701(a) ...................................................................................................... 19

50 U.S.C. § 1702 ........................................................................................... 17, 24, 32

50 U.S.C. § 1702(a)(1)(B) ...................................................................................... passim

50 U.S.C. §§ 1701–1710 .......................................................................................... 5, 26

50 U.S.C.§ 1702(a) ....................................................................................................... 27

Pub. L. 73-316 ........................................................................................................... 5, 1

Pub. L. 93-618 ............................................................................................................. 21

Pub. L. 95-223 ....................................................................................................... 21, 25

Pub. L. 103-465 ........................................................................................................... 31

Pub. L. 116-113 ........................................................................................................... 32

Pub. L. 118-50 ............................................................................................................ 20

U.S. Const. Art. I, § 7 .............................................................................................. 4, 5, 7

U.S. Const. Art. I, § 8, cl. 1 ....................................................................................... 4, 7

U.S. Const. Art. I, § 8, cl. 3 ............................................................................................. 4

U.S. Const. Art. I, § 9, cl. 5 .................................................................................. 17, 24

Other Authorities

Exec. Order No. 12170 ............................................................................................. 28

Exec. Order No. 13338 ............................................................................................. 29

Exec. Order No. 13694 ............................................................................................. 28

Exec. Order No. 13873 ............................................................................................. 28

Exec. Order No. 13959 ............................................................................................. 28

Exec. Order No. 14068 ............................................................................................. 29

Exec. Order No. 14105 ............................................................................................. 28

Exec. Order No. 14117 ............................................................................................. 28

H. R. Rep. No. 95-459 ........................................................................................ 26, 27

S. Rep. No. 95-466 ................................................................................................... 27

### INTEREST OF *AMICI*

*Amici Curiae* are 148 elected Members of the U.S. House of Representatives representing districts around the country and include (1) Members of the House Committee on Ways and Means, which has had responsibility for tax and tariff matters since 1789, (2) Members of the House Committee on Foreign Affairs, which has responsibility for foreign affairs matters, including the exercise of the President's powers under the International Emergency Economic Powers Act (IEEPA), and (3) Members who serve on the House Committee on the Judiciary, which is concerned, *inter alia*, with protecting Congress's constitutional prerogatives and the faithful execution of the law.

*Amici* represent diverse districts and hold diverse positions on American trade policy. But *Amici* are united in their view that the President has usurped Congress's constitutional authority by using IEEPA to impose chaotic, across-the-board tariffs. Our Constitution grants Congress, not the President, the power to impose tariffs. The President may raise tariffs only pursuant to a lawful Congressional delegation of Congress's Article I, Section 8 power. IEEPA is not such a delegation as the law's plain text and legislative history make clear. As Members of Congress, *Amici* will not stand idly by while the President usurps an effectively unbounded authority over American tariffs and trade. When the President wishes to impose tariffs, he must do so in accordance with the many lawful delegations of trade power that Congress has enacted over more than 50 years or, if existing authorities are insufficient, ask Congress to provide him with additional authorities.

The scale of the President's actions has been substantial. The Yale Budget Lab estimates that the President's tariffs since January 20, 2025 will raise the average U.S. effective tariff rate

from 2.4% to 28%, the highest since 1901, and that even after trade flows adjust to the new rates, the average U.S. tariff rate will be 18%, the highest since 1934.[1]  The President's IEEPA tariffs comprise the bulk of this increase, which also includes several other, smaller tariff measures. The Tax Foundation estimates the tax increase will be $2.1 trillion over ten years; while the White House itself has estimated the number at $6 trillion.[2]

By using IEEPA, rather than other statutes in which Congress did provide the President both authority to impose tariffs and well defined procedures to do so, the President has implemented these tariffs in a hasty and chaotic manner.  He has announced tariffs that come into effect within days, only to announce partial reductions days later in the face of a declining stock market.  This creates enormous challenges and uncertainty for businesses of all sizes, but particularly small businesses, that rely on global supply chains for manufacturing equipment as well as products to stock their shelves.  The uncertainty caused by constantly shifting tariff policies is profoundly chilling to investment, a key driver of U.S. economic growth.[3]

Congress actually and clearly delegated tariff powers to the President in other statutes.

---

[1] The Yale Budget Lab, *State of U.S. Tariffs: April 15, 2025*, https://budgetlab.yale.edu/research/state-us-tariffs-april-15-2025 ("The 2025 tariffs to date are the equivalent of a 25.6 percentage point increase in the US average effective tariff rate … This increase would bring the overall US average effective tariff rate to 28%, the highest since 1901").

[2] The Tax Foundation, *Trump Tariffs: The Economic Impact of the Trump Trade War* (May 5, 2025), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/; CNN Business, "Trump Aide Says Tariffs Will Raise $6 Trillion, Which Would be Largest Tax Hike in US History," March 31, 2025, https://www.cnn.com/2025/03/31/economy/tariffs-largest-tax-hike

[3] *See* Jeffrey Sonnenfeld and Steven Tian, *The Trump Tariffs Are Paralyzing Business Investment*, Yale Insights (April 7, 2025), https://insights.som.yale.edu/insights/the-trump-tariffs-are-paralyzing-business-investment.

Those statutes provide the President with substantial powers to address unfair foreign trade practices, to protect U.S. national security, and to support U.S. manufacturers and American workers—the backbone of the American economy.  But the President must pursue his trade policies in a lawful, orderly, and bounded manner.  Instead, the President has unlawfully exceeded the authority conferred to him by Congress in a chaotic manner that is damaging to many of *Amici's* constituents.

Amici thus submit this brief in support of Plaintiff's motion for a preliminary injunction (Dkt. No. 14) converted into a motion for summary judgment by this Court (see Dkt. No. 18).

## INTRODUCTION

The Framers of the Constitution made a deliberate choice to give only Congress the power to "lay and collect Taxes, Duties, Imposts and Excises," U.S. Const. Art. I, § 8, cl. 1, and to "regulate Commerce with foreign nations," U.S. Const. Art. I, § 8, cl. 3. This allocation of power to "lay and collect Taxes, Duties, Imposts and Excises" reflected the British tradition of the Parliament, not the King, possessing the power to enact tariffs and other taxes. It also reflected the Framers' interest in ensuring that the most democratically accountable part of the government—the one closest to the people—be responsible for enacting taxes that would necessarily have to balance different interests. Federalist Papers Nos. 31–36. Indeed, the Constitution specifically requires that "all Bills for raising revenue shall originate" in the more democratic chamber of Congress, the House of Representatives. U.S. Const. Art. I, § 7.

Throughout the history of the nation, Congress has held its tariff power closely. In the nineteenth and the early twentieth century, Congress generally specified tariff rates in the statutes it enacted. It only delegated the power to adjust tariff rates within tightly controlled limits and after specific factual findings. *See generally Field v. Clark*, 143 U.S. 649 (1892) (upholding against a constitutional challenge a provision of the 1890 Tariff Act allowing the President to suspend duty-free entry of goods upon a finding that the exporting country's own duties are reciprocally unequal and unreasonable); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) (upholding a delegation to the President in the 1922 Tariff Act to increase or decrease duties based on differences in costs of production). Beginning with the Reciprocal Trade Agreements Act of 1934 (RTAA), Congress began to delegate more significant authority to the President to set tariffs. Even then, though, Congress carefully circumscribed the President's

4

authority, for example by sunsetting the authority to proclaim duties after three years, placing limits on the extent to which the President could alter preexisting duties, and requiring public notice and consultation, including with administrative agencies. *See* Reciprocal Trade Agreement Act, Pub. L. 73-316, 48 Stat. 943.

