ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
SHIWON CHOE
CAROLYN F. DOWNS
ZELDA VASSAR
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-4400
Fax: (415) 703-5480
E-mail: Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Zelda.Vassar@doj.ca.gov
*Attorneys for the State of California and Gavin Newsom, in his official capacity as Governor of California*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **STATE OF OREGON, et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**<br><br>Defendants. | Case No. 1:25-cv-00077-GSK-TMR-JAR<br><br>**STATE OF CALIFORNIA AND GOVERNOR GAVIN NEWSOM'S AMICI CURIAE BRIEF** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTERESTS OF AMICI CURIAE ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

STATUTORY TEXT ..... 2

ARGUMENT ..... 3

I. The Plain-English Meaning of "Regulate" Does Not Include the Power to Impose Tariffs ..... 3

II. Reading "Regulate . . . Importation" in the Full Context of the Statutory Lists in Which "Regulate" and "Importation" Appear in 50 U.S.C. § 1702(a)(1)(B), Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs ..... 4

A. Reading "Regulate . . . Importation" in Context With the Full Statutory List of Twelve Activities to Which "Regulate" Could Be Applied, Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs ... 5

B. Reading "Regulate . . . Importation" in Context With the Full Statutory List of Eight Emergency Powers, of Which "Regulate" Is Only One, Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs ..... 8

CONCLUSION ..... 14

CERTIFICATE OF COMPLIANCE ..... 15

**TABLE OF AUTHORITIES**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 6, 7

*Astrue v. Ratliff*,
560 U.S. 586 (2010) .......... 13

*Brown v. Gardner*,
513 U.S. 115 (1994) .......... 5, 6

*Diginet, Inc. v. Western Union ATS, Inc.*,
958 F.2d 1388 (7th Cir. 1992) .......... 4

*Dir. of Revenue v. CoBank ACB*,
531 U.S. 316 (2001) .......... 12

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1975) .......... 13

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 8, 10, 11

*Gonzalez v. United States*,
553 U.S. 242 (2008) .......... 7

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561 (1995) .......... 4

*Jefferson Cnty. v. Acker*,
527 U.S. 423 (1999) .......... 4

*Markham v. Cabell*,
326 U.S. 404 (1945) .......... 10, 11

*United States v. Jacobs*,
306 U.S. 363 (1939) .......... 12

*United States v. U.S. Shoe Corp.*,
523 U.S. 360 (1998) .......... 7

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) .......... 7

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 4, 7

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001) ... 6, 7, 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ... 1, 2

*Ysleta del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ... 3, 5, 7

**Statutes**

19 U.S.C. § 1862 ... 13

50 U.S.C. § 1702 ... passim

First War Powers Act,
Pub. L. No. 77-354, 55 Stat. 838 (1941) ... 10

Trade Expansion Act of 1962,
Pub. L. No. 87-794, 76 Stat. 877 (1962) ... 13

Trading With the Enemy Act,
Pub. L. No. 65-91, 40 Stat. 411 (1917) ... 9

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ... 12

U.S. Const. art. I, § 9, cl. 5 ... 7

**Legislative Materials**

H.R. Rep. No. 65-85 (1917) ... 9, 10

H.R. Rep. No. 77-1507 (1941) ... 11

H.R. Rep. No. 95-459 (1977) ... 12

S. Rep. No. 77-911 (1941) ... 11

S. Rep. No. 95-466 (1977) ... 12

**Other Authorities**

*Regulate*, American Heritage Dictionary (1976) ... 4

*Regulate*, Black's Law Dictionary (5th ed. 1979) ... 3, 5

*Regulate*, Black's Law Dictionary (12th ed. 2024) ... 3, 5

*Regulate*, Random House College Dictionary (rev. ed. 1975) ........................................................ 3

*Regulate*, Webster's Third International Dictionary (1986) ........................................................... 3

## INTERESTS OF AMICI CURIAE

Amici curiae are the State of California and its Governor Gavin Newsom in his official capacity.

