## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                THE HONORABLE TIMOTHY M. REIF, JUDGE
                THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) | Court No. 25-00077 |
| v. ) | |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for a preliminary injunction and summary judgment, defendants' response thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion for a preliminary injunction is DENIED, and it is further

ORDERED that plaintiffs' motion for summary judgment is DENIED, and it is further

ORDERED that judgment is entered in favor of defendants.


Dated:_____                    _____
        New York, New York                                JUDGE

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

   I.    The President's Authority Under IEEPA To Regulate Importation During National Emergencies ........................................................................................................... 2

   II.   Factual Background ........................................................................................... 5

      A.   Mexico and Canada Executive Orders ...................................................... 5

      B.   China Executive Orders ............................................................................. 6

      C.   Reciprocal Tariff Executive Orders .......................................................... 6

      D.   Plaintiffs Sue To Enjoin The Executive Orders ........................................ 8

SUMMARY OF THE ARGUMENT ................................................................................... 9

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

   I.    The Non-Importer Plaintiffs Lack Article III Standing To Bring This Suit .................... 11

   II.   IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here ....................................................................................... 13

      A.   IEEPA Includes Tariff Authority ............................................................ 13

   II.   The National Emergency Is A Political Question And Valid If Subject To Review ........ 28

      A.   There Are No Judicially Manageable Standards For Whether A Threat Is "Unusual Or Extraordinary" Under IEEPA ........................................... 28

      B.   There Is A Reasonable Relationship Between The Emergency And The Tariffs Imposed ..................................................................................... 36

   III.   Plaintiffs' APA Claims Lack Merit ............................................................... 40

   IV.   Plaintiffs Are Not Entitled To An Injunction ................................................ 41

      A.   Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm ............ 41

      B.   The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs ..................... 44

      C.   Any Injunction Should Be Limited Only To Plaintiffs With Standing And Irreparable Harm ......................................................................................... 44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021).............................................................................. 25

*Alcan Sales v. United States,*
   693 F.2d 1089 (Fed. Cir. 1982) ........................................................... 15

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
   751 F.2d 1239 (Fed. Cir. 1985) ........................................................... 33

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).............................................................................. 11

*Arjay Assocs., Inc. v. Reagan,*
   707 F. Supp. 1346 (Ct. Int'l Trade 1989) ........................................... 13

*Asociacion Colombiana de Exportadores de Flores v. United States,*
   717 F. Supp. 847 (Ct. Int'l Trade 1989) ............................................. 47

*Baker v. Carr,*
   369 U.S. 186 (1962)................................................................. 33, 35, 36

*Bd. of Trs. of Univ. of Ill. v. United States,*
   289 U.S. 48 (1933)................................................................................ 15

*Beacon Prods. Corp. v. Reagan,*
   633 F. Supp. 1191 (D. Mass. 1986) ............................................... 34, 38

*Beacon Prods. Corp. v. Reagan,*
   814 F.2d 1 (1st Cir. 1987).................................................................... 37

*Biden v. Missouri,*
   595 U.S. 87 (2022)................................................................................ 26

*Biden v. Nebraska,*
   600 U.S. 477 (2023)........................................................................ 30, 31

*B-West Imports, Inc. v. United States,*
   75 F.3d 633 (Fed. Cir. 1996) ......................................................... 22, 24

*Canadian Lumber Trade All. v. United States,*
   517 F.3d 1319 (Fed. Cir. 2008) ........................................................... 13

*Canadian Wheat Bd. v. United States,*
   580 F. Supp. 2d 1350 (Ct. Int'l Trade 2008) ..................................... 11

*Chang v. United States,*
    859 F.2d 893 (Fed. Cir. 1988) ........................................................ 32, 34

*City and County of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ............................................................. 50

*City of Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ............................................................... 50

*Corus Grp. PLC v. Bush,*
    217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ................................... 48, 49

*Ctr. for Biological Diversity v. Trump,*
    453 F. Supp. 3d 11 (D.D.C. 2020) ...................................................... 32

*Dalton v. Specter,*
    511 U.S. 462 (1992) ............................................................................. 46

*Dames & Moore v. Regan,*
    453 U.S. 654 (1981) ........................................................................ 4, 20

*Dep't of Navy v. Egan,*
    484 U.S. 518 (1988) ....................................................................... 24, 25

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ....................................................................... 12, 46

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ....................................................... 35, 42

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................................. 27

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
    426 U.S. 548 (1976) ............................................................................. 17

*Florida v. HHS,*
    19 F.4th 1271 (11th Cir. 2021) ...................................................... 31, 50

*Florsheim Shoe Co. v. United States,*
    744 F.2d 787 (Fed. Cir. 1984) ..................................................... passim

*Forest Grove Sch. Dist. v. T.A.,*
    557 U.S. 230 (2009) ............................................................................. 19

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................. 46

*Gemveto Jewelry Co. v. Jeff Cooper Inc.,*
    800 F.2d 256 (Fed. Cir. 1986) ............................................................. 50

*Georgia v. Public.Resource.Org, Inc.*,
  590 U.S. 255 (2020) ......................................................................................... 20

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) ............................................................................................... 16

*Helsinn Healthcare S. A. v. Teva Pharm. USA, Inc.*,
  586 U.S. 123 (2019) ......................................................................................... 20

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................................................. 41

*Htet v. Trump*,
  2025 WL 522033 (D.D.C. Feb. 18, 2025) ...................................................... 42

*Humane Soc. of U.S. v. Clinton*,
  236 F.3d 1320 (Fed. Cir. 2001) ................................................................. 22, 33

*In re Section 301 Cases*,
  570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ................................................. 46

*Indus. Chems., Inc. v. United States*,
  941 F.3d 1368 (Fed. Cir. 2019) ...................................................................... 46

*INS v. Chadha*,
  462 U.S. 919 (1983) ......................................................................................... 37

*Invenergy Renewables LLC v. United States*,
  422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ................................................. 14

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) ............................................................................. 34, 35, 36

*Lee v. Garland*,
  120 F.4th 880 (D.C. Cir. 2024) ....................................................................... 36

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ......................................................................................... 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................... 12

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ......................................................................................... 18

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ..................................................................... 30, 33

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ......................................................................................... 30

*Martin v. Mott*,
    25 U.S. 19 (1827) ............................................................................................ 36

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ........................................................................................ 14

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir. 2023) ........................................................................... 24

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ........................................................................................ 11

*Michael Simon Design, Inc. v. United States*,
    609 F.3d 1335 (Fed. Cir. 2010) ...................................................................... 41

*Mingus Constructors, Inc. v. United States*,
    812 F.2d 1387 (Fed. Cir. 1987) ...................................................................... 11

*Munaf v. Geren*,
    553 U.S. 674 (2008) ........................................................................................ 11

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .......................................................................................... 12

*NFIB v. Dep't of Lab.*,
    595 U.S. 109 (2022) .................................................................................. 23, 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................ 49

*Ontario Forest Indus. Association v. United States*,
    444 F. Supp. 2d 1309 (Ct. Int'l Trade 2006) ................................................. 13

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
    182 F.3d 17 (D.C. Cir. 1999) ..................................................................... 35, 36

*PrimeSource Bldg. Prods., Inc. v. United States*,
    59 F.4th 1255 (Fed. Cir. 2023) .................................................................. 35, 42

*Pulsifer v. United States*,
    601 U.S. 124 (2024) ........................................................................................ 17

*Regan v. Wald*,
    468 U.S. 222 (1984) ..................................................................................... 4, 20

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ........................................................................................ 34

*Retractable Techs., Inc. v. United States*,
    739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ................................................. 47

*Rucho v. Common Cause*,
    588 U.S. 684 (2019) ....................................................................................... 34

*S. Corp. v. United States*,
    690 F.2d 1368 (Fed. Cir. 1982) .................................................................... 15

*Sardino v. Fed. Res. Bank of New York*,
    361 F.2d 106 (2d Cir. 1966) ......................................................................... 36

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ...................................................................... 36

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
    513 F. Supp. 864 (C.D. Cal. 1981) .......................................................... 20, 21

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ....................................................................................... 24

*Shandong Huarong General Grp. v. United States*,
    122 F. Supp. 2d 143 (Ct. Int'l Trade 2000) ................................................. 48

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018) ................................................................ 12, 30

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) .................................................................... 38

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ....................................................................................... 12

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ........................................................................... 46

*Sumecht NA, Inc. v. United States*,
    923 F.3d 1340 (Fed. Cir. 2019) .................................................................... 12

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ....................................................................................... 20

*Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*,
    576 U.S. 519 (2015) ....................................................................................... 19

*Totes-Isotoner Corp. v. United States*,
    594 F.3d 1346 (Fed. Cir. 2010) ................................................................ 12, 48

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ...................................................................... 43

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................................. passim

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) ...................................................................... 36

*United States v. Bush & Co.*,
    310 U.S. 371 (1940) ........................................................................ 33, 35

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ............................................................................. 30

*United States v. Shih*,
    73 F.4th 1077 (9th Cir. 2023) ............................................................ 32, 40

*United States v. Spawr Optical Rsch., Inc.*,
    685 F.2d 1076 (9th Cir. 1982) ...................................................... 15, 32, 42

*United States v. Texas*,
    599 U.S. 670 (2023) ........................................................................ 13, 14

*United States v. White*,
    97 F.4th 532 (7th Cir. 2024) .................................................................. 31

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) .......................................................... passim

*USP Holdings, Inc. v. United States*,
    36 F.4th 1359 (Fed. Cir. 2022) ......................................................... 35, 40

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................. 24

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ....................................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................... 11, 47, 49

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
    594 U.S. 338 (2021) ............................................................................. 21

*Yoshida Int'l, Inc. v. United States*,
    378 F. Supp. 1155 (Cust. Ct. 1974) ........................................................ 18

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................. 24

*Zenith Radio Corp. v. United States*,
    710 F.2d 806 (Fed. Cir. 1983) ................................................................ 47

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................. 25

**Constitutional Provisions**

U.S. Const. art. I, §8, cl. 4............................................................................... 28

U.S. Const. art. II, §2 .................................................................................... 49

