IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

1

2   THE STATE OF OREGON, THE STATE OF      Case No.  1:25-cv-00077-GSK-TMR-JAR
     ARIZONA, THE STATE OF COLORADO,
3   THE STATE OF CONNECTICUT, THE       PLAINTIFFS' REPLY IN SUPPORT OF
     STATE OF DELAWARE, THE STATE OF      SUMMARY JUDGMENT
4   ILLINOIS, THE STATE OF MAINE, THE
     STATE OF MINNESOTA, THE STATE OF
5   NEVADA, THE STATE OF NEW MEXICO,
     THE STATE OF NEW YORK, and THE
6   STATE OF VERMONT,

7            Plaintiffs,

8

        v.
9

10   DONALD J. TRUMP, in his capacity as
      President of the United States;
11   DEPARTMENT OF HOMELAND
      SECURITY; KRISTI NOEM, in her official
12   capacity as Secretary of the Department of
      Homeland Security; UNITED STATES
13   CUSTOMS AND BORDER PROTECTION;
      PETER R. FLORES, in his official capacity as
14   Acting Commissioner for U.S. Customs and
      Border Protection; and THE UNITED
15   STATES,

          Defendants.
16

17

18

19

20

21

22

23

24

25

26

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ..................................................................................................... 2

    A.    The States have standing................................................................................. 2

    B.    IEEPA does not authorize the Tariff Orders................................................ 5

        1.    IEEPA does not authorize the President to rewrite tariff schedules. .......... 5

        2.    *Yoshida*'s interpretation of "regulate …importation" in TWEA
        does not support a broader interpretation of the phrase in IEEPA. ............ 6

        3.    If IEEPA conferred limitless authority to impose tariffs, it would
        violate the major questions doctrine. ........................................................... 8

        4.    At any rate, because the IEEPA Tariff Orders do not bear a
        reasonable connection to an "unusual and extraordinary threat,"
        they are unlawful................................................................................... 12

            a.    This Court may review the Tariff Orders for compliance
            with IEEPA's requirements. ......................................................... 12

            b.    The President has not identified an "unusual and
            extraordinary" threat that the Worldwide Tariff Orders are
            necessary to "deal with."…....................................................... 14

            c.    None of the Tariff Orders bears a reasonable connection to
            the declared "unusual and extraordinary" threats. ................ ...... 17

    C.    The States have established the other elements for an injunction. ...................... 19

III.    CONCLUSION................................................................................................. 21

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ................................... 24

Page i -    PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v.
    Trump, et al.*

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't. of Health & Human Servs.*, 594 U.S. 758 (2021) .............. 10

*Am. Signature, Inc. v. United States*, 598 F.3d 816 (Fed. Cir. 2010) .......................... 20

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) ................................................................. 3

*Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191 (D. Mass. 1986) ........................ 13

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................... 8, 9, 10

*Corus Grp. PLC. v. Int'l Trade Comm'n*, 352 F.3d 1351 (Fed. Cir. 2003) ................................. 14

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ................................................................. 7

*Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581 (2004) ................................................ 7

*Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022) ................................ 10

*Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261 (3d Cir. 2016) ..................... 3

*Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d 1374 (Fed Cir. 2015) ................................ 15

*In re Section 301 Cases*, 570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ........................ 14

*INS v. Chadha*, 462 U.S. 919 (1983) ................................................................... 13

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) .......................................................... 10

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ...................................... 18

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) ...................................................... 10

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) .......................... 18

*Marbury v. Madison*, 5 U.S. 137 (1803) ................................................................... 13

*Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023) ............................................................ 10

*Murthy v. Missouri*, 603 U.S. 43 (2024) ..................................................................... 5

*Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018). ..................... 3

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) ............................................................... 10

*Ontario Forest Industries Association v. United States*, 444 F. Supp. 2d 1309 (Ct. Int'l Trade 2006) ..................................................................................................... 4

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Patel v. Garland*, 596 U.S. 328 (2022). ................................................................. 12

*Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593 (5th Cir. 2023) ................................. 20

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ........................................................... 7

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ..................................................... 20

*Solar Energy Indus. Ass'n v. United States*, 111 F.4th 1349 (Fed. Cir. 2024) ............................. 18

*Timex V.I., Inc. v. United States*, 157 F.3d 879 (Fed Cir. 1998) ......................................... 14

*Totes-Isotoner Corp. v. United States*, 594 F.3d 1346 (Fed. Cir. 2010) .................................... 3

*Trump v. Hawaii*, 585 U.S. 667 (2018) ................................................................... 11

*United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011) ................................................. 12

*United States v. Austin*, 125 F.4th 688 (5th Cir. 2025) .................................................. 15

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) ..................................... 7

*United States v. Dhafir*, 461 F.3d 211 (2d Cir. 2006) .................................................... 12

*United States v. Texas*, 599 U.S. 670 (2023) ............................................................. 4

*United States v. Williams*, 553 U.S. 285 (2008) .......................................................... 6

*United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975) .................................. passim

*Utility Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) .................................................... 10

*Watt v. Energy Action Educ. Found.*, 454 U.S. 151 (1981) ................................................. 2

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952 .............................................. 10

*Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ............................................................. 13

**Statutes**

5 U.S.C. § 801 .......................................................................................... 13

8 U.S.C. § 1252 ......................................................................................... 12

19 U.S.C. § 1862 ......................................................................................... 6

19 U.S.C. § 2132 ........................................................................................ 11

19 U.S.C. § 2135 ......................................................................................... 8

20 U.S.C. § 1098bb ....................................................................................... 9

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

50 U.S.C. § 1622 ..................................................................................................... 12

50 U.S.C. § 1701 ............................................................................................... 17, 19

Congressional Review Act ..................................................................................... 13

Congressional Review Act (CRA) ......................................................................... 13

HEROES Act ...................................................................................................…….13

