IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE STATE OF MAINE, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, and THE STATE OF VERMONT,<br><br>    Plaintiffs,<br><br>  v.<br><br>DONALD J. TRUMP, in his capacity as President of the United States; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; PETER R. FLORES, in his official capacity as Acting Commissioner for U.S. Customs and Border Protection; and THE UNITED STATES,<br><br>    Defendants. | Case No. 1:25-cv-00077-GSK-TMR-JAR<br><br>SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. |

**TABLE OF CONTENTS**

I.  SCOPE. ........................................................................................................................... 1

II. TRADE DEFICITS. ....................................................................................................... 1

III. TARIFF PASS-THROUGH TO PRICES. ..................................................................... 4

IV. IMPACT OF TARIFFS ON THE ECONOMY ............................................................. 6

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.   Scope.

1. I have reviewed Defendants' response in opposition to Plaintiffs' motion for preliminary injunction and summary judgment. Counsel invited me to comment on three issues raised in the response: the history of trade deficits; pass-through of tariffs to prices; and two studies cited in the response regarding the economic impact of tariffs.

## II.   Trade Deficits.

2. Page 35 of Defendants' response concedes that "Trade deficits are not new," but immediately thereafter adds "…but the United States's trade deficit has increased by 40 percent over the last five years. The scope and gravity of the trade deficit and trade barriers – along with the acuity of their effects – built up over time, constitute the unusual and extraordinary threat." Section III of my prior declaration, including the accompanying Figure 8, presents data indicating that the United States has experienced persistent trade deficits for the last 50 years. It is, therefore, useful to consider what the data say about the extent to which the last five years might represent a break from prior experience.

3. There are mild seasonal cycles in international trade patterns, and occasional temporary events such as natural disasters, armed conflicts, and foreign financial crises that cause unusual short-term movements in actual and recorded trade deficits. As a result, in evaluating the trade performance of the economy it is customary and helpful to consider data over periods longer than a day, week, month, or quarter. Table 3 below presents annual U.S. trade deficits, as a fractions of GDP, for years starting in 2000. As the table reports, the U.S. trade deficit from January-December 2024 was 3.1 percent of GDP. The U.S. trade deficit in 2019 was 2.7 percent of GDP, which is the smallest annual U.S. trade deficit of the last 25 years; but despite that, the 2024 figure of 3.1 percent is less than 15 percent higher than the corresponding annual deficit five years earlier.

Page 1 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

# Table 3[1]

## Annual U.S. Trade Deficits as Percentages of GDP

| Year | Trade Deficit |
|------|---------------|
| 2000 | 3.7 |
| 2001 | 3.6 |
| 2002 | 4.0 |
| 2003 | 4.6 |
| 2004 | 5.2 |
| 2005 | 5.7 |
| 2006 | 5.7 |
| 2007 | 5.1 |
| 2008 | 5.0 |
| 2009 | 2.9 |
| 2010 | 3.5 |
| 2011 | 3.7 |
| 2012 | 3.4 |
| 2013 | 2.8 |
| 2014 | 2.9 |
| 2015 | 2.9 |
| 2016 | 2.7 |
| 2017 | 2.8 |

---

[1] Tables are numbered continuously from my first declaration.  The figures in Table 3 represent annual averages of U.S. quarterly trade deficits to GDP, constructed from data provided by the U.S. Bureau of Economic Analysis, and as reported by the Federal Reserve Bank of St. Louis in https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 2 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

| Year | |
|---|---|
| 2018 | 2.9 |
| 2019 | 2.7 |
| 2020 | 2.9 |
| 2021 | 3.6 |
| 2022 | 3.7 |
| 2023 | 2.9 |
| 2024 | 3.1 |

4.  It is also useful to consider longer time windows. Over the 5-year period from January 2020 to December 2024, the U.S. trade deficit averaged 3.2 percent of U.S. GDP.[2] Table 4 below presents average trade deficits, as a fraction of GDP, for recent 5-year periods starting in January 2000. It is clear from these data that the U.S. economy during the five years ending in December 2024 did not have trade deficits that were abnormally high by the standards of recent U.S. experience. In fact, an average trade deficit of 3.2 percent of GDP is well below the 25-year average (2000-2024) of 3.7 percent of GDP. It is true that the 3.2 percent of GDP trade deficit from January 2020 to December 2024 is somewhat higher than the 2.7 percent of GDP trade deficit from January 2015 to December 2019; but it is noteworthy that the 2015-2019 trade deficit was unusually low compared to other five-year periods in this millennium.