What is jealously guarded is not lightly bestowed. ***Every*** delegation of the tariff power left no doubt as to Congress's intent by expressly and explicitly invoking the language of Article I, using the term "duties" along with "tariffs," "articles," "countries of origin," and other clear statements of its intent. Congress has ***never*** delegated its tariff power implicitly. Moreover, in each and every delegation, Congress has retained substantial control, by prescribing the scope of the tariff power the President may exercise; defining trade-specific conditions that must be satisfied before the power may be exercised; requiring formal processes such as investigations, fact finding, and public hearings; or setting explicit temporal limits on tariffs the President may impose pursuant to the grant.

In declaring, reconsidering, revising, and revoking tariffs in the sweeping regime challenged here, the President did not use any of the statutes Congress has enacted that expressly delegate the authority to impose tariffs. Again, those statutes are limited in scope and impose procedural requirements. Those statutes would require a process to be followed, a justification for tariffs to be established, and notice and an opportunity to be heard for those the tariffs will affect. The President did not follow the procedures and rules set forth by Congress. The President did not follow the law.

Instead, the President chose to invoke the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1710, a 1977 statute that provides the President with defined

5

powers to address national emergencies.  But IEEPA does not empower the President to impose tariffs, or to remove them.  Neither the word "duties" nor the word "tariffs" appears anywhere in the statute.  Rather, IEEPA merely allows the President, in times of emergency, to "regulate … importation or exportation" of property.  50 U.S.C. § 1702(a)(1)(B).  But a delegated power to "regulate" is not a power to impose tariffs or other taxes; otherwise dozens of federal agencies that are authorized to regulate subject matter X, Y, or Z, would seemingly be authorized to tax subject matter X, Y, or Z—and they are not.  Moreover, the President's reading of "regulate" would violate still other canons of construction, as his novel interpretation of IEEPA would permit unconstitutional export tariffs and undermine the policies Congress has pursued through free trade agreements, tariff preference programs, and other trade laws.

IEEPA also has none of the hallmarks of a tariff statute, such as limited scope, trade-specific conditions, procedural safeguards, public input, collaboration with Congress, or a time limit.  Rather, IEEPA's text and legislative history confirm that Congress neither intended to nor provided for IEEPA to be a tariff statute.  In the five decades since IEEPA's enactment, no President, from either party, aside from President Trump, had ever claimed that IEEPA conferred the authority to impose tariffs.

Unmoored from the structural safeguards and cabined discretion Congress crafted into actual tariff statutes, the President's on-again, off-again, up-then-down emergency tariffs under IEEPA have led to chaos and uncertainty.  At the same time, those unlawful tariffs conflict with and undermine the tariff statutes, preference programs, and trade agreements that Congress has duly enacted, that the President is bound to faithfully execute.

The President has no power to impose tariffs under IEEPA, and *Amici* respectfully submit

that the relief sought in the complaint and in Plaintiffs' motion for a preliminary injunction is amply warranted.

## DISCUSSION

I.    **When Congress Delegates Its Constitutional Authority to Impose Tariffs, It Does So Explicitly and with Express Parameters and Procedural Safeguards.**

A.    ***Congress, not the President, has the constitutional power to impose tariffs.***

"The President's power, if any, … must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Neither is present here.

Only Congress, not the President, has the constitutional power to impose tariffs and to regulate trade with foreign nations. *Am. Inst. Int'l Steel v. United States*, 376 F. Supp. 3d 1355, 1376 (Ct. Int'l Trade 2019) (Katzmann, J.) ("[T]he power to impose duties is a core legislative function."). Article I Section 8 vests Congress—not the President—with the power to "lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign Nations." The Constitution thus gives Congress the power to enact legislation imposing tariffs on U.S. imports, consistent with the constitutional mandate that tariffs "shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. Unless Congress has clearly delegated that authority by legislative act, the President may not raise tariffs on imported goods. *See id.*; *Youngstown*, 343 U.S. at 585. Congress granted the President no such power through IEEPA.

B.    ***When Congress delegates its tariff-raising authority, it does so explicitly and specifically.***

When Congress intends to authorize duties, it says so. It uses the word "duty" to signal a delegation of its Article I power to "lay and collect Duties" and has done so from the moment it

7

began delegating tariff authority.  There are four primary statutes in which Congress has clearly and explicitly delegated tariff-raising authority to the President.[4]  Two more laws (providing for anti-dumping duties and countervailing duties pursuant to investigations) authorize the imposition of tariffs on specific products from specific countries following investigations of unfair trade practices by the Department of Commerce and the U.S. International Trade Commission.  19 U.S.C. §§ 1673 *et seq.*, 1671 *et seq.*  One other statute prohibits the decrease or elimination of certain duties, while authorizing adjustments to imports that threaten national security, Section 232 of the Trade Expansion Act of 1962.  19 U.S.C. § 1862 [hereinafter Section 232].  Every delegation of tariff authority has expressly invoked the power to lay "duties":

- Section 338 of the Tariff Act of 1930 permits the President to proclaim "new or additional duties" when he finds that a country has discriminated against the commerce of the United States.  19 U.S.C. § 1338(a) [hereinafter Section 338].

- Section 232, which authorizes the President to "adjust imports," 19 U.S.C. § 1862(c), explicitly refers to duties when discussing limits on presidential adjustments.  *Id*. § 1862(a) (titled "Prohibition on Decrease or Elimination of Duties or Other Import Restrictions").

- Section 122 of the Trade Act of 1974 empowers the President to proclaim "a temporary import surcharge ... in the form of duties."  19 U.S.C. § 2132(a)(3)(A).

- Section 201 of that same Act authorizes the President to "proclaim an increase in,

---

[4] Sections 122 (19 U.S.C. § 2132 [hereinafter Section 122]), 201–204 (19 U.S.C. §§ 2251-2254 [hereinafter Section 201]), and 301–310 (19 U.S.C. §§ 2411–2420 [hereinafter Section 301]) of the Trade Act of 1974; and Section 338 of the Tariff Act of 1930 (19 U.S.C. § 1338).

or the imposition of, any duty on the imported article" or to "proclaim a tariff-rate quota." 19 U.S.C. § 2253(a)(3)(A)–(B).

- Section 301, also of the Trade Act of 1974, allows the President to "impose duties or other import restrictions." 19 U.S.C. § 2411(c)(1)(B).

Unlike these statutes, IEEPA does not contain the term "duty" or "tariff" anywhere. *See infra* § II.A.

Congress enacted each of the statutes delegating tariff authority in legislation focused exclusively on trade policy (the Tariff Act of 1930 for Section 338, the Trade Expansion Act of 1962 for Section 232, and the Trade Act of 1974 for Section 122, Section 201, and Section 301). IEEPA was not enacted pursuant to a trade or tariff act. Congress also codifies tariff statutes in Title 19 of the United States Code (denominated "Customs Duties"):

- Section 338 is a part of Chapter 4 of Title 19 of the U.S. Code. Chapter 4 is titled the "Tariff Act of 1930." 19 U.S.C. § 1338.

- Section 232 is a part of Chapter 7 of Title 19 of the U.S. Code. Chapter 7 is titled the "Trade Expansion Program." 19 U.S.C. § 1862.

- Sections 122, 201, and 301 are all part of Chapter 12 of Title 19 of the U.S. Code. Chapter 12 is titled the "Trade Act of 1974." 19 U.S.C. §§ 2132, 2251–2254, & 2411–2420.

By contrast, IEEPA is part of Title 50 (denominated "War and National Defense"), and is titled the "International Emergency Economic Powers Act"—not a "Tariff" or "Trade" act.

Further, because tariffs are taxes imposed on imports of a specific product imported from a specific country, when it delegates tariff authority to the President, Congress also includes

9

words that explicitly limit the delegation to imported "articles," often from a single country:

- Section 338 allows duties "upon articles wholly or in part ... the product of … any foreign country" found to be expressly discriminating against the United States. 19 U.S.C. § 1338(a).

- Section 201 limits the President's tariff authority to a duty or a tariff-rate quota "on the imported article."  19 U.S.C. § 2253(a)(3).