The State of California is the most populous State in the United States and represents the fourth-largest economy in the world, behind only the United States as a whole, China, and Germany. California produced a gross state product ("GSP") of over $4 trillion in 2024, accounting for 13.7% of the entire U.S. gross domestic product ("GDP"). California is the largest importer and second-largest exporter among U.S. states. In 2024, California's total merchandise trade reached $675 billion, accounting for close to 16% of GSP. Much of this trade flows through California's eleven public ports, two of which are the largest and busiest container ports in North America. California's ports process one-third of all exports and 40% of all containerized imports for the entire world, generating an estimated $9 billion in state and local tax revenue annually.

Because of California's outsize economic footprint, it is subject to outsize effects from the tariffs that President Trump has imposed and threatened to impose pursuant to the International Emergency Economic Powers Act ("IEEPA"). California and Governor Newsom thus have a strong interest in the legal question of whether IEEPA does or does not authorize the imposition of tariffs.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Under our constitutional system, the President may not rule by fiat. Instead, "[t]he President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). In the past three months, President Trump has issued numerous executive orders imposing tariffs that claim IEEPA as their legal authority for doing so. But, as a legal matter, IEEPA does not

authorize imposition of tariffs. President Trump's tariffs invoking IEEPA thus lack legal authority and are unlawful and unenforceable. *Youngstown*, 343 U.S. at 585.

Defendants do not and cannot dispute that IEEPA contains no mention of tariffs. Instead, Defendants cherry-pick two words out of one section of IEEPA, 50 U.S.C. § 1702(a)(1)(B), string them together with an ellipsis to read them as "regulate . . . importation," and try to construe this ellipted phrase—read in isolation and shorn of its context—as authorizing tariffs. But Defendants' approach of selecting isolated words from a statute and reading those words out of context violates basic tenets of statutory construction and Supreme Court precedent, which hold that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. This is particularly true where (as here) the relevant words are part of statutory lists: *words from statutory lists must be read in the full context of their lists*. When "regulate" and "importation" are read in the full context of their respective statutory lists, of § 1702 as a whole, and of IEEPA's overall statutory scheme, it is clear that they do not authorize tariffs.

**STATUTORY TEXT**

Defendants take their "regulate . . . importation" language from 50 U.S.C. § 1702(a)(1)(B). In relevant part, § 1702 provides that:

> At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A) investigate, regulate, or prohibit—
> (i) any transactions in foreign exchange,
> (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
> (iii) the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the jurisdiction of the United States; [and]

> (B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit,
>
> any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving,
>
> any property in which any foreign country or a national thereof has any interest
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States[.]

50 U.S.C. § 1702(a)(1)(A)–(B) (line breaks inserted in § 1702(a)(1)(B) for readability).

## ARGUMENT

The plain language of IEEPA confirms that it does not authorize tariffs. IEEPA does not contain any mention of tariffs, or any mention of any synonyms of tariffs (duties, imposts, etc.), or any mention of taxes or revenues. And Defendants' theory that IEEPA authorizes tariffs based on the "regulate . . . importation" language that they cherry-picked from 50 U.S.C. § 1702(a)(1)(B), pulled out of context, and tied together with an ellipsis, fails.

### I. The Plain-English Meaning of "Regulate" Does Not Include the Power to Impose Tariffs

As used in a statute, "to *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to rule[s],'" *Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 697 (2022) (quoting *Regulate*, Webster's Third International Dictionary 1913 (1986)), or "[t]o 'control' (an activity or process) esp. through the implementation of rules," *Regulate*, Black's Law Dictionary (12th ed. 2024); *accord, e.g.*, *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("fix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) ("to control or direct by a rule, principle, method, etc.");

*Regulate*, American Heritage Dictionary 1096 (1976) ("[t]o control or direct according to a rule").