**Statutes**

19 U.S.C. §1806(2) ....................................................................................... 17

19 U.S.C. §1862 ............................................................................................ 17

19 U.S.C. §1862(c) ....................................................................................... 17

19 U.S.C. §2132 ............................................................................................ 17

19 U.S.C. §2251 ............................................................................................ 17

19 U.S.C. §2411 ............................................................................................ 17

19 U.S.C. §2481(2) ....................................................................................... 17

28 U.S.C. §1581(i) ........................................................................................ 46

28 U.S.C. §2640(e) ....................................................................................... 11

28 U.S.C. §2643 ............................................................................................ 49

28 U.S.C. §2644 ............................................................................................ 49

5 U.S.C. §706 ................................................................................................ 11

50 U.S.C. §1621(a) .................................................................................... 3, 4

50 U.S.C. §1622(a)(1) ..................................................................................... 4

50 U.S.C. §1622(b) ......................................................................................... 4

50 U.S.C. §1622(d) .................................................................................. 4, 39

50 U.S.C. §1641 ............................................................................................. 4

50 U.S.C. §1701(a) ......................................................................... 4, 25, 33

50 U.S.C. §1702 ........................................................................................... 25

50 U.S.C. §1702(a)(1)(B) ..................................................................... passim

50 U.S.C. §1702(b) .................................................................................. 5, 21

50 U.S.C. §1703(a) ................................................................................................ 5

50 U.S.C. §1703(b) ................................................................................................ 5

50 U.S.C. §1703(c) ................................................................................................ 5

50 U.S.C. §1703(d) ................................................................................................ 5

50 U.S.C. §4302 .................................................................................................... 4

50 U.S.C. §4305(b)(1)(B) ..................................................................................... 21

8 U.S.C. §1182(f) ................................................................................................. 28

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838 (1941) ........................... 3, 19

National Emergencies Act, Pub. L. No. 94-412, 90 Stat. 1255 (1976) ..................... 3

Trading With the Enemy Act, Pub. L. No. 65-91, 40 Stat. 411 (1917) ...................... 2

**Rules**

USCIT Rule 56(a) ................................................................................................. 11

USCIT Rule 56(f)(1) .............................................................................................. 11

USCIT Rule 65(c) ................................................................................................. 50

**Executive Actions**

Executive Order 12959,
     *Prohibiting Certain Transactions With Respect to Iran*,
     60 Fed. Reg. 24,757 (May 9, 1995) .............................................................. 26

Executive Order 13222,
     *Continuation of Export Control Regulations*,
     66 Fed. Reg. 44,025 (Aug. 22, 2001) ........................................................... 39

Executive Order 13873,
     *Securing the Information and Communications Technology Services Supply Chain*,
     84 Fed. Reg. 22,689 (May 15, 2019) ............................................................ 26

Executive Order 14059,
     *Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade*,
     86 Fed. Reg. 71,549 (Dec. 17, 2021) ........................................................... 40

Executive Order 14193,
     *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
     90 Fed. Reg. 9,113 (Feb. 7, 2025) ................................................................. 6

Executive Order 14194,
*Imposing Duties to Address the Situation at Our Southern Border*,
90 Fed. Reg. 9,117 (Feb. 7, 2025) ............................................... 6

Executive Order 14195,
*Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*,
90 Fed. Reg. 9,121 (Feb. 7, 2025) ............................................... 7

Executive Order 14197,
*Progress on the Situation at Our Northern Border*,
90 Fed. Reg. 9,183 (Feb. 10, 2025) ............................................... 6

Executive Order 14198,
*Progress on the Situation at Our Southern Border*,
90 Fed. Reg. 9,185 (Feb. 10, 2025) ............................................... 6, 43

Executive Order 14228,
*Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*,
90 Fed. Reg. 11,463 (Mar. 7, 2025) ............................................... 7

Executive Order 14231,
*Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*,
90 Fed. Reg. 11,785 (Mar. 11, 2025) ............................................... 6, 13

Executive Order 14232,
*Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*,
90 Fed. Reg. 11,787 (Mar. 11, 2025) ............................................... 6

Executive Order 14257,
*Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*,
90 Fed. Reg. 15,041 (Apr. 7, 2025) ............................................... passim

Executive Order 14266,
*Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*,
90 Fed. Reg. 15,625 (Apr. 15, 2025) ............................................... 8, 9, 50, 51

Executive Order of May 12, 2025,
*Modifying Reciprocal Tariff Rates To Reflect Discussions With The People's Republic of China*,
https://perma.cc/FL69-4TJY ............................................... 9, 51

Notice,
*Continuation of the National Emergency with Respect to Export Control Regulations*,
89 Fed. Reg. 66,187 (Aug. 15, 2024) ............................................... 39, 40

Notice,
*Continuation of the National Emergency with Respect to Iran,*
89 Fed. Reg. 87,761 (Nov. 4, 2024) ........................................................ 39

Notice,
*Continuation of the National Emergency with Respect to Significant Narcotics Traffickers Centered in Colombia,*
89 Fed. Reg. 83,417 (Oct. 15, 2024) ....................................................... 39

Notice,
*Continuation of the National Emergency With Respect to Transnational Criminal Organizations,*
89 Fed. Reg. 58,617 (July 18, 2024) ....................................................... 40

Proclamation 10886,
*Declaring a National Emergency at the Southern Border of the United States,*
90 Fed. Reg. 8,327 (Jan. 29, 2025) ........................................................... 5

Proclamation 10896,
*Adjusting Imports of Steel Into the United States,*
90 Fed. Reg. 9,817 (Feb. 18, 2025) ........................................................ 29

Proclamation 10908,
*Adjusting Imports of Automobiles and Automobile Parts Into the United States,*
90 Fed. Reg. 14,705 (Mar. 26, 2025) ...................................................... 29

Proclamation 4074,
*Imposition of Supplemental Duty for Balance of Payments Purposes,*
36 Fed. Reg. 15,724 (Aug. 17, 1971) ........................................................ 3

**Legislative Materials**

Global Trade Accountability Act of 2021, H.R. 2618, 117th Cong., 1st sess., April 16, 2021.... 27

Global Trade Accountability Act, H.R. 723, 116th Cong., 1st sess., January 23, 2019 .............. 28

Global Trade Accountability Act, S. 1060, 118th Cong., 1st sess., March 29, 2023 .................. 27

Global Trade Accountability Act, S. 691, 117th Cong., 1st sess., March 10, 2021 ..................... 28

H.R. Rep. No. 95-459 (1977)............................................................................................... 3, 5, 20

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. (Mar. 6, 1975) ...................................................................................................................... 3

Protecting Our Democracy Act, S. 2921, 117th Cong., 1st sess., September 30, 2021 .............. 27

Reclaiming Congressional Trade Authority Act of 2019, S. 899, 116th Cong., 1st sess., March 27, 2019 ............................................................................................................................................. 28

S. Rep. No. 93-1298 (1974) ................................................................................ 18

S.J. Res. 37, 119th Cong. (2025) ................................................................ 37, 38

S.J. Res. 49, 119th Cong. (2025) ...................................................................... 38

**Other Authorities**

Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 (Jan. 30, 2024) ............................................................................ 26

*Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023) .............................................................................. 43

*Exec. Power with Regard to the Libyan Situation*, 5 U.S. Op. Off. Legal Counsel 432 (1981)... 37

*Extraordinary*, Black's Law Dictionary (12th ed. 2024) ............................................ 40

*Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025), https://www.whitehouse.gov/fact-sheets/2025/05/fact-sheet-u-s-uk-reach-historic-trade-deal/ [https://perma.cc/7CPW-8CF2] ....................................................................... 44

Inv. No. 701-TA-758 and 731-TA-1739 (Preliminary), *Fiberglass Door Panels from China* .... 29

Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024), https://prosperousamerica.org/global-10-tariffs-on-u-s- imports-would-raise-incomes-and-pay-for-large-income-tax-cuts-for-lower-middle-class/ [https://perma.cc/XUZ8-BG99] ............... 44

*Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644 (1982) ............................................................ 22

*Proposed Action in Section 301 Investigation of China's Targeting of the Maritime, Logistics, and Shipbuilding Sectors for Dominance*, 90 Fed. Reg. 10,843 (USTR Feb. 27, 2025) ............................................................ 29

*Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ............................................ 15

*Unusual*, Black's Law Dictionary (12th ed. 2024) ................................................... 40

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
               THE HONORABLE TIMOTHY M. REIF, JUDGE
               THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Court No. 25-00077

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT

## INTRODUCTION

In a series of Executive Orders starting in February, the President has invoked his

authority under the International Emergency Economic Powers Act (IEEPA) to "regulate …

importation" by imposing tariffs on imports.  Plaintiffs, several states, challenge the President's exercise of congressionally delegated and inherent authority to regulate importation during a national emergency.  They argue that regulating importation under IEEPA does not include the power to impose tariffs.  They also question the national emergencies that the President declared, inviting second-guessing of the President's judgment.

The Court should reject those arguments and deny plaintiffs' motions for a preliminary injunction and summary judgment.  For one, several plaintiffs lack standing to bring this lawsuit, and so cannot obtain any relief.  In any event, IEEPA's text, purpose, and history authorize the President to "regulate" importation during a national emergency by imposing tariffs.  Despite plaintiffs' claim to the contrary, the major-questions doctrine does not undermine this clearly established authorization.  And plaintiffs' alternative challenge to the merits of the President's emergency declaration is a nonjusticiable political question.  To the extent courts can review the fit between the actions of the President and the emergency, there is a reasonable relationship between the tariffs imposed and the national emergencies.

In addition, plaintiffs' request for a permanent or preliminary injunction requires plaintiffs to show additional elements—on irreparable harm, the balance of hardships, and the public interest—that plaintiffs are unable to make.  Accordingly, the Court should deny plaintiffs' motions.

## BACKGROUND

## I.    The President's Authority Under IEEPA To Regulate Importation During National Emergencies

Before IEEPA, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917), authorized the President to "regulate… importation" of foreign goods during wartime.  Later, Congress expanded the authority to apply during times of peace as well.  *See*

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941).  In 1971, President

Nixon invoked TWEA's importation regulation authority to impose tariffs during peacetime.

Proclamation 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).  Because a "prolonged decline in the

international monetary reserves" of the United States over a number of years had seriously

threatened its "international competitive position" and potentially impaired its ability to assure

national security, he "declared a national emergency with respect to the balance-of-payments

crisis and under that emergency imposed a surcharge on imports" and called upon the public and

private sector to "make the efforts necessary to strengthen the international economic position of

the United States."  H.R. Rep. No. 95-459, at 5 (1977); Proclamation 4074, 36 Fed. Reg. at

15,724.  The Federal Circuit's predecessor upheld the lawfulness of those tariffs, rejecting an

argument that TWEA did not authorize the President to impose tariffs.  *United States v. Yoshida*

*Int'l, Inc.*, 526 F.2d 560, 575-76 (C.C.P.A. 1975).