National Emergencies Act.. ...........................................................................……..16

Section 122 of the Trade Act of 1974 ........................................................……….11

Trading with Enemies Act .......................................................................... 1, 14, 15

**Constitutional Provisions**

Art. I § 8, cl. 1 ......................................................................................................... 24

Article III ................................................................................................................... 7

**Other Authorities**

H.R. Rep. 95-459, 10 (1977) .................................................................................... 7

H.R. Rep. No. 95-459, at 2 (1977) ........................................................................... 6

Worldwide Tariff Order ................................................................................... 11, 14

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# I.    INTRODUCTION

If Defendants' understanding of the International Emergency Economic Powers Act (IEEPA) were correct, Congress ceded to the President nearly absolute authority to set tariffs, while simultaneously precluding the courts from reviewing whether the tariffs "deal with an unusual and extraordinary threat," as Section 1701(b) requires. The only check on the President's authority, they claim, is Congress's authority to enact a joint resolution terminating the emergency declaration over the President's veto.

But Congress did not hide the elephantine power to rewrite tariff schedules in the statute's inclusion of the verb "regulate" and the noun "importation" among a list of more than a dozen related terms in Section 1702(a)(1)(B). Defendants' contrary argument rests on overreading *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975)—a decision that disclaimed presidential authority to "rewrite the tariff schedules" and admonished that courts "remain prepared … to impede an unreasonable or ultra vires exercise of the [emergency] power." *Id.* at 583.

This Court is perfectly capable of interpreting and enforcing IEEPA's textual constraints on the power to "regulate … importation," regardless of *Yoshida*'s interpretation of the Trading with Enemies Act (TWEA). Congress limited the President's IEEPA power to dealing with an "unusual and extraordinary threat" because it intended IEEPA to serve as residual authority to address unprecedented circumstances that Congress could not have anticipated through ordinary legislation. A persistent trade deficit for which Congress has already equipped the President with separate authorities that he "must, of course, comply with," *Yoshida*, 526 F.2d at 582 n.33, does not constitute an "unusual and extraordinary threat." Similarly, across-the-board tariffs on products that bear no relationship to the fentanyl crisis do not "deal with" that threat. *See id.* at 572 ("[T]he primary implication of an emergency power is that it should be effective to deal with a national emergency successfully.").

Page 1 -    PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

IEEPA is not a blank check for the President to fill out at his whim. As a matter of law, the tariffs that the President imposed fall outside authority Congress delegated under IEEPA. This Court should grant the States' motion for summary judgment, declare the tariffs unlawful, and permanently enjoin them.

## II.    ARGUMENT

### A.    The States have standing.

Defendants do not dispute that States that pay tariffs directly have standing. (U.S. Resp. 11, ECF 46.) That concession renders their objection to other States' standing academic. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs.").

Defendants also do not dispute that the other States have suffered an injury in fact. (Decl. of Professor James R. Hines, Jr. ¶ 52, ECF 14-2 (estimating that the IEEPA Tariffs cost the plaintiff States $1.6 billion per year).) Defendants argue only that those States' injuries are not traceable to the tariffs or redressable by this Court, because the involvement of third-party importers purportedly breaks the chain of causation between the tariff and purchaser. (U.S. Resp. 11–12, ECF 46.) This Court has rejected that exact argument. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1274 (Ct. Int'l Trade 2019) (rejecting arguments that a purchaser's injuries "ar[o]se[] from relationships with third parties," and that the court "would have no control over what the suppliers decide to do with their pricing models").

As both this Court and the Federal Circuit have recognized, standing is not limited to importers of record. Rather, a tariff can inflict an "economic injury" on non-importers that is traceable to the challenged tariff and redressable by an injunction. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1334 (Fed. Cir. 2008). Accordingly, a plaintiff who relies on imported goods can "allege[] sufficient claims of economic harm to constitute injury-in-fact."

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Invenergy*, 422 F. Supp. 3d at 1273. "Th[o]se economic harms can be shown through 'economic logic,'" as well as through testimony. *Id.* (citing *Canadian Lumber*, 517 F.3d at 1333).

A purchaser's injury can "stem[] directly from" a challenged tariff, "even if some of the specific harms … involve relationships with third parties." *Id.* at 1274. And the injury is redressable if those third parties are "likely to respond to the [elimination of the tariffs] in a way that causes the [States'] injury to be redressed." *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1357 (Ct. Int'l Trade 2018). *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346 (Fed. Cir. 2010), is not to the contrary. (*See* U.S. Resp. 11.) That case held that an importer had third-party standing to assert the equal protection rights of individual purchasers in challenging a discriminatory tariff classification, and the court suggested, without explanation, that those purchasers had no remedy themselves. *Totes-Isotoner*, 594 F.3d at 1352. But that importer, in addition to challenging the tariff classification, was seeking "restoration, with interest, of any excess duty paid" due to the disparate tariff rates, which only the importers could seek. *Totes-Isotoner Corp. v. United States*, 569 F. Supp. 2d 1315, 1323 (Ct. Int'l Trade 2008). The court was not announcing a categorical rule that only direct importers have standing to challenge tariffs, and neither the Federal Circuit nor this Court has applied such a rule. *See Invenergy*, 422 F. Supp. 3d at 1274–75 (purchasers had standing to challenge tariff, and the involvement of third-party importers and suppliers was "not a conclusive bar to standing"); *Canadian Lumber*, 517 F.3d at 1334 (Canadian wheat sellers had standing to challenge tariff scheme that "was likely to cause [them] economic injury").[1]

---

[1] That indirect purchasers in antitrust cases retain Article III standing also demonstrates that standing is not limited to direct payors. *See, e.g.*, *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 270 (3d Cir. 2016) (in antitrust cases, "the direct purchaser rule represents a policy decision intended to aid the purposes of the antitrust statutes and does not speak to whether there is an Article III case or controversy."). Even the stringent *statutory* direct-purchaser requirements to recover damages under federal antitrust law do not bar injunctive and declaratory relief. *See Apple Inc. v. Pepper*, 587 U.S. 273, 279 n.1 (2019).