## Table 4

### Five-Year Average U.S. Trade Deficits as Percentages of GDP

| 2000-2004 | 2005-2009 | 2010-2014 | 2015-2019 | 2020-2024 |
|---|---|---|---|---|
| 4.2 | 4.9 | 3.3 | 2.7 | 3.2 |

---

[2] This 3.2 percent number, and the figures in Table 4, represent 5-year averages of U.S. quarterly trade deficits to GDP, constructed from data provided by the U.S. Bureau of Economic Analysis, and as reported by the Federal Reserve Bank of St. Louis in https://fred.stlouisfed.org/series/A019RE1Q156NBEA.

Page 3 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

## III. Tariff Pass-Through to Prices.

5.  The text of page 12 of Defendants' response offers the observation that "Prices are set by independent private actors and informed by multiple, complex market forces. Plaintiffs cannot reasonably infer that importers will uniformly pass on not just these costs but also any savings (like duty refunds or post-tariff price decreases) to consumers – let alone onto these specific plaintiffs." Economic understanding informed by decades of theory and evidence takes a contrary position. While it is correct that prices are set by independent private actors in large markets, it is these very market forces that ensure that costs imposed by tariffs will be borne by consumers. Competition in large markets disciplines firms to behave in certain predictable ways, lest they be driven out of business by their competitors. As a result, in standard competitive markets, consumer prices rise one-for-one with tariffs. And indeed the evidence from the recent U.S. tariff experience, reviewed in Section VI (pp. 24–25) of my prior declaration, is entirely consistent with this standard economic proposition.

6.  In a separate section of their reply (p. 38), Defendants rely on a recent International Trade Commission report for the proposition that tariffs have only small effects on prices: "In 2023, the International Trade Commission issued a report analyzing the effects of the President's previous tariffs, imposed under Sections 232 and 301, on more than $300 billion of U.S. imports. U.S. Int'l Trade Comm'n, Economic Impact of Section 232 and 301 Tariffs on U.S. Industries, Inv. No. 332-591, USITC Pub. No. 5405 (May 2023). This analysis revealed that the tariffs…had very minor effects on U.S. prices. Id. at 21-22." This is an entirely inaccurate reading of the findings of the International Trade Commission study, which instead repeatedly finds that that costs imposed by the tariffs were passed on to consumers one-for-one. *See, e.g.*, Economic Impact of Section 232 and 301 Tariffs, USITC Pub. No. 5405, at 124 (of the International Trade Commission study: "The delivered price of covered steel imports increasing by nearly the full value of the tariff is consistent with the chapter 6 econometric results and the academic literature, which both estimate that tariffs under sections 232 and 301 [are] passed through fully into U.S. importer prices.").

7. The confusion that appears in Defendants' reading of the International Trade Commission report arises because imports are only a fraction of the U.S. market, so higher tariff-inclusive import prices are reflected not only in the prices of imported goods, but also in the prices of the domestic goods with which they compete in the market. In such a setting, tariffs whose costs are borne one-for-one by consumers will nonetheless raise observed market prices by less than one-for-one, because the market itself consists not solely of imports. For example, if imports represent ten percent of the goods in a market, then a $10 tariff whose cost is entirely borne by consumers will raise the average market price of all goods, imported and domestic combined, by (approximately) $1, not $10. Market prices must be carefully analyzed to draw accurate inferences about the degree to which consumers bear the cost of tariffs, since even with full pass-through of tariff costs to consumers, average market prices may exhibit small reactions to tariff changes.[3] Furthermore, in the cases of the tariffs considered by the report Defendants cited, it is clear that consumers bore the entire cost of the tariffs. The analysis in Section VII of my prior declaration, which analyzes the costs that the IEEPA-based tariffs imposed on state governments, relies on a methodology that accurately captures the effects of tariffs in settings where imported goods compete with domestic goods in the same markets, so can draw reliable inferences in settings where naïve readings of price responses would be entirely misleading.

---

[3] This is a standard proposition in the theory of tax incidence. *See, e.g.*, Laurence J. Kotlikoff & Lawrence H. Summers, Tax incidence, in 2 Handbook of Public Economics, 1043, 1043–1092 (Alan J. Auerbach and Martin Feldstein, eds.1987).