Section 301 permits the duties or other import restrictions "on the goods of … such foreign country." 19 U.S.C. § 2411(c)(1)(B).  It is only Section 122 that permits temporary broad-based tariffs on all imports from all countries; but Section 122 limits those tariffs to a maximum increase of 15% *ad valorem* and to a period of no more than 150 days.  19 U.S.C. § 2132(a)(3)(A).

IEEPA, on the other hand, permits the regulation of the importation or exportation of "any property in which any foreign country or a national thereof has any interest …, or with respect to any property subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).  As such, IEEPA extends to many forms of property that have never been subjected to tariffs, such as financial assets, real property, or intellectual property rights.  Indeed, IEEPA has most commonly been applied to freezing financial assets or prohibiting certain kinds of financing.  *See infra* § II (B) and III (A) and (B).  When IEEPA has restricted physical articles that crossed the U.S. border, it has typically done so in the form of embargoes, consistent with IEEPA's common use as a tool of U.S. foreign policy.

**C.**      ***When Congress delegates its tariff-raising authority, it imposes substantive limitations and procedural controls on the imposition of tariffs.***

Because tariffs fall within Congress's taxing power, which under the Constitution

requires the explicit consent of the people's representatives, Congress has been careful in its delegation of tariff-raising authority to the President, jealously guarding that power.

Notably, prior to the 1930s, Congress did not typically delegate tariff power at all. Instead, it usually set tariff rates legislatively rather than delegating tariff-setting authority to the President. Those delegations that did exist generally provided the President the power only to adjust legislatively established tariff rates within specified limits and after the president made specific factual determinations. For example, the Tariff Act of 1922 ("Fordney-McCumber Tariff Act") followed that pattern, raising tariffs from where they had been under the Tariff Act of 1913 ("Underwood-Simmons Act") but adding a twist: the legislation authorized the President to raise or lower a tariff rate by 50% in order to even out foreign and domestic production costs.

With the Reciprocal Trade Agreements Act of 1934, Pub. L. 73-316, 48 Stat. 943, Congress began delegating carefully limited, more general tariff-setting authority to the President. Those delegations generally took the form of authorizing the President to negotiate reciprocal trade agreements and to proclaim limited tariff reductions, within bounds Congress prescribed, as to the scope and coverage of any such trade agreements.

In the Trade Act of 1974, Congress granted the President broad authority to negotiate trade agreements (now referred to as Trade Promotion Authority) and added specific requirements to be included in any of those agreements if they were to be given expedited congressional consideration as part of congressional approval. Even that authority sunset, however, and Congress has only periodically renewed it, thus retaining its hold over trade and tariff policy. *See, e.g.*, Omnibus Trade and Competitiveness Act of 1988; Bipartisan Trade Priorities and Accountability Act of 2015.

11

Congress has passed seventeen implementing measures for comprehensive free trade agreements since 1979, consistently demonstrating its close supervision of and control over tariff policy.[5]  When it most recently granted the trade promotion authority in the Bipartisan Comprehensive Trade Priorities and Accountability Act of 2015, Congress added critical criteria that the President must address in any trade agreements negotiated under this authority.  Each time Congress has voted to approve any agreements negotiated under delegated trade-promotion authority, it has engaged in an extensive consultative and legislative process to ensure that the President has not exceeded his authority in any agreements negotiated on behalf of the United States.  Through this consistent process of delegated authority to negotiate trade agreements within the bounds of and subject to Congressionally mandated negotiating objections and ultimate approval by a vote of Congress, Congress has remained firmly in control of trade and tariff policy.

In addition to trade agreements, Congress has also delegated to the President limited authority to raise, impose, or adjust tariffs.  These delegations include Section 232 (19 U.S.C. § 1862); Sections 122, 201, and 301 of the Trade Act of 1974 (19 U.S.C. §§ 2132, 2251–2254, & 2411–2420); and Section 338 (19 U.S.C. § 1338).  These laws authorize the President to adjust tariff rates in response to specific trade-related concerns or in response to specific findings by U.S. agencies.  These laws, however, include specific procedures, substantive standards, and temporal limits, starkly contrasting with IEEPA.

***First***, Congress establishes trade-specific prerequisites that must be met before the

---

[5] Keigh E. Hammond, *Congressional Votes on Free Trade Agreements and Trade Promotion Authority*, Congressional Research Service (April 16, 2025), https://www.congress.gov/crs-product/R45846.

President is authorized to act.  Section 338, for example, requires a finding "as a fact" that a foreign country imposes a non-reciprocal "charge, exaction, regulation, or limitation" on U.S. exports, or "discriminates in fact" against the commerce of the United States.  Section 338(a)(1)–(2).  Section 338 was included in the section of the Tariff Act of 1930 establishing and listing the duties of the U.S. International Trade Commission, and the Commission had been involved in investigating and making such factual findings.  Section 338 was rarely invoked or discussed after 1940.  And since the enactment of Section 301 in 1974, Section 338 has never been invoked, as Section 301 provides for a wider variety of actions to address discrimination against U.S. commerce.  Section 232 requires a finding by the Secretary of Commerce that an article is being imported "in such quantities or under such circumstances as to threaten to impair the national security."  Section 232(b)(3)(A).  Section 122 requires a determination of fundamental international payments problems ("large and serious United States balance-of-payments deficits" or "an imminent and significant depreciation of the dollar") requiring special import measures.  Section 122(a)(1)–(2).  A surge in imports that is significant enough to cause or threaten serious injury to the domestic industry producing a comparable product is the prerequisite to action under Section 201.  Action under Section 301 can be based on either a finding that U.S. rights under a trade agreement have been denied or that an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts U.S. commerce.

Each of the statutes requires ***trade-specific*** prerequisites to be met before the President is authorized to impose tariffs.  Indeed, the constitutionality of Section 232 was upheld in large part because it "establishes clear preconditions to Presidential action."  *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976).

**Second**, Congress insists on procedural safeguards before it hands over tariff authority to the President.  Both Section 201 and previous Section 338 investigations have involved extensive processes conducted by the independent U.S. International Trade Commission, including (1) the issuance of questionnaires to collect extensive data, (2) public hearings in which all interested parties can submit written submissions and appear to provide testimony, (3) a formal vote by the Commission as to whether the prerequisites are met, and (4) a written report outlining the factual basis for the Commission's determination as to whether a surge in imports is causing serious injury (Section 201), or whether, in fact, another country has practices which expressly discriminate against the United States (Section 338).

Similarly, Section 301 requires (1) a formal investigation by the Office of the United States Trade Representative (USTR), which often begins with a petition from an industry group or union, (2) consultations with interested parties, (3) a public hearing, and (4) the publication in the Federal Register of the results of the investigation and the determination as whether the statutory prerequisites to tariff action have been met.  Section 301 investigations must be undertaken pursuant to regulations that Congress insisted USTR issue concerning the filing of petitions and the conduct of investigations and hearings.  These robust processes, many including public hearings and substantial advance notice to the public regarding the timing, range and type of products, and potential tariff rates to be imposed, are indications that Congress wanted to keep the trade agencies on a short leash.  Congress also included significant reporting requirements so it would be constantly apprised of any tariff actions taken under these tariff-delegating statutes.

**Third**, Congress maintains control over delegated tariff authority by imposing time limitations on the process governing the imposition of the tariffs, the length of time the tariffs

can be in place, or how much notice importers must be given. Section 338, for example, requires a 30-day notice period between the time the tariffs are announced and when they are collected. (President Trump's IEEPA orders generally become effective within 48 hours). Section 122 permits duties to remain in place for no more than 150 days unless Congress extends that time period. Section 232 requires the Secretary of Commerce to issue its report and findings within 270 days of the beginning of an investigation and requires a Presidential determination of agreement (or not) with the Secretary's report within 90 days, with action implemented no less than 15 days later. While Section 201 contains procedural time limitations, its most significant restrictions are on the length of time that the tariffs can remain in place: four years with the possibility of a single extension, resulting in a maximum of eight years.