This does not encompass the power to impose tariffs on imports, which are not controls on imports but instead are simply *taxes* on imports. A tariff or tax simply extracts funds from the importer; it does not control imports or fix their time, amount, degree, or rate. As long as the tariff or tax is paid, imports can continue to come in unrestricted. Tariffs no more "regulate" imports than income taxes "regulate" an individual's livelihood or employment. *See, e.g.*, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 440 (1999) (discussing how imposing a tax on federal officials does "no[t] in any way regulate[] them in the performance of their duties"); *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax."). Imposing tariffs thus does not fall within the plain language of § 1702(a)(1)(B) or plain English meaning of "regulate . . . importation."

## II. Reading "Regulate . . . Importation" in the Full Context of the Statutory Lists in Which "Regulate" and "Importation" Appear in 50 U.S.C. § 1702(a)(1)(B), Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs

That "regulate . . . importation" does not encompass the power to impose tariffs is further evident when "regulate" and "importation" are read in the full context of the provision where they appear, 50 U.S.C. § 1702(a)(1)(B). As the Supreme Court has held, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Additionally, where a statute contains a list of words, parties and courts must read the entire list in context and may not just select "but one word in a list, a word [a party] reads altogether out of context," and then "ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574–75 (1995). And, of course, a

given term is presumed "to mean the same thing throughout a statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994).

### A. Reading "Regulate . . . Importation" in Context With the Full Statutory List of Twelve Activities to Which "Regulate" Could Be Applied, Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs

"Importation" is not the only activity listed in § 1702(a)(1)(B). Rather, it is just one entry in a list of twelve activities to which the emergency powers set forth in IEEPA (including but not limited to the power to "regulate") can be applied:

> any [(1)] acquisition, [(2)] holding, [(3)] withholding, [(4)] use, [(5)] transfer, [(6)] withdrawal, [(7)] transportation, [(8)] importation or [(9)] exportation of, or [(10)] dealing in, or [(11)] exercising any right, power, or privilege with respect to, or [(12)] transactions involving,
>
> any property in which any foreign country or a national thereof has any interest[.]

50 U.S.C. § 1702(a)(1)(B) (line break inserted for readability). "Regulate" must have a consistent meaning when applied to each item in that list of activities. *See, e.g.*, *Brown*, 513 U.S. at 118. That meaning does not include imposing tariffs or taxes, as reading "regulate" in context with the full list of activities confirms. *See id.* at 119–20 (rejecting government's interpretation of statutory phrase where interpretation could not be applied to all items in statutory list without "incongruity").

Consider, for example, "regulate . . . use." As a matter of plain English, this does not mean to *tariff or tax* use. No one would say, for example, that to "regulate . . . use" of pesticides in organic food or chemicals in drinking water, or to "regulate . . . use" of confidential trade secrets or protected patient medical records, or to "regulate . . . use" of steroids in sporting events, and so on, means to *tariff or tax* such use. Instead, "regulate . . . use" means to control such use or to fix the time, amount, degree, or rate of such use. *Accord Ysleta del Sur Pueblo*, 596 U.S. at 697; *Regulate*, Black's Law Dictionary (12th ed. 2024); *Regulate*, Black's Law Dictionary 1156 (5th

ed. 1979). Likewise, "regulate . . . importation" means to control importation or fix its time, amount, degree, or rate, perhaps by limiting the times and places when imports can be brought in or by subjecting them to inspections. It does not mean to *tariff or tax* importation.