Later, Congress modified the TWEA authority through two new laws: the National

Emergencies Act (NEA) and IEEPA.  *See* H.R. Rep. No. 95-459, at 6-7.  These changes are

discussed in greater depth the merits brief submitted by the United States in *V.O.S. Selections,*

*Inc. v. Trump*, No. 25-cv-00066, ECF No. 32 (Ct. Int'l Trade) (U.S. Br.) at 3.[1]

Recognizing that emergency declarations would be political questions, Congress gave

itself oversight authority over national-emergency declarations.  National-emergency

declarations must be "immediately … transmitted to the Congress and published in the Federal

Register."  50 U.S.C. §1621(a); *see id*. §1641(a)-(c).  Congress is authorized to terminate a

national emergency by enacting a joint resolution into law.  50 U.S.C. §1622(a)(1)*.*  And

---

[1]  Because of the highly expedited briefing schedule of related issues, we incorporate by reference portions of the Government's merits brief in *VOS* in the present case, to avoid repetition.

Congress must meet within six months of the declaration of a national emergency to consider terminating the emergency. 50 U.S.C. §1622(b). In addition, national-emergency declarations automatically terminate after one year unless the President notifies Congress that the emergency "continue[s]." *Id.* §1622(d).

Second, IEEPA separated the President's authority to act in wartime and peacetime. Congress limited TWEA to apply only in periods of declared wars. *See* 50 U.S.C. §4302. IEEPA then extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those under its predecessor TWEA. *Id.* Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames & Moore v. Regan*, 453 U.S. 654, 671-72 (1981). IEEPA authorizes the President to exercise those powers during peacetime, "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. §1701(a). Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate… importation… with respect to any property, subject to the jurisdiction of the United States." *Id.* §1702(a)(1)(B). Unlike TWEA, IEEPA contains narrow exceptions to this broad grant of authority. Among other things, the President cannot regulate or prohibit "the importation from any country … of any information or informational materials …." *Id.* §1702(b)(1)-(4). But none of IEEPA's exceptions involve the President's authority to impose tariffs to deal with a declared national emergency.

Congress gave itself additional oversight authority over exercises of IEEPA powers beyond that afforded by NEA. 50 U.S.C. §1703(d). The President "shall consult regularly with

the Congress so long as [IEEPA] authorities are exercised." *Id.* §1703(a). The President also is directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months. *Id.* §1703(b)-(c). Even so, the Congress that enacted IEEPA recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." H.R. Rep. No. 95-459, at 10. For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency." *Id.*

## II.    Factual Background

### A.    Mexico and Canada Executive Orders

In January 2025, the President declared the flow of contraband drugs like fentanyl through illicit distribution networks, and the resulting public-health crisis, to be a national emergency. Proclamation 10886, 90 Fed. Reg. 8,327 (Jan. 29, 2025). On February 1, 2025, the President found that the actions of Canada and Mexico contributed to this crisis. Executive Order 14193, §1, 90 Fed. Reg. 9,113, 9,114 (Feb. 7, 2025); Executive Order 14194, §1, 90 Fed. Reg. 9,117, 9,118 (Feb. 7, 2025).

Using his broad powers under IEEPA, the President took action to deal with the unusual and extraordinary threat to the United States's national security, foreign policy, and economy, ordering a 25 percent duty on most Canadian and Mexican imports (except for energy and energy resources from Canada, which were assessed a 10- percent duty). Executive Order 14193, 90 Fed. Reg. at 9,114; Executive Order 14194, 90 Fed. Reg. at 9,118.

On February 3, 2025, the President issued two Executive Orders, recognizing that Canada and Mexico had taken immediate steps to alleviate their role in the emergency, but finding that additional time was needed to assess those steps' sufficiency and thus pausing most of the tariffs

until March 4, 2025.  Executive Order 14197, 90 Fed. Reg. 9,183 (Feb. 10, 2025); Executive Order 14198, 90 Fed. Reg. 9,185 (Feb. 10, 2025).

Shortly after that pause lapsed, the President issued two Executive Orders exempting all Canadian and Mexican goods that qualify for duty-free entry under the United States-Mexico-Canada Agreement (USMCA).  Executive Order 14231, 90 Fed. Reg. 11,785 (Mar. 11, 2025); Executive Order 14232, 90 Fed. Reg. 11,787 (Mar. 11, 2025).  As a result, only goods imported from Canada that are not USMCA-qualifying are subject to the tariffs imposed by Executive Orders 14193 and 14194.

### B.    China Executive Orders

On February 1, 2025, the President took additional action under IEEPA to address the unusual and extraordinary threat from the People's Republic of China (PRC), including the PRC's failures to stem the flow of contraband drugs to the United States.  Executive Order 14195, 90 Fed. Reg. 9,121 (Feb. 7, 2025).  To address the national emergency, the President imposed a 10 percent *ad valorem* duty rate on most goods imported from the PRC and authorized DHS to take any necessary actions to implement the order.  *Id.* at 9,122-23.  On March 3, 2025, the President amended the order to increase the amount of duty to 20 percent.  Executive Order 14228, 90 Fed. Reg. 11,463 (Mar. 7, 2025). The President also imposed duties on low-value imports from China because "[m]any shippers based in the People's Republic of China (PRC) hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices" and "often avoid detection due to the administration of the *de minimis* exemption." Executive Order 14256, 90 Fed. Reg. 14,899 (Apr. 7, 2025).).

### C.    Reciprocal Tariff Executive Orders

On April 2, 2025, the President declared a separate national emergency, finding "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships,

6

disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States." Executive Order 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025). That threat, the President found, "has its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system." *Id.*

In particular, these "large and persistent annual U.S. goods trade deficits" have "atrophied" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "comprise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad." *Id.* at 15,044-55. The Executive Order explains that "[t]he future of American competitiveness depends on reversing" the hemorrhage of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors. *Id.* at 15,044.

Using his broad powers under IEEPA, the President took action to deal with this unusual and extraordinary threat to the United States's national security and economy, and imposed a 10 percent duty on most imported goods. *Id.* at 15,045. These duties took effect on April 5, 2025, with select countries having additional duties imposed on April 9. *Id.* Since the initial declaration, the President has taken additional actions that he determined necessary to address this national emergency, including raising the duty rate for Chinese products and pausing the country-specific duties for 90 days for countries that took steps to negotiate and align with the United States's economic, national-security, and foreign-policy interests. Executive Order

14266, 90 Fed. Reg. 15,625 (Apr. 15, 2025); Executive Order 14259, 90 Fed. Reg. 15,509 (Apr. 14, 2025). More recently, the additional tariffs imposed on China were "suspend[ed]" for 90 days "[i]n recognition of the intentions of the PRC to facilitate addressing the national emergency declared in Executive Order 14257." Executive Order of May 12, 2025, *Modifying Reciprocal Tariff Rates To Reflect Discussions With The People's Republic of China*, https://perma.cc/FL69-4TJY.

The 10 percent duty on most imported goods imposed on April 5, and the additional country-specific duties starting on April 9, do not currently apply to Canadian or Mexican goods. Executive Order 14257, 90 Fed. Reg. at 15,041 (Apr. 7, 2025). These executive orders have opened discussions with trading partners on solutions that will strengthen our country. As Executive Order 14266 explained, "more than 75 . . . foreign trading partners . . . have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns." 90 Fed. Reg. at 15,625. "This is a significant step by these countries toward remedying non-reciprocal trade arrangements and aligning sufficiently with the United States on economic and national security matters." *Id.*

### D.    Plaintiffs Sue To Enjoin The Executive Orders

Plaintiffs, a group of states, filed their complaint on April 23, 2025, and moved for a preliminary injunction on May 7. Compl, ECF No. 2; Mot., ECF No. 14. The Court later entered an order construing the preliminary injunction motion "as a Motion for Summary Judgment." ECF No. 15. In their motion, plaintiffs argue that IEEPA "does not empower the President to usurp Congress's authority to impose tariffs," that the trade deficit is not an

"unusual" and "extraordinary" threat under IEEPA, and that the tariffs "do not 'deal with' any threat President Trump has identified."  Mot. 12.

## SUMMARY OF THE ARGUMENT

This Court should deny plaintiffs' motion for summary judgment and instead enter judgment in favor of the Government.  IEEPA authorizes the President to "regulate … importation" of foreign goods.  Binding authority interpreting identical text from IEEPA's predecessor statute holds that this term encompasses the power to impose tariffs on imported goods.  The major-questions doctrine does not change this conclusion.  Congress  delegates authority to regulate importation and international commerce to the President, and the Federal Circuit has recognized that statutes delegating power to the President in foreign affairs should be read broadly.  Nor do emergency tariffs under IEEPA undermine other congressional delegations of tariff authority.

Plaintiffs' remaining merits arguments—challenging the validity of the President's declarations of national emergencies—are unreviewable and simply incorrect.  Whether an emergency is unusual or extraordinary is a judicially unreviewable political question.  And even if the Court could examine whether the President's chosen means address the emergency (despite Supreme Court precedent holding otherwise), the tariffs at issue easily survive that review.  Accordingly, the Court should deny plaintiffs' motion and enter summary judgment for defendants.

The Court should also deny plaintiffs' request for an injunction.  *See* ECF No. 32.  Plaintiffs cannot establish actual success on the merits, for the same reasons defendants are entitled to summary judgment in this action.  Nor can plaintiffs establish irreparable harm, given that they allege no more than speculative economic loss and, in any event, would have the

possibility of a refund of any duties through the reliquidation of entries. Moreover, the equities and public interest cut against enjoining a President from using his foreign-affairs powers to protect the United States' economy and national security. This is especially true where injunctive relief threatens to disrupt the President's negotiations on matters of foreign policy with other countries.

## STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine disputes as to any material fact. USCIT R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Because this case "hinges on pure questions of law," there are no material factual disputes to resolve and "resolution by summary judgment is appropriate." *Canadian Wheat Bd. v. United States*, 580 F.Supp.2d 1350, 1356 (Ct. Int'l Trade 2008), *aff'd*, 641 F.3d 1344 (Fed. Cir. 2011). The Court may grant summary judgment in favor of the nonmovant. USCIT R. 56(f)(1).[2]

"[A] preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must make a clear showing of all four factors: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the

---

[2] Plaintiffs filed a purported Statement of Undisputed Material Facts, ECF No. 32-1, but the scope and standard of review for this action does not anticipate the proffering of material facts. 28 U.S.C. §2640(e) (incorporating the scope and standard of review from the Administrative Procedure Act, 5 U.S.C. §706). In any event, plaintiffs themselves assert, "[t]he core issues in this case are legal, not factual," ECF No. 32, and, none of plaintiffs' statements can be described as material. As just one example, their conclusions that the tariffs "are unlikely to increase domestic wages and consumption," ECF No. 32 ¶ 3, "are arbitrary," *id.* ¶ 4, and "are designed to achieve ends unrelated to a national emergency," *id.* ¶ 5, are plaintiffs' immaterial conclusions and characterizations. The President, not plaintiffs, determines whether a national emergency exists and through what means to address such an emergency. Defendants otherwise respond to plaintiffs' purported "facts" as needed in the body of this brief.

balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1345 (Fed. Cir. 2019) (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)). Similar considerations apply where a plaintiff seeks a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## ARGUMENT

### I.    The Non-Importer Plaintiffs Lack Article III Standing To Bring This Suit

Judgment should be entered against plaintiffs who do not claim to be importers—here, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, and Vermont. To have standing, a plaintiff must prove it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs allege that they are suffering "actual, ongoing, and imminent economic harm." Mot. 11. But, critically, only some plaintiff states say that any of their arms or instrumentalities are importers of record. None of the other plaintiff states (Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, and Vermont) are importers who have personally paid tariffs; rather, they are purchasers who allegedly paid increased costs to third party importers. While importers have standing to challenge tariffs, purchasers of imported goods do not. "[P]urchasers have no remedy to challenge [a] tariff classification." *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010). This is because the requirements of traceability and redressability are not satisfied where an injury "results from the independent action of some third party not before the court," such as an importer. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted),. Thus, the non-importer states' allegations of "increased cost" in the goods

they purchase, Mot. 11, are not sufficient. Prices are set by independent private actors and informed by multiple, complex market forces. Plaintiffs cannot reasonably infer that importers will uniformly pass on not just these costs but also any savings (like duty refunds or post-tariff price decreases) to consumers—let alone onto these specific plaintiffs.[3]

Indeed, this Court has held that plaintiffs lack standing where the requested relief would require independent action by a non-party to the action. *Ontario Forest Indus. Association v. United States*, 444 F.Supp.2d 1309, 1313 (Ct. Int'l Trade 2006) (holding that plaintiffs lacked standing because the requested relief would require independent action by the Canadian government—a party not before the Court); *see Arjay Assocs., Inc v. Reagan*, 707 F.Supp.1346, 1347 (Ct. Int'l Trade), *aff'd*, 891 F.2d 894 (Fed. Cir. 1989). Here, as in *Ontario Forest*, the non-importer plaintiffs' claims of redressability are based on future, independent action that their third-party vendors might take. And that independent action—vendors lowering their prices—is highly speculative even *if* the Court were to grant injunctive relief, as vendors may retain higher prices for any number of reasons independent of tariffs. *See* Mot. 31-32 (discussing the difficulty of connecting specific tariffs to the surcharges paid by plaintiffs). The Supreme Court has also criticized States' reliance on downstream harms for standing. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

---

[3] Plaintiffs claim it is undisputed that the "IEEPA Tariffs are causing increases in prices of goods and materials on which the States rely," ECF No. 32-1 ¶13, but the very evidence on which they rely for that statement refutes it. For example, plaintiffs say that vendors of certain *Canadian goods* have "pass[ed] through the cost of the IEEPA Tariffs to the States," *id.* ¶13(c), but no IEEPA tariffs currently apply on these Canadian (*i.e.*, USMCA-qualifying) goods. Executive Order 14231, 90 Fed. Reg. at 11,785; Executive Order 14257, 90 Fed. Reg. at 15,046. And plaintiffs themselves acknowledge that "[t]ariff costs that are passed through to the States by vendors and importers of record are administratively infeasible to recover," ECF No. 32-1 ¶14, making it purely speculative that a favorable ruling would somehow cause those vendors and importers to pass on their savings.

The cases plaintiffs cite are inapposite. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008), employed the doctrine of "'competitor standing,' which relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors." That doctrine does not apply where plaintiffs have not shown that these tariffs (which are not unique to them) are causing them competitive injury. *Invenergy Renewables LLC v. United States*, 422 F.Supp.3d 1255, 1273-74 (Ct. Int'l Trade 2019), is also inapposite. The plaintiffs there did not rely solely on "economic harm," but also raised valid claims of procedural harm that are inapplicable here. Finally, *Maryland v. Louisiana*, 451 U.S. 725, 736-37 (1981), concluded that states that purchased natural gas had standing to challenge a tax imposed on the gas pipelines— but there, in sharp contrast to the circumstances here, state law "forb[ade] the Tax from being passed on or back to any third party other than the purchaser of the gas," "explicitly direct[ed] that it should be considered as a cost of preparing the gas for market," and had specifically been passed on to the purchasing states with regulatory approval for the pass-through. *Id.* at 737. The states' boundless theory of purchaser standing bears no resemblance to that decision and contravenes more recent precedent on state standing. *Texas*, 599 U.S. at 680 n.3.

## II.     IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here

### A.     IEEPA Includes Tariff Authority

The President imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate … importation" to deal with a national emergency. 50 U.S.C. §1702(a)(1)(B); Executive Order 14257, 90 Fed. Reg. 15,041. IEEPA clearly authorizes the President to impose tariffs—text, context, and history compel this conclusion.

### 1.    Text And Context

IEEPA's plain text authorizes the President to impose tariffs.  When a national emergency is declared:

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise… investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in… *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. §1702(a)(1)(B) (emphases added).  Imposing tariffs falls within the power to "regulate … importation" of foreign goods.  *Id.*  Tariffs set the terms on which foreign goods enter the United States.  That is consistent with the definition of "regulate."  *See Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws").

Precedent confirms this straightforward reading of IEEPA's language.  Interpreting identical relevant language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" permitted the President to "impos[e] an import duty surcharge."  *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982); *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982).  That precedent's holding continues to control.  *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (Federal Circuit adopting the holdings of decisions of the Court of Customs and Patent Appeals (CCPA)).  For a greater discussion of IEEPA and tariff's role in regulating commerce, *see* U.S. Br at 12-13.

Statutory context reinforces this conclusion.  The power to "regulate" imports by imposing tariffs is similar to the other powers granted in IEEPA's subsection (a)(1)(B), like the

power to "block" the import of goods during an investigation, or the power to "prevent or prohibit" those imports. *Id.* §1702(a)(1)(B). Each of these terms grants the President a significant power over foreign commerce. And many partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions. For example, the provision's list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit." *Id.* It confers the overlapping powers to "nullify" and "void" various transactions. *Id.* Similarly, the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of its way to grant both powers. *Id.*

Regardless, attempting to read section 1702(a)(1)(B)'s list as enumerating discrete powers instead of providing broad Presidential authority would lead to the same conclusion about "regulation." If each power articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little, if anything, other than the power to "prevent or prohibit" imports—leaving the term largely superfluous. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "without any operative significance").

Plaintiffs seek to narrow IEEPA's plain text by pointing to statutes that use different language to authorize the President to impose tariffs in certain circumstances. Mot. 15-17 (discussing the President's powers under 19 U.S.C. §§1862, 2132, 2411, and 2251). Plaintiffs are wrong: Congress used similarly broad language to permit imposition of tariffs in section 232. *See* 19 U.S.C. §1862(c) ("adjust … imports"); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976) (Section 232's "adjust … imports" means that "the President's authority

15

extends to the imposition of monetary exactions, i.e., license fees and duties.").[4]  Regardless, the

fact that Congress has elsewhere used narrower language to convey a non-emergency power says

little about the meaning of the broader language it used in TWEA or IEEPA.  Nor does the

existence of a statute permitting the President to impose tariffs to address balance-of-payment

issues somehow narrow the scope of the later-enacted IEEPA.  Mot. 16-17 (citing 19 U.S.C.

§2132).  That earlier-enacted statute cannot narrow IEEPA; when statutes irreconcilably conflict,

it is the *later* enactment that prevails.  *See Maine Cmty. Health Options v. United States*, 590

U.S. 296, 315-16 (2020).  In any event, there is no conflict here.  Section 2132 authorizes the

President to impose tariffs to address balance-of-payment issues before the issues reach the level

of an emergency; IEEPA provides broad emergency powers, including tariffs, to address a variety

of threats.  Indeed, *Yoshida* already rejected the idea that statutes applicable in non-emergency

situations can narrow the powers available in an emergency.  *See* 526 F.2d at 578 ("trade acts"

that do not involve "national emergency powers" did not narrow TWEA's scope).[5]

---

[4] Furthermore, in both the Trade Expansion Act of 1962 and the Trade Act of 1974, Congress defined the phrase "duty or other import restriction" as encompassing not only duties but also "exaction[s] other than dut[ies]" that are "imposed for the regulation of imports."  19 U.S.C. §1806(2); 19 U.S.C. §2481(2).

[5] *Yoshida*'s footnote stating that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action," did not limit the Court's reasoned analysis of the power conferred by "regulate … importation" in TWEA or contradict the Court's earlier explanation of the way IEEPA's emergency powers mesh with other non-emergency tariff powers.  526 F.2d at 578, 582 n.33.  The footnote is better read as rejecting an argument that Congress had disagreed with the lower court's conclusion that TWEA did not confer tariff authority.  *Id.* (declining to "draw … conclusions, regarding the existence of [tariff] authority … in 1971, from the specific grant of the surcharge authority spelled out in the Trade Act of 1974").  And regardless, the footnote at most speaks in dicta about the interaction between Section 122 and TWEA (since Section 122 had not been enacted when President Nixon imposed the tariffs at issue in *Yoshida*), and it certainly could not have spoken to the interaction between Section 122 and IEEPA (since IEEPA was enacted only after *Yoshida*'s interpretation of the language Congress borrowed).  Moreover, reading the footnote to limit the President's

Nor does the passage of the Trade Act of 1974 limit *Yoshida*'s holding or the breadth of IEEPA's text. In July 1974, the trial court in *Yoshida* concluded that TWEA did not authorize tariffs. *Yoshida Int'l, Inc. v. United States*, 378 F.Supp.1155 (Cust. Ct. 1974). In response, Congress passed the Trade Act of 1974, which authorized the President to impose a limited surcharge to address certain balance-of-payments issues. *See* S. Rep. No. 93-1298, at 88 (1974) (enacting the Trade Act as "necessary … *in the light of the recent decision by the United States Customs Court*," despite Congress's view that the President's "authority" to impose import surcharges was already "manifest") (emphasis added)). But the CCPA's decision reversing the trial court and holding that "regulate importation" authorizes tariffs was issued *after* the enactment of Section 122. Thus, in enacting Section 122, Congress ensured that, if the CCPA did not reverse the trial court, the President would still have a mechanism to impose tariffs to address a balance-of-payments deficit. And when Congress enacted IEEPA, the most recent change in the landscape was *Yoshida*—not Section 122. Plaintiffs point to *no* history supporting the notion that Congress enacted a non-emergency statute to strip the President's authority to impose tariffs in an emergency, and they fail to establish that the "legal background" against which IEEPA was enacted permits departing from *Yoshida*.