Page 3 -    PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Here, like in *Invenergy*, the States' injuries are fairly traceable to the challenged tariffs, because the States have "provide[d] evidence that [the] injuries would not exist but for" the IEEPA Tariffs. *See Invenergy*, 422 F. Supp. 3d at 1274. (*E.g.*, Decl. of Hanna Emerson (Or.) ¶ 7, ECF 14-4 (vendor specifies that "[p]ricing is based on current US tariff regulations for imports from Switzerland," and "reserves the right to adjust the prices accordingly" in response to "new or increased tariffs"); Decl. of Elizabeth Hayes (Minn.) Ex. B, ECF 14-5 (price increase results in part from tariffs on China imposed "pursuant to … (IEEPA)").) These are not merely the "attenuated" indirect effects that federal policies often have on state revenues or spending. *Cf. United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) (rejecting standing based on costs of social services for people the states claimed should have been arrested). Rather, these costs borne by States as purchasers "stem[] directly" from the IEEPA Tariffs. *See Invenergy*, 422 F. Supp. 3d at 1274.

Those harms are redressable because importers are "likely to respond to the [elimination of the tariffs] in a way that causes the [States'] injury to be redressed." *Ross*, 331 F. Supp. 3d at 1357. This case is not like *Ontario Forest Industries Association v. United States*, 444 F. Supp. 2d 1309, 1324–25 (Ct. Int'l Trade 2006), where the injury stemmed from the failure of two governments to convene a binational committee, and where the court could not order Canada to take the additional necessary steps. (*See* U.S. Resp. 12.) Here, the IEEPA Tariffs are the direct *cause* of the importers passing costs to the States, and removing those tariffs will remove those costs. Indeed, some of the States have contracts with vendors that expressly authorize the vendor to add any tariff it pays to the price it charges the State. (*See, e.g.*, Hayes Decl. (Minn.) ¶ 12, Ex. D (contract provision authorizing vendor to pass through increased tariff costs); Decl. of Robert Jaros (Colo.) ¶¶ 12–13, Ex. 3, ECF 14-6 (contract provides that prices are subject to change due to tariff increase); Decl. of Jenifer Johnson (Ill.) ¶ 14, ECF 14-7 (agreement that tariffs will be passed on to Illinois).) Those vendors would thus be contractually obligated to reduce prices if

Page 4 -   PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

the tariffs were enjoined. Further, enjoining the IEEPA Tariffs would also prevent additional tariff increases that would be paid by or passed on to the States. (*See, e.g.*, Decl. of Gregory Shabram (Or.) ¶¶ 9–11, Ex. B, ECF 14-11 (identifying purchases soon arriving at ports of entry); Jaros Decl. (Colo.) Ex. 1.)

This case does not require "guesswork as to how independent decisionmakers will exercise their judgment." *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Both economic logic and detailed testimony show that, because of the IEEPA Tariffs, the States will suffer economic injuries, and that an injunction will redress those injuries.

**B.     IEEPA does not authorize the Tariff Orders.**

**1.     IEEPA does not authorize the President to rewrite tariff schedules.**

Defendants recognize that, unlike several statutes in Title 19, IEEPA says nothing about the President's authority to impose tariffs or duties. Defendants' argument thus turns on IEEPA's grant of authority to "regulate … importation." (U.S. Resp. 14–15.) Yet the plain meaning of "regulate" does not suggest a power to collect tariffs or duties from the matter being regulated. (*See* Cal. Amici 3–4, ECF 38). Those powers are distinct, as indicated in numerous legal authorities using the two terms distinctly. (*See* States' PI Memo 15, ECF 14.) Similarly, the words surrounding "regulate" in Section 1702 do not indicate a power to collect revenue. (*See* Cal. Amici 5–7.) Rather, terms like "prohibit" or "direct" describe a power to control and block property, not to impose revenue-raising tariffs. In fact, reading the term "regulate" to encompass the power to tax U.S. importers of foreign goods would produce incongruous results, permitting the President to impose taxes on the "acquisition," "holding," or "use" of "any foreign property" and permitting any agency with the power to regulate certain property to impose taxes on that property. (*See* Cal. Amici 6; Congress Reps.' Amici 23, ECF 40.)

Ignoring those problems, Defendants contend that Congress has used similarly broad language—"adjust … imports"—to authorize licensing fees under Section 232 of the Trade

Page 5 -   PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Expansion Act. (*See* U.S. Resp. 15–16 (citing *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976)). But "adjust" and "regulate" are not the same. And the Court in *Algonquin* emphasized that its holding was "a limited one," confined to licensing fees. *Algonquin*, 426 U.S. at 571 Moreover, Section 232's legislative history showed that key legislators understood the amendment to authorize the President "to take whatever action he deems necessary to adjust imports … (including the use of) tariffs, quotas, import taxes or other methods of import restriction." *Id.* at 564 (quoting legislative history).

Defendants have identified nothing comparable in IEEPA's legislative history suggesting that Congress intended to authorize the President to impose tariffs with the term "regulate … importation." Moreover, the list of specific powers in IEEPA—"investigate," "block," "regulate," "direct and compel," "nullify, void, prevent or prohibit"—suggests a narrower power focused preventing or conditioning importation, *see United States v. Williams*, 553 U.S. 285, 294 (2008) (applying doctrine of *noscitur a sociis* to a series of verbs). The authorization in Section 232, by contrast, is broader. *See* 19 U.S.C. § 1862(c)(1)(a)(ii) (authorizing determination of action that, in the President's judgment "must be taken to adjust the imports). *Algonquin* does not support Defendants' argument.