Page 5 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

# IV. Impact of Tariffs on the Economy.

8. Defendants claim (p. 38) that "plaintiffs ignore the evidence that supports the President," drawing attention to the International Trade Commission report cited in Section II above, maintaining that "this analysis revealed that the [earlier Sections 232 and 301] tariffs reduced imports from China, were effective in stimulating increased U.S. production of steel and aluminum, and had very minor effects on U.S. prices." Defendants' response adds that "the Coalition for a Prosperous America released an economic model simulating a worldwide 10 percent tariff on U.S. imports and found that the 'tariff makes imports less competitive and domestic production of manufactured and other goods rise to take advantage of the opportunities' leading to 'more jobs and more capital investment.'" It is useful to consider whether the calculations offered by these two studies in fact support the President's position.

9. As noted in Section V of my original declaration, tariffs impede the functioning of market economies, making their firms and workers less productive, with accompanying reductions in national output, firm profits and individual incomes. It clearly follows that it is not possible to introduce significant tariffs that would have the effect of "improving this nation's 'domestic production capacity'" (Defendants' report, at 37 (quoting Executive Order 14257).) Because domestic production capacity consists of many sectors and industries, it is necessary to look beyond just those industries that most closely compete with imports, in order to obtain a comprehensive view of the impact of tariffs on domestic production. In the cases of tariffs on steel and aluminum, the U.S. industries that use steel and aluminum as inputs to production will be adversely affected by the tariffs, as will other industries for which their outputs are subsequently used as inputs. These adverse effects must then be considered along with any expansions of import-competing industries in evaluating the impact of tariffs on domestic production capacity.

10. The International Trade Commission report on which Defendants rely documents a wealth of negative effects of the earlier steel and aluminum tariffs on output by industries that rely, directly or indirectly, on steel and aluminum inputs. For example, Appendix Table F.13 (p. 303) reports that the tariffs were responsible for a 3.35 percent reduction in output by the U.S. Industrial Machine Manufacturing industry, a 1.38 percent reduction in output by the Engine and Turbine Manufacturing industry, a 0.83 percent reduction in output by the Electrical Equipment Manufacturing industry, a 0.71 percent reduction in output by the Household Appliance Manufacturing industry, and significant output declines in countless other manufacturing industries. Unfortunately, the International Trade Commission does not display its findings in a way that makes it possible for an external analyst to summarize what the report claims to be the impact of the earlier Section 232 and 301 tariffs on aggregate U.S. manufacturing production capacity; but it is clear from the appendix tables that appear in the report that significant predicted negative effects on U.S. production levels are strewn across the manufacturing sector.

11. The policy brief circulated by the Coalition for a Prosperous America does not claim to analyze the impact of higher tariffs on the U.S. economy, but instead considers a simultaneous combination of higher tariffs and reduced average and marginal tax rates in the U.S. individual income tax.  The model used by the Coalition for a Prosperous America is constructed in a way that ensures that lower tax rates will produce model predictions of greater economic activity, greater employment, and higher levels of aggregate investment.[4]  Because the simulation described by the policy brief includes both higher tariffs and lower taxes, it is not possible to identify which if any of the economic effects described by the brief are the consequences of tariffs that would appear without the specific individual income tax changes also included in the simulation.  Indeed, the significantly negative manufacturing output effects described by the International Trade Commission report on which Defendants also rely suggest that any positive aggregate output effects appearing in the Coalition for a Prosperous America's simulation exercise are likely due to the tax cuts, not the tariffs.  Though it is important also to not that the policy simulation offered by the Coalition for a Prosperous America is not grounded in modern economic theory, nor does it use carefully calibrated empirical evidence to obtain its predictions.

12. A correct reading of the International Trade Commission report, together with the Coalition for a Prosperous America policy brief, reinforces the conclusion that significant tariffs will significantly impair the performance and productive capacity of the U.S. economy.

---

[4] The model and simulation used by the Coalition for a Prosperous America is itself an idiosyncratic exercise informed by its understanding that "traditional international economic models are based on unrealistically rigid assumptions which bias the model to favor free trade," so as a corrective matter, the Coalition for a Prosperous America adopts a framework in which the U.S. economy is assumed to have access to unlimited resources. This innovative approach certainly distinguishes the Coalition for a Prosperous America's framework from all of modern economics, this inconsistency coming at the cost of relying on an entirely unrealistic and untenable assumption.

Page 8 -   SECOND DECLARATION OF PROFESSOR JAMES R. HINES, JR. – *Oregon, et al. v. Trump, et al.*

**I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.**

**Executed on May 19, 2025, at Ann Arbor, Michigan.**

*s/ James R. Hines, Jr.*
JAMES R. HINES Jr.