Congress has also placed caps on how high tariff increases can go, as the amount of the tariff matters. Section 122 limits the additional duties to 15% *ad valorem*. Similarly, Section 338 limits the additional tariffs to 50% *ad valorem*, no matter how large the discrimination against US exports might be. Section 301 requires that any action taken be "in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States Commerce." Section 301(a)(3).

IEEPA is an emergency powers statute, not a tariff statute, and so it contains none of the carefully constructed limits that Congress has consistently written into its delegations of tariff power. President Trump's IEEPA tariffs likewise include none of these limitations, safeguards, or means of democratic accountability. The tariffs have been put in place without any procedure, or notice, or hearings, or examination of the impact of the tariffs. Every one of the guardrails that Congress puts in place to ensure it retains an appropriate level of control over tariffs is

completely absent from IEEPA and from President Trump's use of it.

## II. IEEPA Does Not Authorize the Raising or Lowering of Tariffs.

Viewed from any angle, IEEPA's text does not delegate power to the President to raise or lower tariffs; indeed, text and context foreclose any such reading.

*First*, IEEPA enumerates the powers it grants the President, and makes no reference to "duties" or "tariffs" or any other term typically associated with the exercise of such a power.

*Second*, when it *has* chosen to delegate the tariff power, Congress has spoken clearly and unambiguously to delegate the power to impose "Duties." The delegation of so fundamental an Article I power—a power to *tax*—cannot be implied or inferred.

*Third*, in its actual, express delegations of tariff power, Congress specifically authorized the President to impose temporary, emergency tariffs to address balance of payments crises (in Section 122) and likewise authorized tariff actions in specific circumstances to address national security concerns (in Section 232). The President's interpretation of IEEPA to do the same thing (albeit without the limits and safeguards Congress prescribed) would render those other statutes nullities. That is not a reasonable or plausible interpretation of IEEPA.

*Fourth*, because IEEPA contains no express reference to "Duties" or tariffs, the President justifies his tariffs via IEEPA's more general grant of power to "regulate … importation or exportation" of property. 50 U.S.C. § 1702(a)(1)(B). The text cannot support the argument. To be sure, courts have held that ***Congress's*** power to regulate commerce includes a power to tax, but even so, the power to tax and the power to regulate commerce are distinct—and whether Congress has delegated that power requires a far clearer statement than the vague term "regulate." Indeed, scores of statutes authorize agencies to "regulate" but those agencies plainly

have no power to "tax."

**Fifth**, the President's novel and expansive interpretation of "regulate" would render IEEPA unconstitutional. IEEPA confers a power to "regulate" both imports **and** exports. Thus in the President's reading, IEEPA must authorize "tariffs" on exports. 50 U.S.C. § 1702(a)(1)(B). But the Constitution expressly forbids export tariffs. U.S. Const. art. I, § 9, cl. 5. Under the doctrine of constitutional avoidance, the Court should avoid an interpretation of a statute that is both implausible **and** unconstitutional.

A.      **The plain text of IEEPA does not provide the President with the power to impose tariffs.**

IEEPA specifies the powers it grants the Executive. 50 U.S.C. § 1702. It authorizes the President to

(A) investigate, regulate, or prohibit—

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States ....

*Id.*

Despite the many powers clearly enumerated in the statute, nowhere does it contain the

17

word "tariff," duty," "excise," or other similar word that Congress has consistently used when enacting statutes that delegate tariff powers to the President.  *See supra* § I.B.  This silence speaks volumes.  *See, e.g.*, *Jama v. Immig. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply…."); *Bittner v. United States*, 598 U.S. 85, 94 (2023) (similar).

B.    ***Congress has demonstrated it knows how to clearly and unmistakably authorize tariffs when it wants to—and it did not do so in IEEPA.***

The Supreme Court has made clear that Congress must speak clearly if it wishes to delegate decisions of vast economic and political significance.  Such delegation will not be inferred from ambiguous text.  *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there…. The agency instead must point to 'clear congressional authorization' for the power it claims looking at the history and the breadth of the authority that [the Executive Branch agency] has asserted.") (cleaned up); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) (the Court "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance") (cleaned up); *accord Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

Congress speaks clearly and explicitly when it delegates power to the President to raise or lower tariffs.  *See supra* §§ I.B–C; 19 U.S.C. §§ 1338(a), 1862(a), 2132(a)(3)(A), 2251(a)(3)(A), (B), 2411(c)(1)(B), 2492(a).  It refers to "duties," "tariffs," "articles," "countries of origin," and other clear statements of its intent to delegate tariff authorities.  *See* 19 U.S.C. §§ 1338(a), 1862, 2132(a)(3)(A), 2253(a)(3), 2411(c)(1)(B).  IEEPA contains no such references to specific

18

imported articles or their country of origin. Rather, it permits a broad array of actions—investigate, block, regulate, direct and compel, nullify, void, prevent or prohibit, any importation or exportation of "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). Because "any property" can encompass a variety of types of property beyond specific imported goods such as financial assets, land or intellectual property rights, IEEPA is not directed at the narrower category of physical goods imported from a specific country that are the subject of tariffs. Rather, IEEPA was designed to enable the President, during a foreign policy crisis, to freeze assets or block transactions or seize foreign property, or to impose embargoes. It does not provide for the imposition of tariffs.

Each of Congress's express tariff delegations also require *trade-specific* prerequisites to be met before the President is authorized to impose tariffs. IEEPA, by contrast, contains no comparable "clear preconditions to Presidential action." *Algonquin SNG, Inc.*, 426 U.S. at 559. IEEPA has an open-ended, non-trade specific requirement: the declaration of "*any* unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a) (emphasis added). Because of the wide variety of national emergencies that could fall within IEEPA's ambit, IEEPA is not consistent with Congress's practice of limiting the delegation of tariff authority solely to meet trade-related concerns and findings.

Congress knows how to speak clearly to authorize tariffs when it wants to. It did not do so in IEEPA.

**C.**    ***Congress addressed the need for the President to impose tariffs in appropriate, genuine trade emergencies in other tariff statutes, not IEEPA.***

Interpreting IEEPA to delegate tariff authority would render unnecessary the other

19

statutes that do expressly delegate tariff authority. Chief among them are Section 122 of the Trade Act of 1974, which allows temporary, limited emergency tariffs to address a balance of payments crisis, and Section 232 of the Trade Expansion Act of 1962, which provides the President with the authority to adjust imports for national security purposes, as well as Section 301 of the Trade Act of 1974, which allows tariffs in response to unfair foreign trade practices. Given these specific delegations of authority, Congress did not intend IEEPA to have residual emergency tariff authority.[6]

The only time Congress recognized that tariffs might be needed on an emergency basis, and might be needed to be applied to all goods from all countries, was Section 122 of the Trade Act of 1974. Section 122 allows the President to take measures that may include a temporary tariff when necessary to address "large and serious United States balance-of-payments deficits" or certain other situations that present "fundamental international payments problems." 19 U.S.C. § 2132. Section 122 tariffs are limited in duration to 150 days unless extended by Congress, are limited to 15% *ad valorem*, and contain other substantive limitations. *Id.*

The fact that Congress specifically addressed a similar situation in Section 122 shows that it did not intend for IEEPA to have residual authority overlapping with Section 122. Further, if IEEPA were to authorize emergency tariffs, it would effectively render Section 122 a

---

[6] The President is entitled to no deference from the courts when he misuses IEEPA. For example, in 2020, two federal district courts enjoined the President from using IEEPA to ban distribution of Chinese-owned social media app TikTok, ruling that the ban on TikTok likely exceeded the President's authority under the statute. *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020); *Marland v. Trump*, 498 F. Supp. 3d 624 (E.D. Pa. 2020). Congress subsequently passed the Protecting Americans from Foreign Adversary Controlled Applications Act (Pub. L. 118-50, div. H), which the Supreme Court upheld in *TikTok Inc. v. Garland*, 604 U.S. __, 145 S. Ct. 57 (2025).

nullity, violating the canon against rendering other statutes redundant. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

And Congress, knowing it had already passed Section 122 in 1975, with strict limits on emergency tariffs, would not have casually or silently expanded tariff powers two years later in IEEPA without making that clear. *See, e.g.*, *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (Congress is presumed to legislate against the background of existing law).