Consider too the converse. Suppose "regulate . . . importation" *were* construed to include the power to impose tariffs or taxes on imports. The term "regulate" must have a consistent meaning when applied to the other entries in the list of activities in § 1702(a)(1)(B). *See, e.g.*, *Brown*, 513 U.S. at 118. But a construction of "regulate" that includes the power to impose tariffs or taxes would mean that § 1702(a)(1)(B) provides for an immense and unheralded power to tariff or tax not just "importation" but all of the other activities listed in § 1702(a)(1)(B), i.e., the power to tax acquisitions, tax holdings, tax withholdings, tax uses, tax exportations, etc., all of which are as much a part of § 1702(a)(1)(B) as importation is. In other words, on Defendants' reading of the statute, Congress granted the President the authority to place not just a 145% tax on "importation" from China, but also to place, e.g., a 145% tax on any "acquisition" by a U.S. company of a foreign business, or a 145% tax on any "holding" by a U.S. citizen of funds in a joint bank account she shares with her noncitizen mother to help pay her medical expenses, or a 145% tax on any "use" by a U.S. citizen of plane tickets on a foreign airline to travel on a long-awaited vacation, and so on. The vast economic and political significance of such a taxing power would be unprecedented. Nothing in IEEPA allows for so tremendous and unheralded a power, representing such a transformative expansion in presidential authority with such a vast economic and political significance as this would be, through so "wafer-thin [a] reed" as the lone, cherry-picked word "regulate" in § 1702(a)(1)(B). *Cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764–65 (2021); *accord, e.g.*, *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme

in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").[1]

Construing "regulate" as authorizing tariffs or taxes, when read in context with the full list of activities in § 1702(a)(1)(B), also likely renders IEEPA unconstitutional—and the doctrine of constitutional avoidance thus dictates that this construction must be rejected. *See, e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("Under the avoidance canon, when a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.") (quotation marks omitted). Consider, for example, "regulate . . . exportation." If "regulate . . . importation" authorizes the President to impose tariffs on imports, "regulate . . . exportation" likewise authorizes the President to impose tariffs on exports. But this would be unconstitutional, as the Constitution expressly bars tariffs on exports. U.S. Const. art. I, § 9, cl. 5; *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). Either "regulate . . . importation or exportation" authorizes tariffs, in which case IEEPA is unconstitutional, or it does

[1] *United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975), is not to the contrary. Even assuming that *Yoshida* survived later Supreme Court precedents like *Whitman*, 531 U.S. 457, *Alabama Association of Realtors*, 594 U.S. 758, and *West Virginia*, 597 U.S. 697, the limited issue before *Yoshida* was the reductions or removals of certain tariff *concessions* back up to levels that had been authorized by Congress, not impositions of tariffs beyond levels that Congress had authorized. *Yoshida*, 526 F.2d at 577–78 ("the surcharge was limited to articles which had been the subject of prior tariff concessions" and did not "tear down or supplant the entire tariff scheme of Congress"). *Yoshida* thus does not establish that "regulate" means a freestanding power to impose tariffs or taxes, particularly in light of the enormity that such a ruling would have when "regulate" is read with the other activities to which it can be applied listed in that same statute. *Cf. id.* at 583 ("We do not here sanction the exercise of an unlimited power, which, we agree . . . would be to strike a blow to our Constitution."). *Yoshida* also confirmed that the word "regulate" as used in a statute is *not* the equivalent of the word "regulate" as used in the Commerce Clause, because "[e]xercise of the regulatory power by the President differs substantially from its exercise by the Congress." *Id.* at 582 & n.35; *accord Ysleta del Sur Pueblo*, 596 U.S. at 697 (construing "regulate" in the context of a statute by reference to dictionaries, not the Commerce Clause).

not authorize tariffs. The doctrine of constitutional avoidance imposes a duty on courts to adopt the latter, constitutionally-sound construction: that IEEPA does not provide for tariffs.[2]

### B. Reading "Regulate . . . Importation" in Context With the Full Statutory List of Eight Emergency Powers, of Which "Regulate" Is Only One, Confirms That "Regulate . . . Importation" Does Not Authorize Tariffs

"Regulate" is not the only emergency power listed in § 1702(a)(1)(B). Rather, it is just one entry in a list of eight emergency powers set forth in IEEPA:

> [(1)] investigate, [(2)] block during the pendency of an investigation, [(3)] regulate, [(4)] direct and compel, [(5)] nullify, [(6)] void, [(7)] prevent or [(8)] prohibit[.]