## 2. History

IEEPA's history further confirms that it authorizes the President to impose tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434

---

emergency authority would make *Yoshida* internally inconsistent because elsewhere the court made clear that "[t]he existence of limited authority under certain trade acts does not preclude the execution of other, broader authority under a national emergency powers act," and that it is "unreasonable" to read TWEA (and thus IEEPA) to require the Executive to "follow limiting procedures prescribed in other acts designed for continuing use during normal times" in order to deal with an emergency. *Id.* at 578.

U.S. 575, 580 (1978); *see Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009). Congress drew the relevant language directly from TWEA, and it did so *after* the CCPA interpreted that identical language to permit the President to impose tariffs in 1975.  During the legislative process for IEEPA, Congress was well aware of the relevant language and the court's decision interpreting the language to authorize the President to impose tariffs but chose to keep the language when it enacted IEEPA in 1977, as discussed in U.S. Br. at 19-20.

Plaintiffs read this history backwards.  They argue that Congress passed IEEPA to take away power previously asserted by the President.  Mot. 16.  But Congress limited the President's power by including specific procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to deal with a declared national emergency.  Congress *knew* that TWEA had been used to impose tariffs, yet it chose to use the same language that had conferred such authority, without modifying it or expressly precluding their imposition.  *See* 50 U.S.C. §1702(b) (listing "Exceptions to Grant of Authority," none of which involve imposing tariffs). Moreover, as explained below, Congress has repeatedly declined to *revoke* the President's authority to impose tariffs under IEEPA.  And plaintiffs' theory would mean that TWEA itself does not authorize the President *in times of war* to impose tariffs, as TWEA still has the same relevant language plaintiffs claim does not authorize the President to impose tariffs under IEEPA.  50 U.S.C. §4305(b)(1)(B); *see Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021) (rejecting interpretation that would have a "highly counterintuitive result"). In other words, plaintiffs effectively ask the Court to overturn *Yoshida*'s holding interpreting "regulate importation" in TWEA to authorize imposing tariffs.

18

### 3.     Purpose

Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes, like IEEPA, is to give the President broad and flexible powers to effectively address problems associated with a national emergency. "[T]he primary implication of an emergency power is that it should be effective to deal with a national emergency successfully." *Yoshida*, 526 F.2d at 573. "The delegation in [TWEA] is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress." *Id.* Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982). Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies.

Especially in this context. "[S]tatutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed." *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996). Indeed, in foreign affairs, "broad grants by Congress of discretion to the Executive are common." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984). IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." *Id.* at 793 (cleaned up). When foreign affairs and national security are involved, "the President plays a dominant role,"

and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language." *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001). Plaintiffs cannot point to clear language cabining the President's authority. Just the opposite—text, history, and context all show that IEEPA authorizes the President to impose tariffs.

Plaintiffs seek a narrower reading by invoking constitutional avoidance. Mot. 19. That argument fails for the reasons discussed in ECF No. 27 at 10.

### 4.    The Major-Questions Doctrine

In plaintiffs' view, the Court should not presume that Congress delegated authority to the President because of the "vast economic and political significance" of the tariffs. Mot. 18. But the major-questions doctrine does not apply here and, even if it did, it would not help plaintiffs. "Where the statute at issue is one that confers authority upon an administrative agency … there are extraordinary cases that … provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such cases, under the major-questions doctrine, the agency "must point to clear congressional authorization" for the proposed regulation." *Id.* at 723.

At the threshold, the major-questions doctrine does not apply because "the statute at issue" does not "confer[] authority upon an administrative agency." *Id.* at 721. It confers authority on the President. The Supreme Court has never applied the major-questions doctrine to a statute delegating power to the President. It has instead described the doctrine as applicable to statutes giving authority to agencies. "[T]he major questions doctrine label … took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: *agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724

(cleaned up) (emphasis added). Unlike the President, agencies lack political accountability. *See NFIB v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (allowing Congress to "hand off all its legislative powers to unelected agency officials" would replace "government by the people" with "government by bureaucracy"). No political-accountability justification applies here, where "the Framers made the President the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020), and the President directs an action in an executive order.

And the President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach. The President's "authority is at its maximum" when he acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment). A unanimous panel of the Ninth Circuit has recognized that "[t]he Major Questions Doctrine is motivated by skepticism of agency interpretations" and "does not apply to Presidential actions." *Mayes v. Biden*, 67 F.4th 921, 933, 934 (9th Cir. 2023), *vacated as moot by* 89 F.4th 1186 (Mem.) (9th Cir. 2023). *See* ECF No. 27 at 10-13 (discussing further why the doctrine is inapplicable to the President).

Similarly, the major-questions doctrine does not apply to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the

"utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters); *B-West Imports*, 75 F.3d at 636. So, in this area, unlike in cases where courts have taken a major-questions approach, there is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (cleaned up).

Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. The Supreme Court has identified several traits of regulatory action that, in combination, implicate the major-questions doctrine when an agency takes a sufficiently significant action. No one doubts the significance of the challenged tariffs, but significance alone is not enough; otherwise, the doctrine would apply to countless government actions, including every emergency statute. None of the remaining indicia of major questions—let alone an adequate combination—are present here.

Plaintiffs point to the CDC's eviction moratorium, which presented a major question when the CDC attempted to transform its regulatory power by acting far outside its typical expertise based on a catch-all phrase in a statute. Mot. 18-19 (citing *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)). But this comparison is irrelevant for the same reasons as discussed at U.S. Br. at 23.

Nor is the President's use of IEEPA an exercise of "unheralded power," especially given the President's exercise of his tariff power under materially identical language in IEEPA's predecessor statute. *West Virginia*, 597 U.S. at 724. The President's exercise of his power under materially identical language in IEEPA's predecessor statute means the challenged action is far from "unheralded." *Id.* Likewise, the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating

imports and exports—often with even more serious measures like total or near-total embargoes. *See, e.g.*, Executive Order 13873, *Securing the Information and Communications Technology Services Supply Chain*, 84 Fed. Reg. 22,689 (May 15, 2019) (invoking IEEPA to bar the "importation … of any information and communications technology" that was "designed, developed, manufactured, or supplied, by persons owned by, controlled by, or subject to the jurisdiction or direction of a foreign adversary"); Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 60 Fed. Reg. 24,757 (May 9, 1995) (invoking IEEPA to bar "the importation into the United States or the financing of such importation of any goods or services of Iranian origin," with certain exceptions); Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 at 58-62 (Jan. 30, 2024) (collecting dozens of similar uses of IEEPA to regulate imports and exports, with one or more in nearly every year since 1979).

IEEPA's authorization of the President to regulate imports in an emergency is not a catch-all clause; nor is it an example of "modest words" or an "ancillary provision" of the statute. *West Virginia*, 597 U.S. at 723-24; *see* Amicus Br. 23-24 (making a similar argument based on *NFIB*, 595 U.S. at 109). Just the opposite: the power is conferred as one of the enumerated terms in a list of powers making up one of the statute's principal provisions, and that term straightforwardly grants the President broad, consequential powers over foreign commerce to deal with broad, consequential problems facing the country. Section 1702(a)(1)(B), by including authorization for the President to "regulate … importation," could never be mistaken for a mousehole—*especially* when Congress expressly acknowledged that the court with exclusive jurisdiction over the matter had just conclusively interpreted that language to authorize the President to impose tariffs.

Plaintiffs point out Congress's authorization of the President to impose tariffs in other statutes, Mot. 16-17, but they fail to realize that those statutes cut *against* their argument. Those statutes only prove that it is *not* surprising that Congress would delegate tariff authority to the President—the basic thrust of the major-questions inquiry. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (looking to evidence of "Congress'[s] consistent judgment to deny the" power being exercised); *West Virginia*, 597 U.S. at 724 (agency adopted "a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."). Here, Congress has repeatedly conferred tariff power on the President and—more specifically— has repeatedly considered and decided *not* to revoke the President's power to impose tariffs under IEEPA. *See, e.g.*, Global Trade Accountability Act, S. 1060, 118th Cong., 1st sess., March 29, 2023; Protecting Our Democracy Act, S. 2921, 117th Cong., 1st sess., September 30, 2021; Reclaiming Congressional Trade Authority Act of 2019, S. 899, 116th Cong., 1st sess., March 27, 2019.

Nor does the existence of these other statutes (or Congress's constitutional authority to impose tariffs) suggest that IEEPA should be read narrowly despite its plain text. The Supreme Court rejected essentially the same argument in *Hawaii*. There, relying on 8 U.S.C. §1182(f)'s broad delegation of power to "suspend the entry of … any class of aliens" whose entry the President determines "would be detrimental to the interests of the United States," the President issued a Proclamation "prevent[ing] the entry of those foreign nationals about whom the United States Government lacks sufficient information," among others. *Id.* at 679; *see* U.S. Const. art. I, §8, cl. 4 (granting Congress power to "establish a uniform Rule of Naturalization"). The plaintiffs argued that the President, in relying on §1182(f), "supplant[ed]" two more-specific statutes addressing "the problem of aliens seeking entry from countries that do not share

24

sufficient information with the United States," requiring a narrow reading of §1182(f). *Id.* at 688-89. The Court rejected that argument. There was no "conflict between the statute and the Proclamation that would implicitly bar the President from addressing deficiencies in the Nation's vetting system." *Id.* at 689. The more specific statutes did not "*require* that systemic problems such as the lack of reliable information be addressed only in a progression of case-by-case admissibility determinations." *Id.* at 689-90. And "[o]ne of the key objectives of the Proclamation [was] to encourage foreign governments to improve their practices, thus facilitating the Government's vetting process overall." *Id.* at 690.

The same is true here. The Trade Act of 1974, the Trade Expansion Act of 1962, and the antidumping and countervailing duty laws, none of which are predicated on a finding of a national emergency, address the specific situations of balance-of-payment problems, injuries to domestic industries, unfair trade practices, and impairment of national security. But those statutes do not "*require* that" the "systemic problems" that the President identified in the challenged Executive Orders be addressed through "case-by-case"—for instance, product-, industry-, or trade-practice-specific—application of these non-emergency statutes. *Hawaii*, 585 U.S. at 689-90. And one of the objectives of the President's actions here is likewise "to encourage foreign governments to improve their practices," which has the benefit of enhancing, not supplanting, enforcement of statutes like Section 301 and the antidumping and countervailing duty laws. *Id.* at 690.