## 2. *Yoshida*'s interpretation of "regulate …importation" in TWEA does not support a broader interpretation of the phrase in IEEPA.

Because neither IEEPA's text nor its legislative history specifically authorizes the President to rewrite tariff schedules, Defendants heavily rely on *Yoshida* to support that authority. (U.S. Resp. 14–15.) But *Yoshida* does not control this Court's interpretation of IEEPA.

As the States have explained, *Yoshida* interpreted a different statute, TWEA, against a different statutory background. (States' PI Memo 16–17.) IEEPA's history demonstrates that it provides authorities "*more limited* in scope than those of [TWEA]" that are subject to procedural limitations. H.R. Rep. No. 95-459, at 2 (1977) (emphasis added). Defendants nonetheless maintain that identical wording must be interpreted the same way in two different statutes with

Page 6 -   PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

two different histories. Yet they overlook that courts do not hesitate to do otherwise for statutes with different history, structure, or purpose. *See, e.g.*, *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595–97 (2004) (holding that "age" has different meaning in different parts of the ADEA); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 213 (2001) (same for "wages paid" in different provisions of Title 26); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 343–44 (1997) (same for "employee" in different parts of Title VII); *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522–25 (1994) (same for Copyright Act's attorney's fees provision despite "virtually identical language" in an analogous provision in Title VII). Here, Congress made it clear that it was neither endorsing nor disclaiming any past uses of TWEA when it enacted IEEPA. H.R. Rep. 95-459, 10 (1977). Rather, Congress was taking "a new approach to international emergency economic powers." *Id.* Equally important, the context shows Congress had taken a new approach to tariff authority by enacting several statutes empowering the President to impose or adjust duties to address recurring trade problems, including Section 122 of the Trade Act of 1974, which responded to President Nixon's use of TWEA to impose duty surcharges.

In sidestepping that history, Defendants suggest that Congress enacted Section 122 in response to the *Yoshida* Customs Court's conclusion that TWEA did not authorize tariffs to respond to the balance-of-payments deficit. (U.S. Resp. 17 (citing *Yoshida Int'l, Inc. v. United States*, 378 F.Supp.1155 (Cust. Ct. 1974)). But that point confirms only that Congress did not intend TWEA or IEEPA to be a mechanism "to impose tariffs to address a balance-of-payment deficit." (U.S. Resp. 17.) After all, Congress did not amend TWEA in response to the Customs Court's opinion in *Yoshida*; nor did it include in IEEPA any powers like those described in Section 122. *See* 19 U.S.C. § 2132 (limiting duties to 15% and permitting their imposition for 150 days in response to balance-of-payments deficit). And, as Congress would have known when enacting IEEPA, the appellate court in *Yoshida* understood Section 122 to supersede any authority to impose tariffs under TWEA to address a trade deficit. *See Yoshida*, 526 F.2d at 582

Page 7 -   PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

n.33 (noting that "of course" any tariffs imposed after January 3, 1975 in response to balance-of-payments problems must adhere to the requirements of Section 122 of the Trade Act of 1974).

Finally, *Yoshida*'s cursory textual analysis does not persuasively establish that "regulate … importation" encompasses authority to impose tariffs or duties. *Yoshida* deployed almost none of the tools of statutory interpretation used by modern courts. *See Yates v. United States*, 574 U.S. 528, 537 (2015) (considering dictionary definitions, context, statutory caption, contemporaneous statutes, textual canons, and legislative history). It did not identify the ordinary meaning of "regulate" or consider the meaning of the words surrounding the term "regulate." (*See* Cal. Amici 8 (explaining how context shows that "regulate" was likely intended to control or restrict import activities, not tax or tariff them).) It failed to give proper weight to the context of related trade statutes, which show that Congress knew how to delegate tariff-making authority but declined to use the same wording to delegate that authority in TWEA. It could not know of the legislative history showing that, unlike TWEA, IEEPA was intended to limit Presidential authority. And it did not have the benefit of the modern articulation of the major questions doctrine's canon of statutory construction. *See Biden v. Nebraska*, 600 U.S. 477, 516 (2023) (Barrett, J., concurring) (tracing the doctrine's "skepticism" of broad readings of executive authority "in a line of decisions spanning at least 40 years" starting in 1980).

### 3.    If IEEPA conferred limitless authority to impose tariffs, it would violate the major questions doctrine.

Defendants' arguments, if accepted, would mean that IEEPA granted the President unreviewable authority to impose any tariff on any country for any interval, subject only to Congress's authority to terminate the emergency by enacting a veto-proof joint resolution. That result would permit the President to completely overhaul the intricate scheme of trade laws created over the last century. (*See* States' PI Memo 2–3 (describing laws governing implementation of trade agreements after Presidential negotiation); *see also* 19 U.S.C. § 2135 (providing authority for President to remove or adjust congressionally approved tariffs under

Page 8 -   PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

particular circumstances). As the States have explained, given "the breadth of the authority" that President Trump is asserting and the "economic and political significance" of that assertion, courts should find "reason to hesitate before concluding that Congress' meant to confer such authority." *Biden v. Nebraska*, 600 U.S. at 501 (quoting *West Virginia v. EPA*, 597 U.S. 697 (2022)).

 *Biden v. Nebraska* illustrates why a President's declaration of an emergency is not a "talisman enabling the President to rewrite" laws affecting huge swaths of the U.S. economy. *See Yoshida*, 526 F.2d at 583. There, the Executive invoked the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act) to "waive" or "modify" statutory provisions applicable to student loan laws as a response to the national COVID-19 emergency. *Biden v. Nebraska*, 600 U.S. at 485–87. The regulations would have created $430 billion in debt relief for 43 million borrowers. *Id.* at 488. The only statutory constraint in the HEROES Act was that the waivers or modifications must be "necessary in connection with … [a] national emergency" to ensure that financial aid recipients affected by the national emergency are not "placed in a worse position financially." 20 U.S.C. § 1098bb(a)(1), § 1098bb(a)(2)(A).