Further, Congress enacted Section 122 in January 1975, Pub. L. 93-618, Title I § 122, 88 Stat. 1987 (1975), as a direct response to President Nixon's imposition of emergency import surcharges under the Trading With the Enemy Act—the same executive action at issue in *United States v. Yoshida Int'l, Inc.*, which the Court of Customs and Patent Appeals upheld later that year, 526 F.2d 560 (C.C.P.A. 1975). *See infra* § II.F. Section 122 reflected Congress's intent to cabin the executive's emergency tariff powers through a specific and limited statutory framework. Congress enacted IEEPA just two years later. Pub. L. 95-223, Title II § 203, 91 Stat. 1626 (1977). Congress considered IEEPA against a backdrop in which it had already separately authorized the type of tariff at issue in *Yoshida*—and chose to make that tariff subject to limits in both scope and duration. Section 122 thus displaces authority allowing reliance on general emergency statutes like IEEPA for the imposition of broad tariffs, setting narrow and exclusive conditions for such actions. *See Parker Drilling*, 587 U.S. at 611. Whatever authority a President today would have to repeat what President Nixon did in *Yoshida* would have to come from Section 122, not IEEPA.

Congress has also separately provided the President with the authority to impose tariffs in circumstances where he determines that tariffs are a useful tool for protecting national security,

21

which has been one of the principal uses of IEEPA throughout the statute's history. Namely, Section 232 of the Trade Expansion Act of 1962 authorizes the President to adjust imports when imports impair or threaten to impair U.S. national security. *See* 19 U.S.C. § 1862. The current Administration has used this statute aggressively, either directing or overseeing 13 of the 28 total Section 232 investigations that the Department of Commerce has conducted since it assumed responsibility for Section 232 in the early 1980s.[7]

The President must use appropriate authorities, and not IEEPA, to pursue his tariff objectives.

### D.    *IEEPA's power to "regulate" does not include the power to "tariff."*

The President contends that IEEPA's grant of authority to "regulate … importation or exportation" of any property, 50 U.S.C. § 1702(a)(1)(B), includes the power to "tariff." But this reading of the power to "regulate" is not a clear delegation of the tariff power, and is an implausible interpretation of the text.

In defense of this reading of "regulate," the President has relied on case law holding *Congress* may impose taxes pursuant to Congress's Commerce Clause authority in addition to Congress's taxation powers.[8] *See* Defendants' Response in Opposition to Motion for

---

[7] Bureau of Industry and Security, *Section 232 Investigations: The Effect of Imports on National Security* (2024), https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations.

[8] A tariff is a tax imposed on an importer of record. *E.g.*, Int'l Trade Admin., *Import Tariffs Overview and Resources*, https://www.trade.gov/import-tariffs-fees-overview-and-resources; Christopher A. Casey, *U.S. Tariff Policy: Overview*, Congressional Research Service (Jan. 25, 2025), https://www.congress.gov/crs-product/IF11030; *see also Totes-Isotoner Corp v. U.S.*, 569 F. Supp. 2d 1315, 1327-28 (Ct. Int'l Trade 2008), *aff'd on other grounds*, 594 F.3d 1346 (Fed.

Preliminary Injunction and Summary Judgment at 25-26, *V.O.S. Selections Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade Apr. 14, 2025), ECF No. 32.  But the fact that Congress may use its Commerce Clause power to impose duties or other taxes is entirely separate from the question of whether **Congress delegated** that tariff authority to the President; any such delegation must be clear and unequivocal, not cryptic or tacit.  *See West Virginia*, 597 U.S. at 723; *Util. Air*, 573 U.S. at 324; *Biden*, 600 U.S. at 501.  And even when Congress does use its power to "regulate" commerce, recent U.S. Supreme Court authority establishes that the power to "regulate" and the power to "tax" are not coterminous—the two do not necessarily go hand in hand.  *See Nat'l. Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561-63 (2012) (the Affordable Care Act's individual mandate was a permissible exercise of Congress's taxation power, even if it could not be sustained under its discrete commerce power).

Congress confers the power to regulate in many statutes that belie any intention to grant a power to tax.  *See, eg.*, Securities Exchange Act of 1934, § 4(a), 15 U.S.C. § 78(d) (SEC's power to regulate); Communications Act of 1934, § 303, 47 U.S.C. § 303(e) (FCC's power to regulate); 12 U.S.C. § 5491 (Bureau of Consumer Financial Protection power to regulate).  These are not grants of taxing power, and the presumption of consistent usage requires treating the term in IEEPA the same way.  *See, e.g.*, *United States v. Penn*, 63 F.4th 1305, 1313 (11th Cir. 2023) (courts "read terms consistently across multiple statutes on the same subject"; "a legislative body generally uses a particular word with a consistent meaning in a given context" (cleaned up) (citing, *inter alia*, *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972))).

---

Cir. 2010); *Rack Room Shoes v. United States*, 821 F. Supp. 2d 1341, 1347 (Ct. Int'l Trade 2012), *aff'd in part, appeal dismissed in part*, 718 F.3d 1370 (Fed. Cir. 2013).

23

E.   ***The term "regulate" in IEEPA cannot include the power to impose tariffs because it would put IEEPA in conflict with the constitutional prohibition on export taxes.***

The President's interpretation of IEEPA is a nonstarter because it renders the statute unconstitutional.  According to the President, the regulation of imports under IEEPA empowers him to tax imports.  But the term "regulate" in IEEPA cannot be read to include the power to impose tariffs.  IEEPA permits the President to "regulate ... importation ***or exportation***."  50 U.S.C. § 1702 (emphasis added).  The President's interpretation would place the statute in direct conflict with the Constitution's prohibition on export taxes.  *See* U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State.").  If "regulate imports" were construed to include imposing tariffs, consistency would require reading "regulate exports" the same way.  This latter scenario would plainly run afoul of the Constitution.  *See id.*; *A.G. Spalding & Bros. v. Edwards*, 262 U.S. 66 (1923).

But, as the U.S. Supreme Court has made clear, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."  *Sebelius*, 567 U.S. at 537-38 (cleaned up); *accord, e.g.*, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  This Court has a "duty to construe a statute to save it, if fairly possible."  *Sebelius*, 567 U.S. at 574.  Thus, IEEPA must be interpreted such that the President's power to "regulate" does not grant him the power to tax.

F.   ***The court's opinion in*** United States v. Yoshida International, Inc. ***does not control here or establish that IEEPA provides for tariffs.***

*Yoshida*, 526 F.2d 560, held that a temporary surcharge that President Nixon imposed in 1971 was a valid exercise of authority under the Trading with the Enemy Act (TWEA).