50 U.S.C. § 1702(a)(1)(B). The meaning of "regulate" must be consistent with the other items in that list of emergency powers. *See, e.g.*, *Fischer v. United States*, 603 U.S. 480, 487–88 (2024) (reading lists of statutory terms under the "the canon of *noscitur a sociis*[, which] teaches that a word is 'given more precise content by the neighboring words with which it is associated'" because "a general phrase can be given a more focused meaning by the terms linked to it"). That meaning does not include imposing tariffs or taxes, as reading "regulate" in context in with the full list of emergency powers confirms. The other emergency powers (block, direct and compel, nullify, void, prevent, and prohibit) reflect an overall statutory scheme to *control or restrict* activities, not to *tariff or tax* them, which is an activity that is "simply not of that kind." *Cf. id.* at 488.

This is borne out by the legislative history and statutory scheme of IEEPA. *See, e.g.*, *id.* at 491–92 (interpreting statute in light of its legislative history).

[2] This is even before considering whether a construction of "regulate" that authorizes tariffs and taxes would also be unconstitutional when applied to the other activities beyond "importation" and "exportation" list in § 1702(a)(1)(B), e.g., a tax on "acquisition," a tax on "holding," a tax on "use," etc.

The language of § 1702(a)(1)(A) and (B) trace their history back to a predecessor statute, the Trading With the Enemy Act ("TWEA"), first enacted in 1917 after the United States's entry into World War I. Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917). The TWEA's purpose was to (1) "interdict[]," i.e., prohibit, "trade in time of war" with the enemy and (2) "conserve and utilize . . . enemy property found within the jurisdiction of the United States." H.R. Rep. No. 65-85, at 1 (1917). To serve its first purpose—interdiction—section 3 of the TWEA prohibited outright any trade by individuals in the United States with the "enemy" (residents of nations with which the United States was at war and certain other categories) or any "ally of [the] enemy." Pub. L. No. 65-91, § 3(a). To serve its second purpose—conserving and utilizing enemy property—section 6 of the TWEA provided for the appointment of a new official to be known as the "alien property custodian," to hold money or property belonging to the "enemy" or any "ally of [the] enemy" during the pendency of the war. *Id.* § 6.

"Regulate" did not provide for tariffs on imports in the original TWEA. In fact, in the original TWEA, there was no "regulate . . . importation" language at all. The word "regulate" did not appear anywhere in the section prohibiting trade with the enemy. *Id.* § 3. Instead, "regulate" appeared only in a separate section, section 5(b)—a section that contained no mention of importation. "Regulate" appeared as one entry in a list of three powers, in between "investigate" and "prohibit," as part of a statutory scheme that limited the application of those powers to financial transactions[3] between the United States and foreign nationals, not imports writ large. *Id.* § 5(b).[4] And the context in which these powers to "investigate, regulate, or

[3] Specifically, transactions in foreign exchange or in gold or silver, credit transfers, and transfers of evidence of indebtedness (e.g., bonds or promissory notes) or ownership (e.g., deeds or stock certificates). Pub. L. No. 65-91, § 5(b).

[4] This original TWA § 5(b) is the ancestor to what is now § 1702(a)(1)(A) in IEEPA.

prohibit" collectively appeared reflected a design to restrict transactions—not a design to allow transactions to continue as long as monies were paid, as would be the case under a tariff. *Cf. Fischer*, 603 U.S. at 488 (rejecting broad interpretation of the meaning of an action in a list that "is simply not of that kind" as compared to the other listed actions). This makes sense when one considers the context in which the TWEA was enacted: shortly after the United States had entered World War I, where the United States was not looking to impose tariffs on continuing trade but instead was looking to *restrict* trade with the enemy. *See* H.R. Rep. No. 65-85, at 1–2; *accord Markham v. Cabell*, 326 U.S. 404, 414 n.1 (1945) (Burton, J., concurring).