The President's use of the emergency authorities that IEEPA provides, in short, coexists with enforcement of existing non-emergency trade laws. For example, the imposition of tariffs under IEEPA has not stopped the U.S. Trade Representative from addressing unfair trade practices on a non-emergency basis under Section 301. *Proposed Action in Section 301*

*Investigation of China's Targeting of the Maritime, Logistics, and Shipbuilding Sectors for Dominance*, 90 Fed. Reg. 10,843 (USTR Feb. 27, 2025).  IEEPA has not supplanted the use of Section 232 to impose duties to adjust the importation of specific products to protect national security, either.  *E.g.*, Proclamation 10896, *Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 9,817 (Feb. 18, 2025); Proclamation 10908, *Adjusting Imports of Automobiles and Automobile Parts Into the United States*, 90 Fed. Reg. 14,705 (Mar. 26, 2025) Nor has IEEPA slowed the work of the U.S. International Trade Commission under the antidumping and countervailing duty laws in determining whether imports of certain products of particular countries are threatening domestic industries.  *E. .g.*, Inv. No. 731-TA-1739 (Preliminary), *Fiberglass Door Panels from China*.  Given the existence of all of these concurrent investigations and actions under other delegated authorities to deal with non-emergency situations, it is difficult to see how IEEPA is the trade-statute-supplanting authority that plaintiffs make it out to be.  Though IEEPA "overlap[s] with the traditional framework of trade legislation, it is not controlling that some of the same considerations are involved."  *Yoshida*, 526 F.2d at 578; *Hawaii*, 585 U.S. at 689-90.

Applying the major-questions doctrine would also conflict with the strong presumption that when Congress uses broad language in a delegation to the President in the foreign-affairs and national-security context, courts give the statute "a broad construction."  *Florsheim*, 744 F.2d at 793; *see, e.g.*, *Marshall Field & Co.  v. Clark*, 143 U.S. 649, 691 (1892) ("[I]n the judgment of the legislative branch of the government, it is often desirable, if not essential for the protection of the interests of our people … to invest the [P]resident with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations."); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 312 (1936); *seeMaple*

*Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985) (because case involves the President's authority, the court's review is limited to whether the case involves a "clear misconstruction" of IEEPA). "If Congress desires to eliminate these tariffs or to cabin the President's authority, that is a matter for Congress to address in future legislation, not a matter for this court." *Silfab*, 892 F.3d at 1349.

Finally, the major-questions doctrine compares the text of the statute to the power exercised. The doctrine is more likely to apply when the power exercised amounts to "a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (cleaned up)—or, put differently, whether the power goes "beyond what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 724. These considerations are largely accounted for already. But to sum up: IEEPA unambiguously confers far-reaching powers over foreign trade, the President has repeatedly exercised his powers under IEEPA in comparable actions and contexts, and the powers conferred upon and exercised by the President fall within his core competencies of national security and foreign relations. The President's latest step, exercising tariff authority, is predictable and precedented, not transformational or surprising. The major-questions doctrine is not implicated here.

Even if it were, the Executive Orders would still be supported by the "clear congressional authorization for the power" they exercised to impose and modify tariffs in response to unfair foreign trade practices. *West Virginia*, 597 U.S. at 723. The major-questions doctrine provides no basis to invalidate an action where the statute "specifically authorizes the [agency] to make decisions like th[e] one" under review. *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024). That remains true, plaintiffs' denial notwithstanding, *see* Mot. 18-19, when the authorization is

couched in clear but broad language.  *See Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021)

(major-questions doctrine did not apply because "a broad grant of authority" that "plainly

encompasses the [agency's] actions… does not require an indication that specific activities are

permitted"); *Nebraska*, 600 U.S. at 511 (Barrett, J., concurring) (unlike true "clear-statement"

rules, major-questions doctrine does not require "an 'unequivocal declaration' from Congress

authorizing the *precise* agency action under review"); *West Virginia*, 597 U.S. at 723 ("something

more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)).

Indeed, the Ninth Circuit has found the relevant language here to be "*unambiguous*" and to

"*clearly* show[] that the President's actions [imposing tariffs] were in accordance with the power

Congress delegated."  *Spawr Optical*, 685 F.2d at 1081 n.10 (emphases added).[6]

## II.  The National Emergency Is A Political Question And Valid If Subject To Review

### A.  There Are No Judicially Manageable Standards For Whether A Threat Is "Unusual Or Extraordinary" Under IEEPA

Plaintiffs argue that IEEPA, even if it authorizes tariffs in some circumstances, does not

authorize the tariffs challenged here because plaintiffs disagree with the merits of the President's

declared emergency.  Mot. 20-21.  But whether a threat is unusual or extraordinary is reviewable

only by Congress, not by the courts.

Plaintiffs concede that this Court cannot review the President's declaration of a national

emergency, as they must. Mot. 21 ("the States are not challenging the President's declaration of

an emergency under the National Emergencies Act"). "[N]o court has ever reviewed the merits

of such a declaration." *Ctr. for Biological Diversity v. Trump*, 453 F.Supp.3d 11, 31 (D.D.C.

2020). For good reason: reviewing the President's emergency declaration would require

---

[6] Plaintiffs rightly do not raise a non-delegation argument, as there is no constitutional issue with Congress's delegation of tariff authority to the President in IEEPA.

"examin[ing] the President's motives and justifications for declaring a national emergency" and the President's factfinding—something the Federal Circuit has said "would likely present a nonjusticiable political question." *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988) (IEEPA); *see, e.g.*, *Yoshida*, 526 F.2d at 579, 581 n.32 ("courts will not review the bona fides of a declaration of an emergency by the President"); *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023)) (refusing to review declaration of emergency under IEEPA). Indeed, the Federal Circuit, following the Supreme Court's lead, has repeatedly concluded that the President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see, e.g.*, *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1248 (Fed. Cir. 1985); *Maple Leaf*, 762 F.2d at 89 same); *Humane.*, 236 F.3d at 1330; *United States v. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains.").

Plaintiffs instead say the Court should probe whether the President properly found that there was an "unusual and extraordinary threat," 50 U.S.C. §1701(a), justifying the emergency declaration. But that is a textbook political question. The seminal political-question case, *Baker v. Carr*, identified six different ways a case could present a nonjusticiable political question: Nonjusticiable political questions arise where there is:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).   The question that plaintiffs seek judicial resolution of fits within

multiple of *Baker*'s categories.  Most obviously, there is a profound "lack of judicially

discoverable and manageable standards for resolving" the validity of the President's threat

assessment.  *Id.*  As one court explained:

> [T]o address the claim that Nicaragua does not pose an unusual and
> extraordinary threat to the United States … would require the court
> to assess the wisdom of the President's judgment concerning the
> nature and extent of that threat, a matter not susceptible to judicially
> manageable standards.  How, for example, is the court to determine
> whether Nicaragua poses more than an ordinary or usual threat?
> How is a court to resolve disputed issues of fact concerning the
> situation in Nicaragua?  The court simply lacks the resources and
> expertise to address these questions.  Nor could it resolve such
> questions without making its own policy judgments about national
> security and foreign policy, judgments best left to the political
> branches         of         the         federal         government.

*Beacon Prods. Corp. v. Reagan*, 633 F.Supp.1191, 1194-95 (D. Mass. 1986), *aff'd*, 814 F.2d 1

(1st Cir. 1987).  The Federal Circuit has signaled agreement with *Beacon Products* that "whether

[a certain circumstance] poses a sufficient threat to trigger the President's IEEPA powers is a

nonjusticiable political question."  *Chang*, 859 F.2d at 896 n.3. And the Supreme Court has

concluded, in a different context, that whether the Executive correctly determined that "nationals

of a particular country [are] a *special* threat" is unreviewable because the courts are "utterly

unable to assess their adequacy."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471,

491 (1999) (emphasis added); *see Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230

(1986) ("[C]ourts are fundamentally underequipped to formulate national policies or develop

standards for matters not legal in nature.").

　　　Tellingly, plaintiffs do not even try to provide a "'clear, manageable, and politically

neutral'" standard that to identify a threat, let alone one that "can reliably differentiate" unusual

and extraordinary threats from usual and ordinary ones. *Rucho v. Common Cause*, 588 U.S. 684, 703-04 (2019). That showcases that this is a political question. The Federal Circuit in the international-trade space has held that a President's determination of whether something constitutes a national-security threat is unreviewable. *See USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023) (similar); *cf., e.g.*, *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (whether an organization's activity "threatens … the national security of the United States" is "nonjusticiable"); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 843 (D.C. Cir. 2010) (same). If courts cannot review national-security threat assessments, they certainly cannot compare those assessments to determine whether a particular threat is "unusual" or "extraordinary."[7]

Similarly, the matter is nonjusticiable because it is "impossib[le] [to] decid[e] without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The underlying merits of the emergency declaration, just like the choice to impose tariffs as a remedy and the particular formulas used to impose those tariffs, "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling*, 478 U.S. at 230. The President's "motives, his reasoning, his finding of facts requiring the action, and his judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see Hawaii*, 585 U.S. at 708 ("[W]e cannot

---

[7] That the "unusual and extraordinary" threat determination is made by the President and revolves around foreign affairs and national security clearly distinguishes this statute from other circumstances in which courts assess standards that involve some similar words in radically different contexts well within the judiciary's core competencies. *See* Mot. 21 (discussing "unusual" in the Eighth Amendment context, for example).

substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").

None of this means that the President's emergency declarations go unreviewed. Indeed, *Baker* recognizes political questions arise where there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or potential "embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. at 217. Here, as with many emergency statutes, the President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts." *Martin v. Mott*, 25 U.S. 19, 31 (1827); *see Sardino v. Fed. Res. Bank of New York*, 361 F.2d 106, 109 (2d Cir. 1966) (regarding President Nixon's declaration of a national emergency, emphasizing that "the courts will not review a determination so peculiarly within the province of the chief executive"). After that, Congress designated *itself*—not the judiciary—as the body to supervise emergency declarations and the adequacy of the President's response. *See* 50 U.S.C. §1622(c) (creating fast-tracked procedures for review and disapproval of emergency declarations); *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011) (in IEEPA, "Congress reaffirmed its essential legislative function, and struck a careful balance"). Congress in the NEA and IEEPA "place[d] the onus on Congress to ensure emergency situations remain anomalous and do not quietly evolve into default norms." *Id.* at 581. And rightly so: "the issue of national security is a quintessential source of political questions." *Lee v. Garland*, 120 F.4th 880, 890-91 (D.C. Cir. 2024) (cleaned up).

The Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919 (1983), holding concurrent resolutions unconstitutional, does not affect the analysis. That is because Congress doubled down on its exclusive role in reviewing emergencies and threat assessments by

32

amending the NEA post-*Chadha* to provide for joint resolutions to terminate national emergencies. 99 Stat. 407, 448; *see Beacon Prods. Corp. v. Reagan*, 814 F.2d 1, 3 (1st Cir. 1987) (discussing this amendment). This process has worked as intended, with Congress terminating the national emergency relating to the COVID-19 pandemic in 2023. 137 Stat. 6; *see* S.J. Res. 37, 119th Congress (2025). Any challenge to the fact of the emergency itself— particularly plaintiffs' claim that the emergency is not "unusual" or "extraordinary" enough—is a nonjusticiable political question.

Historical practice confirms that the President's determination that a threat is unusual and extraordinary is unreviewable. Presidents have declared national emergencies and deemed threats to be unusual and extraordinary without significant explanation that could enable judicial review. In fact, Presidents have repeatedly done so in a single sentence. *See, e.g.*, *Exec. Power with Regard to the Libyan Situation*, 5 U.S. Op. Off. Legal Counsel 432, 434 (1981); Executive Order 12513; Executive Order 12543; Executive Order 12635; Executive Order 12722; Executive Order 12735; Executive Order 12775. Congress has likewise stipulated that certain circumstances satisfy IEEPA's unusual-and-extraordinary-threat requirement in a single sentence. *See, e.g.*, Pub. L. No. 99-529, 100 Stat. 3010 (Oct. 24, 1986). Under plaintiffs' theory, these single-sentence findings are reviewable even though there is no detail to review.

Plaintiffs' opinions on economic theory, Mot. 23, merely reinforce why that must be the case. Plaintiffs claim that persistent trade deficits are not "extraordinary threats."[8] But whether that is so is precisely the sort of judgment committed to the political branches of government.

---

[8] Plaintiffs make no structured argument contending that the Mexico, Canada, and China Orders do not involve unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. Mot. 25-27. That argument is thus forfeited. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006).

"How, for example, is the court to determine whether" the effects of persistent trade deficits on the United States' national security posture "pose[] more than an ordinary or usual threat?" *Beacon Prods.*, 63 F.Supp. at 1195. The question is not fit for judicial resolution, but is for the political branches to resolve. Indeed, the tariffs at issue are presently being debated in Congress, as designed under IEEPA's legislative-review component. *See* Joint Resolution, S.J. Res. 49, 119th Cong. (2025) (49-49 failed vote on resolution terminating the national emergency the President declared in Executive Order 14257); Joint Resolution, S.J. Res. 37, 119th Cong. (2025) (passed Senate resolution terminating the national emergency the President declared in Executive Order 14193 regarding fentanyl from Canada; currently held in the House). The Court should let the political process resolve these political questions.

Plaintiffs hinge their argument that a trade deficit cannot constitute an "unusual and extraordinary threat" under IEEPA on the premise that the trade deficit is not "rare and brief," but instead a persistent state of affairs. Mot. 22. But "unusual and extraordinary" threats need not be short-lived—and, regrettably, are often persistent, as demonstrated in the discussion of other persistent IEEPA emergencies in ECF No. 27 at 17-20. Indeed, the 2001 Executive Order, which declared a national emergency with respect to export control regulations and is still active, did no more than extend the provisions of an expiring law that had been enacted in 1979. Executive Order 13222, *Continuation of Export Control Regulations*, 66 Fed. Reg. 44,025 (Aug. 22, 2001).[9]

---

[9] Notably, Executive Order 13222 also regulated commerce with foreign nations, relying on IEEPA "to exercise the necessary vigilance over exports and activities affecting the national security" and "to protect the domestic economy from the excessive drain of scarce materials[.]" Executive Order 13222, 66 Fed. Reg. at 44,025. This shows that these executive orders are not the first time that the President has used IEEPA to regulate commerce to protect the domestic economy.

Nor should the Court countenance plaintiffs' claim that the "worldwide" nature of some of the tariffs affects the nature of the emergency, or the means of addressing it.  Mot. 4. Presidents have frequently issued Executive Orders to address emergencies that—rather than targeting specific countries or regions—have worldwide effect.  *See, e.g.*, *Continuation of the National Emergency with Respect to Export Control Regulations* (applying worldwide); Executive Order 14059, *Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade*, 86 Fed. Reg. 71,549 (Dec. 17, 2021) (declaring national emergency with respect to trafficking of fentanyl and other opioids, applied on a worldwide basis); *Continuation of the National Emergency With Respect to Transnational Criminal Organizations*, 89 Fed. Reg. 58,617 (July 18, 2024) (continuing national emergency with respect to transnational criminal activity, applied on a worldwide basis).  Those national emergencies have vastly varied in nature, length, and breadth. But the through-line is that courts are, as they must be, "hesitant to review the executive's declaration of a national emergency."  *Shih*, 73 F.4th at 1092.

At the very least, there has been no "clear misconstruction of" the "unusual and extraordinary threat" language in IEEPA.  *See USP Holdings*, 36 F.4th at 1369.  "Unusual and extraordinary threats" are those beyond what is common.  *See Extraordinary*, Black's Law Dictionary (12th ed. 2024) ("Beyond what is usual, customary, regular, or common"); *Unusual*, Black's Law Dictionary (12th ed. 2024) ("Different from what is reasonably expected.").  Trade deficits are not new, but the United States's trade deficit has increased by 40 percent over the last five years. The scope and gravity of the trade deficit and trade barriers—along with the *acuity* of their *effects*—built up over time, constitute the unusual and extraordinary threat.  *See* Executive Order 14257, 90 Fed. Reg. at 15,044-45; *Yoshida*, 526 F.2d 560 (at no point reviewing the President's declared emergency, *even where the balance of payments deficit had existed for*

*many years*); Executive Order 13818 ("the prevalence and severity of human rights abuse and corruption … have reached such scope and gravity that they threaten the stability of international political and economic systems"); Executive Order 12532 (South Africa's longstanding "policy and practice of apartheid"); Executive Order 14078 ("hostage-taking and the wrongful detention of United States nationals abroad"); Executive Orders 12868, 12930, 12938 ("the proliferation of nuclear, biological, and chemical weapons").

### B.    There Is A Reasonable Relationship Between The Emergency And The Tariffs Imposed

Just as the existence of a national emergency is a political question, so too is the President's chosen means for addressing such an emergency.  As the Supreme Court recently reiterated, "[w]hether the President's chosen method of addressing perceived risks is justified from a policy perspective is irrelevant to the scope of his authority."  *Hawaii*, 585 U.S. at 686 (cleaned up); *see Michael Simon Design, Inc. v. United States*, 609 F.3d 1335, 1342-44 (Fed. Cir. 2010) (use of "may" in statutory authorization to the President meant that "the President's exercise of his discretion is not subject to judicial review," even when it involves consideration of "the nation's economic interests").  In the area of national security and foreign affairs, "the impact of certain conduct" can be "difficult to assess," making "the lack of competence on the part of the courts … marked."  *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). Just as with the emergency declaration, and the closely tied assessment of whether there is an unusual and extraordinary threat, the President's selection of the means to address the emergency "is a 'multifaceted judgmental decision,' for which there is 'no law to apply.'" *Florsheim*, 744 F.2d at 796; *see, e.g.*, *El-Shifa*, 607 F.3d at 843 (concluding that "the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the

institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters").

Just like the previous questions, attempting to review whether the President's chosen means sufficiently "deal with" the emergency "would require the Court to closely scrutinize and second guess the President's foreign policy decision-making," including the President's "goals," "the nature of the emergency," and "the effectiveness of" the President's action in "counter[ing] the threat." *Htet v. Trump*, 2025 WL 522033, at *5-7 (D.D.C. Feb. 18, 2025). Such an inquiry "would require the Court to step into the shoes of political decision makers," "would not be legal in nature," and has "no judicial standards," meaning whether the President's chosen means deals with the emergency is "a nonjusticiable political question." *Id.* Section 232 precedent confirms as much. There, as here, "there is no review of the President's pertinent factual and remedial-appropriateness determinations." *PrimeSource*, 59 F.4th at 1263 (the court "may not second-guess the facts found and measures taken by the President to support his adjustment").

If there were to be any review in this area, it must be only to determine whether the President's chosen means are reasonably related to the national emergency. *Yoshida*, 526 F.2d at 578; *Spawr*, 685 F.2d at 1081 (assessing whether the President's action is "rationally related to the national emergencies invoked"). The President's chosen means reasonably "deal with" the national emergencies.

As to the trade deficit, the imposed tariffs have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and on improving this nation's "domestic production capacity," "military readiness," and "national security posture," Executive Order 14257, 90 Fed. Reg. at 15,044-45. As a result, the tariffs are "'plausibly related to the Government's stated objective to protect' national security" and increase domestic production. *Transpacific Steel*

*LLC v. United States*, 4 F.4th 1306, 1333-34 (Fed. Cir. 2021) (rejecting the contention that differing tariff rates between countries was irrational, explaining that "it is rational for the President to try a steep increase on tariffs for only one major exporter to see if that strategy helps to achieve the legitimate objective of improve domestic capacity utilization without extending the increase more widely" (quoting *Hawaii*, 585 U.S. at 704-05)); *Yoshida*, 526 F.2d at 580.

In response, plaintiffs point to a selection of economist advocates to opine on the wisdom and effectiveness of the President's tariffs. Mot. 34-35. Their contrary views, however, are immaterial. And plaintiffs ignore the evidence that supports the President. In 2023, the International Trade Commission issued a report analyzing the effects of the President's previous tariffs, imposed under Sections 232 and 301, on more than $300 billion of U.S. imports. *Economic Impact of Section 232 and 301 Tariffs on U.S. Industries*, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023). This analysis revealed that the tariffs reduced imports from China, were effective in stimulating increased U.S. production of steel and aluminum, and had very minor effects on U.S. prices. *Id.* at 21-22. Further, the Coalition for a Prosperous America released an economic model simulating a worldwide 10 percent tariff on U.S. imports and found that the "tariff makes imports less competitive and domestic production of manufactured and other goods rise to take advantage of the opportunities" leading to "more jobs and more capital investment." Jeff Ferry, *Global 10% Tariffs on U.S. Imports Would Raise Incomes and Pay for Large Income Tax Cuts For Lower/Middle Class*, Coalition for a Prosperous America (July 24, 2024), https://perma.cc/XUZ8-BG99. Indeed, the tariffs are already beginning to address the national emergencies, as the extensive ongoing negotiations with many countries and the recently announced historic trade deal with the U.K. show. *See Fact Sheet: U.S.–U.K. Reach Historic Trade Deal* (May 8, 2025), https://perma.cc/7CPW-8CF2.