 The Court invalidated the Executive's student-loan forgiveness regulations because the Executive would otherwise "enjoy virtually unlimited power to rewrite the Education Act," effecting a "fundamental revision of the statute." *Biden v. Nebraska*, 600 U.S. at 502 (quoting *West Virginia*, 597 U.S. at 728). In doing so, the Court articulated a standard that is equally applicable here: Because the "basic and consequential tradeoffs" inherent in a mass debt cancellation program "are ones that Congress would likely have intended for itself," the Executive must "point to clear congressional authorization" for its actions. *Id.* at 506 (quoting *West Virginia*, 597 U.S. at 730). The same is true of President Trump's Tariff Orders under IEEPA.

Page 9 - PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Because Defendants cannot distinguish *Biden v. Nebraska* or any of the other cases invalidating Executive actions with breathtaking "economic and political significance"—*West Virginia*, 597 U.S. at 721; *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758 (2021) (*per curiam*); *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)—they argue that the major questions doctrine never applies to the President. But the doctrine is a canon of statutory construction that applies regardless of whether the President acts directly or through an agency, which every circuit court to address the issue has held. *See Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022) (applying major questions doctrine to the exercise of President's authority); *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (same); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (same). The only authority that Defendants cite to the contrary has been vacated as moot, *Mayes v. Biden*, 67 F.4th 921, 933, 934 (9th Cir. 2023), *vacated* 89 F.4th 1186, and at least one judge of the same court disagrees with its conclusion. *See Nebraska v. Su*, 121 F.4th 1, 17–22 (9th Cir. 2024) (Nelson, J., concurring) (concluding that "nothing excuses the President from [the] commands" of the major questions doctrine).

Defendants further argue that the major questions doctrine does not apply to the President's authority to conduct foreign policy. (U.S. Resp. 21–23.) But the Constitution grants authority to Congress, not the President, to regulate foreign commerce and impose tariffs and duties. U.S. Const., Art. I, § 8, cls. 1, 3. So even if the President seeks to use IEEPA to pursue certain ends based on foreign policy, he still must identify a clear delegation of authority to exercise powers constitutionally committed to Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."). There is no clear delegation here.

Page 10 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Relying on *Trump v. Hawaii*, 585 U.S. 667, 686 (2018), Defendants also contend that statutes specifically authorizing the President to impose tariffs in response to particular trade problems does not displace his purported general authority to impose tariffs under IEEPA. (U.S. Resp. 24–25.) But *Trump v. Hawaii* turned on the particulars of the Immigration and Nationality Act (INA). The Presidential proclamation at issue, which restricted the entry of nationals from certain countries with deficient information-sharing practices, served to supplement rather than supplant the statutory vetting processes that relied on such information and the Visa Waiver Program that created an exception for countries that maintained exemplary security standards. *Hawaii,* 585 U.S. at 689–90. Accordingly, the INA provisions did not present "a situation where Congress ha[d] stepped into the space and solved the exact problem." *Id.* at 691 (internal quotation marks omitted).

Here, in contrast, the Worldwide Tariff Order *is* designed to address the exact issue governed by Section 122(a) of the Trade Act of 1974. As the CCPA recognized in *Yoshida*, Section 122(a) is "the statute now governing" the imposition of import duties "in response to balance of payments problems." *Yoshida*, 526 F.2d at 582 n.33. The statute provides that the President "shall proclaim … duties" on imports "[w]henever fundamental international payments problems require special import measures to restrict imports … to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). The Worldwide Tariff Order addresses the same problem ("large and persistent annual U.S. goods trade deficits") by the same method (import duties) yet bypasses Section 122(a)'s mandatory terms and limitations. *See* 90 Fed. Reg. at 15044; 19 U.S.C. § 2132(a) (the President "shall proclaim" an import duty "not to exceed 15 percent ad valorem," "for a period not exceeding 150 days (unless such a period is extended by Act of Congress)"). If Congress had intended such an expansion of presidential power, it would have expressed that intent clearly.

Page 11 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

**4.     At any rate, because the IEEPA Tariff Orders do not bear a reasonable connection to an "unusual and extraordinary threat," they are unlawful.**

This Court can and should end the analysis by concluding that IEEPA does not authorize the President to impose tariffs. But even if IEEPA authorizes the use of tariffs, it does not authorize the President to rewrite the tariff schedules for all U.S. trading partners simply by declaring an emergency.

**a.     This Court may review the Tariff Orders for compliance with IEEPA's requirements**.

Defendants insist that this Court either cannot review the President's compliance with IEEPA's requirements or must defer to the President's view of whether those standards are satisfied. (U.S. Resp. 28–36.) Defendants are incorrect.

To begin, IEEPA's requirements provide intelligible principles that meaningfully constrain the President, as other courts have held. *See United States v. Amirnazmi*, 645 F.3d 564, 576 (3d Cir. 2011) (finding that the "unusual and extraordinary threat" requirement and other limitations were a meaningful constraint on the President's discretion); *United States v. Dhafir*, 461 F.3d 211, 217 (2d Cir. 2006) (same). Defendants suggest that Congress nonetheless silently precluded courts from reviewing whether a President's use of IEEPA comports with those constraints by reserving fast-track review authority under the National Emergencies Act, 50 U.S.C. § 1622. (U.S. Resp. 32–33.) But courts "presume that [judicial] review is available [for executive determinations] when a statute is silent." *Patel v. Garland*, 596 U.S. 328, 346 (2022). Congress knows how to strip the federal courts of jurisdiction, as exemplified by the statute at issue in *Patel. See* 8 U.S.C. § 1252(a)(2)(C) ("[N]o court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense."). Congress did not clearly prohibit judicial review of actions taken under IEEPA.