*Yoshida* provides no real guidance here, because the world changed in response to the

24

Executive action that led to that decision.  After *Yoshida*, (a) Congress enacted Section 122, which granted the President's limited power to impose emergency tariffs to address the exact problem at issue in *Yoshida*; (b) Congress enacted Section 301, empowering the President to use tariffs or other trade tools to address unfair or discriminatory practices, and (c) Congress amended TWEA and enacted IEEPA to narrow Presidential authority.  Further, the U.S. Supreme Court has issued multiple decisions since *Yoshida* emphasizing that Congress does not delegate its constitutional authority in a cryptic or indirect manner, as the President argues Congress did here in enacting IEEPA.  *E.g.*, *West Virginia*, 597 U.S. at 723; *Util. Air*, 573 U.S. at 324.  Congress does not "hide elephants" (broad tariff authority) "in mouseholes" (a strained and unconstitutional interpretation of the term "regulate").  *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

## III.     IEEPA's Legislative History and Historical Practice Confirm It Does Not Delegate Congress's Tariff Power.

Beyond IEEPA's text, two additional considerations demonstrate that IEEPA is not a delegation of the tariff power.  ***First***, the legislative history of IEEPA shows it was intended to limit the President's emergency powers and confine them to exercises that did not include tariffs. ***Second***, IEEPA is almost 50 years old, yet in that entire span, no President had ever asserted that it gave the Executive the right to impose tariffs—until now.

### A.     *IEEPA's legislative history confirms it was not intended to grant tariff-raising authority to the President.*

Congress enacted IEEPA in 1977 as part of a package of reforms designed to reduce the President's use of emergency powers, which Presidents had invoked frequently over the prior decades.  Pub. L. 95-223, Title II § 203, 91 Stat. 1626 (1977); Patrick A. Thronson, *Toward*

*Comprehensive Reform of America's Emergency Law Regime*, 46 U. Mich. J. L. Reform 737 (2013). In particular, Congress wanted to limit the expansive powers that Presidents had under Section 5(b) of the Trading with the Enemy Act of 1917 (TWEA), which Congress had come to view as providing Presidents with overly broad powers, such as President Roosevelt's "bank holiday" in 1933.

In Congress's view, the purpose of IEEPA was to "redefine the power of the President to regulate international economic transactions in future times of war or national emergency…. [IEEPA] would separate war and non-war authorities and procedures, preserving existing Presidential powers in time of war declared by Congress, and providing somewhat narrower powers subject to congressional review in times of 'national emergency' short of war." H. R. Rep. No. 95-459 at 1 (1977).

Congress thus structured IEEPA to strike a delicate balance. Congress crafted the statute to provide the President with a flexible tool to address genuine national emergencies, but to limit those powers and subject them to stricter oversight. As the House Report stated, Congress would create a "new set of international economic powers, more restricted than those available during a time of war, …and conferred upon the President as standby authority for use in time of national emergency declared by the President. The committee did not adopt the approach of entirely repealing the President's international emergency economic powers, or making them routine, nonemergency powers." *Id.* at 10. IEEPA included additional procedural limitations related to the assertion of an emergency: to invoke IEEPA, Presidents must declare a national emergency pursuant to the National Emergencies Act. To sustain IEEPA actions for more than a year, a President must submit an annual declaration extending the emergency. 50 U.S.C. § 1701.

26

Congress also gave itself the power to overturn IEEPA actions with a concurrent resolution, which, at the time, was not subject to a presidential veto.

Nothing in the House and Senate reports support the position that IEEPA contains a tariff power.  The Senate Report stated that IEEPA Section 203(a) (50 U.S.C.§ 1702(a)) "would grant the President emergency authority to regulate foreign exchange transactions, transfers of credit between banking institutions where a foreign interest is involved, import or export of currencies or securities, and to control or freeze property transactions where a foreign interest is involved, and to require records to be kept or produced…."  S. Rep. No. 95-466 at 4,543 (1977).  The House Report characterized the grant of authorities as one that "authorizes the President to regulate transactions in foreign exchange, banking transactions involving any interest of any foreign country or a national thereof, and to regulate or freeze any property in which any foreign country or national thereof has any interest."  H. R. Rep. No. 95-459 at 15 (1977).

Indeed, the only references to tariffs in either the House or the Senate report are in sections recounting historical uses of TWEA, not in sections discussing IEEPA's affirmative grant of powers.  The reports also make clear that Congress intended IEEPA to be used only during emergencies, and that "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems."  *Id.* at 10.  And, as discussed above (*supra* § II.C), by the time Congress enacted IEEPA, Congress had already enacted separate legislation, Section 122 of Trade Act of 1974, to provide for the one type of emergency for which Presidents had used TWEA to impose tariffs, the balance of payments crisis the U.S. faced in 1971 once President Nixon untethered the U.S. dollar from the gold standard.

**B.**    ***For nearly 50 years, Presidents used IEEPA without imposing tariffs, which are a poor fit for carrying out IEEPA's purposes.***

Presidents invoked IEEPA 69 times between Congress passing the statute and early 2024.[9]  During that time, Presidents used IEEPA to respond to a diverse range of emergencies ranging from President Carter imposing sanctions on Iran in the wake of the 1979 Iranian revolution, *see* Exec. Order No. 12170, 44 Fed. Reg. 65,729 (1979), to President Obama imposing sanctions on foreign cyber hacking groups that threatened U.S. security, *see* Exec. Order No. 13694, 80 Fed. Reg. 18,077 (2015).  In recent years Presidents have used IEEPA to address the rising threat posed by America's geopolitical rivalry with China, for example signing executive orders to address the risks posed by the use of Chinese telecommunications network infrastructure equipment in the U.S., *see* Exec. Order No. 13873, 88 Fed. Reg. 22,689 (2019), to limit high risk bulk data flows to China, *see* Exec. Order No. 14117, 89 Fed. Reg. 15,421 (2024), and to restrict certain categories of U.S. investment in companies linked to the Chinese military or deemed to support China's development of key technologies, *see* Exec. Order No. 13959, 85 Fed. Reg. 73,185 (2020); Exec. Order No. 14105, 88 Fed. Reg. 54,867 (2023).

Presidents have used IEEPA to impose a range of measures to address these diverse threats.  Presidential actions often include freezing the assets of specific individuals and companies: the Treasury Department currently includes more than 9,400 names on its "SDN"

---

[9] Christopher A. Casey & Jennifer K. Elsea, *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, Congressional Research Service (Jan. 30, 2024), https://www.congress.gov/crs-product/R45618.

sanctions list, which blocks the assets of targeted entities.[10]  IEEPA has served as the legal basis for embargoes on trade in many types of products with countries such as Syria, *see* Exec. Order No. 13338, 69 Fed. Reg. 26,751 (2004), and Russia, *see* Exec. Order No. 14068, 87 Fed. Reg. 14,381 (2022).  Presidents have also used IEEPA to impose more finely targeted measures.  For example, in 2014, after Russia's first invasion of Ukraine, the President used IEEPA to prohibit certain kinds of financing to Russian companies while allowing other transactions with those same companies.[11]

Yet between 1977 and 2025, not once did a President use IEEPA to impose tariffs.  (In May 2019 President Trump announced his intent to impose 5% tariffs on Mexico, but the President never signed an Executive Order imposing the tariffs and publicly abandoned the plans in early June.)  This consistent historical absence of tariffs for nearly fifty years reinforces the conclusion that the statute was not understood to authorize such measures.  *See Biden*, 600 U.S. at 501 ("[The President's proffered interpretation] is inconsistent with the statutory language and past practice under the statute.").  This historical practice also reflects the fact that tariffs, unlike the powers Congress actually provided the President, are poorly suited to serve the purposes for which Congress enacted IEEPA.

*First*, actions such as freezing assets, imposing trade embargoes, and regulating financial transactions are clearly directed at foreign threats that Congress passed IEEPA to address.

---

[10] Edward J. Collins-Chase, *Sanctions Primer: How the United States Uses Restrictive Mechanisms to Advance Foreign Policy or National Security Objectives*, Congressional Research Service (Nov. 6, 2023), https://www.congress.gov/crs-product/R47829.

[11] *See* Off. Foreign Assets Control, *Directive 1 (As Amended) Under Executive Order 13662* (Sept. 12, 2014), https://ofac.treasury.gov/media/8686/download?inline.