The sentence that contains the "regulate . . . importation" words that Defendants cherry-pick was not added to the TWEA until 24 years later, in 1941, in the first few weeks after the attack on Pearl Harbor and the United States's entry into World War II. In the First War Powers Act ("FWPA"), Congress amended (among other things) section 5(b) of the TWEA to add a new section 5(b)(1)(B), which added new emergency powers ("direct and compel," "nullify," "void," and "prevent") to the three preexisting ones ("investigate," "regulate," and "prohibit") and added a new list of activities to which those powers could be applied ("acquisition[,] holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest"). First War Powers Act, Pub. L. No. 77-354, § 301, 55 Stat. 838 (1941).[5] This amendment marked the first time that "regulate" and "importation" were placed in the same sentence.

---

[5] The previous TWEA § 5(b) was renumbered section 5(b)(1)(A). The new section 5(b)(1)(B) is the ancestor to what is now § 1702(a)(1)(B) in IEEPA.

The congressional reports for the FWPA discussed Congress's purpose behind amending section 5(b). Under the old section 5(b), "the Government [had] exercise[d] supervision over transactions in foreign property, either by prohibiting such transactions or by permitting them on condition and under license." H.R. Rep. No. 77-1507, at 3 (1941). The FWPA amended section 5(b) to give the government the power to *seize* (take, control, use, etc.) foreign property, in addition to simply freezing it. *See id.* And the context of the other powers and activities with which "regulate" and "importation," respectively, appeared, collectively reflected that design to restrict transactions and seize enemy property for the benefit of the United States's war effort—not a design to allow transactions to continue as long as monies were paid, as would be the case under a tariff. *Cf. Fischer*, 603 U.S. at 488 (rejecting broad interpretation of the meaning of an action in a list that "is simply not of that kind" as compared to the other listed actions). This, again, makes sense when one considers the context in which the FWPA was enacted: just weeks after the attack on Pearl Harbor and the United States's entry into World War II, where the United States was not looking to impose tariffs on continuing trade but instead was looking to *restrict* trade with the enemy and seize enemy property. *See* H.R. Rep. No. 77-1507, at 3; S. Rep. No. 77-911, at 2 (1941); *accord Markham*, 326 U.S. at 411 & n.5 (same).

The amended TWEA § 5(b) contained no mention of tariffs, taxes, or revenue. Nor does any mention of tariffs appear anywhere in the FWPA or the accompanying congressional reports regarding the enactment of the FWPA. And it strains credulity to think that the FWPA's simply placing "regulate" and "importation" in the same sentence (as individual entries in a list of seven other powers and a list of eleven other activities, respectively) meant that Congress delegated to

the Executive Branch one of its core constitutional functions—the power to impose tariffs[6]—without a single mention it was doing so. *Cf., e.g.*, *Whitman*, 531 U.S. at 468 ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"); *Dir. of Revenue v. CoBank ACB*, 531 U.S. 316, 323–24 (2001) (rejecting construction of statute that "would mean that Congress made a radical—but entirely implicit—change in the taxation of banks" in statutory amendment where "there [wa]s no indication that Congress intended to change the taxation of banks" because "it would be surprising, indeed," if Congress made such a significant change "*sub silentio*").

Congress adopted the language from this amended TWEA § 5(b) into § 1702(a)(1)(B) when it promulgated IEEPA in 1977. In doing so, Congress described the powers it was transferring from the TWEA to IEEPA as being the powers to regulate financial transactions (foreign exchange and banking, currency, and securities transactions) and to freeze foreign property transactions. H.R. Rep. No. 95-459, at 14–15 (1977); S. Rep. No. 95-466, at 5 (1977). At no point did Congress state that IEEPA included the power to impose tariffs.

Reading "regulate" in context with the other emergency powers with which it is listed in § 1702(a)(1)(B), and the legislative history and statutory structure and scheme of IEEPA and its predecessor the TWEA, confirms that "regulate" does not authorize the imposition of tariffs.

*      *      *

[6] The power to impose tariffs is a power so fundamental that the Constitution lists it first among Congress's powers and sets it out separately and above Congress's general power to regulate commerce. U.S. Const. art. I, § 8, cl. 1; *see United States v. Jacobs*, 306 U.S. 363, 370 (1939) ("No more essential or important power has been conferred upon the Congress" than "the 'Power To lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare.'").