As to the illicit-drugs crisis, the President's actions are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because the President's actions pressure those countries to address the crisis.  The tariffs imposed on China, Canada, and Mexico have fostered ongoing negotiations to address the country-specific emergencies. In response to the President's action, the Governments of Canada and Mexico, for instance, took "immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions" in response to tariffs.  *See* Executive Order 14198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025); Executive Order 14197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9,183 (Feb. 3, 2025); *but see* Executive Order 14228, 90 Fed. Reg. 11,463 (Mar. 3, 2025) ("I have determined that [China] has not taken adequate steps to alleviate the illicit drug crisis" and increasing the tariffs).  And recently, China agreed to work with the United States to address illegal fentanyl distribution into the United States.  *See* https://perma.cc/U7TZ-LLZR.

Plaintiffs argue that imposing tariffs to address the illicit-drug crisis makes no sense because "drug traffickers will not pay tariffs on the drugs that they illegally smuggle into this country."  Mot. 25.  But again, these tariffs are reasonably related to the desired change in behavior the President seeks from Mexico, Canada, and China because they pressure those countries to address the crisis.  In any event, the President found that illicit drugs entered the United States through both illegal networks and through traditional import systems.  *See, e.g.*, Executive Order 14256 ("Many shippers based in the People's Republic of China (PRC) hide illicit substances and conceal the true contents of shipments sent to the United States through deceptive shipping practices."); Executive Order 14193 ("[t]he flow of illicit drugs like fentanyl to the United States [occurred] through both illicit distribution networks and international mail").

The President's action not only incentivizes the countries to address the emergency but also deters importation of illicit drugs concealed within seemingly lawful imports.

Plaintiffs also fault the action because the tariffs apply to more than just imports of illicit drugs. Mot. 26. Of course they do. If the United States identified that an import contained illegal drugs, the article would not be imported at all. The President's action rationally disincentivizes importing illicit drugs with otherwise lawful imports. In sum, the Court should not insert itself into the President's complex, sensitive judgments about foreign affairs, national security, and economic policy. The only question, if the Court finds it can address the question at all, is whether the challenged tariffs are reasonably related to the declared emergencies. There is no serious dispute here that they are.

## III.    Plaintiffs' APA Claims Lack Merit

Plaintiffs raise Administrative Procedure Act (APA) claims against U.S. Customs and Border Protection (CBP), alleging that it acted arbitrarily and capriciously and in excess of statutory authority. Mot. 27-29. But CBP's action is not subject to APA review because CBP did not exercise any independent discretion but rather acted ministerially in implementing the IEEPA duties set by the President—meaning plaintiffs do not challenge *agency* action; rather, they challenge the action of the President in *directing* CBP. *See Indus. Chems., Inc. v. United States*, 941 F.3d 1368, 1371 (Fed. Cir. 2019) (dismissing when CBP is acting in a "merely ministerial" capacity). As a result, the APA is unavailable to challenge these tariffs because the President is not an "agency" within the meaning of the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *see Dalton v. Specter*, 511 U.S. 462, 474 (1992) ("We may assume for the sake of argument that some claims that the President has violated a statutory mandate are reviewable outside the framework of the APA.… But longstanding authority holds that such

review is not available when the statute in question commits the decision to the discretion of the President." (citation omitted)).  Rather, the proper channel to challenge the IEEPA tariffs is through 28 U.S.C. §1581(i), as plaintiffs have in this case.

The cases cited by plaintiffs are inapplicable here, because in each, the agency had some non-ministerial role to play in the decisionmaking process.  *See, e.g.*, *State v. Su*, 121 F.4th 1, 4 (9th Cir. 2024) (agency implemented notice and comment and issued rule); *In re Section 301 Cases*, 570 F.Supp.3d 1306, 1324 (Ct. Int'l Trade 2022) (statutory authority was delegated to the agency, not the President).  In any event, even assuming APA review applies, CBP's actions were within statutory authority and not arbitrary and capricious for the same reasons discussed above in regard to the President.

## IV.    Plaintiffs Are Not Entitled To An Injunction

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc.*, 547 U.S. at 391.  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.*  Similar considerations apply to motions for preliminary injunctive relief.  *See Winter*, 555 U.S. at 24.

### A.  Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm

Plaintiffs are not entitled to injunctive relief because they cannot show they "will be immediately and irreparably injured" before the Court can decide the case on the merits. *Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F.Supp. 847, 851 (Ct. Int'l Trade 1989).  As the Federal Circuit has explained, an injunction "will not issue simply to

prevent a mere possibility of injury…. A presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983). Put another way, "[a] movant must show that the harm is certain to occur and that it is a direct result of the action it is challenging." *Retractable Techs., Inc. v. United States*, 739 F.Supp.3d 1330, 1340 (Ct. Int'l Trade 2024) (citation omitted). Plaintiffs cannot show that they will experience irreparable harm while the Court considers their simultaneous motion for summary judgment, especially given the highly expedited briefing of that motion.

First, it appears that most plaintiffs have not actually *paid* additional duties pursuant to the Executive Orders. *See generally* ECF Nos. 14-2 through 14-14. Nor have these plaintiffs established that they will imminently be required to do so. Only University of Oregon alleges to be an importer of record, *see* Compl. ¶¶ 95-97; Mot. 8, 30; Shabram Decl. (ECF 14-11). And from the information plaintiffs provided, the only other entities we have identified that have entered IEEPA duties are Oregon State University, Oregon Health and Sciences University, Arizona States University, and Colorado State University. Plaintiffs' failure to establish immediacy defeats their claim of irreparable harm. And even if plaintiffs risked immediate liability for duties, any such payments, including those paid by the state universities, could be recovered if plaintiffs prevail in this litigation. *See* Joint Proposed Stipulation, *Auxin Solar, Inc. v. United States*, Ct. Int'l Trade No. 23-274, ECF No. 19.

Second, plaintiffs allege that they are suffering irreparable harm by "paying more for goods, equipment and services where third parties must pay the tariffs." Mot. 31. As discussed above, non-importer plaintiffs lack standing for their claims of economic harm, meaning such injuries cannot be considered in the injunctive factors analysis. *See Totes-Isotoner Corp.*, 594 F.3d at 1352.

Third, even if some plaintiffs would soon be liable for duties or other cost harms pursuant to the Executive Orders, the speculative statements in their declarations show only the possibility of future economic loss, which this Court has held is insufficient to show irreparable harm—far short of a real risk of immediate extinction required to justify a preliminary injunction. *See*, *e.g.*, *Corus Grp. PLC v. Bush*, 217 F.Supp.2d 1347, 1355 (Ct. Int'l Trade 2002) (concluding that the plaintiff had failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure" despite testimony that "sound business principles would require [the company] to close the plant rather than operate at a loss"); *Shandong Huarong General Grp. v. United States*, 122 F.Supp.2d 143, 147 (Ct. Int'l Trade 2000) (similar). As explained in *Corus*, "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," but if "the court were to find irreparable harm under these facts, the court would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue shortfalls possibly resulting in either operating at a loss or plant closure at some future date." 217 F.Supp.2d at 1355. Thus, the mere threat of an "adverse economic impact," such as states paying more for goods and services or uncertainty in their budgeting, Mot. 29-24, cannot establish irreparable harm because it would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy." *Id.*[10]

Finally, plaintiffs fail to explain how monetary compensation would be inadequate. For plaintiffs that will actually pay tariffs, were they to ultimately prevail, they could receive back any duties or tariffs they paid on any unliquidated entries. 28 U.S.C. §§2643-44.

---

[10] Plaintiffs' claims of procedural harm fail because IEEPA does not provide any mechanism for notice and comment, and the President followed all procedural requirements.

**B.  The Remaining Preliminary Injunction Factors Do Not Favor Plaintiffs**

The remaining factors—the balance of hardships and the public interest, which "merge

when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009),

likewise favor the government.  It is not in the public's interest for the President's response to a

national emergency and exercise of foreign-affairs powers to be enjoined; nor does the balance

of hardships favor plaintiffs.

Plaintiffs' purported irreparable harm is far outweighed by the public interest in

maintaining the challenged executive actions.  The President has declared a national emergency

in light of threats to the United States' economy, military preparedness, and national security.  In

these circumstances, the NEA and IEEPA authorize the President to take all appropriate and

feasible action to address this emergency.  The equities and public interest lie there, not with

plaintiffs.  *See Winter*, 555 U.S. at 24.

As for the balance of hardships, plaintiffs' proposed injunction would be an enormous

intrusion on the President's conduct of foreign affairs and efforts to protect national security

under IEEPA and the Constitution.  *See* U.S. Const. art. II, §2.  This is particularly so given that

the United States is currently in sensitive trade negotiations with a multitude of countries—

discussions that would grind to a halt should a preliminary injunction issue.  *See* Executive Order

14266 (discussing negotiations).  Plaintiffs' request to import merchandise without paying the

applicable tariffs would undermine the President's goals, and the requested injunction would

weaken the country's position in negotiations.  The balance of hardships favors the Government.

**C.     Any Injunction Should Be Limited Only To Plaintiffs With Standing And
         Irreparable Harm**

If this Court were to issue an injunction, its order must be limited in scope to the importer

plaintiffs who have paid IEEPA duties, such as the University of Oregon, and should be limited

to the specific countries plaintiffs have identified.  Injunctive relief must be narrowly tailored and limited to the harm shown.  *See Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986).  Moreover, nationwide injunctions are available only in "exceptional cases." *San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018); *see Florida*, 19 F.4th at 1282 (appropriate circumstances for issuing a nationwide injunction "are rare"); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("[S]uch injunctions present real dangers, and will be appropriate only in rare circumstances.").  Here, plaintiffs cannot show why a preliminary injunction is necessary at all, let alone a nationwide one.  Certainly, they cannot show that they will be deprived of complete relief without a nationwide injunction.  *Cf. Florida*, 19 F.4th at 1281.

If the Court determines a preliminary injunction is appropriate, it should order plaintiffs to quantify their harm and post a bond in that amount.  USCIT R. 65(c) (requiring "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

Finally, any injunction should be stayed pending appeal.  As discussed, the United States is currently engaged in ongoing negotiations with many countries, to resolve the issues giving rise to the national emergency.  *See* Executive Order 14266 (discussing negotiations); Executive Order of May 12, 2025, *Modifying Reciprocal Tariff Rates To Reflect Discussions With The People's Republic of China*, https://perma.cc/FL69-4TJY.  A stay pending appeal will prevent those discussions from being interrupted while this case is further litigated.

## CONCLUSION

For these reasons, the Court should deny plaintiffs' motions for a preliminary injunction and summary judgment and enter judgment in favor of defendants.

DATED: May 16, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
CATHERINE M. YANG
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 305-7568
sosun.bae@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's April 22, 2025 order, that this brief contains 13,866 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Sosun Bae
SOSUN BAE