Moreover, Congress's power to terminate national emergencies through a veto-proof joint resolution does not address IEEPA's separate requirements. Defendants' argument reads those

Page 12 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

requirements out of the statute, making Section 1701 surplusage. Even if Congress can enact legislation to override Presidential actions taken under statutory authority, it does not mean that courts have no role to play in interpreting statutes. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

Nor does the availability of fast-track Congressional review suggest that Congress intended to foreclose judicial review of whether underlying statutory requirements have been met. For example, the Congressional Review Act (CRA), which provides fast-track authority to review and disapprove certain regulations, does not preclude courts from reviewing agency action for compliance with statutory authority when Congress chooses not to act. *See* 5 U.S.C. § 801(a)–(b), (g) (clarifying that the failure to enact a joint resolution of disapproval does not imply anything about the intent of Congress). Congress has reserved authority to review various executive actions in hundreds of statutes. *See INS v. Chadha*, 462 U.S. 919, 967 (1983) (White, J., dissenting) (noting nearly 200 statutes reserving a legislative veto). It cannot reasonably be argued that Congress intended to preclude judicial review in all of those circumstances.

To support its position that this Court may not review Presidential actions under IEEPA, Defendants rely primarily on a single district court decision, *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194–95 (D. Mass. 1986). There, the court concluded that the President's identification of an "unusual and extraordinary threat" from the actions of the Nicaraguan government was unreviewable as a political question. (*See* U.S. Resp. 30.) But *Beacon Products* is neither binding on this court nor persuasive on the question of reviewability, not least because it applies none of the analysis developed in later cases like *Zivotofsky v. Clinton*, 566 U.S. 189 (2012). In *Zivotofsky*, the Court observed that "[n]o policy underlying the political question doctrine suggests that Congress or the Executive" can decide for itself whether "Congress or the Executive is 'aggrandizing its power at the expense of another branch.'" *Id.* at 196–97 (quoting

Page 13 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

*Freytag v. Commissioner*, 501 U.S. 868, 878 (1991)). That is a decision for the courts, which can resolve arguments that "sound in the familiar principles" of statutory interpretation and turn on the "textual, structural, and historical evidence put forward by the parties." *Id.* at 201.

More generally, although this Court "affords substantial deference to decisions implicating the *discretionary authority* of the President in matters of foreign relations," this Court is still "the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1329 (Ct. Int'l Trade 2022) (quotation marks omitted). To that end, the Federal Circuit has consistently reviewed discretionary executive action to determine whether statutory requirements have been met. *See, e.g.*, *Corus Grp. PLC. v. Int'l Trade Comm'n*, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (reviewing President's action for compliance with statute where the "President does not have complete discretion under the statute"); *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed Cir. 1998) ("We do not fulfill our duty to say what the law is by merely agreeing to Commerce's interpretation of the statutory provision at issue if it is 'reasonable,' regardless of whether we think it correct." (Internal citation omitted.)).

Finally, *Yoshida* confirmed that the President's acts under TWEA were subject to judicial review: Courts "will not hesitate to review the actions taken" in response to a national emergency, because "[i]t is one thing for courts to review the judgment of a President that a national emergency exists" and "another for courts to review his acts arising from that judgment." *Yoshida*, 526 F.2d at 579. For that reason, as *Yoshida* explained, courts "remain prepared … to impede an unreasonable or ultra vires exercise" of emergency powers. *Id.* at 583.

     **b.**    **The President has not identified an "unusual and extraordinary" threat that the Worldwide Tariff Orders are necessary to "deal with."**

"Unusual" and "extraordinary" are familiar statutory terms. Courts routinely interpret the meaning of those and similar terms in determining the limits of legal authority. (*See* States' PI

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Memo 21–22.) Contrary to Defendants' contention, this Court can apply judicially manageable standards to review whether persistent trade deficits are an unusual or extraordinary threat.

The term "unusual" means "not usual," "rare," or "exceptional." *New Webster's Dictionary of the English Language* 1698 (1975) (defining "unusual"); *see also City of Grants Pass*, 603 U.S. at 543 (concluding that a city's fines for unauthorized camping were not "unusual" because "similar punishments have been and remain among 'the usual mode[s]' for punishing offenses throughout the country").

The term "extraordinary" means that a thing is far beyond what ordinarily would be expected. *United States v. Austin*, 125 F.4th 688, 691–92 (5th Cir. 2025) (observing that "extraordinary" means "'beyond or out of the common order,' 'remarkable,' and synonymous with 'singular'" (quoting *Webster's New International Dictionary* 903 (2d. ed. 1934; 1950)). Courts often answer such questions about the existence of special, unusual, or extraordinary circumstances. Otherwise, agencies and the President could shield themselves from review of ordinary questions of statutory construction. *See, e.g.*, *Hyatt v. U.S. Patent & Trademark Office*, 797 F.3d 1374, 1382 (Fed Cir. 2015) (finding the term "special circumstances" in disclosure law to be reviewable and observing that otherwise an agency could "shield virtually any disclosure from judicial review" as long it "claimed there were 'special circumstances'").