Americans of course may face costs from actions like targeted sanctions and trade embargoes, such as lost business opportunities in foreign markets, or limits on their ability to pursue claims against frozen foreign assets. But those are collateral costs of actions intended to target foreigners. Tariffs fall directly on Americans: the U.S. Customs and Border Protection collects a tariff from the importer of record, generally meaning a U.S. firm importing a good from abroad.

*Second*, tariffs by their nature cause impacts over time, rather than offering immediate action that a President will typically draw upon in response to an emergency. To be sure, tariffs impact international commerce. Starting in 2018, for example, the President used Section 301 of the Trade Act of 1974 to begin imposing tariffs on a range of U.S. imports from China, and steadily escalated tariffs in 2019 and early 2020. This spurred a gradual relative reduction in U.S imports from China and increase from other trade partners, such as Mexico, which overtook China as America's largest source of imports in 2023.[12] But tariffs play out over time, as illustrated by the multi-year lag between tariffs on China and Mexico emerging as an alternative supplier, and thus are poorly suited for the type of emergency situation for which Congress enacted IEEPA.

Indeed, where tariffs can serve important national security purposes—for example, to maintain or expand over time U.S. production of particular products that are important to America's defense-industrial base—Congress has delegated to the President separate statutory authority to adjust imports, in particular Section 232 of the Trade Expansion Act of 1962. *See* 19

---

[12] Brad W. Setser, *Why U.S. Imports From Mexico Surpassed Those From China*, Council on Foreign Relations In-Brief (Feb. 20, 2024), https://www.cfr.org/in-brief/why-us-imports-mexico-surpassed-those-china.

U.S.C. § 1862. But as described earlier in this brief, Section 232, unlike IEEPA, requires the Executive Branch to engage in a detailed investigatory process, identify specific products threatened by imports, and otherwise administer the import adjustments in ways set out by Congress. *Supra* § 13–14.

Because tariffs are a poor fit for IEEPA's core purpose of enabling swift and targeted emergency responses, they fall outside the statute's intended scope. *See Gundy v. United States*, 588 U.S. 128, 142 (2019) ("Wherever [the purpose] resides, it is an appropriate guide to the meaning of the [statute's] operative provisions."); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (court must avoid interpreting a statute to produce an unreasonable result at variance with the policy of the legislation as a whole); *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("[T]he court must avoid an interpretation that undermines congressional purpose considered as a whole when alternative interpretations consistent with the legislative purpose are available.").

## IV.    Allowing the President to Impose Tariffs Under IEEPA Would Allow the Executive to Usurp Trade Power.

Tax and trade are core Congressional prerogatives. "The question here is not whether something should be done; it is who has the authority to do it"—and how. *Biden*, 600 U.S. at 501.

Since the country's founding, Congress has taken its constitutional responsibility over trade seriously. The very First U.S. Congress enacted the Tariff Act of 1789, which George Washington signed into law on July 4, 1789, within its first months of existence. In the more than two centuries since, Congress has enacted thousands of pages of statutes related to U.S. trade and tariffs. And Congress has continued to take seriously its constitutional responsibility

for tariffs and trade in recent decades.  In 1994 Congress made the decision to approve the

GATT's so-called Uruguay Round agreements, which established the World Trade Organization

and authorized the United States' participation in it.  Uruguay Round Agreements Act, Pub. L.

103-465.  Since the 1980s, Congress has authorized the President to negotiate, and subsequently

approved, fourteen Free Trade Agreements (FTAs) with trading partners as diverse as Canada

and Oman.  These include the U.S.-Mexico-Canada Agreement that President Trump negotiated,

and which Congress enacted in 2020.  Pub. L. 116-113.  Congress has also enacted a series of

tariff preference programs to promote trade and economic development in Africa, the Caribbean,

Haiti, and Nepal.[13]

The President's sweeping tariffs threaten to undermine the trade policies and programs

that Congress has pursued through these and other laws.  The IEEPA tariffs do not merely

modify the statutory tariffs Congress has promulgated and approved—except perhaps "in the

same sense that the French Revolution modified the status of the French nobility—it has

abolished them and supplanted them with a new regime entirely."  *Biden*, at 496 (cleaned up)

(holding the Secretary of Education could not entirely rewrite the nation's student loan

forgiveness policy based on narrow grant of authority to permit debt forgiveness in a few exigent

circumstances).

Today, the President claims an authority to fundamentally upend Congress's

longstanding and constitutional power over trade based on no more than the inclusion of the

---

[13] *See, e.g.*, The African Growth and Opportunity Act (AGOA); Caribbean Basin Economic Recovery Act (CBERA), Caribbean Basin Trade Partnership Act (CBTPA) of 2000; Haitian Hemispheric Opportunity through Partnership Encouragement (HOPE) Act of 2006; Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA).

phrase "regulate … importation or exportation" of any property in a 1977 emergency powers statute.  50 U.S.C. § 1702.  He has relied on this single phrase to impose the largest U.S. tariff increases since the 1930s, including tariffs on countries with which Congress has approved and implemented FTAs or tariff preference programs through legislation.  The power he claims—to raise or lower tariffs unbounded by any limits on geography, rates, or the types of products covered—far exceeds any authority that Congress has ever granted the President in a trade statute.  Indeed, the President now asserts even greater authority by concluding a so-called trade deal with the United Kingdom, and is purporting to negotiate other deals, with no input or oversight from Congress.[14]  The "trade deal" with the U.K., announced on May 8, 2025, appears to include an indefinite continuation of a 10% tariff on most U.S. imports from the U.K., without ever seeking authorization from Congress for this seemingly perpetual new tariff or any of the substantive provisions of the so-called deal.[15]

When Congress has acted, it has established stable trade and tariff regimes carefully, deliberately, and transparently, ensuring accountability to the democratic process.  In stark contrast, the President's tariffs under IEEPA are mercurial, sudden, and uncertain.  It is unclear when they may start, when they may increase or decrease, how much they may increase or

---

[14] For example, on May 5, 2025, the President said: "We're negotiating with many countries but at the end of this I'll set my own deals because I set the deal, they don't set the deal, I set the deal. This is not like a big deal that's gonna be signed — in some cases we'll sign them, but we don't have to sign them. I'll be setting the deal, I'll be setting the tariff." *See* David Goldman, *The clock is ticking down to zero, and Trump needs a trade deal — badly*, CNN.com (May 5, 2025), https://www.cnn.com/2025/05/05/business/trade-war-deal-trump.

[15] The White House, *Fact Sheet: U.S.-U.K. Reach Historic Trade Deal* (May 8, 2025), https://ustr.gov/sites/default/files/Press/fs/US%20UK%20EPD_050825_FINAL%20rev%20v2.pdf.

decrease, and when they may end—and for any of these vagaries, **_why_**.

This is dysregulation, not delegation.  The President's actions are not consistent with the lawful power Congress granted in IEEPA in 1977 nor America's constitutional structure.  If the President believes that tariffs are an appropriate policy measure, Congress has given him ample and effective tools to accomplish that goal.  But IEEPA is not one of those tools.

## CONCLUSION

*Amici* respectfully submit that granting the relief prayed for in the complaint and in Plaintiffs' motion for a preliminary injunction is amply warranted.