Defendants argue that "regulate" is a transitive verb and requires an object, Defs.' Br. 6 (ECF No. 27), but this is entirely irrelevant. That a verb is transitive and requires an object does not mean it can *change its meaning* depending on what that object is. *See, e.g.*, *Astrue v. Ratliff*, 560 U.S. 586, 592–93 (2010) (noting how the word "award" as used in statute was a "transitive verb" but nonetheless holding that it had a "settled meaning").

Defendants have also attempted to analogize the "regulate . . . importation" phrase they cherry-picked out of IEEPA to other phrases from other statutes. Defs.' Br. 7–8 (ECF No. 27).[7] But before looking to *other* statutes, Defendants and the Court must first read "regulate . . . importation" in the full context of its *own* statute, i.e., IEEPA, and in the context of (1) the full list of emergency powers and (2) the full list of activities subject to those emergency powers, that IEEPA sets forth in 50 U.S.C. § 1702(a)(1)(B). Read in full context, it is clear that "regulate"

---

[7] For example, Defendants have attempted to analogize "regulate . . . importation," as used in IEEPA, to "adjust . . . imports," as used in section 232(c) of the Trade Expansion Act of 1962 ("TEA"), to argue that because the Supreme Court held that "adjust . . . imports" as used in the TEA includes the power to impose tariffs, "regulate . . . importation" as used in IEEPA must too. Defs. Br. 7–8 (ECF No. 27) (citing *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548 (1975)). But this analogy fails. The TEA and IEEPA are different statutes—and first and foremost among their differences is that the TEA expressly provides for tariffs and duties, whereas IEEPA contains no mention of tariffs and duties at all. *See, e.g.*, Trade Expansion Act of 1962, Pub. L. No. 87-794, §§ 201, 202, 211, 213, 221, 224, 225, 231, 232, 241, 251, 252, 253, 254, 256, 257, 258, 301, 302, 351, 352, 402, 403, 405, 76 Stat. 877 (1962); *West Virginia*, 597 U.S. at 721 (words of a statute must be read in their context and with a view to the overall statutory scheme). Additionally, the Supreme Court held that the legislative history of the TEA was rife with express discussions of tariffs and evinced a congressional intent to have the "adjust . . . imports" phrase include the power to impose tariffs, *see Algonquin*, 426 U.S. at 562–67, whereas there is nothing comparable in IEEPA's legislative history. Additionally, the "adjust . . . imports" language from TEA § 232(c) comes from a provision that contains only *one* verb, "adjust," and only *one* object for that verb, "imports." 19 U.S.C. § 1862(c). By contrast, the "regulate . . . importation" language from IEEPA that Defendants cite comes from a provision that lists *eight* emergency powers paired with *twelve* activities, and the meanings of those various powers and activities must be consistent when paired with each other across the statute. There is no internally consistent way to construe "regulate" in that context so as to include the power to impose tariffs.

and "regulate . . . importation" cannot be construed in an internally consistent manner so as mean the power to impose tariffs.

## CONCLUSION

For these reasons, Amici respectfully submit that IEEPA does not authorize the imposition of tariffs.

Dated: May 13, 2025                                  Respectfully submitted,

                                                                                                                                          ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
ZELDA VASSAR
CAROLYN F. DOWNS
Deputy Attorneys General

*s/Shiwon Choe*
SHIWON CHOE
Deputy Attorney General
*Attorneys for State of California and Gavin Newsom, in his official capacity as Governor of California*

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this brief contains a total of 4,745 words.

Dated: May 13, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
LARA HADDAD
Supervising Deputy Attorney General
ZELDA VASSAR
CAROLYN F. DOWNS
Deputy Attorneys General

*s/Shiwon Choe*
SHIWON CHOE
Deputy Attorney General
*Attorneys for the State of California and Gavin Newsom, in his official capacity as Governor of California*