For IEEPA, the question of whether a threat is "unusual" turns on whether it involves circumstances that are uncommon and whether it is "extraordinary" on whether Congress has anticipated those circumstances in other statutes. That was how *Yoshida* addressed the similar question of what authorities were appropriate under TWEA for emergencies: "Congress has said what may be done with respect to foreseeable events in the Tariff Act, the TEA, and in the Trade Act of 1974 (all of which are in force) and has said what may be done with respect to unforeseeable events in the TWEA." *Yoshida*, 526 F.2d at 578; *see also id.* at 574–75 (observing that it was reviewing Proclamation 4074 "in the absence of any statute 'providing procedures' for

Page 15 - PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

dealing with a national emergency involving a balance of payments problem such as that which existed in 1971"); *id.* at 582 n.33 (discussed in Section II.A.2 and 3 above). Congress has foreseen several trade problems for which the imposition of tariffs or duties may be an appropriate response—when foreign nations import goods that would cause material injury to a domestic industry, when foreign trading partners subsidize goods or dump artificially cheap goods on foreign markets, when the importation of certain goods pose a threat to U.S. national security, and when a balance-of-trade crisis poses a threat to the U.S. economy. (*See* States' PI Memo 3–4 (describing tariff statutes in Title 19)). Those ordinary authorities are the tools Congress provided to the President to address the very circumstances that he now claims are "unusual and extraordinary."

Here, for the reasons that the States have already explained, a "persistent" trade deficit is neither unusual nor extraordinary. (*See* States' PI Memo 22–23). Defendants provide no factual support for their position beyond the bare assertions from the Executive Orders themselves. (U.S. Resp. 35 (suggesting that the trade deficit has increased in the last five years and have had acute effects).) But a trade deficit is not unusual at all, as the government's own economic data shows:

Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**Hines Decl., Figure 8: U.S. Net Imports of Goods and Services as Shares of GDP.**



Source: U.S. Bureau of Economic Analysis via FRED®
*Shaded areas indicate U.S. recessions.*

(Hines Decl. ¶ 16, fig. 8.) And a trade deficit is not extraordinary if the President may respond by deploying the ordinary tools of trade law in Title 19, such as Section 122.

      c.      **None of the Tariff Orders bears a reasonable connection to the declared "unusual and extraordinary" threats.**

This Court can also apply judicially manageable standards to determine whether the tariffs "deal with" the fentanyl crisis and the trade deficit. IEEPA specifies that the actions taken by a President "may only be exercised to deal with an unusual and extraordinary threat" and "may not be exercised for any other purpose." 50 U.S.C. § 1701(b). That specification demands an even tighter fit than the reasonable-relationship standard described in *Yoshida*: Not only must the connection between the President's actions and the threat be "reasonable," but the actions taken cannot be "exercised for any other purpose." In other words, the actions must be tailored to address the threat, and only the threat, directly.

In contending that no judicially manageable standards exist, Defendants argue that courts must simply defer to whatever the President believes will "deal with" the trade deficit. (U.S.

Page 17 - PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Resp. 29, 37 (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985)). But Defendants misunderstand both the *Maple Leaf* standard and the States' contentions.

To begin, *Maple Leaf*'s deference to a President's construction of statutes is no longer good law after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024), which observed that "a court is not somehow relieved of its obligation to independently interpret the statute" merely because the statute is ambiguous. *Cf. Solar Energy Indus. Ass'n v. United States*, 111 F.4th 1349, 1351 (Fed. Cir. 2024) (declining to decide if *Loper Bright* abrogated *Maple Leaf* because the claim failed under either standard). But even if *Maple Leaf* survives *Loper Bright*, the States are contending that the President has acted "beyond delegated authority," which, under *Maple Leaf*, would allow a court to review the Executive's actions. *See Maple Leaf*, 762 F.2d at 89 (recognizing that courts may interpose to review actions if there is a "clear misconstruction of the governing statute, a significant procedural violation, or *action outside delegated authority*" (emphasis added)). In that respect, Defendants' position cannot be reconciled with *Yoshida*. *See Yoshida*, 526 F.2d at 579 (stating that courts "will not hesitate to review the actions taken in response or in reliance" on emergency declarations).

The Worldwide Tariffs do not bear a reasonable connection to the trade deficit. As the States explained, the 10 percent baseline tariffs and the reciprocal tariffs have no basis in economic reality as a response to the trade deficits between the United States and its various trading partners. (States' PI Memo 23–24). And President Trump has repeatedly boasted that the tariffs are being used for "other purpose[s]" than remedying the persistent trade deficit. (*See id.* 24–25 (collecting statements from the President about the benefits of raising revenue from tariffs and securing concessions from foreign nations relating to national security and other issues outside of trade policy); 2d Decl. of Brian Marshall, Exs. L, M, ECF 32-2.) Defendant's citations to the general conclusions of two studies do not contradict those facts.

Page 18 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

Likewise, the Mexico, Canada, and China Tariffs Orders do not bear a reasonable connection to the fentanyl crisis. As the States explained, the tariffs are not targeted at fentanyl or related products or any of aspect of illicit drug trafficking. Rather, they apply to almost all goods from the affected nations regardless of whether any particular good has a reasonable connection to fentanyl or drug trafficking. (States' PI Memo 25–26.)

In response, Defendants claim only that the tariffs will exert "pressure" on Mexico, Canada, and China to address the fentanyl crisis. (U.S. Resp. 39–40.) But imposing tariffs for the sake of leverage does not "deal with" the crisis. Congress flatly forbade the President from using IEEPA's powers "for any other purpose" other than directly dealing with the threat. 50 U.S.C. § 1701(b). Indirectly inflicting generic economic harm on foreign producers in the hope that they will pressure their governments into taking unspecified actions against fentanyl trafficking runs far afoul of that limitation. Defendants cannot claim that the tariffs are tailored to address drug-trafficking or the importation of fentanyl. For that reason, the Mexico, Canada, and China Tariff Orders do not comply with IEEPA's requirement that Presidential actions taken in response to unusual and extraordinary threats "deal with" that threat.

## C.    The States have established the other elements for an injunction.

In addition to being entitled to summary judgment on the merits, the States have established irreparable harm and that the public interest and balance of hardships weigh in their favor. This Court should thus enter a permanent injunction.