Respectfully submitted,

Date: May 12, 2025

<u>  /s/ *William Fred Norton*</u>
William Fred Norton

The Norton Law Firm PC
*Attorneys to Amici Curiae*

34

## APPENDIX: LIST OF *AMICI CURIAE*

**Jamie Raskin**
   Representative of Maryland

**Richard E. Neal**
   Representative of Massachusetts

**Gregory W. Meeks**
   Representative of New York

**Hakeem Jeffries**
   Representative of New York

**Katherine Clark**
   Representative of Massachusetts

**Pete Aguilar**
   Representative of California

**Joe Neguse**
   Representative of Colorado

**Rosa L. DeLauro**
   Representative of Connecticut

**Gerald E. Connolly**
   Representative of Virginia

**Gabe Amo**
   Representative of Rhode Island

**Jake Auchincloss**
   Representative of Massachusetts

**Becca Balint**
   Representative of Vermont

**Nanette Barragán**
   Representative of California

**Joyce Beatty**
   Representative of Ohio

**Wesley Bell**
   Representative of Missouri

**Ami Bera, M.D.**
   Representative of California

**Donald S. Beyer Jr.**
   Representative of Virginia

**Suzanne Bonamici**
   Representative of Oregon

**Brendan F. Boyle**
   Representative of Pennsylvania

**Shontel Brown**
   Representative of Ohio

**Julia Brownley**
   Representative of California

**Salud O. Carbajal**
   Representative of California

**Troy A. Carter, Sr.**
   Representative of Louisiana

**Sean Casten**
   Representative of Illinois

**Joaquin Castro**
   Representative of Texas

**Sheila Cherfilus-McCormick**
   Representative of Florida

**Judy Chu**
  Representative of California

**Gilbert R. Cisneros, Jr.**
  Representative of California

**Yvette Clarke**
  Representative of New York

**Emanuel Cleaver, II**
  Representative of Missouri

**Steve Cohen**
  Representative of Tennessee

**Herbert C. Conaway, Jr.**
  Representative of New Jersey

**J. Luis Correa**
  Representative of California

**Jim Costa**
  Representative of California

**Joe Courtney**
  Representative of Connecticut

**Angie Craig**
  Representative of Minnesota

**Jasmine Crockett**
  Representative of Texas

**Jason Crow**
  Representative of Colorado

**Sharice Davids**
  Representative of Kansas

**Danny K. Davis**
  Representative of Illinois

**Madeleine Dean**
  Representative of Pennsylvania

**Diana DeGette**
  Representative of Colorado

**Suzan K. DelBene**
  Representative of Washington

**Maxine Dexter**
  Representative of Oregon

**Lloyd Doggett**
  Representative of Texas

**Sarah Elfreth**
  Representative of Maryland

**Veronica Escobar**
  Representative of Texas

**Adriano Espaillat**
  Representative of New York

**Dwight Evans**
  Representative of Pennsylvania

**Cleo Fields**
  Representative of Louisiana

**Lizzie Fletcher**
  Representative of Texas

**Bill Foster**
  Representative of Illinois

**Valerie P. Foushee**
Representative of North Carolina

**Lois Frankel**
Representative of Florida

**Laura Friedman**
Representative of California

**Jesús G. "Chuy" García**
Representative of Illinois

**Sylvia Garcia**
Representative of Texas

**Dan Goldman**
Representative of New York

**Jimmy Gomez**
Representative of California

**Maggie Goodlander**
Representative of New Hampshire

**Josh Gottheimer**
Representative of New Jersey

**Pablo José Hernández**
Representative of Puerto Rico

**Jim Himes**
Representative of Connecticut

**Steven Horsford**
Representative of Nevada

**Jared Huffman**
Representative of California

**Glenn F. Ivey**
Representative of Maryland

**Jonathan L. Jackson**
Representative of Illinois

**Sara Jacobs**
Representative of California

**Henry C. "Hank" Johnson, Jr.**
Representative of Georgia

**Julie Johnson**
Representative of Texas

**Sydney Kamlager-Dove**
Representative of California

**William Keating**
Representative of Massachusetts

**Robin L. Kelly**
Representative of Illinois

**Timothy M. Kennedy**
Representative of New York

**Ro Khanna**
Representative of California

**Raja Krishnamoorthi**
Representative of Illinois

**Greg Landsman**
Representative of Ohio

**Rick Larsen**
Representative of Washington

**John B. Larson**
Representative of Connecticut

**George Latimer**
Representative of New York

**Teresa Leger Fernández**
Representative of New Mexico

**Mike Levin**
Representative of California

**Sam T. Liccardo**
Representative of California

**Ted W. Lieu**
Representative of California

**Stephen F. Lynch**
Representative of Massachusetts

**Seth Magaziner**
Representative of Rhode Island

**Doris Matsui**
Representative of California

**Lucy McBath**
Representative of Georgia

**Sarah McBride**
Representative of Delaware

**April McClain Delaney**
Representative of Maryland

**Jennifer L. McClellan**
Representative of Virginia

**Betty McCollum**
Representative of Minnesota

**James P. McGovern**
Representative of Massachusetts

**Grace Meng**
Representative of New York

**Kweisi Mfume**
Representative of Maryland

**Dave Min**
Representative of California

**Gwen S. Moore**
Representative of Wisconsin

**Joseph D. Morelle**
Representative of New York

**Kelly Morrison**
Representative of Minnesota

**Jared Moskowitz**
Representative of Florida

**Jerrold Nadler**
Representative of New York

**Eleanor Holmes Norton**
Representative of the District of
Columbia

**Johnny Olszewski**
Representative of Maryland

**Ilhan Omar**
Representative of Minnesota

**Frank Pallone, Jr.**
Representative of New Jersey

**Jimmy Panetta**
Representative of California

**Nancy Pelosi**
Representative of California

**Scott H. Peters**
Representative of California

**Brittany Pettersen**
Representative of Colorado

**Chellie Pingree**
Representative of Maine

**Stacey E. Plaskett**
Representative of the Virgin Islands

**Nellie Pou**
Representative of New Jersey

**Mike Quigley**
Representative of Illinois

**Delia C. Ramirez**
Representative of Illinois

**Deborah K. Ross**
Representative of North Carolina

**Linda T. Sánchez**
Representative of California

**Mary Gay Scanlon**
Representative of Pennsylvania

**Jan Schakowsky**
Representative of Illinois

**Bradley Scott Schneider**
Representative of Illinois

**Kim Schrier, M.D.**
Representative of Washington

**David Scott**
Representative of Georgia

**Robert C. "Bobby" Scott**
Representative of Virginia

**Terri A. Sewell**
Representative of Alabama

**Mikie Sherrill**
Representative of New Jersey

**Lateefah Simon**
Representative of California

**Adam Smith**
Representative of Washington

**Eric Sorensen**
Representative of Illinois

**Melanie A. Stansbury**
Representative of New Mexico

**Greg Stanton**
Representative of Arizona

**Marilyn Strickland**
Representative of Washington

**Suhas Subramanyam**
  Representative of Virginia

**Thomas R. Suozzi**
  Representative of New York

**Eric Swalwell**
  Representative of California

**Shri Thanedar**
  Representative of Michigan

**Bennie G. Thompson**
  Representative of Mississippi

**Mike Thompson**
  Representative of California

**Dina Titus**
  Representative of Nevada

**Jill Tokuda**
  Representative of Hawaii

**Ritchie Torres**
  Representative of New York

**Lori Trahan**
  Representative of Massachusetts

**Juan Vargas**
  Representative of California

**Marc Veasey**
  Representative of Texas

**Eugene Vindman**
  Representative of Virginia

**Debbie Wasserman Schultz**
  Representative of Florida

**Maxine Waters**
  Representative of California

**Bonnie Watson Coleman**
  Representative of New Jersey

**Nikema Williams**
  Representative of Georgia

**Frederica S. Wilson**
  Representative of Florida

# IN THE UNITED STATES COURT OF
# INTERNATIONAL TRADE

Before The Honorable Gary S. Katzmann, Judge, The Honorable Timothy Reif, Judge, The Honorable Jane A. Restani, Judge

| | |
|---|---|
| THE STATE OF OREGON, *et al.,* | Case No. 1:25-cv-00077 |
| Plaintiffs, | |
| vs. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## Certificate of Compliance

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel, certifies this brief complies with the Court's type volume limitation rules. This brief contains no more than 9,760 words, including the Statement of Interest of *Amici*. This brief also complies with all typeface and margin requirements.

Respectfully submitted,

    */s/ William Fred Norton*
William Fred Norton

The Norton Law Firm PC
*Attorneys to Amici Curiae*

1