On irreparable harm, Defendants do not dispute that tariffs will cause goods, equipment, and services from vendors to cost more for the States, but they argue that those harms do not matter because the States lack standing to assert them. (U.S. Resp. 42.) That is not correct, for the reasons explained in Section II.A above. Regardless, Defendants concede that several States are paying the IEEPA tariffs. (*Id.*) And even if tariff payments can eventually be recovered, that would not remedy the administrative costs, procurement frustration, budgetary uncertainty, and

Page 19 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

related harms caused by the President's unlawful tariffs. (*See* States' PI Memo 30–34.) And those harms are exacerbated by the President's constantly changing tariff policy, including the stated policy to reimpose the country-specific Worldwide Tariffs in the coming months. Those harms are irreparable. *See Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 598 (5th Cir. 2023) ("[N]onrecoverable compliance costs are usually irreparable harm.").

Defendants also wrongly argue that the States have not established that they will be imminently required to pay tariffs. (*See, e.g.*, Shabram Decl. (Or.) ¶¶ 9–11 & Ex. B, at 2–3, 7 (identifying several purchases in-process that will be subject to tariffs upon arrival at the port of entry).)

Defendants further err in treating the States' harm as comparable to pure economic harm suffered by private businesses. (U.S. Resp. 43.) The States' agencies and universities are not businesses that merely face reduced profits. Rather, they are State instrumentalities whose ability to provide *public services* are impaired by the IEEPA Tariffs. (*See* States' PI Memo 30–34.)

Defendants' arguments on the public interest and the balance of hardship fail too. "The public interest is served by ensuring that governmental bodies comply with the law." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). There is thus no public interest in allowing the President to deploy unlawful tariffs as leverage in negotiations. Nor would Defendants suffer any cognizable hardship from an injunction enjoining unlawful tariffs. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (ending of unlawful practice is not hardship).

Finally, Defendants' perfunctory argument for a "narrowly tailored" injunction offers no workable way to order state- and country-of-origin-specific relief. (U.S. Resp. 44–45.) The Constitution requires uniform tariffs, Art. I § 8, cl. 1, and the States' harm is not limited to importers using particular points of entry or suppliers.

Page 20 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

### III.     CONCLUSION

The Court should grant summary judgment to the States. If this Court does not grant summary judgment to either side, then it should grant the States' Motion for Preliminary Injunction.

DATED: May 20, 2025

Respectfully submitted,

DAN RAYFIELD
Attorney General
State of Oregon
By: */s/ Brian Simmonds Marshall*
Benjamin Gutman
Solicitor General
Dustin Buehler
Special Counsel
Brian Simmonds Marshall
Christopher A. Perdue*
Leigh Salmon
Nina R. Englander*
Senior Assistant Attorneys General
YoungWoo Joh
Alexander C. Jones*
Assistant Attorneys General Oregon
Department of Justice 100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Chris.Perdue@doj.oregon.gov
Nina.Englander@doj.oregon.gov
YoungWoo.Joh@doj.oregon.gov
Alex.Jones@doj.oregon.gov

Attorneys for the State of Oregon

KRISTIN K. MAYES
Attorney General
State of Arizona
By: */s/ Syreeta A. Tyrell*
Joshua D. Bendor**
Solicitor General
Syreeta A. Tyrell
Senior Litigation Counsel
2005 North Central Avenue Phoenix, Arizona 85004
Phone: (602) 542-8333
Joshua.Bendor@azag.gov
Syreeta.Tyrell@azag.gov
ACL@azag.gov

Attorneys for the State of Arizona

Page 21 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

**PHILIP J. WEISER**
Attorney General
State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Attorneys for the State of Colorado

**WILLIAM TONG**
Attorney General
State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov

Attorneys for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

Attorneys for the State of Delaware

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Pete Farrell*
Peter J. Farrell
Deputy Solicitor General
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1424
Peter.Farrell@ag.state.mn.us

Attorneys for the State of Minnesota

**AARON D. FORD**
Attorney General
State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

Attorneys for the State of Nevada

**RAÚL TORREZ**
Attorney General
State of New Mexico

By: */s/ James W. Grayson*
James W. Grayson*
Chief Deputy Attorney General
Amy Senier
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
jgrayson@nmdoj.gov
asenier@nmdoj.gov

Attorneys for the State of New Mexico

Page 22 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson
Assistant Chief Deputy Attorney General
Gretchen Helfrich
Deputy Chief, Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

Attorneys for the State of Illinois

**AARON M. FREY**
Attorney General
State of Maine

By: */s/ Vivian A. Mikhail*
Vivian A. Mikhail
Deputy Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Vivian.mikhail@maine.gov

Attorneys for the State of Maine

*\* Admission application forthcoming \*\**
*Admission application pending*

**LETITIA JAMES**
Attorney General
State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Special Counsel for Federal Initiatives
(929) 638-0447
Mark Ladov
Special Counsel
Office: (212) 416-8240
Cell: (347) 814-9434
28 Liberty St.
New York, NY 10005
rabia.muqaddam@ag.ny.gov
mark.ladov@ag.ny.gov

Attorneys for the State of New York

**CHARITY R. CLARK**
Attorney General
State of Vermont

By: */s/ Ryan P. Kane*
Ryan P. Kane
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
Ryan.kane@vermont.gov

Attorneys for the State of Vermont

Page 23 - PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – *Oregon, et al. v. Trump, et al.*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I certify that this reply brief, including headings, footnotes, and quotations (but excluding the table of contents, table of authorities, counsel's signature blocks, and this certificate), does not exceed 7,000 words as required by the Court's order (ECF 18).

_/s/ Brian Simmonds Marshall_
Brian Simmonds Marshall
Senior Assistant Attorneys General
Oregon Department of Justice

Of Attorneys for the State of Oregon

Page 24 -  PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT – _Oregon, et al. v._
           _Trump, et al._